UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
OXBOW CARBON & MINERALS LLC, et al.,    )
                                        )
            Plaintiffs,                 )
                                        )
      v.                                )            Civil Action No. 11-1049 (PLF)
                                        )
UNION PACIFIC RAILROAD COMPANY, et al.  )
                                        )
            Defendants.                 )
_____)

OPINION

          This matter is before the Court on defendants' motions to dismiss under Rule

12(b)(6) of the Federal Rules of Civil Procedure.  The Court has carefully considered the

arguments made by the parties in their papers and the oral arguments presented by counsel in

court on October 26, 2012.[1]  The Court concludes that plaintiffs have failed to allege adequate

facts to state claims under Section 1 and Section 2 of the Sherman Act, although it is plausible

that plaintiffs could amend their complaint to sufficiently allege a claim under the Act.

Accordingly, defendants' motions to dismiss will be granted; plaintiffs' claims will be dismissed

without prejudice.

---

[1]       The papers reviewed in connection with the pending motions include: plaintiffs'
joint complaint ("Compl.") [Dkt. 1]; BNSF Railway Company's motion to dismiss ("BNSF
Mot.") [Dkt. 19]; Union Pacific Railroad Company's motion to dismiss ("UP Mot.") [Dkt. 21];
plaintiffs' opposition to defendants' motions to dismiss ("Opp'n") [Dkt. 36]; UP's reply in
support of motion to dismiss ("UP Reply") [Dkt. 40]; BNSF's reply in support of motion to
dismiss ("BNSF Reply") [Dkt. 42]; UP's request for judicial notice [Dkt. 22]; plaintiffs'
opposition to request for judicial notice [Dkt. 34]; UP's reply in support of request for judicial
notice [Dkt. 41]; and Memorandum Opinion and Order granting in part and denying in part
request for judicial notice [Dkt. 46].

I.  BACKGROUND

Six related companies – Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Calcining International LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC and Terror Creek LLC – have brought this suit against defendants Union Pacific Railroad Company ("Union Pacific" or "UP") and BNSF Railway Company ("BNSF"), claiming that plaintiffs have been harmed by a variety of anticompetitive actions undertaken by defendants in violation of Section 1 and Section 2 of the Sherman Act.  Plaintiffs engage in various aspects of the production, marketing, sale, and shipment of coal and petroleum coke.  Compl. ¶¶ 12-17. Plaintiffs allege that they have been harmed by supra-competitive pricing and inferior rail freight services resulting from defendants' alleged misconduct.  Defendants have moved to dismiss both claims.

In support of their first claim, brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, plaintiffs allege that Union Pacific and BNSF engaged in price-fixing through the adoption of a uniform fuel surcharge, in violation of Section 1's prohibition on contracts, combinations, and conspiracies in restraint of trade.  Compl. ¶¶ 33-68.  The conspiracy alleged is virtually identical to that alleged in a related class action before this Court, In re Rail Freight Fuel Surcharge Antitrust Litigation, Misc. No. 07-0489 ("Rail Freight Action").  In that suit, a class of direct and indirect purchasers of rail freight transportation services claim that BNSF and Union Pacific, along with two other railroad companies, violated Section 1 of the Sherman Act by conspiring to raise freight prices above competitive levels through the imposition of a uniform fuel surcharge.  In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight I"), 587 F. Supp.

2d 27, 29-31 (D.D.C. 2008).[2]  According to the Complaint in the instant case, plaintiffs together have paid over thirty million dollars in wrongfully imposed fuel surcharges.  Compl. ¶ 124.

In support of their second claim, brought under Section 2 of the Sherman Act, plaintiffs allege that defendants engaged in monopolization, attempted monopolization, and conspiracy to monopolize.  The heart of plaintiffs' second claim is that Union Pacific and BNSF engaged in a conspiracy to monopolize by (a) imposing the aforementioned fuel surcharge on customers and (b) allocating the market such that defendants ceased competing with each other for customers.  Compl. ¶¶ 133-37.  Plaintiffs also argue that UP independently monopolized or attempted to monopolize the rail freight market in the Western United States by participating in the alleged conspiracies and failing to take certain pro-competitive actions, including expanding rail infrastructure in the Western United States.  Id. ¶ 110.

Plaintiffs bring this suit pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, which provide a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15(a).

## II. MOTION TO DISMISS UNDER RULE 12(B)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal of a complaint if a plaintiff fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of

---

[2]     In the Rail Freight Action, this Court has denied motions to dismiss direct purchasers' claims, granted in part and denied in part motions to dismiss the claims of indirect purchasers, and granted direct purchaser plaintiffs' motion for class certification.  Rail Freight I, 587 F. Supp. 2d 27 (D.D.C. 2008); In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight II"), 593 F. Supp. 2d 29 (D.D.C. 2008), aff'd, Fayus Enters. v. BNSF Ry. Co., 602 F.3d 444 (D.C. Cir. 2010); In re Rail Freight Surcharge Antitrust Litig. ("Rail Freight III"), —— F.R.D. ——, 2012 WL 2870207 (D.D.C. June 21, 2012).

3

the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice

of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Although

"detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss,

the facts alleged must be "enough to raise a right to relief above the speculative level."  Id.  The

complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations

omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) (quoting Ashcroft

v. Iqbal, 556 U.S. at 678).

        In considering a motion to dismiss under Rule 12(b)(6), the Court "must accept as

true all of the factual allegations contained in the complaint."  Bell Atlantic Corp. v. Twombly,

550 U.S. at 555 (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 508, 508 n.1 (2002)). The

complaint is construed liberally in plaintiffs' favor, and the Court gives plaintiffs "the benefit of

all inferences that can be derived from the facts alleged."  Hettinga v. United States, 677 F.3d

471, 476 (D.C. Cir. 2012) (internal quotations omitted).  Nevertheless, the Court need not accept

inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the

complaint, nor must the Court accept the plaintiffs' legal conclusions.  Id. (citing Kowal v. MCI

Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

III.  ANALYSIS

        The Sherman Act, passed by Congress in 1890, prohibits "certain practices and

agreements inimical to free trade as a means 'to promote the national interest in a competitive

economy.'"  <u>Brown v. Pro Football, Inc.</u>, 50 F.3d 1041, 1044 (D.C. Cir. 1995) (quoting

<u>Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.</u>, 473 U.S. 614, 635 (1985)).  Section 1

of the Act prohibits two or more entities from entering into contracts or conspiracies in restraint

of trade, and thus is frequently used to regulate anticompetitive agreements between two or more

firms.  <u>See</u> <u>United States v. Topco Associates, Inc.</u>, 405 U.S. 596 (1972) (considering market

allocation under Section 1); <u>see</u> <u>also</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. at 553-54 (same).

Section 2, by contrast, is intended to inhibit the willful market domination by a single firm, and

therefore "addresses the actions of single firms that monopolize or attempt to monopolize, as

well as conspiracies and combinations to monopolize."  <u>Spectrum Sports, Inc. v. McQuillan</u>, 506

U.S. 447, 454 (1993); <u>see</u> <u>also</u> <u>United States v. Microsoft Corp.</u>, 253 F.3d 34, 58 (D.C. Cir.

2001) (reviewing alleged monopoly charges against single manufacturer).

   Plaintiffs have framed their allegations in a curious manner.  Plaintiffs' price-

fixing allegations, which in the Rail Freight Action were brought only under Section 1 of the

Sherman Act, are cast here as violating both Sections 1 and 2 of the Act.  Plaintiffs' allegations

of market allocation by defendants – conduct that typically gives rise to claims under Section 1 –

are presented only as part of plaintiffs' Section 2 monopoly claim.

   After careful consideration of the Sherman Act's statutory requirements, and the

pleading requirements under the Federal Rules of Civil Procedure, the Court finds that plaintiffs

have failed to state a claim under either section of the Act.  Accordingly, plaintiffs' claims must

be dismissed.

<em>A.  Section 1 Claim</em>

   Section 1 of the Sherman Act prohibits any "contract, combination . . . or

conspiracy, in restraint of trade or commerce[.]"  15 U.S.C. § 1.  To make out a Section 1 claim,

5

"plaintiffs must allege: (1) that the defendants entered into some agreement, contract, combination, conspiracy, or other concerted activity; (2) that at least one defendant committed an overt act in furtherance of the conspiracy; and (3) that the agreement constituted an unreasonable restraint of trade in the relevant market in a manner that had an impact on interstate commerce." Jung v. Ass'n Am. Med. Colls., 300 F. Supp. 2d 119, 157-58 (D.D.C. 2004) (internal citations omitted).  Price-fixing is considered to be one of those types of agreements that "so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances." NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998) (internal citations omitted); see also City of Moundridge v. Exxon Mobil Corp., 471 F. Supp. 2d 20, 39-40 (D.D.C. 2007) ("[A] combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.") (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940)).

Plaintiffs must show both antitrust injury and injury-in-fact to establish standing. Rail Freight III, 2012 WL 2870207, at *32.  Injury-in-fact is the "familiar factual question whether the plaintiff has indeed suffered harm."  Id. (quoting Cordes & Co. Fin. Servs. Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 106 (2d Cir. 2007)).  Antitrust injury requires an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Meijer, Inc. v. Biovail Corp., 533 F.3d 857, 862 (D.C. Cir. 2008) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (emphasis omitted)).

Defendants argue that even if plaintiffs have adequately alleged the existence of a fuel surcharge conspiracy, plaintiffs failed to allege any injury as a result of the alleged

conspiracy.  Defendants first argue that because Oxbow Mining's Colorado coal mine is served

solely by UP, there is no competition between rail freight providers; where there is no

competition, there can be no injury from anti-competitive conduct.  UP Mot. at 30-32.[3]

Defendants then argue that the Complaint contains insufficient facts regarding the surcharges

paid by each of the individual plaintiffs.  UP Mot at 27, 29-30; UP Reply at 24.  The Court

rejects defendants' first argument but finds their second argument persuasive.

        This Court previously has rejected the argument that a sole-served (or "captive")

shipper cannot suffer antitrust injury as a matter of law.  In its opinion on class certification in

the Rail Freight Action, the Court found that captive shippers may be subject to competitive

forces, and thus can suffer antitrust injury.  See Rail Freight III, 2012 WL 2870207, at *39-*40.

In fact, railroad executives have testified before Congress and in depositions that railroads are

subject to competitive constraints even when serving captive shippers.  Id.  The question of

whether a captive shipper actually was injured is a question of fact that cannot be adjudicated on

the pleadings.[4]

        By contrast, defendants' second argument – that plaintiffs have not alleged

adequate facts about their payment of surcharges to support an inference of injury – has merit.

While there are six plaintiffs in this case, the Complaint lacks adequate facts concerning how any

individual plaintiff was harmed by the alleged conspiracy.  The Complaint provides only a one or

---

[3]    BNSF adopts UP's arguments regarding the alleged deficiencies of plaintiffs' Section 1 claim, as stated by UP.  BNSF Mot. 1, 7-8.

[4]    UP also argues that plaintiffs have not alleged that they first paid fuel surcharges *after* the start of the alleged conspiracy; if they had paid surcharges previously, UP argues, plaintiffs could not have been injured by the conspiracy.  See UP Mot. at 32.  This presents a factual question to be adjudicated at a later stage of the litigation.  The Court notes, however, that it has observed that "the fuel surcharge programs applied before the class period were nothing like the widespread and uniform application of standardized fuel surcharges during the class period."  Rail Freight III, 2012 WL 2870207, at *47.

two sentence description of each entity and includes very little information about the business operations of the individual plaintiffs. For example, Terror Creek LLC appears to deal only with coal operations, Compl. ¶ 14, while Oxbow Calcining International LLC, Oxbow Calcining LLC and Oxbow Midwest Calcining LLC are involved only with petroleum coke. Id. ¶¶ 15, 16, 17. The scope of Oxbow Carbon & Minerals LLC's operations is not clear from the Complaint. See id. ¶ 12. Oxbow Mining, LLC ("Oxbow Mining") operates a coal mine in Colorado, id. ¶ 13, but the Complaint contains no information about where other plaintiffs conduct their coal and petroleum coke operations. Absent from the Complaint are any facts about which plaintiffs purchased freight transportation services from defendants, or which plaintiffs paid the alleged surcharge.

Defendants assert that the plaintiffs that engage in coal operations did not actually pay the uniform standard fuel surcharge described in the Complaint, or instead paid only a *non-uniform, coal-specific* fuel surcharge, UP Mot. at 27. In response, plaintiffs appear to concede that certain plaintiffs did not pay the uniform standard fuel surcharge, but rather a distinct but similar coal-specific surcharge. See Opp'n at 57-58 (comparing coal fuel surcharges and standard charges). But even if the Court were to accept plaintiffs' characterization of the coal surcharge as sufficiently similar to the fuel surcharge referenced in the Complaint, the Court cannot identify within the Complaint the basic facts to support an inference that each plaintiff was harmed by the imposition of *any* surcharge.

This is because plaintiffs fail to specifically allege that each entity paid a surcharge at all; they merely state that the six entities *in the aggregate* paid fuel surcharges. Compl. ¶ 124. But "standing is not dispensed in gross," Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996), and each plaintiff must demonstrate that it has suffered injury in order to establish

standing.  By omitting basic facts about each entity's business operations and conduct, plaintiffs

have failed to meet "the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess

enough heft to 'sho[w] that the pleader is entitled to relief.'"  Bell Atlantic Corp. v. Twombly,

550 U.S. at 557.

       Plaintiffs have indicated that they would be able to provide additional facts

pertaining to the injuries that each has incurred, if given the opportunity to amend their

Complaint.  See Opp'n at 59.  "When a court dismisses a claim, typically it does so without

prejudice to refile or amend the complaint."  Jefferies v. District of Columbia, --- F. Supp.

2d ----, 2013 WL 66085, at *4 (D.D.C. Jan. 7, 2013) (quoting O'Donnell v. Barry, 148 F.3d

1126, 1137 n. 3 (D.C. Cir. 1998)); see also Belizan v. Hershon, 434 F.3d 579, 583 (D.C. Cir.

2006).  The Court therefore will dismiss plaintiffs' Section 1 claim without prejudice.

*B.  Section 2 Claim*

       Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to

monopolize, or combine or conspire with any other person or persons, to monopolize any part of

the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.

Plaintiffs allege that UP has monopolized or attempted to monopolize "the relevant markets",

which plaintiffs define as the product market of either (1) rail freight transportation services or

(2) rail freight transportation services for coal and petroleum coke, within the geographic

markets of either (a) the Western United States or (b) the region including Wyoming, Colorado,

Utah, and Montana.  Compl. ¶¶ 69-74, 79-80, 133-35.  Plaintiffs also allege that UP and BNSF

conspired to monopolize these markets.  Id. ¶¶ 134, 136; Opp'n at 24.

       To establish a successful monopolization claim, plaintiffs must show "(1) the

possession of monopoly power in the relevant market and (2) the willful acquisition or

maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Microsoft Corp., 253 F.3d at 50 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).  To plead attempted monopolization, plaintiffs must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  Id. at 80 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. at 456).

To state a cognizable claim for conspiracy to monopolize, plaintiffs must plead "'(1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in futherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize a designated segment of commerce.'"  City of Moundridge v. Exxon Mobil Corp., 471 F. Supp. 2d at 41-42 (quoting Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 420 (D.D.C. 1988)).

Defendants present several arguments as to why plaintiffs' Section 2 claim must fail.  First, Union Pacific and BNSF assert that plaintiffs' allegations of market allocation and price-fixing do not state a Section 2 claim since horizontal agreements between competitors to *share* market power cannot be "monopolizing" acts.  Second, defendants argue that even if any of these allegations could give rise to a Section 2 claim, plaintiffs have failed to allege sufficiently specific facts to show conspiracy to monopolize or injury under Twombly.  Finally, Union Pacific argues that a firm's decision not to assist its competitors does not constitute an

antitrust offense; thus, UP's alleged failure to provide adequate rail access to its competitors cannot give rise to a monopolization claim.[5]

      1. A Conspiracy Between Two Firms to Share Market Power is Not a Conspiracy to Monopolize

Plaintiffs assert that UP and BNSF conspired to monopolize the rail freight market by agreeing not to compete with each other for incumbent customers and/or customers in certain areas. Defendants argue that plaintiffs' allegations are inconsistent with a specific intent to monopolize, as plaintiffs merely assert that defendants undertook actions to *share* market power, rather than acting with the intent or effect of creating a single monopoly in either UP or BNSF. According to defendants, acts to create or maintain a "shared monopoly" cannot give rise to a Section 2 claim. In their opposition, plaintiffs counter that they have not alleged that BNSF and UP share monopoly power, but rather that BNSF conspired to assist UP in maintaining or expanding UP's monopoly through the alleged market allocation and price-fixing schemes. Opp'n at 24-29. Plaintiffs also suggest that a "shared monopoly" claim can be sustained under Section 2. Id. at 27, n. 11.

The Court agrees with defendants that the Complaint clearly alleges that BNSF and UP each hold market power in the same markets and act in order to protect this *shared* power. See, e.g., Compl. ¶ 3 ("UP and BNSF jointly and/or separately monopolize freight rail traffic in the Western United States and other markets described below and arrogantly abuse their

---

[5]      BNSF also asserts that its low market share (approximately 30%) precludes, as a matter of law, a finding that BNSF has or could obtain monopoly power, as required to find BNSF liable for monopolization or attempted monopolization. As plaintiffs now state that they do not bring monopolization or attempted monopolization claims against BNSF, the Court does not address this defense. A low market share does not preclude a conspiracy to monopolize claim, which plaintiff continues to assert against BNSF.

monopolies"); <u>id</u>. ¶ 5 (describing BNSF as "the other railroad that with UP dominates the market in the Western United States); <u>id</u>. ¶ 8 ("Defendants have openly and affirmatively asserted *their* monopoly power") (emphasis added); <u>id</u>. ¶ 18 ("UP is the largest railroad network in North America"); <u>id</u>. ¶ 19 ("BNSF is the second largest railroad network in North America"); <u>id</u>. ¶ 78 (UP . . ., together with Defendant BNSF, effectively maintained control of all the rail shipments across the west"); <u>id</u>. ¶ 86 (alleging "a pattern of combination and/or conspiracy behavior between UP and BNSF that eliminated and prevented competition and permitted them to combine and/or conspire to secure, maintain and abuse *their* monopoly power") (emphasis added); <u>id</u>. ¶ 117 ("As a result of the Defendants' unlawful conduct and monopolization . . ."); <u>id</u>. ¶ 118 ("UP and BNSF engaged and combined and/or conspired to engage in the conduct described above with a specific intent to secure and maintain monopoly power.").

Because the Complaint alleges that defendants conspired to share monopoly power, the next question is whether a "shared monopoly" can support a Section 2 claim. This Court agrees with the vast majority of other courts and concludes that it cannot. <u>See</u>, <u>e.g.</u>, <u>Midwest Gas Servs., Inc. v. Indiana Gas Co., Inc.</u>, 317 F.3d 703, 713 (7th Cir. 2003) ("a § 2 claim can only accuse one firm of being a monopolist"); <u>Harkins Amusement Enterprises, Inc. v. Gen. Cinema Corp.</u>, 850 F.2d 477, 490 (9th Cir. 1988) (shared monopoly does not violate Section 2); <u>City of Moundridge v. Exxon Mobil Corp.</u>, 471 F. Supp. 2d at 42 (shared monopoly argument insufficient to state a claim); <u>Standfacts Credit Services, Inc. v. Experian Information Solutions, Inc.</u>, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("section 2 prohibits only monopolization by a single entity, as opposed to shared monopolization"); <u>Sun Dun, Inc. of Washington v. Coca-Cola Co.</u>, 740 F. Supp. 381, 391-92 (D. Md. 1990) (where competitors

conspire to restrict competition but market power is shared between them, there is no conspiracy to monopolize under Section 2).[6]

A monopoly arises when a single firm "controls all or the bulk of a product's output, and no other firm can enter the market, or expand output, at comparable costs."  IIB Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 403a, at 7 (3d ed. 2007).  The very phrase "shared monopoly" is paradoxical; when a small number of large sellers dominates a market, this typically is described as an oligopoly.  Id. ¶ 404a, at 9.  In enacting the prohibitions on monopolies, Congress was concerned about "the complete domination of a market by a *single* economic entity," and therefore did not include "shared monopolies" or oligopolies within the purview of Section 2.  Sun Dun, Inc. of Washington v. Coca-Cola Co., 740 F. Supp. at 391 (emphasis in original).  As a result, "[o]ligopoly can, in some cases, violate Sections 1 and/or 3 of the Sherman Act, but *competitors,* by conspiring to maintain or create an oligopoly, do not run afoul of the Section 2 prohibitions against monopoly."  Id. at 390 (emphasis in original); see City of Moundridge v. Exxon Mobil Corp., 471 F. Supp. 2d at 43.  To the extent that plaintiffs have alleged a market structure in which UP and BNSF each possess and seek to

---

[6]       Although a few courts have suggested that two firms dominating the market can together constitute a monopoly, none of these courts has considered the issue directly.  In JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 779-80 (7th Cir. 1999), relied on heavily by plaintiffs at oral argument, the Seventh Circuit permitted a "puzzling" joint monopoly claim to proceed without engaging in any substantive analysis.  In Movie 1 & 2 v. United Artists Commc'ns, Inc., 909 F.2d 1245, 1255-56 (9th Cir. 1990), also cited by plaintiffs, the Ninth Circuit permitted a monopoly claim to go forward where the defendant firm was accused of entering into an agreement allocating *an entire submarket* to that defendant, thus allowing it to enjoy monopoly power within that submarket.

protect market power within the same markets, their monopoly claims based on an alleged agreement to monopolize must fail.[7]

### 2. Plaintiffs Have Not Sufficiently Alleged Conspiracy to Monopolize

Even if the Complaint is construed as alleging a conspiracy to allocate an entire market to UP, plaintiffs have not sufficiently pleaded conspiracy to monopolize under Twombly. Like this case, Twombly addressed allegations that the defendants agreed not to compete for customers, albeit under section 1 of the Sherman Act.  In dismissing plaintiffs' claim, the Supreme Court held that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy. . . . [Allegations of parallel conduct] must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well have been independent action."  Bell Atlantic Corp. v. Twombly, 550 U.S. at 556-57.  To show conspiracy, therefore, plaintiffs must plead "plus factors" that suggest collusion, in addition to merely alleging parallel conduct.  See Bell Atlantic Corp. v. Twombly, 550 U.S. at 557 n.4; White v. R.M. Packer Co., Inc., 635 F.3d 571, 577 (1st Cir. 2011) ("Plaintiffs must establish that it is plausible that defendants are engaged in more than mere conscious parallelism, by pleading . . . evidence pointing toward conspiracy, sometimes referred to as 'plus factors'"); In re Text Messaging Antitrust Litig., 630 F.3d 622, 627-28 (7th Cir. 2010) (upholding denial of Rule 12(b)(6) motion where plaintiffs alleged a

---

[7]      The Court therefore does not consider whether price-fixing or market allocation are "exclusionary acts," as required for monopolizing behavior.  See United States v. Microsoft Corp., 253 F.3d at 58 (noting that a firm only violates Section 2 by acquiring or maintaining, or attempting to acquire or maintain, a monopoly through exclusionary conduct); cf. Fed. Trade Comm'n v. H.J. Heinz Co., 246 F.3d 708, 717 n.13 (D.C. Cir. 2001) (observing that price-fixing can encourage entry by firms currently not competing in the market); JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d at 777 (noting that price-fixing and market allocation provide opportunities to competitors outside of the conspiracy).

"mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion," constituting "the kind of 'parallel plus' behavior" required under <u>Twombly</u>); <u>In re Elevator Antitrust Litig.</u>, 502 F.3d 47, 51 (2d Cir. 2007) ("An allegation of parallel conduct . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.") (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. at 557).

   Defendants argue that the conduct alleged by plaintiffs – dramatically increasing prices, ceasing efforts to compete for each other's customers, changing contract terms, and using public pricing announcements – amounts merely to parallel conduct of the sort deemed insufficient by the Supreme Court in <u>Twombly</u>.  UP Mot. at 14-15.  The Court finds that defendants overstate the degree to which plaintiffs allege only parallel conduct.  The Complaint alleges a parallel sudden shift in defendants' conduct in the context of an industry structure conducive to collusion and alongside an alleged conspiracy regarding pricing.

   Defendants correctly note, however, that the Complaint lacks factual allegations about how the alleged agreement came about, the basic terms of the agreement itself, or how the defendants used the agreement to monopolize the rail freight market.  If plaintiffs intended to allege that UP and BNSF conspired to allocate an entire market to UP, they have failed to do so with the requisite specificity.  Plaintiffs do not once explicitly specify which market UP and BNSF allegedly agreed to allocate to UP, but rather suggest that UP and BNSF continued to serve their respective incumbent customers within the same markets.  <u>See</u>, <u>e.g.</u>, Compl. ¶ 94 (alleging that BNSF and UP allocated customers according to which railroad had historically served the customer); Opp'n at 27 (clarifying that Complaint does not allege that BNSF "turn its customers over" to UP, but rather that BNSF and UP agreed not to compete for each other's

incumbent customers).  Without basic factual information about the alleged conspiratorial

agreement, plaintiffs' allegations are not "enough to raise a right to relief above the speculative

level."  Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  Nor are they sufficient to notify

defendants of the nature of plaintiffs' claim.

      The Court therefore will dismiss plaintiffs' Section 2 conspiracy to monopolize

claim without prejudice.

      3. Plaintiffs Have Not Sufficiently Alleged Monopolization or Attempted Monopolization

      Plaintiffs also allege that Union Pacific has "restricted in many ways the flow of

all rail traffic in the Western United States to prevent meaningful competition."  Compl. ¶ 110.

Plaintiffs allege that UP failed to take procompetitive actions, specifically citing UP's

discontinuation of operations on the Tennessee Pass Line and failure to increase capacity at the

Moffat Tunnel, despite UP's representations that it would invest in infrastructure.  Id. at

¶¶ 110-113.  Plaintiffs seem to argue that UP intentionally limited available rail infrastructure in

order to dissuade competitors from renting UP tracks around Oxbow Mining's Colorado coal

mine.  Plaintiffs allege that these actions have "insulated [UP] from the threat of losing market

share."  Compl. ¶ 113.

      Claims of "insufficient assistance in the provision of service to rivals" generally

are not cognizable Section 2 claims.  Verizon Commc'ns. Inc. v. Law Offices of Curtis V.

Trinko, LLP, 540 U.S. 398, 410 (2004); see id. at 415-16 ("Section 2 of the Sherman Act . . .

seeks merely to prevent *unlawful monopolization*. . . . [B]ut it does not give judges *carte blanche*

to insist that a monopolist alter its way of doing business whenever some other approach might

yield greater competition.") (emphasis in original).  Plaintiffs provide no further explanation of

how UP's alleged failure to undertake these infrastructure developments falls within an

exception to this general rule.  See In re Elevator Antitrust Litig., 502 F.3d at 52 (dismissing

complaint alleging monopolization based on defendant's refusal to deal, where plaintiff did not

plead termination of a prior course of dealing).

The Court finds that plaintiffs have not pleaded sufficient facts to make out

monopolization or attempted monopolization claims based on UP's alleged attempts to restrict

rail infrastructure in the Western United States.  It therefore will dismiss without prejudice

plaintiffs' claim against UP for monopolization and attempted monopolization.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that plaintiffs have failed to allege

adequate facts to state a claim under either Section 1 or Section 2 of the Sherman Act.  It is, of

course, possible that plaintiffs will be able to cure these defects by amendment.  Accordingly, the

Court will dismiss plaintiffs' claims without prejudice.

An Order consistent with this Opinion shall issue this same day.


/s/_____
PAUL L. FRIEDMAN
DATE: February 26, 2013                United States District Judge