UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OXBOW CARBON & MINERALS LLC;   )
OXBOW MINING, LLC; OXBOW MIDWEST  )
CALCINING LLC; OXBOW CALCINING LLC; )
and TERROR CREEK LLC,    )
       )
    Plaintiffs,    )
       )
    v.    )   Case No. 1:11-cv-01049 (PLF)
       )
UNION PACIFIC RAILROAD COMPANY;   )
and BNSF RAILWAY COMPANY,    )
       )
    Defendants.    )
       )

## FIRST AMENDED COMPLAINT

TROUTMAN SANDERS LLP
John R. Gerstein, D.C. Bar No. 913228
Merril Hirsh, D.C. Bar No. 366952
901 9th Street, NW, Suite 1000
Washington, DC 20004-2134
Telephone:  (202) 274-2950

Fletcher Paddison
11682 El Camino Real, Suite 400
San Diego, CA 92130-2092
Telephone: (858) 509-6007

BOIES SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY 10504
Telephone:  (914) 749-8201

Robert B. Silver
Ellen Brockman
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2394

Samuel C. Kaplan, D.C. Bar No. 463350
5301 Wisconsin Ave., NW
Washington, DC 20015
Telephone:  (202) 237-2727

*Attorneys for Plaintiffs Oxbow Carbon & Minerals LLC; Oxbow Mining, LLC;*
*Oxbow Midwest Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC*

# <u>TABLE OF CONTENTS</u>

Page

Introduction ................................................................................................................... 1

The Parties .................................................................................................................... 4

The Non-Party Co-Conspirators ................................................................................... 6

Jurisdiction and Venue................................................................................................... 6

Factual Background ....................................................................................................... 7

I.     CONGRESS ENACTED THE STAGGERS ACT TO FOSTER
       COMPETITION IN THE RAIL INDUSTRY, BUT CONSOLIDATION
       INCREASED OPPORTUNITIES FOR COLLUSION......................................... 7

II.    TO OVERCOME OBJECTIONS THAT THE UP/SP MERGER
       WOULD HARM COMPETITION, UP AGREED TO PROVIDE
       TRACKAGE RIGHTS TO BNSF AND UTAH RAILWAY THAT IT
       SAID WOULD PRESERVE AND EVEN INTENSIFY PRIOR
       COMPETITION IN THE CENTRAL CORRIDOR AND FOR THE RAIL
       TRANSPORTATION OF UINTA BASIN COAL .................................................. 9

III.   UNTIL UP AND BNSF BEGAN TO COLLUDE IN 2003,
       COMPETITIVE PRESSURE FROM BNSF PREVENTED UP FROM
       RAISING RATES TO MONOPOLY LEVELS IN THE UINTA BASIN ........ 12

IV.    UP AND BNSF AGREED TO FIX FUEL SURCHARGES AND NOT
       TO COMPETE TO SHIP COAL ...................................................................... 14

       A.     The Fuel Surcharge Conspiracy ................................................... 16

              1.     Prior to 2003:  The age of the All-Inclusive Index ("AII") .................... 16

              2.     2003:  The inception of the fuel surcharge conspiracy through the
                     Association of American Railroads ......................................................... 16

              3.     The Railroads adopted a new "*All* Inclusive Index – *Less Fuel*"
                     ("AII-LF") and used it to coordinate fuel surcharges ............................. 17

              4.     The Railroads acted contrary to their independent self-interest .............. 24

              5.     The Railroads changed other practices to facilitate the conspiracy......... 26

              6.     Increasing the fuel surcharge for coal..................................................... 27

              7.     The Result:  supra-competitive profits.................................................... 28

              8.     The STB declared it an "unreasonable practice" and "mislabeling" ....... 28

# TABLE OF CONTENTS
### (continued)

**Page**

B.   BNSF Agreed Not to Compete for Uinta Basin Coal, Giving UP an Effective Monopoly, and the Railroads Generally Agreed Not to Compete for New Coal Business.................................................... 30

C.   UP and BNSF's Rates Increased Drastically, and Both Offered Reduced Service Terms............................................................... 35

D.   UP and BNSF Both Switched to Public Pricing.............................. 37

E.   UP and BNSF Both Abandoned Long-Term Contracts ................... 39

V.   UP's RESULTING MONOPOLY OVER THE SHIPMENT BY RAIL OF COAL EMANATING FROM THE UINTA BASIN................................... 40

VI.   UP's AND BNSF'S ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL ........................... 43

VII.   EACH OF THE OXBOW COMPANIES SUFFERED INJURY BY VIRTUE OF SOME OR ALL OF UP'S AND BNSF'S ANTICOMPETITIVE CONDUCT .................................................. 44

COUNT I    Price Fixing (Fuel Surcharge) in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1........................................................................ 47

COUNT II   Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1................................................ 48

COUNT III  Monopolization (and Attempt to Monopolize and Conspiracy to Monopolize) by UP in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2........................................................................... 49

COUNT IV   Breach of Contract:  Tolling Agreement ............................................ 52

PRAYER FOR RELIEF ................................................................................................ 54

DEMAND FOR JURY TRIAL ..................................................................................... 55

Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC and Terror Creek LLC (collectively,"Oxbow" or the "Oxbow Companies") allege against Defendants Union Pacific Railroad Company ("UP") and BNSF Railway Company ("BNSF") (collectively, the "Defendants"), based on personal knowledge as to their own acts and practices and otherwise based on information and belief, the following claims for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

**Introduction**

1.      This lawsuit challenges violations of both Sections 1 and 2 of the Sherman Act that have damaged each of the respective Oxbow Companies by dramatically increasing the rates it paid to ship products by rail during the period 2004-2012.

2.      As alleged in detail, defendants UP and BNSF engaged in multiple interrelated antitrust violations.  UP and BNSF conspired with their eastern United States counterparts, CSX Transportation, Inc. and Norfolk Southern Railway Company, to engage in price fixing in violation of Section 1 of the Sherman Act.  The four railroads artificially enhanced rates and resulting revenues by jointly adopting and uniformly imposing a charge to shippers that the railroads called a "fuel surcharge," but which was actually calculated as a percentage of base rates, unrelated to the actual fuel costs the railroads incurred.

3.      The concerted surcharge imposed by Defendants and their co-conspirators increased their revenues far in excess of the railroads' actual costs for fuel.  UP boasted to its shareholders that its revenues from this surcharge were over $1 billion in 2005.  In a proceeding denominated Rail Fuel Surcharges, *Ex Parte* No. 662 (Jan. 25, 2007), the Surface Transportation Board ("STB"), the federal agency now charged with regulating aspects of the railroad industry, addressed the Railroads' practice of computing rail fuel surcharges as a percentage of their base

rail freight rate and found their uniform conduct was "unreasonable" and that the practices, invoices, and documents relating to those fuel surcharges were "misleading."  The fuel surcharge conspiracy imposed even more severe burdens on coal shippers when UP and BNSF later raised the percentage of coal shippers' base rates that determined the fuel surcharge.

4.      Defendants' fuel surcharge conspiracy was part of a broader conspiracy.  At the same time that UP and BNSF were conspiring with their eastern counterparts to impose illegal fuel surcharges, UP and BNSF also agreed to take a series of steps that were a marked departure from a prior history of competition in connection with the shipment of coal—the commodity representing by far the largest percentage of freight carload traffic.  Among other things, they both stopped competing for each other's customers, announced dramatic rate increases unsupported by market conditions, moved to "public pricing" so as to exchange information, refused to enter long-term contracts with their customers, and ended a previous practice of quoting prices to junction points that would enable competition.  By their nature, these steps required agreement—they would not have been in UP's or BNSF's business interests were it not for the security of an agreement to do so jointly.  Defendants' fuel surcharge conspiracy facilitated this broader conspiracy.

5.      Defendants' conspiracy constituted a *per se* violation of Section 1 of the Sherman Act.  The conspiracy also violated Section 2 of the Sherman Act by enabling UP to obtain and to maintain a monopoly over markets for rail transportation of coal produced from the Uinta Basin—a region located in western Colorado and eastern Utah, where high-BTU, low-sulfur coal is mined.

6.      UP dominates what is known as the "Central Corridor"—a 1,200 mile stretch of track from Denver, Colorado to Stockton, California that includes the only effective means for

transporting coal for any significant distance from the Uinta Basin mines in Colorado and Utah. At the time of its 1996 merger with the Southern Pacific Railroad ("SP"), UP entered into trackage agreements with both BNSF and Utah Railway Company to preserve prior levels of competition. As UP and BNSF recognized (and said) at the time, these trackage agreements would preserve, indeed intensify, the competition for the transportation of Uinta Basin coal and prevent UP from acquiring a monopoly. As discussed below, in the absence of concerted conduct, a number of other factors contributed to the competitive pressure in the Central Corridor.

7.     Competitive pressure did in fact keep rates at competitive levels throughout the late 1990s and the first few years of the 21st century. At or about the end of 2003, however, as a result of the conspiracy between UP and BNSF, UP succeeded in eliminating those competitive pressures and began to exercise monopoly power over Uinta Basin coal shipments, resulting in dramatically increased rates for Uinta Basin coal shippers.

8.     Defendants' illegal conduct has injured each of the Oxbow companies that are plaintiffs in this action. Three Oxbow companies (Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, and Terror Creek LLC) each paid illegal fuel surcharges for the shipment of coal that they would not have paid but for the fuel surcharge conspiracy. Three Oxbow companies (Oxbow Carbon & Minerals LLC, Oxbow Calcining LLC, and Oxbow Midwest Calcining LLC) each directly paid illegal fuel surcharges for the shipment of petroleum coke ("petcoke") that they would not have paid but for the fuel surcharge conspiracy. Each of these plaintiffs is entitled under Section 4A of the Clayton Act, 15 U.S.C. § 15a, to damages for violation of Section 1 of the Sherman Act. In addition, as a result of UP's wrongful acquisition and maintenance of a monopoly in the Uinta Basin and its related conspiracy with BNSF, Oxbow

Carbon & Minerals LLC and Oxbow Mining, LLC, as well as all other shippers of coal, have paid inflated amounts to ship coal produced from the Uinta Basin.  These Oxbow plaintiffs are entitled to damages and other relief under Section 4A of the Clayton Act for violations of both Section 1 and Section 2 of the Sherman Act.

**The Parties**

9.      Oxbow Carbon & Minerals LLC is a limited liability company formed and organized under the laws of the State of Delaware, having its principal place of business in West Palm Beach, Florida.  Oxbow Carbon & Minerals LLC contracts with UP for the rail shipment of coal from mines in the Uinta Basin of Western Colorado and Utah, including some of the shipments from the Elk Creek Mine operated by Oxbow Mining, LLC, as well as other Uinta Basin mines which obtain rail access along the "Central Corridor" rail line that runs from Denver, Colorado to Stockton, California.  It also contracts with both UP and BNSF for shipment of petcoke from refineries located throughout the western United States including but not limited to California, Wyoming, and Kansas.  Petcoke is a by-product produced from the process of refining petroleum into gasoline, aviation or diesel fuel and can be used as a utility and industrial fuel source or can be "calcined" for use in the process of making anodes for the aluminum, steel and titanium smelting industry.

10.      Oxbow Mining, LLC is a limited liability company formed and organized under the laws of the State of Delaware and has its principal place of business in West Palm Beach, Florida.  Oxbow Mining, LLC owns and operates the Elk Creek Mine near Somerset, Colorado, and has operated coal mines in Colorado for over 15 years.  Some of the rail shipments from the mine are under contract with Oxbow Carbon & Minerals LLC; in others, Oxbow Mining, LLC contracts directly as the "shipper."

11.     Terror Creek LLC is a limited liability company formed and organized under the laws of the State of Delaware and has its principal place of business in West Palm Beach, Florida.  Terror Creek LLC owns and operates a coal blending operation, is an aggregator of coal and is involved in the marketing, sale and rail shipment of coal, and also holds the rail contracts directly or through Oxbow Carbon & Minerals LLC, acting as its agent, for shipments of stoker coal.  Stoker coal is an egg-shaped coal generally used for fuel in automatically-fired stoves.

12.     Oxbow Calcining LLC, formerly known as Great Lakes Carbon LLC, is a limited liability company formed and organized under the laws of the State of Delaware and has its principal place of business in West Palm Beach, Florida.  Oxbow Calcining LLC owns calcining facilities served by rail in Enid, Oklahoma, Baton Rouge, Louisiana and Texas City, Texas. Oxbow Calcining LLC receives petcoke by rail, treats the petcoke at its calcining facility, and then ships calcined coke out to end users by rail.

13.     Oxbow Midwest Calcining LLC is a wholly-owned subsidiary of Oxbow Calcining International.  It is a limited liability company formed and organized under the laws of the State of Delaware and has its principal place of business in West Palm Beach, Florida. Oxbow Midwest Calcining LLC owns a calcining facility in Lamont, Illinois.  Oxbow Midwest Calcining LLC receives petcoke by rail, treats the petcoke at its calcining facility, and then ships calcined coke out to end users by rail.

14.     Defendant UP is a corporation formed and organized under the laws of Utah and has its principal place of business at 1416 Douglas Street, Omaha, Nebraska 68179.  UP is the largest railroad network in North America.  It serves primarily the western two-thirds of the United States and maintains coordinated schedules with other carriers to handle freight to and from other parts of the country.

15.     Defendant BNSF is a corporation formed and organized under the laws of Delaware and has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is the second largest railroad network in North America and has offices and rail lines throughout the western United States.

### The Non-Party Co-Conspirators

16.     CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida 32202.  CSX has railway lines throughout the eastern United States and connects with rail partners in the west.

17.     Norfolk Southern Railway Company ("Norfolk") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  Norfolk has railway lines in the eastern United States and connects with rail partners in the west.

### Jurisdiction and Venue

18.     This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15, § 26, to recover damages, treble damages, injunctive relief, costs, and reasonable attorneys' fees for the injuries sustained by Oxbow by reason of violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

19.     This Court has jurisdiction over this Action under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337, and 1367.

20.     This Court has personal jurisdiction over the Defendants and venue in this judicial district is proper pursuant to the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391.  Defendants transact business, maintain offices or are found within this judicial district, have substantial aggregate contacts with this judicial district, and engaged in illegal conduct that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or

doing business in this District.  The interstate commerce described below was and is carried on

in part within this judicial district, and the wrongful conduct alleged in this Complaint was

carried out in part within this judicial district.

**Factual Background**

I.     **CONGRESS ENACTED THE STAGGERS ACT TO FOSTER
       COMPETITION IN THE RAIL INDUSTRY, BUT CONSOLIDATION
       INCREASED OPPORTUNITIES FOR COLLUSION**

21.     The freight railroad industry in the United States has played a central role in the

country's economic growth and in the laws designed to foster that growth and protect consumers

through competition.  The United States Supreme Court said over 100 years ago that "there is no

other line of business carried on in our midst which is so intimately connected with the public as

that conducted by the railways of the country."  *United States v. Trans-Missouri Freight Ass'n*,

166 U.S. 290, 336 (1897).  Congress cited the misuse of rail service to stifle competition as one

of the main reasons for passing the Sherman Act in 1890.  Lawsuits against the rail industry

formed one of the first subjects for enforcement of the Sherman Act.

22.     For 93 years, between 1887, when Congress passed the Interstate Commerce Act,

and 1980, railroad operations in the United States were conducted by a large number of

federally-regulated railroads with rates for shipment of freight required to be published in tariffs

filed with the Interstate Commerce Commission (the "ICC").

23.     In 1980, Congress sought to introduce competition and market principles into the

rail transportation industry.  With the passage of the Staggers Rail Act of 1980 ("Staggers Act"),

Pub. L. No. 96-448, 94 Stat. 1895, 49 U.S.C. § 10101, *et seq*., the railroads became free to set

rates for rail transportation.

24.     The policy of the Staggers Act is to rely on competitive forces, rather than government regulation, to improve the efficiency of railroad operations.  Among other things, instead of having all rates set in accordance with mandatory tariffs, rail shippers and rail carriers were generally allowed to enter into rail transportation contracts whose terms were not subject to ICC review and approval.  The Staggers Act also phased out across-the-board industry-wide rate increases.  The objectives of the Staggers Act included the creation of a modern, competitive and healthy railroad industry that would serve the American business community, with competitive rates and concern for serving the customer base, particularly those that depend on rail freight services for the movement of products.  As the House Committee Report for the Staggers Act stated with respect to 49 U.S.C. § 10709:  "If anticompetitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available."  H.R. Rep. No. 96-1035, 96th Cong. 2d Sess. 1, (1980) *reprinted in* 1980 U.S.C.C.A.N. 3978, 4003.

25.     In 1995, Congress replaced the ICC with a new agency—the Surface Transportation Board ("STB")—which assumed some of the ICC's former functions.

26.     More than 80% of all U.S. rail freight shipments move under terms that are not regulated by the STB or any other government agency.  This case involves such non-regulated rail traffic.

27.     The era between the passage of the Staggers Act in 1980 and the 1996 saw a dramatic consolidation of the freight rail industry.  Before the Staggers Act, 35 Class I railroads operated within the United States.  ("Class I" railroads are the largest national freight railroads according to annual carrier revenues.)  Today, the industry is highly concentrated—only seven Class I railroads operate within the United States.  Of these, the Defendants UP and BNSF (collectively, the "Western Railroads") in the west, and those railroads in the east who combined

or conspired with them—CSX and Norfolk (collectively, the "Eastern Railroads")—control the

vast majority of rail shipments.  These four Class I Railroads now receive approximately 90% of

all freight rail revenue in the United States, leaving a highly concentrated industry with great

susceptibility to collusion.

II.   **TO OVERCOME OBJECTIONS THAT THE UP/SP MERGER WOULD HARM COMPETITION, UP AGREED TO PROVIDE TRACKAGE RIGHTS TO BNSF AND UTAH RAILWAY THAT IT SAID WOULD PRESERVE AND EVEN INTENSIFY PRIOR COMPETITION IN THE CENTRAL CORRIDOR AND FOR THE RAIL TRANSPORTATION OF UINTA BASIN COAL**

28.     The last consolidation in the freight rail industry's 1980-96 period of concentra-

tion was UP's 1996 merger with Southern Pacific Railroad ("SP").  At the time of the merger,

UP agreed to provide trackage rights to BNSF along the Central Corridor, a route critical to the

shipment of various commodities including coal from mines in the Uinta Basin where Oxbow's

Elk Creek mine is located.  Responding to the objections of those who asserted that only

divestiture of the Central Corridor would preserve competition, UP represented that enabling UP

to retain the Central Corridor, while providing trackage rights to BNSF and Utah Railway, would

not only preserve the prior vigorous levels of competition, but would intensify it.  This

competition historically had limited the ability of any one railroad to raise rates on shippers of

Uinta Basin coal, including rates paid by shippers served only by one railroad.

29.     The UP/SP merger was one of the largest in the history of American railroads.  It

merged two of the three largest freight railroads in the western United States, leaving no

significant Class I carrier to compete in the west besides UP and BNSF.  To obtain approval for

this merger, UP needed to convince the STB that the merger was in the public interest.

30.     Shippers and shipper organizations were concerned that railroad consolidations

such as the UP/SP merger increased the chances for successful collusion affecting rates for the

shipment of coal, particularly in the Central Corridor.  Coal is a particularly important

commodity to the rail business, accounting for over 40% of the freight shipped by rail in the

United States—a far higher percentage than any other product.

31.     The Central Corridor is the only rail line that provides for effective shipment of

coal from the mines in the Uinta Basin.

32.     The Uinta Basin is a coal mining region in western Colorado and eastern Utah

that produces a very desirable type of coal.  Uinta Basin coal is uniquely high in British Thermal

Unit ("BTU") content—which means that it produces high energy when it is burned.  It burns

clean and has an environmentally-attractive low sulfur content.  Oxbow's Elk Creek Mine is

located in the Uinta Basin.  Coal mined by one mine in the Uinta Basin is fungible and entirely

substitutable with coal mined by another mine in the Uinta Basin, whether the mine is located in

Colorado or in Utah.

33.     The sale of Uinta Basin coal depends on the railroads and the Central Corridor.  In

the Uinta Basin, there are no rivers that provide access to barge traffic.  Although trucking or

other modes of transportation may be feasible for certain distances, coal mines in the Uinta Basin

have no meaningful substitute for rail transportation of coal for distances of approximately 100

miles or more.

34.     The competition that existed in the Uinta Basin limited the rates that could be

charged to mine owners, including the rates to ship coal from those Uinta mines served by only

one railroad.  Because Uinta coal is generally fungible regardless of which mine produces it,

utilities and industry purchasers of such coal are particularly price-sensitive.  Competition thus

limited the prices a railroad could charge to the mines it alone served because excessive

increases to such mines would have prevented the mines from delivering the coal to customers at

a competitive price.  Accordingly, the need to limit the "as delivered" price of Utah/Colorado

coal constrained the amount that a railroad could charge shippers for shipping such coal.

35.     BNSF repeatedly recognized (and said, including in 2000) that BNSF served as a

competitive constraint on the prices that UP could charge for shipping "Utah/Colorado" coal

even though it served no Colorado mines.  UP's CEO similarly acknowledged even in those

geographic regions where there is only one railroad serving a facility, there are market factors

that create "competitive constraints" on the prices that railroads can charge in those regions.

36.     Before filing for merger approval, UP and SP entered into settlement agreements

with both BNSF and Utah Railway, which were adopted as conditions of the merger.  The

settlement agreement with BNSF included a grant of certain trackage rights to BNSF over 4,000

miles of UP and SP track (the "trackage rights agreement").  In the Central Corridor through the

Uinta Basin, the agreement gave BNSF access to rail shippers that had previously been served by

both UP and SP, and allowed BNSF to serve new facilities that were located along the tracks of

the merged UP/SP after the merger.

37.     Utah Railway is a Class III carrier that, among other things, provides rail service

to and from coal mines in Utah.  Under its settlement agreement with UP and SP, Utah Railway

obtained trackage rights from Utah Railway Junction, near Salt Lake City, Utah, to Grand

Junction, Colorado, as well as rights to serve a coal loading facility in Utah and an additional

Utah coal mine.  These rights enabled Utah Railway to pick up coal at the Utah mines to which it

had existing rights and access rights via the agreement, and transport the coal along the Central

Corridor to junctions where BNSF, UP or both, would provide further transportation service.  As

Utah Railway stated at the time, the agreement "will provide the market discipline to assure

competitive rates for coal customers in the western region by means of its cost-efficient

operations and access to Utah coal acting either in conjunction with the BNSF or with the UPSP."

38.     UP understood (and said) that, in the absence of collusion, the trackage rights it contracted to give BNSF and Utah Railway would preserve, and intensify, the competition that had previously existed with respect to the shipment of Uinta Basin coal.  UP further understood (and said) that the merger would lead to greater efficiency in connection with the shipment of Utah and Colorado coal and that this would enable, and competition would require, UP to continue SP's prior policy of aggressive pricing.  UP also understood (and said at the time of the merger) that the super-compliant, high-BTU coal that Oxbow and other Uinta miners produce is "particularly well-suited to export markets," and that the lower costs that resulted from its merger with SP would allow for "significant increases" in exports of Colorado coal to Asia.

39.     UP further understood (and said) that, in the absence of collusion, vigorous competition would force UP to provide a wide range of benefits for shippers including, among other things:  (i) to invest in infrastructure to provide reliable service and opportunities for connections by proposed competitors; (ii) to provide competitive rates to facilitate competition that required access to shippers dependent on UP tracks; and (iii) otherwise, to promote access to areas it served.

## III.   UNTIL UP AND BNSF BEGAN TO COLLUDE IN 2003, COMPETITIVE PRESSURE FROM BNSF PREVENTED UP FROM RAISING RATES TO MONOPOLY LEVELS IN THE UINTA BASIN

40.     Until the decision of UP and BNSF to conspire in 2003, competitive pressure from BNSF prevented UP from substantially raising rates for transporting Uinta Basin coal, and rates remained at competitive levels.

41.     From the time of the UP/SP merger until UP and BNSF began to conspire in 2003, BNSF moved to take advantage of its trackage rights and become an effective competitor in the Central Corridor, both generally and with respect to coal.  BNSF represented in 1997 that it would "not be satisfied until the conditions are working as intended to provide customers with a full substitute for the competition that was lost" when SP merged with UP.  Thus, prior to the conspiracy, BNSF did not hesitate to object when it felt that UP was deliberately impeding its efforts to take full advantage of its trackage rights.  BNSF complained among other things about UP's practice of crewing UP's trains first, notwithstanding an obligation to make sufficient crews available for BNSF, and of blocking switching stations.

42.     Throughout the period, BNSF significantly increased the amount of traffic that it carried using its Central Corridor rights, provided daily merchandise service along the Central Corridor that enabled it to take on any new business that it was able to win, and established BNSF as a realistic alternative to UP in the view of Central Corridor shippers.  BNSF substantially invested in improving its Central Corridor trackage rights lines.  BNSF also made numerous bids for coal sourced in Utah and was successful on a number of occasions in acquiring the business.

43.     As the STB recognized a few years after the merger, "pre-merger UP vs. SP competition *has* been effectively replicated by post-merger UP vs. BNSF competition."  As the STB also recognized, the "most important indicator of the impact of BNSF's Central Corridor traffic rights is the effect that BNSF's presence in the market has on the rates offered by UP."  Throughout the period prior to the conspiracy, the competitive constraint posed by BNSF and Utah Railway had the intended effect of preventing UP from significantly raising rates on Oxbow and other coal shippers in the Uinta Basin.  As the STB also found, "BNSF is indeed an

effective competitor in the Central Corridor," and "its presence has placed a competitive discipline on UP's rates both in the Central Corridor *and with respect to Utah/Colorado coal*" (emphasis added).

44.     UP and BNSF repeatedly internally recognized (and publically said) in the period prior to the conspiracy that BNSF exerted substantial competitive pressure on UP.  In 1998, for example, UP quoted with approval the statement of Utah Railway's Executive Vice President that "BNSF has shown itself to be an aggressive competitor for business in our corridor" and has been "vigorous in bidding for new business."  UP reported in 1999 that Utah Railway's trackage rights—which could serve as a competitive constraint only if BNSF was available to serve as a competitive alternative to UP—"continue to act as a competitive check on UP" and that "UP's rates for Utah and Colorado coal have remained highly competitive."  UP represented in July 2000 that Utah Railway's "trackage rights continue to act as a competitive check on UP."

45.     BNSF recognized in a 2000 filing:  "There can be no real doubt that BNSF service offerings have been—and remain—a level which provides a 'realistic choice' for shippers."  BNSF added that "BNSF has served as an effective competitive alternative to UP, and the evidence submitted by UP establishes that BNSF's presence has placed a competitive discipline on UP's rates in general *and in the Central Corridor and with respect to Utah/Colorado coal*" (emphasis added).

## IV.     UP AND BNSF AGREED TO FIX FUEL SURCHARGES AND NOT TO COMPETE TO SHIP COAL

46.     The period between 1996 and 2003 was not just a period of competitive prices in the Uinta Basin.  It was a period of competitive prices generally for commercial rail freight service.

47.    Not everyone, however, was pleased by low prices.  As one BNSF executive commented in 2002:

> We need to be able to achieve price rate improvement.  ***How can we do this if the other competing railroads do not do this at the same time?***  (Emphasis added.)

48.    The solution that the Railroads found to this competitive predicament was collusion.  They were well poised to do so.  The freight railroad industry is conducive to collusion.  It is heavily concentrated, there are significant barriers to entry, services are interchangeable across railroads, shippers are price sensitive, and the demand for freight rail services is generally inelastic.

49.    Beginning in the second half of 2003, UP and BNSF entered into a conspiracy to increase revenue by (i) imposing across-the-board, non-negotiable "fuel surcharges" on all customers and for all products; and (ii) agreeing not to compete with each other to ship coal.  During this period, UP and BNSF jointly departed from prior practice in a number of ways, including (i) the joint imposition of fuel surcharges that formed the basis for the Court's decision in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 587 F. Supp.2d 27 (D.D.C. 2008); (ii) the unexplained cessation of competitive bidding for each other's coal customers in the Powder River Basin; (iii) the elimination of the competitive constraint that BNSF had imposed on UP's pricing in the Uinta Basin; (iv) significant increases in rates for shipment of coal in both the Powder River Basin and Uinta Basin; (v) increases by both BNSF and UP in the fuel surcharges for coal over and above the standard fuel surcharge imposed on all products as a result of the conspiracy; (vi) the use of public pricing in contravention of the STB's prior recognition that the confidentiality of prices was an essential check against collusion in this industry; and (vii) the joint refusal to offer long-term contracts notwithstanding the existing demand for such contracts.  These departures from past practice, both individually and

collectively, were contrary to the individual self-interest of each party in the absence of collusive assurance that the other party would abide by their common agreement.

### A.     The Fuel Surcharge Conspiracy

#### 1.     Prior to 2003:  The age of the All-Inclusive Index ("AII")

50.     Following the passage of the Staggers Act, railroads typically entered into private freight transportation contracts that included cost-adjustment provisions.  The adjustment provisions typically relied on a price index called the All Inclusive Index ("AII") or a price index called Rail Cost Adjustment Factor ("RCAF").  The Association of American Railroads ("AAR")—a railroad trade organization that the four major Railroads control and dominate— publishes the AII, and the STB publishes the RCAF.  As the name "*All Inclusive* Index" suggests, the AII and RCAF weighted a number of price inputs, labor, fuel, materials and supplies, equipment rents, depreciation, interest and other expenses, so that the index would reflect the actual impact of particular price increases on overall rail transportation costs.  This meant that the AII and RCAF would capture any actual increase in fuel prices, no matter how significant.  In fact, James R. Young, the President of UP, acknowledged publicly that the RCAF "looks at actual costs through the industry."

51.     Prior to 2003, some of the Railroads attempted to impose fuel surcharges on rail freight transportation.  But the Railroads' application of these surcharges was neither uniform nor consistent, and each Defendant had different fuel surcharge formulas.

#### 2.     2003:  The inception of the fuel surcharge conspiracy through the Association of American Railroads

52.     In 2003, the Defendants and the Eastern Railroads conspired to use fuel surcharge formulas as the means to create an across-the-board rate increase.  Defendants conspired to overcome the obstacle that fuel cost increases were already accounted for in the AII and RCAF;

they embarked on a scheme to remove the fuel component from the AII, to refuse to use the RCAF in contact rate adjustment formulas, and to apply a brand new index, combined with a "fuel surcharge" to adjust rail rates.  This scheme allowed the railroads pretextually to label across-the-board price increases as a "fuel surcharge" to recover increased fuel costs, when what they were actually doing was simply raising total freight prices by a given (and agreed) percentage that was the product of conspiracy.  The pretextual fuel surcharge was not based on actual cost.

53.     The Defendants and those acting in conspiracy with them adopted this "fuel surcharge" through a series of coordinated actions using a common organization.  Top executives of the Railroads met frequently, including at the biannual meetings of the National Freight Transportation Association and at AAR board meetings, to discuss "industry developments." The AAR was a particularly potent tool to coordinate and monitor a conspiracy because:  (i) the Chief Executive Officers of the four Railroads constitute four members of the AAR's Board of Directors; (ii) the AAR Board of Directors meets regularly and its members regularly communicate between meetings; (iii) many former AAR employees and staff members are now employed by Class I railroads; and (iv) the AAR publishes the AII.

54.     At the Spring 2003 meeting of the AAR and, in the months that followed, executives of the four Railroads conspired on a plan to use a new type of ostensible "fuel surcharge."

### 3.     The Railroads adopted a new "*All* Inclusive Index – *Less Fuel*" ("AII-LF") and used it to coordinate fuel surcharges

55.     The plan began with the Western Railroads—UP and BNSF, as part of their joint plan to reduce competition and increase revenues and profits.  Prior to April 2003, BNSF had assessed a fuel surcharge based on the actual miles that freight traveled.  In April 2003, a BNSF

executive called a UP executive and asked if he had "heard anyone charging a fuel surcharge in miles," and the following month, BNSF abandoned a mileage-based program.

56.     UP and BNSF then conspired to use the same industry fuel index for new fuel surcharge formulas that calculated a surcharge as a percentage of the base rail transportation rate. Previously, they used fuel surcharges for a minimal portion of their contracts and adjusted their respective fuel surcharges using different indexes.  UP had calculated its fuel surcharge based on the West Texas Intermediate ("WTI") Index; BNSF based its surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price ("HDF") Index.  In or about July 2003, however, pursuant to their agreement, UP suddenly switched to the HDF Index for calculation of its fuel surcharges.  UP made this sudden switch even though, only three months earlier, it had demonstrated its commitment to the WTI Index by undertaking modifications to surcharges based on that index.

57.     UP and BNSF also conspired to apply the HDF Index in the same way.  They selected "trigger" points that operated to impose identical rail fuel surcharges on shippers. Although UP and BNSF ostensibly used different thresholds as "trigger points" ($1.35 for UP and $1.25 for BNSF), this difference had no practical effect.  The UP and BNSF fuel surcharge programs provided for identical fuel surcharges once the $1.35 threshold was reached—and in practice, that threshold was always exceeded.  UP and BNSF both increased the surcharge by 2% for every twenty-cent increase in the HDF Index above $1.35 per gallon.  Beginning in July 2003, BNSF and UP made their standard rail fuel surcharges identical.

58.     UP and BNSF coordinated the timing of their fuel surcharges.  They each applied the rail fuel surcharge to shipments beginning in the second month after the month in which there was a change in the HDF Index average price calculation:  if the average price changed in

January, UP and BNSF would announce their new fuel surcharge percentage on February 1 and then apply the surcharge to shipments in March.  Defendants published their monthly fuel surcharge percentages on their websites to enforce against deviation from the pricing conspiracy.

59.     UP and BNSF thus simultaneously selected and adopted the same novel, arbitrary and complex combination of features for their rail fuel surcharges, including using the same HDF Index, setting functionally identical trigger points and applying the surcharge at the same time after the HDF Index price had changed.  UP and BNSF adopted this common pricing despite the fact that their rate and cost structures, customer bases, fuel sources, fuel costs, and their relationship with the rail rate were different.

60.     Figure 1 reflects the absolutely lock-step standard carload fuel surcharges the two companies were to apply for nearly the next four years:

**Figure 1**



61.     Even after conspiring to coordinate fuel surcharges, however, UP and BNSF still had to address a significant barrier to widespread application of the fuel surcharge to raise rail rates.  Most contracts contained rate adjustment provisions that utilized periodic changes in the

AII or the RCAF, both of which accounted for changes in fuel costs, when adjusting rates over a contract term.  This left no objective basis for a separate and additional fuel surcharge.

62.      In the fall of 2003, UP and BNSF commenced an effort to get the two Eastern Railroads to conspire on a fuel surcharge program that would enable the Railroads not to use the RCAF to adjust rail rates, to remove the fuel cost component from the weighted AII, and to substitute it with artificially high rail fuel surcharges calculated as a percentage increase of the base rail transportation rate, regardless of actual fuel costs.  At AAR meetings in late 2003, including October 2-3 and December 11-12, the Railroads conspired to create and implement coordinated fuel surcharge programs.

63.      Through combination or conspiracy the Railroads, which collectively dominate the AAR and its board, caused the AAR to develop and announce in December 2003 a new index that did not include fuel costs.  That index, known paradoxically as the ***All***-Inclusive Index ***Less Fuel*** ("AII-LF"), was similar to the AII and RCAF but excluded a component for changes in fuel costs.  The announcement of the AII-LF, and the underlying decision to create the new index, was a product of the collective action of the Defendants and those acting in conspiracy with them.  The AII-LF specified the fourth quarter of 2002 as its base period.

64.      Never before in its nearly 60-year history had the AAR separated out fuel costs from the AII index, and the STB-published RCAF still contains a fuel cost component.  The railroads did not decide it was appropriate to exclude fuel from the index in 1979, when the law still allowed common rate-setting based upon costs and the Arab Oil embargo pushed domestic crude oil prices to their all time inflation-adjusted high of more than $99/barrel in 2010 dollars. The railroads did not do so in 1998, when crude oil prices had dropped to $16/barrel by the same

measure.  They did not do so in 2000, when prices had more than doubled to almost $35/barrel by that measure.

65.     UP and BNSF (and the Eastern Railroads in conspiracy with them) planned to create a new index without a fuel cost component not because it better **_tracked_** their costs than the prior indexes; but because it did **_not_**.  Moreover, they decided to use this new index in combination with pretextual "fuel surcharges" to conceal their conspiracy to impose price increases across the board without regard to recovering actual fuel costs.  The Railroads chose a method for calculating rail fuel surcharges that did not correspond with actual or unanticipated increases in fuel costs.  The AII and RCAF, in contrast, had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors.  Following publication of the AII-LF, the Western Railroads and the Eastern Railroads uniformly applied rail fuel surcharges using the "base rate" method.  This method calculated rail fuel surcharges as a percentage of the total rate charged for the freight shipment, regardless of how much fuel contributed to costs, or whether the particular trips used more fuel or less.  This made the new "base rate" method a **_less_** accurate fuel cost recovery method than the methods that the industry had previously used for decades.  These conspiratorial fuel surcharges were applied to shipments of coal and petcoke, including shipments by the Oxbow plaintiffs.

66.     Just as UP and BNSF had conspired to operate in lockstep based on the HDF Index, the Eastern Railroads also moved in lockstep with their "fuel surcharges" based on the WTI Index.  They each conspired: (i) to apply a "fuel surcharge" whenever the monthly average WTI price exceeded $23 per barrel crude oil; (ii) to charge a "fuel surcharge" of 0.4 percent for every $1 above the monthly average WTI price of $23 per barrel; (iii) to time the "fuel

surcharge" in the same way; and (iv) to publish their monthly fuel surcharge percentages on their websites to enforce against deviation from such pricing.

67.     The Eastern Railroads thus also simultaneously selected and adopted the same novel, arbitrary and complex combination of features for their rail fuel surcharges, in this case using the same WTI Index, setting the same trigger point and applying the surcharge at the same time after the WTI Index price had changed.

68.     As Figure 2 reflects, the Eastern Railroads, like their Western counterparts, imposed the same fuel surcharge month after month for years.  The Railroads also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each railroad's actual increase in fuel costs:

**Figure 2**



69.     The four Railroads conspired not only to charge illegal fuel surcharges, but also to use the same cover story.  Following AAR's publication of the AII-LF, the Railroads all began to apply rail fuel surcharges as separate items on shipping bills.  The Railroads also all inaccurately

represented the rail fuel surcharges to be charges they imposed merely to account for unanticipated increases in fuel prices.  In fact, these charges did not merely account for fuel costs; they were a rate increase.

70.     The Railroads coordinated and enforced their rate-based fuel surcharges.  For instance, in November 2004, a BNSF executive "shopped the concept" of a mileage-based fuel surcharge with his counterparts at the other railroads, and they "pushed back, as expected."  The following year, in an internal assessment, BNSF recognized that its hugely profitable fuel surcharge program depended upon no one deviating from the plan:  "While fuel surcharges are working well now, it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

71.     The "convergence" in rail fuel surcharge methodologies and prices among railroad competitors raised concerns of industry experts.  At the time, one analyst concluded that the fuel surcharges were "not supported" by fuel cost increases and found it odd that "the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives," as a "way to gain significant market share."  An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity found an over $6 billion discrepancy between the Railroads' rail fuel surcharge revenue and their publicly reported fuel costs between 2003 and early 2007.  A 2010 joint report by the United States Departments of Agriculture and Transportation, titled Study of Rural Transportation Issues, similarly found:  "There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits.  From 2001-2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."

**4.      The Railroads acted contrary to their independent self-interest**

72.      There was no business or other procompetitive reason why UP, BNSF, CSX and Norfolk would collectively adopt and publish the AII-LF.  The AII and RCAF had been appropriately "weighted" to reflect the relative impact of fuel costs as compared to other cost factors.  Reworking the index to operate "less fuel (LF)" and substituting a pretextual "fuel surcharge" formula that would be applied to the entire base rate, ensured that the formula would drive rate increases far out of proportion to the actual increases in fuel costs for the relevant rail movement.

73.      In a competitive environment free of unlawful collusion, carriers with lower fuel costs would negotiate a fuel cost adjustment provision that closely tracked actual costs in an effort to increase competition for additional business and revenues and increased shares of business.  However, starting in 2003, the Railroads uniformly refused to negotiate any changes to their surcharge formulas even when doing so would have allowed them to capture additional business, revenue and market share rather than engage in competitive behavior.  Each Railroad instead restricted its freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on a percentage of the base transportation rate.  The Railroads did not compete with one another for sales but instead collectively maintained the artificially-high fuel surcharges.

74.      If the Railroads had wanted to recover actual fuel costs efficiently and accurately, they would never have adopted uniform percentages applied to the base rate.  Actual fuel cost as a percentage of operating cost and fuel efficiency differs widely among the railroads and individual rail movements.  Thus, absent conspiracy, it is inconceivable that the four Railroads would each independently design their fuel surcharges to arrive at the identical percentage month

after month, for a period of more than three years.  The only way to achieve uniform pricing of fuel surcharges (and especially to achieve a pricing that exceeds actual anticipated rises in fuel costs) was by a conspiracy to decouple fuel prices from the historical railroad cost indices and to then conspire to create new uniform indices and trigger points for computing the resulting stand-alone fuel surcharge percentages.

75.     Even within a particular railroad, actual fuel costs for routes and trains vary.  A uniform fuel rate applied as a percentage of base rates is inefficient because it taxes routes based upon the rates that the railroad has been charging for them, rather than the amount of fuel the routes require.  Accordingly, a percentage surcharge forces Oxbow to pay more simply because it was paying more already, regardless of the amount of fuel required by the trip.

76.     The rail fuel surcharges also did not correspond with the variation of fuel prices affected by free-market influences.  They did not take into account the "hedging" activities of some of the railroads that affected the actual fuel costs incurred.  Nor did they account for the phase-out in the railroad diesel fuel tax that occurred between 2004 and 2007.

77.     The Railroads' actions thus were not independent responses to a common problem of increasing actual fuel costs.  The only purpose in taking these collective actions was to assess a stand-alone fuel surcharge designed to substantially increase revenues rather than recover actual fuel costs, to act illicitly in concert with one another to set the surcharge and demand them from shippers and customers, and to ensure collective enforcement of the conspiratorial program.  The rail fuel surcharges were intended to achieve—and did achieve—across-the-board profits and increases in the prices the Railroads charged for unregulated rail freight shipments.

78.     By conspiring on rail fuel surcharges, each railroad was acting against the independent business self-interest it would have had absent the conspiracy.  In a competitive environment free of combination and conspiracy, carriers with lower fuel costs would impose a lower rail fuel surcharge.  That way, they could obtain business from less efficient competitors. It was the combination and conspiracy not to compete that made the uniform, rate-based fuel surcharges an effective strategy.

**5.     The Railroads changed other practices to facilitate the conspiracy**

79.     The Railroads also collectively changed aspects of their pricing and other behavior to advance the conspiracy.  Prior to adopting the base rate method, the Railroads had allowed long-term contracts of five years or more with clauses based on the AII, RCAF and other indices that bore a close nexus to the actual fuel costs associated with handling the traffic. After the Railroads announced the AII-LF, the Railroads resisted entering into long-term contracts with shippers and instead entered into contracts for much shorter time periods, making it easier to implement the fuel surcharges.

80.     The Railroads forced customers to abide by the new rate adjustment method even though most shippers, including Oxbow, preferred the system in place before 2003 that provided for long-term contracts that allowed shippers to ascertain their costs and operating expenses with considerable certainty.  In a competitive market, at least some railroads would see a benefit in long-term contracts, because they allow railroads to lock-in customers and minimize risks in fluctuating demand.

81.     BNSF, UP, CSX and Norfolk also took other collective actions to enforce the conspiracy and make it more effective.  For example, pursuant to the conspiracy, they limited the previously prevailing practice of sending a customer a single invoice for the entire transport in

circumstances where more than one railroad (usually an Eastern and a Western Railroad) was involved in long-distance freight transport.  Instead, the Railroads, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate invoice (and thus each could separately impose its own fuel surcharge).  This practice also made it easier for each railroad to recoup its share of the supra-competitive profits from the fuel surcharge program imposed by the conspiracy.

### 6.      Increasing the fuel surcharge for coal

82.      More than a year after the commencement of the conspiracy, UP and BNSF agreed to impose even higher rate-based fuel surcharges on transportation for coal.  As coal accounts for more than 40% of the freight shipped by rail, a conspiracy to further increase the already illegal fuel surcharge for coal shipments was especially lucrative.

83.      As with all other products covered by the fuel surcharge conspiracy, UP and BNSF continued to calculate their fuel surcharges as a percentage of the base rate, apply the fuel surcharge on a "take it or leave it" basis, use the HDF index and the AII-LF, and apply changes to the HDF average price calculation to shipments beginning in the second month following this change.

84.      Beginning in July 2004, however, while using the same percentage increment that it applied to all other products (.5%), BNSF began increasing the fuel surcharge percentage for every 4 cent increase in the HDF index, rather than for every 5 cent increase as applied to other products (effectively yielding an increase of .625 percent for every 5 cent increase).  In November 2004, UP began increasing the percentage by .75 percent for every 5 cent increase.  The formulas employed by UP and BNSF thus effectively used the fuel surcharge conspiracy core predicates and then increased the charges even further—by amounts that were almost

identical. BNSF's illegal fuel surcharges for coal under these formulas differed from UP's by a little over one-tenth of one percent (.00125). Thus, for the duration of the conspiracy, coal fuel surcharges either exceeded or (for the first year of the conspiracy) equaled the illegal fuel surcharges applied to all other products, including petcoke.

### 7. The Result: supra-competitive profits

85.     Defendants and those who conspired with them reaped huge, supra-competitive profits as a result of the success of their conspiracy. Through their conspiracy to coordinate on fuel surcharges, the Railroads realized billions of dollars in revenues in excess of their actual increase in fuel costs from the customers on whom they imposed the surcharge. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years" that "the financial returns in the business has [sic] started to move in the right direction."

86.     Thus, although fuel prices increased between 2003 and 2008, the Defendants and those who conspired with them continued to realize increasing profits each year of the conspiracy. A report commissioned by the American Chemistry Council estimates that between 2005 and 2007, UP's fuel surcharge formula alone produced $1.369 billion in revenues over and above UP's actual fuel costs.

### 8. The STB declared it an "unreasonable practice" and "mislabeling"

87.     On January 25, 2007, the STB concluded an investigation and public proceeding concerning railroad fuel surcharge practices by issuing an administrative decision finding that the Railroads' practice of computing rail fuel surcharges as a percentage of the base rail freight rate for regulated rail freight traffic was an "unreasonable practice" because the method "stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular

traffic to which the surcharge is applied."  Rail Fuel Surcharges, STB *Ex Parte* No. 661 (Jan. 25,

2007).  Thus, the STB concluded:

> [I]mposing rate increases in this manner, when there is no real correlation
> between the rate increase and the increase in fuel costs for the particular
> movement to which the surcharge is applied, is a misleading and ultimately
> unreasonable practice.  *Id.* at 7.

88.     The STB also determined that the term "fuel surcharge" used by the Railroads

was itself deliberately misleading:

> The term 'fuel surcharge' most naturally suggests a charge to recover increased
> fuel costs associated with the movement to which it is applied.  ***If it is used
> instead as a broader revenue enhancement measure, it is mislabeled***.  This sort
> of mislabeling appears designed to avoid the type of response a carrier would
> likely receive if it were to honestly inform a shipper that a higher rate was being
> imposed to recover not only the increased cost of fuel serving that shipper, but
> also the increased cost of fuel for another shipper's traffic—which is what would
> often occur under rate-based fuel surcharges.  *Id.* at 6-7 (emphasis added).

89.     Although the conclusions the STB reached about the fuel surcharge apply to all of

the instances in which the railroads applied fuel surcharges, the STB's decision did not.  In that

decision, the STB explicitly noted that it was addressing rate-regulated rail freight traffic only (as

opposed to non-rate regulated traffic addressed in this Complaint) and that its jurisdiction did not

reach rail freight traffic under private contract or otherwise exempted from rate regulation.

90.     Pursuant to the conspiracy, the Defendants and those who conspired with them

continued to apply the same unreasonable fuel surcharge practices addressed by the STB by

insisting on a "take it or leave it" basis that these formulas be included in the private rail freight

transportation contracts, and other unregulated freight transport, at issue here.  These misleading

and unreasonable practices removed competitive constraints and raised shipping costs for

shippers such as Oxbow.

B.    **BNSF Agreed Not to Compete for Uinta Basin Coal, Giving UP an Effective Monopoly, and the Railroads Generally Agreed Not to Compete for New Coal Business**

91.    At the same time that UP and BNSF agreed with their eastern counterparts to impose functionally identical across-the-board rate-based fuel surcharges on their customers, they also agreed to cease competition for each other's coal customers.  This conspiracy prevented competition on base rates, rate adjustment provisions (including for changes in fuel costs), and service terms that would have undercut the fuel surcharge conspiracy for the commodity that represented the greatest percentage of railcar traffic, and enabled BNSF and UP to impose significant rate increases and markedly inferior service terms on their existing customers.  As part of the agreement, BNSF agreed not to compete to serve shippers of Uinta Basin coal.

92.    Prior to 2004, in most of the Western United States UP and BNSF had vigorously competed to gain market share.  For coal mines in the Powder River Basin, located in Wyoming and Montana, shippers served by more than one railroad regularly received more than one competitive bid, and large coal transportation contracts regularly changed hands.

In 2002, for example, BNSF won a bid to transport 7 million tons of Powder River Basin coal to Georgia Power's Scherer plant, one of the largest power plants in the country, which had previously been served by UP.  In March 2003, UP underbid BNSF to win a major coal contract from the Omaha Public Power District ("OPPD"), which had previously been served by BNSF.  The five-year contract called for delivery of 2.4 million tons of coal per year from the Powder River Basin.  After its loss of the OPPD contract to UP, BNSF secured a new 10 million ton per year contract with Dynergy, which had previously been served by UP.  Wall Street analysts

estimated that losing the Scherer and Dynergy business reduced UP's coal transportation revenue by $50 million in 2004 alone.

93.     As the STB found, after the UP/SP merger (but prior to the conspiracy) rail competition for Colorado coal and Utah coal was stronger than it was prior to the merger, BNSF was an effective competitor to UP in the Central Corridor, and BNSF had placed competitive discipline on UP's rates both in the Central Corridor and specifically with respect to Utah/Colorado coal.

94.     Starting in or about 2004, however, the railroads stopped competing for new coal business.  UP and BSNF stopped offering competitive bids for one another's customers.  As a result, the incumbent railroad retained the business no matter what unfavorable terms it sought to impose.

95.     As an example, prior to 2004, Ameren Corporation, the fifth largest coal consumer in the United States, saw railroads regularly compete for its business.  During that period, the non-incumbent railroad typically either would successfully compete to take business from the incumbent railroad through lower rates, or the incumbent railroad would retain the business by reducing its rates.  By contrast, in every instance from 2004 to 2010 when Ameren issued bids for rail rate quotes for its competitively served plants, the incumbent railroad both retained the business and significantly increased rates.  This was because the non-incumbent's quoted rate or tariff was, on average, 43 percent higher than the rate of the incumbent railroad.  Ameren also experienced a number of instances of what it has referred to in testimony as "non-responsive bidding"—*i.e.*, no bids at all in response to a request, responses with extreme one-sided conditions that made the quotation unacceptable, or bids that varied from Ameren's bid parameters.

96.     Also in departure from prior practice, UP and BNSF refused to quote rates to locations where a shipper served by one railroad could access the competitor by building out tracks.  For example, between 1990 and 2003, Ameren had often obtained competitive quotes in advance of constructing facilities that enabled it to obtain competitive access to its plants through constructing build-outs, forming short-line railroads, and building barge facilities.  After 2003, both BNSF and UP refused to quote a rate unless the track had been constructed.

97.     AES Corporation experienced a similar lack of competition when it attempted to negotiate a new contract in 2011.  The starting point for negotiations with BNSF and Kansas City Southern was 100% higher than a contract the utility had signed in 2005 for deliveries to its Shady Point plant in Bonanza, Oklahoma.  The utility never received a competitive rate from UP.

98.     Similarly, while OPPD was able to secure competitive terms from UP in 2003, when OPPD's contract ended in 2008, OPPD could not obtain a competitive quote from BNSF. Its contract rate with UP increased by 90 percent, and it lost service and delivery guarantees from its prior agreement.

99.     The experience of Ameren, AES, and OPPD after 2003 was typical of coal shippers generally.  Individuals in the business of negotiating with the Railroads observed these anticompetitive bidding practices over the course of multiple negotiations.  A railroad would offer an unrealistically high bid when bidding as the non-incumbent railroad and justify the bid as the supposed "market rate."  When bidding as the incumbent, however, the same railroad would offer a far lower bid as the supposed "market rate."  In these negotiations, the non-incumbent railroad would not attempt to justify the invariable quotation of a non-competitive rate as being caused by capacity constraints, cost disadvantages, or some other purported reason that prevented it from profitably taking on new business at a rate lower than the exorbitant non-

competitive rate it was quoting.  Instead, the non-incumbent railroad would simply declare the exorbitant rate as the "market rate" with no additional explanation offered and even though the incumbent railroad was offering a significantly lower, but nevertheless still high, rate.

100.    Nor could the non-incumbent railroads have credibly justified their non-competitive bids as resulting from capacity constraints or inherent cost advantages even had they offered such a justification.  The railroads had ample capacity to take on new business profitably throughout the period, and the railroads continued to fail to compete even during the economic downturn and period of reduced demand that began in 2008.  Capacity constraints also could not have accounted for the uniformity of the failure to compete for new coal business throughout the period regardless of destination.  Nor could capacity constraints have explained the decision to favor only existing business, particularly when each railroad would have no way of knowing that the railroad's competitor had similarly chosen not to compete for new business.  Nor can inherent cost advantages explain why a market in which customers *saw* competitive bidding and frequently switched railroads, *transformed* into one afterwards in which non-incumbents stopped making offers that were even remotely competitive and customers had no choice but to remain with incumbents.

101.    At the same time UP and BNSF stopped quoting competitive rates for each other's incumbent business, UP and BNSF also abandoned what had been their practice of negotiating off the rates they had quoted.  Previously, shippers could make counteroffers and negotiate.  Now, the incumbent railroad refused to negotiate, because it knew that the shippers would not face a competitive alternative.

102.    As part of the agreement not to compete with UP for customers, BNSF agreed that it would not utilize its trackage rights to compete for customers shipping coal from the Uinta

Basin. It therefore stopped submitting competitive bids for Utah coal and ceased to serve as a

competitive constraint on UP prices in the region. This failure persisted even as UP began to

raise rates significantly in the Uinta Basin, thereby increasing opportunities for BNSF to take

Utah coal business from UP. As a result, UP acquired monopoly power in the Uinta Basin, and

competition for coal shipments from the Powder River Basin ceased as well.

103.    Against the background of historical competition, and the decision of UP and

BNSF to join the fuel surcharge conspiracy, their simultaneous decision to cease to compete for

business was not the natural or expected result of duopoly, much less "coincidence."

104.    Prior to the conspiracy, neither UP nor BNSF could afford to raise rates or offer

inferior service terms unilaterally without risking a significant loss of business to the other as

BNSF learned when it attempted to raise rates unilaterally on OPPD in 2003, and UP learned

when it lost the Georgia Power and Dynergy contracts to BNSF.

105.    That the railroads achieved this result afterwards was not the result of unilateral

action that just happened to be the same. Indeed, in advocating for approval of the merger, UP

specifically attacked suggestions by witnesses that coal rates would be subject to tacit collusion.

According to UP, a strategy of refraining from bidding aggressively to increase rate levels would

be "dangerous in the extreme and could readily result in a multi-year loss of substantial traffic

and associated revenue." In particular setting rates at higher levels for Utah/Colorado coal

"would risk the loss of traffic to a Utah Railway-BN/Santa Fe interline movement."

106.    UP further mocked as the "esoterica of the classroom, not the stuff of facts," the

suggestion that UP and BNSF might "magically" arrive at a "simple understanding that each

would not aggressively pursue business in corridors that the other had dominated in the past,

corridors where they had trackage rights or corridors where the other had made substantial

investments."  Instead, according to UP, "***Not knowing each other's actual prices, present or proposed, the railroads can be expected, in pursuit of their self-interests, to seek business and aggressively to compete, holding no respect for the other's traffic and indeed seeing that traffic as something to be sought in the interest of revenue and profit enhancement***."  (Emphasis added).

### C.   UP and BNSF's Rates Increased Drastically, and Both Offered Reduced Service Terms

107.    The railroads' agreements to fix fuel surcharges and not to compete for new business resulted in drastic increases in rates and reductions in service.

108.    As a result of the conspiracy, average rates to ship coal more than 500 miles from mines in the Uinta Basin increased dramatically.  Average rates using shipper cars increased by **8% during the period 2000-2003**, but increased by **71.5% during the period 2004-2007**.  Likewise, average rates using railroad railcars increased **29% during the period 2000-2003**, but increased by **70.2% during the period 2004-2007**.  Rates continued to increase significantly throughout the economic downturn beginning in 2008.  Thus, during the period 2008-2011, rates did not go down but instead went **up an additional 30% or more** for both shipments using railroad railcars and shipper railcars.  By 2012 (indeed by 2010), rates were over **250%** the 2003 rates for coal shipments using shipper cars and over **200%** the 2003 rates for coal shipments using railroad railcars.  Oxbow's rates to ship Uinta Basin coal likewise increased over **200%** during the same period.

109.    Average rates to ship coal more than 500 miles from mines in the Powder River Basin for coal using shipper railcars increased by **.1% during the period 2000-2003**, but those same rates increased by **84% during the period 2004-2007**.  Similarly, analogous average rates to ship coal using railroad railcars increased by **26% during the period 2000-2003,** but

increased by **54% during the period 2004-2007**.  Moreover, rates continued to increase

significantly throughout the economic downturn beginning in 2008, and 2012 rates were more

than **275%** those in 2003 for coal shipped in shipper railcars and more than **200%** the rates for

coal shipped in railroad railcars.

110.    The lack of competition has also resulted in degraded service in the Uinta Basin.

Although prior to the conspiracy UP internally recognized and publically said that vigorous

competition would force UP, among other things, to improve service, the opposite has been true

since 2003.

111.    Despite having internally recognized, and publically said, that coal, like Oxbow's,

was "particularly well-suited to export markets," and that the lower costs that resulted from its

merger with SP would allow for "significant increases" in exports of Colorado coal to Asia, after

the conspiracy UP generally refused to ship Oxbow's coal west.  In a competitive market, UP

would not have done so.

112.    Distinguished economists, including the former chief economist of the Antitrust

Division of the Department of Justice who also served as Deputy Assistant Attorney General for

Economic Analysis, have publically expressed the following and other conclusions:

- "There is strong evidence that in about 2004 BNSF and UP successfully colluded to raise prices…"

- "We conclude that there is strong evidence that BNSF and UP have successfully exercised market power in markets for transportation of western coal…" and

- "[T]here have been excessive increases in the prices for the railroads' transportation of Western coal since 2004.  These increases are consistent with tacit or explicit collusion, and cannot be reconciled with competitive markets…"

113.    The railroads also jointly stopped offering rate adjustment mechanisms designed

to track actual cost changes, and service commitments that had been common in prior contracts,

including guaranteed cycle and transit times and liquidated damage provisions.  They also demanded that customers assume regulatory responsibilities such as required railcar inspections for which the railroads are responsible in the first instance under applicable federal regulations.

### D. UP and BNSF Both Switched to Public Pricing

114.     In another significant departure from prior practice, UP and BNSF used public pricing to support both the fuel surcharge conspiracy and the conspiracy not to compete.

115.     Prior to the conspiracies at issue in this case, the confidentiality of price and service terms in rail transportation contracts had served as an important check against collusion in the highly concentrated rail industry.

116.     When the railroads began to conspire, however, they adopted public pricing mechanisms that announced an intent to haul coal only for significantly higher rates and minimal service terms.  These new practices served no legitimate business purpose and instead were adopted to signal price changes and coordinate market allocation by enabling competitors to structure bids to avoid taking business away from their rivals.  BNSF first experimented with public pricing beginning in January 2003, publishing a tariff that specified rate and service terms for shipping coal from mines in the Powder River Basin to various plants, including existing competitively served customers under contract with BNSF.  As a result, in mid-2003, UP underbid BNSF and won a five year contract to transport 2.4 million tons of PRB coal annually to OPPD's coal plants.  BNSF quickly suspended its unilateral efforts to treat its tariff as non-negotiable and recommenced aggressive competition until the commencement of the conspiracy described in this First Amended Complaint.

117.     In March 2004, almost immediately after the adoption of the AII-LF, and at the same time that the railroads stopped competing for new business, UP issued a non-confidential

"circular" to coal shippers that specified the rate and service terms for delivering coal from the Powder River Basin to over 30 utilities, over 80 percent of which could be served both by UP and BNSF.  UP also issued a separate public circular announcing the terms under which it would transport coal from the Uinta Basin.  The circulars contained non-competitive terms, including significantly increased rates and service terms that were markedly inferior to those previously offered in rail transportation contracts.

118.    The railroads have attempted to justify the turn to public pricing as an extension of their statutory common carrier obligations to offer a rate upon reasonable request, but as the STB recognized, these practices were new and represented a marked departure from prior contracting practice that the Staggers Act was intended to foster.  The circulars quoted rates and service terms for competitively served traffic that had traditionally moved by confidential contract.  Indeed, over 80% of the coal shippers in UP's circular could be served by both UP and BNSF.  For this reason, the STB expressed concern in a proceeding that commenced shortly after the issuance of the UP circular for PRB coal that whereas

> the terms and conditions of common carrier rates must be publicly disclosed under section 11101, the terms of a rail transportation contract are to be kept confidential, a factor that makes collusion in this highly concentrated industry more difficult.  Thus, a carrier's hybrid pricing mechanism may not contain the same protection against collusion as do confidential transportation contracts.  An important benefit of contracts is that they often enable shippers to obtain service commitments and lower rates that carriers might not otherwise offer through the public tariff process.  Surface Transportation Board, Interpretation of the Term "Contract" in 49 U.S.C. § 10709, 2007 WL 934379, *3 (March 28, 2007).

119.    The circulars also contained terms that were not typically found in traditional tariffs, such as annual minimum volume commitments and contract terms that went beyond the 20 day term provided by statute.  Thus, as the STB stated, the "new pricing structures we are witnessing" involve

a mutuality of obligation between the carriers and shippers that appear to have the hallmarks of a contractual relationship.  These bilateral agreements mutually bind both the shipper and the carrier for a given period of time.  In exchange for some sort of consideration from the shipper, the carrier commits to a specific rate or service for a specific term.  While Congress intended to permit carriers to have the pricing flexibility to enter into these kinds of agreements, ***we believe that Congress also intended for these contractual agreements to be confidential, outside Board jurisdiction, and subject to the scrutiny of the antitrust laws***, rather than regulation under the Interstate Commerce Act.  *Id*. (emphasis added).

### E.      UP and BNSF Both Abandoned Long-Term Contracts

120.     UP and BNSF changed another longstanding practice by offering only short-term contracts and refusing to agree to long-term contracts.  Whereas the railroads had traditionally entered into coal transportation contracts with terms ranging from 5-20 years, after 2004, UP denied Oxbow contracts longer than one year.  Other shippers suffered similar experiences, and the railroads' public pricing circulars imposed minimum volume commitments to obtain contracts from 1-3 years.  As economists for shippers have concluded, this change from the prior competitive contracting enhanced the ability of UP to raise prices and reduced the incentives to compete, as well as the ability of customers to seek lower prices.

121.     As with the UP's and BNSF's other contemporaneous changes to longstanding business practices, the simultaneous move to short-term contracts was not in their independent business interest absent a conspiracy and demonstrated a lack of fear of competition.  In competitive industries, long-term contracts are a way sellers can keep customers that might otherwise move to a competitor.  In many fields (for example, cellular telephone service) keeping customers in this way is so valuable that companies offer substantial discounts to obtain long-term contracts.  It also is not in a railroad's economic interest to refuse—across the board—

to enter into long-term contracts even when substantial customers for their own reasons might want them.

122.    An absolute insistence on short-term contracts would only be in UP's and BNSF's *collective* interest as part of an illicit agreement.  If both knew that neither would be competing with the other, both could insist on a short-term contract to take advantage of the latest rate increase, without fearing the loss of a customer.  Short-term contracts also provided assurances that each railroad would not deviate on the conspiracy by leaving its customers regularly available for competitive bidding.  Absent agreement, there is no reason why either UP or BNSF, much less both of them, would have this level of confidence about the lack of competition, in an industry that had, up until recently, experienced robust competition for customers the size of Ameren, OPPD and other large utilities.

## V.    UP's RESULTING MONOPOLY OVER THE SHIPMENT BY RAIL OF COAL EMANATING FROM THE UINTA BASIN

123.    As a result of the actions described above, commencing in or about the end of 2003, UP illegally acquired and maintained a monopoly over the shipment of coal from the Uinta Basin.

124.    For purposes of monopolization, attempted monopolization, and conspiracy to monopolize, the long-range (over 100 mile) shipment of Uinta Basin coal by rail is a relevant market.

125.    For purposes of monopolization, attempted monopolization, and conspiracy to monopolize, the long-range (over 100 mile) shipment of Uinta Basin coal by rail to customers west of the Mississippi River is also a relevant market.

126.    There is no significant cross-elasticity of demand, nor are there reasonably interchangeable alternatives, for rail transportation services for most shippers of coal.  Although

the shipment of coal in some instances shares similarities with the shipment of other types of freight, and for convenience sometimes can be analyzed together with freight shipment generally, there is no significant cross-elasticity between the shipment of coal and the shipment of other freight.  Thus, for example, a rise in the cost of non-coal freight shipment does not have a significant effect on the demand for coal shipment.

127.    Uinta Basin coal is uniquely high in BTU (British Thermal Unit) content, burns clean, and has an environmentally attractive low sulfur content.  Coal mined by one mine in the Uinta Basin is entirely substitutable with coal mined by another mine in the Uinta Basin, whether the mine is located in Colorado or in Utah.  Uinta Basin coal is fungible, and hence the "as delivered" price of coal shipped from one mine in the Uinta Basin constrains not only the coal price, but also the shipping price, for all mines in the Uinta Basin.

128.    Uinta Basin coal, however, is only partially substitutable with coal mined outside the Uinta Basin, for example in the Powder River Basin of Wyoming and Montana.  Powder River Basin coal has a much lower BTU content and a higher sulfur content than Uinta Basin coal.  Most customers, principally industrial users and utilities, have plants that either can efficiently burn only Uinta coal or only PRB coal, or some blend of the two.  Customers whose plants are built to burn only one type of coal cannot readily shift to the other type of coal.  Customers whose plants are built to burn a blend of the two types generally cannot greatly vary the relative proportions of the blend.  There are a number of reasons for this.  One reason is that Uinta Basin coal, having a much higher BTU content than Powder River Basin coal, "burns hot," and some end user's plants are not designed to burn coal that "burns hot," whereas other plants are specifically designed to burn such coal and cannot efficiently burn "low BTU" coal.  Another reason that PRB coal and Uinta Basin coal are not fully substitutable is that some end users have

emissions related constraints that effectively require them to utilize Uinta coal, because of its low

sulfur content and positive environmental characteristics.  Likewise, Illinois Basin coal has an

even higher sulfur content than PRB coal, and for this and other reasons is generally not a

competitive alternative for customers of Uinta Basin coal.  As delivered prices for Powder River

Basin coal, and coal from certain other areas, have some effect on the price, and shipping price,

for Uinta Basin coal.  However, the characteristics of Uinta Basin coal and the nature and

location of customers for it cause the transportation of Uinta Basin coal to be a separate market

for antitrust purposes.

129.    As a result of UP's wrongful conduct in restricting competition, and UP's and

BNSF's conspiratorial conduct in agreeing not to compete for rail transportation in the Central

Corridor in general, and from the Uinta Basin in particular, UP has obtained a monopoly and

eliminated the competitive constraint that BNSF had previously imposed on rates for rail

shipment of Utah/Colorado coal.  UP now has a market share of approximately 100% for the rail

shipment of coal mined in the Uinta Basin and has eliminated competitive constraints in the

relevant markets.

130.    Even if UP had otherwise lawfully acquired monopoly power over the market in

which Oxbow's Elk Creek mine is located, it nonetheless illegally maintained that monopoly.

Through its participation in the fuel surcharge conspiracy (and other anticompetitive acts alleged

herein), UP artificially raised the "as delivered" price of coal throughout the country—including

in all locations in the United States where Uinta Basin coal, including Oxbow's, is sold.  UP

thereby artificially raised the ceiling on prices it could charge even captive shippers of coal and

obtained revenues and profits that it could not have obtained if it were a lawful monopolist.  UP

accordingly abused, illegally maintained, and enhanced the monopoly power over Oxbow and

other mine owners in the Uinta Basin that it had acquired (regardless of whether that power was acquired lawfully, as UP has said, or not, as Oxbow alleges here).

## VI.    UP's AND BNSF'S ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL

131.    UP and BNSF's anticompetitive conduct caused poorer service, fewer options, and dramatically higher rail rates for freight in general, even more so for the shipment of coal, and still more for the shipment of coal emanating from the Uinta Basin.  As a result of their anticompetitive conduct, they received increased profits as the result of conspiracy rather than a reduction in their costs or more efficient operations.  Shippers, end users, and the public were damaged as a result.

132.    The fuel surcharge, by itself, reaped extraordinary profits.  As UP's CEO, James Young, admitted in 2007, "three, four years ago [the rail fuel surcharges] were really non-existent," and "it's only been the last couple of years that…the financial returns in this business has [sic] started to move in the right direction."  A Report commissioned by the American Chemistry Council estimates that between 2005 and 2007, UP over-recovered $1.369 billion for fuel surcharges.

133.    UP's and BNSF's anticompetitive conduct was within the flow of, and substantially affected, interstate and international commerce.  During the relevant period, these railroads sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States.  Each of them used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services for coal and other commodities.  UP and BNSF's unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international

commerce and have denied those who ship freight in general, and coal emanating in the Uinta

Basin, of the benefits of free, open and unrestricted competition.

## VII.   EACH OF THE OXBOW COMPANIES SUFFERED INJURY BY VIRTUE OF SOME OR ALL OF UP'S AND BNSF'S ANTICOMPETITIVE CONDUCT

134.    As a proximate result of UP's and BNSF's conduct, each of the Oxbow plaintiffs

has paid supra-competitive rates to ship freight, lost business and profits by virtue of UP's and

BNSF's reduction of service and refusals to ship coal west from Colorado mines, received

reduced revenues from sales of their products, experienced increased costs of doing business,

and lost the benefits of competition that would have led to growth.  These are injuries of the type

the antitrust laws are designed to prevent, and Plaintiffs incurred these injuries as direct

purchasers of rail shipping services.

135.    As a proximate result of the conspiracy described above, Oxbow Carbon &

Minerals LLC, Oxbow Mining, LLC, and Terror Creek LLC each paid fuel charges for

shipments of coal above that they would not have paid in the absence of the conspiracy.

136.    As a proximate result of the conspiracy described above, Oxbow Carbon &

Minerals LLC, Oxbow Calcining LLC, and Oxbow Midwest Calcining LLC each paid fuel

surcharges for shipment of petcoke, and other commercial rail freight, that they would not have

paid in the absence of the conspiracy.

137.    As direct purchasers of rail freight services the Oxbow Companies collectively

have paid ***more than $50,000,000*** in wrongfully imposed fuel surcharges since the initiation of

the conspiracy and have thereby been damaged in their business and property.  Oxbow Carbon &

Minerals LLC paid in excess of $40,000,000 in illegal fuel surcharges.  Oxbow Mining, LLC

paid directly, or through Oxbow Carbon & Minerals LLC acting as its agent, in excess of

$9,000,000 in illegal fuel surcharges.  Oxbow Calcining LLC paid in excess of $2,000,000 in

illegal fuel surcharges.  Oxbow Midwest Calcining LLC paid in excess of $1,600,000 in illegal fuel surcharges.  Terror Creek LLC directly or through Oxbow Carbon & Minerals LLC acting as its agent, paid illegal fuel surcharges in excess of $400,000.

138.    Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC, have each paid supra-competitive prices to ship coal emanating in the Uinta Basin, because of the unlawful monopolization, conspiracy to monopolize, and conspiracy not to compete alleged above. Indeed, these companies saw the rates they paid for shipping coal from Uinta mines more than double during the period 2003 to 2012.

139.    In a competitive market, each of the plaintiffs would have the option to ship freight on more than one railroad.  During the period of the fuel surcharge conspiracy described above, Oxbow Carbon & Minerals LLC, Terror Creek LLC, Oxbow Calcining LLC, and Oxbow Midwest Calcining LLC, each shipped coal and/or petcoke from various locations that are served by more than one railroad.

140.    During the period of the anticompetitive conduct described above, Oxbow Carbon & Minerals LLC also shipped coal from Uinta Basin mines along the Central Corridor at locations along the tracks over which BNSF and Utah Railway had been granted trackage rights and other rights under their settlement agreements with UP and SP.  Oxbow Carbon & Minerals LLC also owns additional rights to mine coal in the Uinta Basin, but it has been unable to make economic use of its mining rights because of supra-competitive prices that UP charges for shipment of coal from the Uinta Basin as the proximate result of its conspiracy with BNSF and other illegal conduct.

141.    Oxbow Mining, LLC and Oxbow Carbon & Minerals LLC, similarly suffered anticompetitive harm in connection with the shipment of coal from the Elk Creek Mine, which is

served by UP and located on an approximately 70-mile UP rail spur connecting the mine head with the Central Corridor.  Both paid the illegal fuel surcharge that UP imposed for shipments from the Elk Creek Mine as the proximate result of the conspiracy between UP and BNSF.

142.    These companies also paid more for shipping coal by rail from the Elk Creek Mine than they would have in a competitive market, because competitive pressure from BNSF and Utah Railway at other mines in the Uinta Basin would have constrained UP's rates for shipping coal emanating from the Elk Creek Mine as it had prior to the conspiracy.  As UP's CEO has acknowledged, because coal from the Elk Creek Mine is substitutable (indeed, fungible) with coal from other Uinta Mines, competition for rail service at these mines would have created "competitive constraints" on the prices that UP could charge even "captive shippers."  In a competitive Uinta Basin market, where Utah shippers could get competitive quotes from UP and BNSF, UP could not increase its prices to the Elk Creek Mine, as much as it did in fact, because once it increased the "as delivered" price beyond that charged from other Uinta mines, customers would not buy coal from the Elk Creek Mine, and UP would receive no shipping business from the mine.

143.    In addition, were it not for the anticompetitive conduct described above, it would be economically reasonable for Oxbow Mining, LLC and Oxbow Carbon & Minerals LLC to obtain the benefits of a competitive alternative to UP by transporting coal the 70 miles to Grand Junction, Colorado (where both BNSF and Utah Railway have trackage rights and other rights under their agreements with UP) and building truck-to-rail loading facilities there.  Indeed, the relative cost of doing so would be less than the cost Ameren invested in building its own rail spurs to reduce its transportation costs via competition between UP and BNSF prior to the onset

of the conspiracy.  And, by virtue of their trackage agreements with UP, BNSF and Utah

Railway would both have had the right to ship coal from these new facilities.

144.    Oxbow Mining, LLC and Oxbow Carbon & Minerals LLC also suffered from

inferior service and lost business because UP refused to ship Oxbow's coal west.

## COUNT I

### Price Fixing (Fuel Surcharge) in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

(By all Plaintiffs against UP and BNSF)

145.    Oxbow fully incorporates by reference the allegations in all of the preceding

paragraphs herein.

146.    The Defendants and those colluding with them entered into and engaged in a

contract, combination, or conspiracy in violation of Section 1 of the Sherman Act.  The contract,

combination, or conspiracy resulted in an agreement, understanding, or concerted action between

and among the Defendants and their co-conspirators to use rail fuel surcharges as a method of

extracting profit from shippers.  The contract, combination, or conspiracy also resulted in an

agreement, understanding, or concerted action between and among the Defendants and their co-

conspirators to refrain from competing against each other in regard to rail fuel surcharges both

for freight, in general, and coal, in particular.

147.    This conspiracy resulted in an agreement, understanding, or concerted action

between and among the Defendants and their co-conspirators in furtherance of which they fixed,

maintained, and standardized prices for rail fuel surcharges for Oxbow's non-regulated

transportation.  This conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act

and an unreasonable and unlawful restraint of trade.

148.    Because of this conspiracy, among other things:

   a.   UP and BNSF fixed prices charged to Oxbow and other shippers and
        customers for fuel surcharges applied to unregulated contract-based
        rail freight transportation in general and coal in particular, and
        maintained those prices at supra-competitive levels;

   b.   Oxbow and other shippers and customers have been deprived of the
        benefits of free, open and unrestricted competition in the market for
        rail freight services; and

   c.   Competition in establishing the prices paid, customers of, and
        territories for rail freight services has been unlawfully restrained,
        suppressed and eliminated.

149.    As a proximate result of the Defendants' unlawful conduct, Oxbow has suffered
injury in that it has paid and continues to pay supra-competitive prices for rail fuel surcharges
applied to unregulated contract-based rail freight transportation for materials, including but not
limited to coal and petroleum coke, since approximately June 2003 and has otherwise been
damaged as above described.

## COUNT II

### Conspiracy in Restraint of Trade in Violation of Section 1
### of the Sherman Act, 15 U.S.C. § 1

(By Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC against UP and BNSF)

150.    Oxbow fully incorporates by reference the allegations in all of the preceding
paragraphs herein.

151.    In addition to, and contemporaneous with engaging in, the fuel surcharge
conspiracy, Defendants UP and BNSF conspired to allocate customers and to fix the terms of
service by, agreeing and conspiring, among other things:

   a.   Not to compete for customers;

   b.   To stabilize and dramatically to increase their rates for shipments of
        freight, including coal;

    c.   To break with prior practice by engaging in public pricing; and

    d.   To break with prior practice by refusing to enter into long-term contracts.

152.    This conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act and an unreasonable and unlawful restraint of trade.

153.    Because of this conspiracy, among other things:

    a.   UP and BNSF stabilized and increased prices to supra-competitive rates

    b.   UP and BNSF degraded service without fear of competition;

    c.   Oxbow and other shippers and customers have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight services; and

    d.   Competition in establishing the prices paid, customers of, and territories for rail freight services has been unlawfully restrained, suppressed and eliminated.

154.    As a proximate result of the Defendants' unlawful conduct, Oxbow has suffered injury in that it has paid and continues to pay supra-competitive rates applied to unregulated contract-based rail freight transportation for coal and has otherwise been damaged as above described.

## COUNT III

## Monopolization (and Attempt to Monopolize and Conspiracy to Monopolize) by UP in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

(By Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC against UP and BNSF (as UP's co-conspirator))

155.    Oxbow fully incorporates by reference the allegations in all of the preceding paragraphs herein.

156.    UP has monopolized and/or attempted to monopolize and, with BNSF, has conspired to monopolize the relevant markets for rail shipment of coal emanating from the Uinta

Basin in violation of Section 2 of the Sherman Act by using exclusionary and anticompetitive means to secure, maintain, enhance, and abuse monopoly power and to attempt to secure monopoly power with a dangerous probability of success of that attempt.

157.    UP and BNSF intentionally conspired to afford UP a monopoly over the relevant markets for rail shipment of coal emanating from the Uinta Basin.  UP and BNSF effected this conspiracy by, among other things:

> a. agreeing that BNSF would not make use of the trackage rights BNSF had been afforded as part of the UP/SP merger in order to compete for customers shipping Uinta Basin coal, in exchange for UP agreeing not to compete with BNSF for each other's customers in PRB;
>
> b. agreeing that BNSF and UP would not compete for customers, including the utilities and industries that purchase Uinta coal—thus, eliminating the competitive pressure on the "as delivered" price;
>
> c. agreeing otherwise to increase prices, engage in public pricing, and eliminate long-term contracts, all of which ensured that UP could charge not only monopolistic prices, but monopolistic prices without the constraint that the "as delivered" price would otherwise have placed on those prices.

158.    This conspiracy violates Section 2 of the Sherman Act.

159.    Even if these actions had not been taken as they were by agreement, UP's unilateral decision to take all of these actions, particularly in the context of the fuel surcharge conspiracy, and to signal BNSF, knowing and expecting that the BNSF would act in kind, and to induce BNSF to act in kind by providing the *quid pro quo* of not competing with BNSF, constitutes unlawful monopolization and attempted monopolization.  UP acted with the specific intent to secure, maintain, enhance and abuse monopoly power and in violation of Section 2 of the Sherman Act.  UP has either achieved monopoly power, with a share approaching 100% of the relevant market, or its anticompetitive conduct demonstrates a dangerous probability of obtaining monopoly power in the relevant market.

160.    Even if UP had otherwise lawfully acquired monopoly power over the market in which Oxbow's Elk Creek mine is located, it nonetheless illegally maintained that monopoly. Through its participation in the fuel surcharge conspiracy (and other anticompetitive acts alleged herein), UP artificially raised the "as delivered" price of coal throughout the country—including in all locations in the United States where Uinta Basin coal, including Oxbow's, is sold.  UP thereby artificially raised the ceiling on prices it could charge even captive shippers of coal and obtained revenues and profits that it could not have obtained if it were a lawful monopolist.  UP thereby violated Section 2 of the Sherman Act by abusing, illegally maintaining, and enhancing its monopoly power over Oxbow and other mine owners in the Uinta Basin, regardless of whether that power was acquired lawfully, as UP has said, or not, as Oxbow alleges here.

161.    As a result of these violations:

    a.  UP has set and maintained prices for Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC and other shippers and customers at supra-competitive levels;

    b.  Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC and other shippers and customers have been deprived of the benefits of free, open and unrestricted competition in the markets for rail freight services and rail freight services for coal;

    c.  Competition in establishing the prices paid, customers of, and territories for rail freight services and rail freight services for coal have been unlawfully restrained, suppressed and eliminated;

    d.  UP has manipulated shipments, quotes and rail rates, specifically the rate differential for rail shipments of coal from Colorado and Utah, to dictate the location of Oxbow Carbon & Minerals LLC's and Oxbow Mining, LLC's coal customers; and

    e.  UP has degraded service.

162.    As a proximate result of these violations of Section 2 of the Sherman Act, Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC have suffered injury in that, among other things, they:  (i) paid and continue to pay supra-competitive prices for rail freight service than

they would have paid absent the violation; (ii) were deprived of access to certain customers and the ability to sell their coal in other geographic regions that they could not practicably service because of UP's illegal monopoly maintenance and abuse; and (iii) have suffered other damages and injuries.

## COUNT IV

### Breach of Contract:  Tolling Agreement

### (By all Plaintiffs against UP)

163.     Oxbow fully incorporates by reference the allegations in all of the preceding paragraphs herein.

164.     On January 14, 2010, Oxbow entered into an agreement (the "Tolling Agreement") with UP to toll the statute of limitations applicable to its claims in this action.  A copy of the Tolling Agreement has been previously furnished to this court [ECF No. 26-2].

165.     The purpose of the Tolling Agreement was to facilitate business discussions of the parties in the hope that the discussions might lead to an amicable resolution of the disputes underlying Oxbow's claims against UP, without either party admitting the validity of any claims or defenses of the other party.

166.     In order to incentivize Oxbow to refrain from initiating litigation, UP agreed in the Tolling Agreement not only to toll the applicable statute of limitations but, among other things:

    a.  to "keep Oxbow reasonably informed of the status of discovery proceedings" in the then pending putative class action, *In re Rail Freight Surcharge Antitrust Litigation*, MDL No. 1869, Misc. No. 07-489 (the "MDL"), in which UP was and is a defendant (ECF No. 26-2 at ¶5); and,

    b.  in order for Oxbow to avoid "being prejudiced" for engaging in discussions, "if Oxbow becomes a party to the class action or files a

complaint, UP will take reasonable steps to facilitate Oxbow's access
to discovery" in the MDL.  [(ECF No. 26-2 at ¶6(c)).

167.    Oxbow fully performed all of its obligations under the Tolling Agreement and

satisfied all conditions to UP's performance.

168.    UP breached its obligations under the Tolling Agreement.  It made no effort to

keep Oxbow reasonably informed of discovery proceedings in the MDL, and it failed to take

reasonable steps to facilitate Oxbow's access to discovery in the MDL upon Oxbow's filing of

its initial complaint in this action.

169.    UP has continued to impede Oxbow's access to obtaining discovery in the MDL,

including access to documents that UP owns, controls, and produced in the MDL.

170.    Oxbow has repeatedly asked UP to comply with its obligations under the Tolling

Agreement, and UP has repeatedly refused or declined to comply.

171.    Oxbow asked UP to take actions to facilitate its access to discovery in the MDL

that were designed to permit UP to comply without violating the existing 2009 protective order

in the MDL.  Oxbow asked UP to provide or facilitate its access to the following MDL materials:

(a) all materials produced by UP, (b) UP's answers to interrogatories and requests for

admissions, (c) depositions of UP personnel, and (d) all other discovery materials not covered by

a protective order.  In addition, Oxbow asked UP to facilitate its access to MDL discovery, as it

had agreed, by stipulating to Oxbow becoming a party to the MDL Protective Order.  However,

UP did not provide any of the requested material or stipulate to Oxbow becoming a party to the

MDL Protective Order.

172.    Oxbow has suffered and continues to suffer damages, including without

limitation, increased legal fees as a result of UP's breaches.  Oxbow is entitled to an order

granting it specific performance of the Tolling Agreement, compelling UP to comply with its

obligations thereunder, as well as an award of damages in an amount to be established at trial

that will reimburse it for its economic losses sustained as a result of UP's breaches.

## PRAYER FOR RELIEF

WHEREFORE, Oxbow requests judgment against Defendants as follows:

(1)     On Counts I and II, that

    a.   judgment be entered against both of the Defendants adjudging and decreeing that they have violated Section 1 of the Sherman Act;

    b.   each Oxbow plaintiff be awarded three times the damages it has sustained, as shown at trial, together with legal fees, costs, interest and other relief recoverable by law;

    c.   each of the Defendants and their respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case, or from enjoying the benefits therefrom;

(2)     On Count III, that:

    a.   judgment be entered against UP that it has unlawfully monopolized and attempted to monopolize in violation of Section 2 of the Sherman Act;

    b.   judgment be entered against UP and BNSF that they have unlawfully conspired to monopolize in violation of Section 2 of the Sherman Act;

    c.   Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC be awarded three times the damages they have sustained, as shown at trial, together with legal fees, costs, interest and other relief recoverable by law.

    d.   UP, BNSF and their respective officers, directors, agents, and employees, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the monopoly or conspiracy to monopolize alleged in this case, or from enjoying the benefits therefrom; and providing for UP and BNSF to take such steps as may be necessary or proper to promote and restore competition;

(3)     On Count IV, that

    a.     UP be declared to be in breach of the Tolling Agreement and ordered
to perform in accordance with its terms;

    b.     Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC be awarded
the damages they sustained, as shown at trial, together with legal fees,
costs, interest and other relief recoverable by law;

(4)     That the Court grants such other and further relief as deemed just and proper.

### DEMAND FOR JURY TRIAL

Oxbow hereby demands a trial by jury on all issues triable to a jury.

Dated:  May 1, 2013

David Boies, admitted *pro hac vice*
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200

Robert B. Silver, admitted *pro hac vice*
Ellen Brockman
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300

Samuel C. Kaplan, D.C. Bar No. 463350
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone: (202) 237 2727

Respectfully submitted,

TROUTMAN SANDERS LLP

/s/   John R. Gerstein
John R. Gerstein, D.C. Bar No. 913228
Merril Hirsh, D.C. Bar No. 366952
901 9th Street, NW, Suite 1000
Washington, DC 20004-2134
Telephone:  (202) 274-2950

Fletcher W. Paddison
11682 El Camino Real, Suite 400
San Diego, CA 92130
Telephone:  (619) 235-4040

*Attorneys for Plaintiffs Oxbow Carbon & Minerals LLC; Oxbow Mining, LLC;*
*Oxbow Midwest Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC*