UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OXBOW CARBON & MINERALS LLC;     )
OXBOW MINING, LLC; OXBOW MIDWEST  )
CALCINING LLC; OXBOW CALCINING LLC; )
and TERROR CREEK LLC,              )
                              )
      Plaintiffs,          )
                              )   Case No. 1:11-cv-01049 (PLF)
     v.                   )
                              )   **ORAL ARGUMENT REQUESTED**
UNION PACIFIC RAILROAD COMPANY;  )
and BNSF RAILWAY COMPANY,       )
                              )
      Defendants.       )

## OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

TROUTMAN SANDERS LLP
John R. Gerstein, D.C. Bar No. 913228
Merril Hirsh, D.C. Bar No. 366952
Glenn B. Manishin, D.C. Bar No. 395724
901 9th Street, NW, Suite 1000
Washington, DC 20004-2134
Telephone: (202) 274-2950

Fletcher Paddison
11682 El Camino Real, Suite 400
San Diego, CA 92130-2092
Telephone: (858) 509-6007

BOIES SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8201

Robert B. Silver
Ellen Brockman
John Nicolaou
Mathew Schutzer
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2394

Samuel C. Kaplan, D.C. Bar No. 463350
5301 Wisconsin Ave., NW
Washington, DC 20015
Telephone: (202) 237-2727

*Attorneys for Plaintiffs Oxbow Carbon & Minerals LLC; Oxbow Mining, LLC;*
*Oxbow Midwest Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STANDARD OF REVIEW ................................................................................................ 7

FACTUAL BACKGROUND ............................................................................................ 8

   I.   THE OXBOW PLAINTIFFS ................................................................................ 8

  II.  PRIOR TO 2003, UP AND BNSF VIGOROUSLY COMPETED TO SHIP COAL
       FROM MINES IN THE UINTA BASIN AND POWDER RIVER BASIN .................... 9

      A.  Passage Of The Staggers Act In 1980 Enabled The Railroads To Set Rates Through
          Competition But Resulted In A Highly Concentrated Industry With Increased
          Opportunities For Collusion ...................................................................... 9

      B.  Prior To The UP-SP Merger, UP Agreed To Provide Trackage Rights To BNSF
          And Utah Railway That It Recognized And Said Would Preserve And Even
          Intensify Prior Competition In The Uinta Basin In The Absence Of Collusion ......... 10

      C.  Prior To The Conspiracy, The Trackage Rights Maintained Competitive Discipline
          On UP's Rates To Ship Uinta Basin Coal .................................................. 11

      D.  During The Pre-2003 Period, The Railroads Also Engaged in Vigorous Competition
          In the Powder River Basin ...................................................................... 12

 III.  THE RAILROADS AGREED TO FIX FUEL SURCHARGES AND NOT TO
       COMPETE TO SHIP COAL ................................................................................ 12

      A.  The Fuel Surcharge Conspiracy ............................................................... 13

      B.  The Agreement Not To Compete To Transport Coal .................................... 15

 IV.  THROUGH ITS ANTICOMPETITIVE CONDUCT, UP ACQUIRED MONOPOLY
       POWER IN THE UINTA BASIN ........................................................................ 16

ARGUMENT .................................................................................................................... 17

   I.   PLAINTIFFS HAVE STATED A VALID SECTION 1 CLAIM IN CONNECTION
      WITH THE DEFENDANTS' CONSPIRACY TO FIX FUEL SURCHARGES ........... 17

      A.  Plaintiffs Have Stated A Valid Section 1 Claim Based On Defendants' Conspiracy
          To Fix Fuel Surcharges ........................................................................... 17

      B.  The Amended Complaint Explains How Each Of The Oxbow Plaintiffs Was
          Injured…………………………………………………………………………… 20

    C.  Defendants Do Not Dispute That Plaintiff Oxbow Carbon & Minerals LLC Has Stated A Valid Section 1 Claim ................................................................................. 23

II. COUNTS II AND III ALLEGE A PLAUSIBLE CONSPIRACY NOT TO COMPETE THAT VIOLATED SECTIONS 1 AND 2 OF THE SHERMAN ACT .......................... 23

    A.  The Amended Complaint Defines The Basic Terms Of The Conspiracy And How It Enabled UP To Monopolize The Uinta Basin Market ........................................... 24

    B.  The Amended Complaint Plausibly Alleges The Existence Of A Conspiracy Not To Compete ..................................................................................................................... 29

        1.  The railroads' common motive to conspire supports the plausibility of the conspiracy ......................................................................................................... 29

        2.  High industry concentration and significant barriers to entry, combined with UP's admissions to the STB about market structure, plausibly reflect the existence of the conspiracy ................................................................................. 32

        3.  The cessation of competition in both the Powder River and Uinta Basins plausibly reflects the existence of the conspiracy .................................................. 33

        4.  The railroads' significantly increased rates and decreased service terms plausibly reflect the existence of the conspiracy .................................................. 42

        5.  The railroads' joint shift to public pricing plausibly reflects the existence of the conspiracy ......................................................................................................... 44

        6.  The railroads' joint shift to short-term contracts plausibly reflects the existence of the conspiracy ................................................................................................. 47

        7.  The railroads' increase in fuel surcharges in 2004 for coal beyond the already excessive amounts they were illegally charging plausibly reflects the existence of the conspiracy ................................................................................................. 50

        8.  The combination of these factors together with the fuel-surcharge conspiracy plausibly reflects the existence of the conspiracy .................................................. 51

        9.  The railroads' assertions of inconsistency do not undermine the plausibility of any of the amended complaint's allegations ....................................................... 52

III. THE COMPLAINT ALLEGES A VALID SECTION 2 CLAIM AGAINST UP FOR UNILATERAL MONOPOLIZATION .......................................................................... 55

IV. OXBOW HAS STATED A VALID CLAIM FOR BREACH OF THE TOLLING AGREEMENT ............................................................................................................. 60

V.  IF NECESSARY, THE COURT SHOULD GRANT OXBOW THE RIGHT TO REPLEAD THE CLAIMS THAT DEFENDANTS HAVE MOVED TO DISMISS……………………………..............................................................................62

CONCLUSION...........................................................................................................................63

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Advanced Technology Corp. v. Instron, Inc.*,
   No. 12-10171, 2013 WL 692936 (D. Mass. Feb. 26, 2013) ................................ 30

*Anderson News, LLC v. American Media*,
   680 F.3d 162 (2d Cir. 2012) ................................................................................. 36

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 8

*Beal Mortg., Inc. v. FDIC*,
   132 F.3d 85 (D.C. Cir. 1998) ............................................................................... 61

*Behrend v. Comcast Corp.*,
   532 F. Supp. 2d 735 (E.D. Pa. 2007) ................................................................... 56

*Belizan v. Hershon*,
   495 F.3d 686 (D.C. Cir. 2007) ............................................................................. 63

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................... passim

*Beltway Mgmt. Co. v. Lexington-Landmark Ins. Co.*,
   746 F. Supp. 1145 (D.D.C. 1990) ........................................................................ 61

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
   620 F.2d 1360 (9th Cir. 1980) .............................................................................. 22

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ................................................................................ 37

*Bradley v. Chiron Corp.*,
   136 F.3d 1317 (Fed. Cir. 1998) ............................................................................ 53

*Carefusion Corp. v. Medtronic, Inc.*,
   No. 10-cv-01111, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) .......................... 37

*Chao v. Ballista*,
   630 F. Supp. 2d 170 (D. Mass. 2009) ................................................................... 37

*City of Moundridge v. Exxon Mobil Corp.*,
   No. 04-940, 2009 WL 5385975 (D.D.C. Sept. 30, 2009) ............................... 18, 36

*Colliton v. Cravath, Swaine & Moore LLP*,
   No. 08-0400, 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) ............................... 53

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) .............................................................................................. 51

*Daniel v. Am. Bd. of Emergency Med.*,
   802 F. Supp. 912 (W.D.N.Y. 1992) ........................................................... 53

*Diskin v. Daily Racing Form, Inc.*,
   1994 WL 330229 (S.D.N.Y. July 7, 1994) .............................................. 22

*District of Columbia v. Young*,
   39 A.3d 36 (D.C. 2012)............................................................................ 61

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*,
   No. 12-60741, 2013 WL 2303764 (S.D. Fla. May 9, 2013) ................. 27

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
   504 U.S. 451 (1992)................................................................................ 55

*Erie County, Ohio v. Morton Salt, Inc.*,
   702 F.3d 860 (6th Cir. 2012).................................................. 30, 35, 39

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013) ...................................... 8, 32, 35, 36

*Fleischman v. Albany Med. Ctr.*,
   728 F. Supp. 2d 130 (N.D.N.Y. 2010) .............................................29-30

*Flynn v. S. Seamless Floors, Inc.*,
   460 F. Supp. 2d 46 (D.D.C. 2006) ......................................................... 61

*FTC v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) ............................................................... 56

*Full Draw Prods. v. Easton Sports, Inc.*,
   182 F.3d 745 (10th Cir. 1999)................................................................ 56

*Green v. Niles*,
   No. 11-1349, 2012 WL 987473 (S.D.N.Y. March 23, 2012) .............. 53

*Gulf States Reorganization Group, Inc. v. Nucor Corp.*,
   No. 11-14983, 2013 WL 3490824 (11th Cir. July 15, 2013)............... 57

*Hear-Wear Techs., LLC v. Oticon, Inc.*,
   551 F. Supp. 2d 1272 (N.D. Okla. 2008) .............................................. 53

*High Tech. Careers v. San Jose Mercury News*,
   996 F.2d 987 (9th Cir. 1993).................................................................. 37

*Hourani v. Mirtchev*,
   No. 10-1618, 2013 WL 1901013 (D.D.C. 2013) .................................. 53

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999).................................................................... 51

*In re Blood Reagents Antitrust Litig.*,
  756 F. Supp. 2d 637 (E.D. Pa. 2010) .........................................................................passim

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990)...........................................................................................44-45

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348 (N.D. Ga. 2010) ................ 59, 60

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)..................................................................................................... 31

*In re Graphics Processing Units Antitrust Litig.*,
  540 F. Supp.2d 1085 (N.D. Cal. 2007) .................................................................................. 34

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002)................................................................................................. 29

*In re OSB Antitrust Litig.*,
  No. 06-cv-826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ............... 45

*In re Packaged Ice Antitrust Litig.*,
  723 F.Supp.2d 987 (E.D. Mich. 2010)................................................................................... 27

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ........................................................................ 33, 36, 48

*In re Processed Egg Prods. Antitrust Litig.*,
  821 F. Supp. 2d 720 (E.D. Pa. 2011) .................................................................................... 37

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  587 F. Supp. 2d 27 (D.D.C. 2008) .................................................................................passim

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  287 F.R.D. 1, 29 (D.D.C. 2012)...................................................................................... 20, 26

*In re Refrigerant Compressors*,
  795 F. Supp. 2d 647 (E.D. Mich. 2011) ............................................................................... 22

*In re Southeastern Milk Antitrust Litig.*,
  555 F. Supp. 2d 934 (E.D. Tenn. 2008) .......................................................................... 26, 27

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010)........................................................................................... 32, 36

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................................................ 44

*In re Travel Agent Commission Antitrust Litig.*
  583 F.3d 896 (6th Cir. 2009)................................................................................................. 27

*In re Uranium Antitrust Litig.*,
  617 F.2d 1248 (7th Cir. 1980)............................................................................................... 22

*In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002)........................................................................21-22

*Interstate Circuit v. United States*,
306 U.S. 208, 222 (1939)....................................................................................44

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
190 F.3d 775 (7th Cir. 1999)..............................................................................56

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008)............................................................................27

*LaFlamme v. Societe Air France*,
702 F. Supp. 2d 136 (E.D.N.Y. 2010.................................................................19

*Maidhof v. Celaya*,
No. 11-C-4971, 2012 WL 1438805 (N.D. Cal. 2012) .......................................37

*Martin Marietta Corp. v. Int'l Telecommc'ns Satellite Org.*,
991 F.2d 94 (4th Cir. 1992)................................................................................62

*Maryland & Virginia Milk Producers Ass'n v. United States*,
362 U.S. 458 (1960)............................................................................................56

*Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................31

*Mayor and City Council of Baltimore, Maryland v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)...............................................................................30

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
246 F.R.D. 293 (D.D.C. 2007)...........................................................................19

*Mellon Bank, N.A. v. United Bank Corp. of N.Y.*,
31 F.3d 113 (2d Cir. 1994).................................................................................62

*Milliken & Co. v. CAN Holdings, Inc.*,
No. 08-578, 2011 WL 3444013 (W.D.N.C. Aug. 8, 2011)............................26, 27

*Nat'l ATM Council, Inc. v. Visa, Inc.*,
922 F. Supp. 2d 73 (D.D.C. 2013) .....................................................................39

*Neumann v. Reinforced Earth Co.*,
786 F.2d 424 (D.C. Cir. 1986)...........................................................................55

*N. Jackson Pharmacy, Inc. v. Express Scripts, Inc.*
345 F. Supp. 2d 1279 (N.D. Ala. 2004) .............................................................19

*Ocasio-Hernandez v. Fortuno-Burset*,
640 F.3d 1 (1st Cir. 2011).................................................................................39

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
   514 F.3d 856 (9th Cir. 2007) ............................................................................52-53

*Palmer v. BRG of Georgia, Inc.*,
   498 U.S. 46 (1990) ............................................................................................ 19

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
   173 F.3d 995 (6th Cir. 1999) ............................................................................ 29

*Ruotolo v. Fannie Mae*,
   No. 09-CV-7851, 2013 WL 989740 (S.D.N.Y. Mar. 13, 2013) ........................ 30

*Russell v. Harman Int'l Indus., Inc.*,
   No. 07-2212, 2013 WL 2237793 (D.D.C. May 22, 2013) ................................ 61

*RxUSA Wholesale Inc. v. Alcon Labs*,
   661 F. Supp. 2d 218 (E.D.N.Y. 2009) .............................................................. 27

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
   740 F.2d 980 (D.C. Cir. 1984) .......................................................................... 55

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   782 F. Supp. 2d 1059 (E.D. Cal. 2011) ............................................................ 53

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) .......................................................................... 37

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) ...................................................................... 27, 35

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) .............................................................................. 44

*Transformational Strategies Consulting, Inc. v. ACS State Healthcare, LLC*,
   526 F. Supp. 2d 66 (D.D.C. 2007) .................................................................... 62

*U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
   456 F. Supp. 2d 46 (D.D.C. 2006) .................................................................... 61

*United States ex rel Miller v. Bill Harbert Int'l Constr., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010) .......................................................................... 29

*United States v. Apple Inc.*,
   No. 12-2826, 2013 WL 3454986 (S.D.N.Y. July 10, 2013) ............................ 44

*United States v. Container Corp. of Am.*,
   393 U.S. 333 (1969) .................................................................................... 19, 44

*United States v. Griffith*,
   334 U.S. 100 (1948) .................................................................................... 56, 59

*United States v. Microsoft*,
　253 F.3d 34 (D.C. Cir. 2001) ................................................................................ 37, 55

*United States v. Socony-Vacuum Oil Co.*,
　310 U.S. 150 (1940) ............................................................................................. 18, 19

*W. Coal Traffic League v. Surface Transp. Bd.*,
　169 F.3d 775 (D.C. Cir. 1999) .................................................................................. 45

*W.A. Butler Co. v. Colgate-Palmolive Co.*,
　No.. 91-1882, 1992 WL 278008 (E.D. Pa. Sept. 30, 1992) .................................... 53

*Warren Gen. Hosp. v. Amgen, Inc.*,
　2010 WL 2326254 (D.N.J. June 7, 2010) ................................................................ 22

*Water Transp. Ass'n v. ICC*,
　722 F.2d 1025 (2d Cir. 1983) ................................................................................... 44

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
　648 F.3d 452 (6th Cir. 2011) .................................................................................... 36

## Other Authorities

1 ABA Antitrust Law Section,
　*ANTITRUST LAW DEVELOPMENTS (SEVENTH)* 245 n.111 (2012) ................................ 59

6 Phillip E. Areeda & Herbert Hovenkamp,
　*Antitrust Law* ¶ 1420b at 154 (3d ed. 2010) ............................................... 34, 35, 58

*Study of Competition in the Freight Railroad Industry*, STB *Ex Parte* No. 680, 2008 WL 4829294
　(S.T.B. Nov. 6, 2008) ............................................................................................... 38

Surface Transportation Board, Interpretation of the Term "Contract" in 49 U.S.C. § 10709, 2007
　WL 934379, at *3 (March 28, 2007) ........................................................................ 46

United States Department of Justice & Federal Trade Commission, Commentary on the
　Horizontal Merger Guidelines (March 2006), ......................................................... 60

## Rules

Federal Rules of Civil Procedure 8 ................................................................... 1, 26, 27

Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC (collectively, "Oxbow" or "the Oxbow plaintiffs") respectfully oppose defendants' motions to dismiss plaintiffs' First Amended Complaint.

## INTRODUCTION

Oxbow's Amended Complaint provides a detailed account of defendants' illegal actions, addresses the concerns that led the Court to dismiss Oxbow's initial complaint, and substantially exceeds the requirements of Fed. R. Civ. P. 8 and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Unable to attack Oxbow's Amended Complaint on its merits, defendants' motions to dismiss (i) ignore or mischaracterize Oxbow's allegations; (ii) recycle previously discredited points; (iii) wrongly conflate the legal requirements that apply to well-pleaded factual allegations with those that apply to legal conclusions; and (iv) improperly rely on conjecture and extra-record material.

Defendants' arguments in favor of dismissal at the pleading stage depend both on assuming facts nowhere in the pleadings, and indeed contrary to the actual allegations, and ignoring the allegations that the Amended Complaint actually makes.  Oxbow does not believe that defendants will be able to support their version of the facts at trial, or at summary judgment. More important for the current motion, defendants' factual assumptions and disputes with the well-pleaded factual allegations of the Amended Complaint have no place in a Rule 12 motion.

In this lawsuit, Oxbow seeks redress for violations by Union Pacific Railroad Company ("UP") and BNSF Railway Company ("BNSF") of Sections 1 and 2 of the Sherman Act that dramatically raised the price for transportation that each of the Oxbow plaintiffs paid to ship coal, petroleum coke ("petcoke") and other products by rail from 2004 to approximately 2012.

The conspiracy that Oxbow alleges was the natural, albeit illegal, by-product of concerns that both defendants shared—competition was keeping their profits down, and in their competitive environment, unilateral price increases were too risky.  BNSF stated:

> We need to achieve price rate improvement.  How can we do this if the other competing railroads do not do this at the same time?

UP observed that any strategy to increase coal rates unilaterally would have been "dangerous in the extreme."  Conspiracy was their solution.

UP and BNSF conspired with the eastern railroads to fix prices by imposing so-called "fuel surcharges" that were calculated as a percentage of base rates, unrelated to and well in excess of actual fuel costs that the railroads incurred.  At the same time, UP and BNSF also conspired to cease competition for each other's coal customers – which alone accounted for more than 40% of all freight shipped by rail, more than any other product.  Previously vigorous competition to ship coal had kept rates low and led to the loss of major contracts for both UP and BNSF in the year leading up to the conspiracy.  The conspiracy not to compete enabled the railroads to raise base rates significantly on their customers and protected the fuel-surcharge conspiracy from base-rate and service competition that would have undercut the fuel-surcharge conspiracy for coal (the commodity representing the greatest percentage of railcar traffic).

The Amended Complaint addresses the issues that led this Court, by order of February 26, 2013, to dismiss the initial complaint in this action with leave to replead.  Plaintiffs address the Court's concern that plaintiffs' fuel-surcharge claim lacked "adequate facts concerning how any individual plaintiff was harmed by the alleged conspiracy" by adding specific allegations explaining that each plaintiff was a direct purchaser of rail shipment services for coal, petcoke, or both, and that each directly paid fuel surcharges as a result of the defendants' conspiracy that it would not have paid in the absence of the conspiracy.  February

26, 2013 Order ("Op.") [Dkt. 50] at 7.  The Amended Complaint also quantifies the amount of illegal fuel surcharges that each plaintiff paid to the defendants.  Defendants concede the sufficiency of plaintiffs' direct-purchaser allegations with respect to the largest purchaser, plaintiff Oxbow Carbon & Minerals LLC ("Oxbow Carbon").  Moreover, defendants' motions ignore specific allegations from the Amended Complaint establishing that each of the four remaining plaintiffs paid illegal fuel surcharges to defendants as a direct purchaser that it would not have paid in the absence of the defendants' conspiracy.

Defendants' only other fuel-surcharge challenge rests on the false premise that Oxbow has alleged a "separate" fuel-surcharge conspiracy with respect to coal.  Oxbow is not alleging any such separate conspiracy.  As alleged by Oxbow, the railroads entered into a conspiracy with respect to all products, including coal, to (i) apply fuel surcharges to all shipments and not to negotiate such charges with individual shippers, (ii) use a formula based on the Highway Diesel Fuel ("HDF") index to calculate them, and (iii) calculate the charge as a percentage of base rates rather than in a manner designed to recover actual fuel costs incurred for the shippers' transportation.  These same elements applied to all products, including coal, for the duration of the conspiracy.  Moreover, BNSF and UP charged coal shippers precisely the same fuel surcharge as all other products for the first year of the conspiracy.  The Amended Complaint simply alleges that a year into the conspiracy, and while continuing to apply the same elements referred to above, BNSF and UP *worsened* the conspiracy's impact for coal shippers by *increasing* the percentages that each applied to coal base rates by slightly different amounts above the floor that the conspiracy had previously established.  The slight differences between the two increases – and the issue of whether the railroads actually agreed to those specific amounts – are of no legal significance given that the coal fuel surcharges were part of the same

conspiracy and in light of the settled law that conspirators need not charge exactly the same prices to violate Section 1.

The Amended Complaint also addresses the Court's prior concern that Oxbow had not adequately explained the nature of the conspiracy to monopolize, and in particular, "which market UP and BNSF allegedly agreed to allocate to UP." Op. at 15. The customer-allocation conspiracy alleged in the Amended Complaint constituted a *per se* violation of Section 1 of the Sherman Act, and violated Section 2 because it enabled UP to monopolize the Uinta Basin – a distinct geographic market in western Colorado and eastern Utah. UP and BNSF both admitted, and the STB found, that BNSF's competitive presence in the Uinta Basin and bidding for customers had constrained UP's ability to increase rates prior to the conspiracy and thus prevented UP from acquiring monopoly power there. BNSF, however, had no appreciable customer base in the Uinta Basin. Indeed, it lacked any competitive presence prior to its acquisition of trackage rights, which it received in 1996 as a condition of UP's merger with Southern Pacific Railroad ("SP"). The agreement not to compete for each other's coal customers ceded the Uinta Basin to UP while protecting BNSF's customer base from competition in the Powder River Basin where vigorous competition had similarly kept rates low prior to the conspiracy. UP thereby gained the ability that (by the railroads' admission) it previously lacked to impose significant rate increases on Uinta Basin shippers, while maintaining a market share of approximately 100% in the region.

Defendants' motions do not dispute the sufficiency of the Amended Complaint's allegations that (1) the Uinta Basin is a relevant market; (2) BNSF's competitive presence in the region prevented UP from acquiring monopoly power over the Uinta Basin market prior to the conspiracy; and (3) UP subsequently increased rates to 200-250% of prior levels while

maintaining a market share of approximately 100 percent.  Nor could UP dispute such
allegations – UP itself previously argued in this case that Uinta Basin coal does not compete with
coal from the Powder River Basin, and UP and BNSF both admitted to the STB (and the STB
found) that BNSF had constrained UP's rates in the Uinta Basin, preventing UP from exercising
monopoly power in the Uinta Basin market.

The railroads' arguments for dismissal based on the Supreme Court's *Twombly* decision
similarly ignore the Court's prior conclusion that Oxbow has alleged more than the naked
parallel conduct "of the sort deemed insufficient by the Court in *Twombly*."  Instead, they simply
repeat their previously discredited arguments, while also failing to account for the significant
amount of additional factual and analytical detail in the Amended Complaint.  Op. at 15.  The
Amended Complaint continues to allege the same combination of factors that formed the basis
for the Court's conclusion, including:

- a highly concentrated industry susceptible to collusion;

- the fuel-surcharge conspiracy, the plausibility of which has already been found;

- cessation of previously vigorous competition, coupled with the submission of
  sham bids by non-incumbents that were far in excess of the bids submitted by
  incumbents;

- a move to public pricing for competitively served traffic that had always moved
  by confidential contract;

- significant increases in rates and reductions in service terms;

- a refusal to offer long-term contracts that even BNSF has acknowledged
  confirmed that the railroads no longer feared competition; and

- all the above factors occurring within a defined and short period of time.

The Amended Complaint also adds significant additional detail that further establishes
the plausibility of the conspiracy not to compete, including:

- UP's own admissions to the STB that cessation of competition and rate increases could not be achieved unilaterally;

- The allegation that BNSF stopped submitting competitive bids for Uinta Basin coal after the commencement of the conspiracy;

- Additional allegations concerning shippers in the Powder River Basin that previously had experienced competitive bidding and contract switching but could not obtain competitive bids after the commencement of the conspiracy;

- The experience of individuals in the business of negotiating with the railroads who had the opportunity to view the railroads' anticompetitive bidding practices over the course of multiple negotiations;

- UP and BNSF's own statements and STB findings that competitive pressure from BNSF had maintained rates for Uinta Basin coal at competitive levels prior to the conspiracy; and

- Additional pre and post-conspiracy rate data for both the Uinta and Powder River Basins demonstrating significant increases in both regions/markets in the years following the conspiracy even as UP has maintained a market share of approximately 100% in the Uinta Basin.

Because the Amended Complaint clearly addresses the deficiencies identified by the Court in its order and amplifies the detail that led the Court to conclude that Oxbow has alleged more than parallel conduct, the railroads invent confusion about the Amended Complaint's allegations and demand additional detail about the inner workings of the conspiracy that is not required at the pleading stage. None of their points alter the basic fact that Oxbow has put the railroads on notice as to the alleged violations of Sections 1 and 2 of the Sherman Act and provided a more than plausible basis for inferring that their suspect conduct resulted from conspiracy, not coincidence.

Additionally, and in the alternative, Oxbow has stated a valid claim against UP for unilateral monopolization even in the absence of the conspiracy not to compete. By entering into the fuel-surcharge conspiracy, agreeing as part of that conspiracy not to discount base rates to cancel out the impact of the fuel surcharges, and then publicly signaling prices to BNSF while

failing to compete for new business, UP ensured that there would be no competition for new coal business.  It thereby monopolized the Uinta Basin by eliminating the competitive constraint that BNSF had previously imposed on UP's pricing in the region.  UP fails to offer any legitimate justification for its conduct or any basis for its contention that the conduct alleged does not constitute exclusionary conduct under Section 2.  Far from it, UP itself admitted to the STB that competition depended upon the railroads' not knowing each other's proposed prices, and the STB and D.C. Circuit have similarly recognized the importance of confidential contracting to preventing collusion in the highly concentrated railroad industry.

UP, moreover, addresses public pricing only in isolation.  It thus does not even attempt to defend the legality of moving to public pricing at the same time that it entered into a plausibly alleged price-fixing agreement and stopped competing, and following a prior attempt by BNSF to signal prices.  Further, the fuel-surcharge conspiracy by itself illegally increased UP's monopoly power by enabling UP to raise as-delivered prices and therefore the ceiling on prices it could charge to mine owners in the Uinta Basin.

Accordingly, for the foregoing reasons, and as discussed more fully below, defendants' respective motions should be denied.

## STANDARD OF REVIEW

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Op. at 3-4 (internal citations and quotation marks omitted) (ellipses in original).  The facts alleged must "state a claim for relief that is plausible on its face," but "detailed factual allegations" are not required to withstand a motion to dismiss under Rule 12(b)(6).  Op. at 4.

A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). *See Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement."); *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the fact finder"). "Determining whether a complaint states a plausible claim" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "In considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all of the factual allegations contained in the complaint," and plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged." Op. at 4 (internal citations and quotation marks omitted).

## FACTUAL BACKGROUND

## I.      THE OXBOW PLAINTIFFS

Each of the Oxbow plaintiffs in this action directly contracts with UP or BNSF to ship coal and/or petroleum coke by rail. Am. Compl. ¶¶ 8-13, 137. Three of the Oxbow plaintiffs contract with UP to ship coal. Oxbow Carbon & Minerals LLC ("Oxbow Carbon") contracts with UP for the rail shipment of coal from mines in the Uinta Basin – a coal mining region in western Colorado and eastern Utah that produces a highly desirable form of coal that is both high energy and environmentally attractive because of its low sulfur content. Am. Compl. ¶¶ 9, 32.

One of those mines is the Elk Creek mine near Somerset, Colorado, which is owned and operated by plaintiff Oxbow Mining, LLC.  Am. Compl. ¶ 10.  Oxbow Mining, LLC, contracts with UP for certain shipments from the mine, while Oxbow Carbon contracts with UP for other shipments.  Am. Compl. ¶ 10.  Terror Creek LLC both contracts directly and through Oxbow Carbon, acting as its agent, to ship stoker coal, an egg-shaped coal generally used for fuel in automatically fired stoves.  Am. Compl. ¶ 11.

Three of the Oxbow plaintiffs contract directly to ship petcoke – a byproduct of the process of refining petroleum into gasoline that can be used as a utility and industrial fuel source or "calcined" to make anodes for the aluminum, steel and titanium smelting industries.  Am. Compl. ¶¶ 8, 9, 137.  Oxbow Carbon contracts directly to ship petcoke from refineries located throughout the western United States, including but not limited to California, Wyoming, and Kansas.  Am. Compl. ¶¶ 8, 9, 137.  Oxbow Calcining LLC receives petcoke by rail, treats the petcoke at its calcining facilities in Oklahoma, Louisiana, and Texas, and then ships calcined coke to end users by rail.  Am. Compl. ¶¶ 8, 12, 137.  Oxbow Midwest Calcining LLC does the same with respect to its Illinois calcining facility.  Am. Compl. ¶¶ 8, 13, 137.  These companies each paid illegal fuel surcharges imposed by defendants in amounts specified in the Amended Complaint.  Am. Compl. ¶¶ 8, 9, 12, 13, 137.

## II.     PRIOR TO 2003, UP AND BNSF VIGOROUSLY COMPETED TO SHIP COAL FROM MINES IN THE UINTA BASIN AND POWDER RIVER BASIN

### A.     Passage Of The Staggers Act In 1980 Enabled The Railroads To Set Rates Through Competition But Resulted In A Highly Concentrated Industry With Increased Opportunities For Collusion

With the passage of the Staggers Act in 1980, Congress sought to create a modern, competitive, and healthy railroad industry through the introduction of competition and market principles.  Am. Compl. ¶¶ 23-24.  Rather than have rates set according to federally-mandated

tariffs as had been the case for nearly a century, Congress generally permitted railroads to set rates and service terms in private transportation contracts that were not subject to government approval.  Am. Compl. ¶¶ 23-24.  Presently, more than 80% of all U.S. rail freight shipments move under terms that are not regulated by any government agency.  Am. Compl. ¶ 26.

Since the passage of the Staggers Act, the railroad industry has seen dramatic consolidation.  Am. Compl. ¶ 27.  The number of Class I railroads has been reduced from 35 to 7, with four railroads – UP and BNSF in the western United States and CSX and Norfolk Southern in the eastern United States – receiving 90 percent of all freight revenue.  Am. Compl. ¶ 27.  The last significant industry consolidation occurred in 1996 with the merger of UP and Southern Pacific Railroad ("SP"), two of the three largest railroads in the western United States at the time.  Am. Compl. ¶ 28.

## B.   Prior To The UP-SP Merger, UP Agreed To Provide Trackage Rights To BNSF And Utah Railway That It Recognized And Said Would Preserve And Even Intensify Prior Competition In The Uinta Basin In The Absence Of Collusion

In connection with its filing for merger approval, UP agreed to provide trackage rights along the Central Corridor to both BNSF and Utah Railway, a Class III carrier that provides service to and from Utah coal mines.  Am. Compl. ¶¶ 28, 36-37.  The "Central Corridor" is a 1,200 mile stretch of track from Denver, Colorado to Stockton, California, that includes the only effective means for transporting coal for any significant distance from the Uinta Basin mines in Colorado and Utah.  Am. Compl. ¶¶ 6, 31-33.  The Uinta Basin is a coal mining region in western Colorado and eastern Utah that produces a very desirable type of low sulfur, high BTU coal.  Am. Compl. ¶ 32.

The trackage-rights agreement gave BNSF access to Utah rail shippers that had previously been served by UP and SP and allowed BNSF to serve new facilities located along the

tracks of the combined UP/SP after the merger.  Am. Compl. ¶¶ 35-36.  Utah Railway received

rights that enabled it to pick up coal at the Utah mines to which it had existing rights and

transport it along the Central Corridor to junctions where UP, BNSF, or both, would provide

further transportation service.  Am. Compl. ¶ 37.

Prior to the merger, competition had limited the rates that could be charged to mine

owners, including those served by only one railroad.  Am. Compl. ¶ 34.  Because Uinta Basin

coal is generally fungible regardless of which mine produces it, utilities and purchasers of such

coal are particularly price sensitive.  *Id.* ¶ 34.  Thus, competition limited the prices a railroad

could charge to the mines it alone served because excessive increases would have prevented the

mines from delivering the coal to customers at a competitive price.  Am. Compl. ¶¶ 34-35.

Responding to the objection that only divestiture of the Central Corridor would preserve

competition after the consolidation of the UP and SP rail systems, UP represented that in the

absence of collusion, the trackage rights would preserve, and intensify, the competition that had

previously existed with respect to Uinta Basin coal and prevent UP from acquiring a monopoly.

Am. Compl. ¶¶ 6, 38-39.  UP also specifically attacked suggestions by witnesses in the merger

proceeding that coal rates would be subject to a strategy of refraining from bidding aggressively

to increase rate levels, labeling such a strategy "dangerous in the extreme" and asserting that

attempting to set rates at higher levels for Uinta Basin coal "would risk the loss of traffic to a

Utah Railway-BN/Santa Fe interline movement."  Am. Compl. ¶ 105.

**C.**   **Prior To The Conspiracy, The Trackage Rights Maintained Competitive
Discipline On UP's Rates To Ship Uinta Basin Coal**

As both the STB and railroads recognized, the trackage rights conditions had the intended

effect prior to 2003 of imposing competitive discipline on rates for shipping coal from Uinta

Basin mines.  Am. Compl. ¶¶ 40-45.  Recognizing that the "most important indicator of the

impact of BNSF's Central Corridor traffic rights is the effect that BNSF's presence in the market has on the rates offered by UP," the STB concluded that BNSF's "presence has placed a competitive discipline on UP's rates both in the Central Corridor *and with respect to Utah/Colorado coal*."  Am. Compl. ¶ 43 (emphasis added).   UP similarly reported that its "rates for Utah and Colorado coal have remained highly competitive" and that the "trackage rights continue to act as a competitive check on UP."  Am. Compl. ¶ 44.  BNSF agreed in 2000 that the "evidence submitted by UP establishes that BNSF's presence has placed a competitive discipline on UP's rates in general *and in the Central Corridor and with respect to Utah/Colorado coal*."  Am. Compl. ¶ 45 (emphasis added).

> **D.  During The Pre-2003 Period, The Railroads Also Engaged in Vigorous Competition In the Powder River Basin**

The period from 1996 to 2003 was not just a period of competitive prices in the Uinta Basin.  Am. Compl. ¶ 46.  It also was a period of competitive prices generally for commercial rail freight service.  *Id*.  This competition included vigorous competition to ship lower Btu coal from the Powder River Basin.  Am. Compl. ¶¶ 92, 95.  During this period, coal shippers served by more than one railroad regularly received more than one competitive bid, and large transportation contracts regularly changed hands.  Am. Compl. ¶ 92.  Just prior to the commencement of the conspiracy, BNSF won contracts to ship coal to Dynergy and Georgia Power, both previously served by UP, costing UP an estimated $50 million in annual revenue.  Am. Compl. ¶ 92.  In March 2003, UP underbid BNSF to win a five-year contract to ship 2.4 million tons of coal per year to the Omaha Public Power District.  Am. Compl. ¶ 92.

## III.   THE RAILROADS AGREED TO FIX FUEL SURCHARGES AND NOT TO COMPETE TO SHIP COAL

Not everyone was pleased by the low prices that resulted from this competition.  As one BNSF executive commented in 2002:  "We need to be able to achieve price rate improvement.

*How can we do this if the other competing railroads do not do this at the same time?*"  Am.

Compl. ¶ 47 (emphasis added).  The solution that the railroads found to this competitive

predicament was collusion.  Beginning in the second half of 2003, the railroads entered into a

conspiracy to increase revenue by (i) imposing across-the-board, non-negotiable "fuel

surcharges" on all customers and for all products; and (ii) agreeing not to compete with each

other to ship coal.  Am. Compl. ¶ 49.

### A.    The Fuel Surcharge Conspiracy

Beginning in 2003, UP and BNSF together with the eastern railroads conspired to

enhance revenues by adopting a charge to shippers that the railroads called a "fuel surcharge,"

but that was actually calculated as a percentage of base rates unrelated to the actual fuel costs the

railroads incurred.  Am. Compl. ¶¶ 2-3, 52-81.  Following passage of the Staggers Act, railroads

typically entered into private freight transportation contracts that included cost-adjustment

mechanisms.  Am. Compl. ¶ 50.  Those mechanisms typically relied on a price index called the

"All Inclusive Index" ("AII") – a compilation the Association of American Railroads ("AAR")

publishes based on data received by the railroads – or the Rail Cost Adjustment Factor

("RCAF"), published by the STB.  *Id*.[1]  Both the AII and RCAF took fuel costs into account in

their proportion to reflect the actual impact of particular price increases on overall rail

transportation costs.  *Id*.  Railroads would in certain instances attempt to impose fuel surcharges

on rail freight transportation, but the application was neither uniform nor consistent and each

defendant had different fuel surcharge formulas.  Am. Compl. ¶ 51.  UP and BNSF used fuel

surcharges for a minimal portion of their contracts and adjusted their respective fuel surcharges

using different indexes.  Am. Compl. ¶ 56.

---

[1] The AAR is a railroad trade organization that the four major Railroads control and dominate.  Am. Compl. ¶ 50.

Beginning in July 2003, BNSF and UP conspired to use the same industry fuel index for new fuel surcharge formulas that calculated a surcharge as a percentage of the base transportation rate.  Am. Compl. ¶ 56.  To ensure coordination with BNSF, on July of 2003, UP switched from the West Texas Intermediate ("WTI") index, which it had been using to calculate its fuel surcharge, to the U.S. Department of Energy On-Highway Diesel Fuel Price ("HDF") index used by BNSF in July of 2003.  *Id.*  Although UP had modified its fuel surcharges just three months earlier using the WTI Index, UP suddenly changed course to match BNSF's use of the HDF index  *Id.*

UP and BNSF also conspired to apply the HDF index in a way that operated to impose identical rail fuel surcharges on shippers.  Am. Compl. ¶ 57.  They used the same formula for determining how frequently and how much it would increase (2% for every $.20 increase in the HDF index above $1.35 per gallon) and the same method for announcing and applying the formula (applying it to shipments beginning in the second month after a change in the HDF).  Am. Compl. ¶¶ 57-58.[2]  The railroads also uniformly refused to negotiate any changes to the formulas.  Am. Compl. ¶ 73.  A year following the commencement of the conspiracy, UP and BNSF further increased the fuel surcharge percentages for coal.  Am. Compl. ¶¶ 82-84.

BNSF and UP also conspired with the eastern railroads to cause the AAR to announce, for the first time in its 60-year history, a new index with the name – "All-Inclusive Index – Less Fuel" ("AII-LF") – that removed fuel costs from the AII.  Am. Compl. ¶¶ 61-63.  Replacing the AII and RCAF with the AII-LF allowed the defendants on a widespread basis to apply a separate, agreed-upon "fuel surcharge," added as a percentage increase to the whole base rail

---

[2] BNSF ostensibly used a trigger point of $1.25, but this difference had no practical effect.  Am. Compl. ¶ 57.  The UP and BNSF fuel surcharge programs provided for identical fuel surcharges after the $1.35 threshold was exceeded and, in practice, that threshold was always exceeded.  *Id.*

transportation rate, without regard to what effect fuel costs had on the total cost.  Am. Compl. ¶ 62.

On January 25, 2007, an STB administrative ruling concluded that computing rail fuel surcharges as a percentage of the base rail freight rate for regulated rail traffic was an "unreasonable practice" because it stood "virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied."  Am. Compl. ¶ 87.  The STB also found that the use of the term "fuel surcharge" to describe this method of assessing charges on shippers was itself deliberately misleading.  Am. Compl. ¶ 88.

On November 7, 2008, the Court determined that these allegations plausibly stated a conspiracy to fix prices under the antitrust laws.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008).  Rejecting a challenge under *Twombly*, the Court concluded that the complaint had alleged "substantially more" than the bare allegations of parallel conduct contained in the *Twombly* complaint.  *Id*. at 32.  The Court further emphasized that the change in fuel pricing was "complex and completely new" – a factor that made "an inference of a conspiratorial agreement from parallel behavior more plausible."  *Id.* at 34.  That conclusion applies equally to the facts and allegations in this case.

## B.    The Agreement Not To Compete To Transport Coal

At the same time that UP and BNSF agreed with the eastern railroads to impose non-negotiable, rate-based fuel surcharges on shippers, UP and BNSF agreed not to compete for each other's coal customers.  Am. Compl. ¶ 91.   Continuation of the previously vigorous competition that had existed with respect to coal would have undermined the fuel-surcharge conspiracy for the commodity that represented the largest percentage of railcar traffic.  *Id*.  As part of this agreement BNSF agreed not to use its trackage rights to compete to serve shippers of Uinta Basin coal.  Am. Compl. ¶¶ 91, 102.  BNSF therefore stopped submitting competitive bids to

ship Uinta Basin coal and continued to do so even after UP began to raise rates significantly in the region.  Am. Compl. ¶ 102.

The same cessation of competition occurred in the Powder River Basin.  Whereas shippers served by more than one railroad regularly received more than one competitive bid prior to 2004, starting in or about 2004, UP and BNSF stopped offering competitive bids for each other's customers.  Am. Compl. ¶ 94.  As a result, the incumbent railroad retained the business no matter what unfavorable terms it sought to impose.  *Id*.  The non-incumbent railroads, moreover, regularly submitted bids containing rates that were well in excess of the already high bids submitted by incumbent railroads.  Am. Compl. ¶¶ 95, 99.  UP and BNSF also sharply departed from prior practice in various other ways that facilitated and reflected their illegal conspiracy.  These practices included the use of public pricing circulars and short-term contracts, significant increases in rates, the refusal to offer service commitments and rate-adjustment mechanisms designed to track actual cost changes, as well as the joint refusal to offer contract rate proposals to shippers who were willing to establish physical access to the non-incumbent by designing and building out their own tracks.  Am. Compl. ¶¶ 96, 107-122.

## IV.    THROUGH ITS ANTICOMPETITIVE CONDUCT, UP ACQUIRED MONOPOLY POWER IN THE UINTA BASIN

As a result of its anticompetitive conduct, UP acquired illicit monopoly power in the Uinta Basin.  Average rates using shipper railcars in the Uinta Basin increased by 8% from 2000-2003, but increased by 71.5% from 2004-2007.  Am. Compl. ¶ 108.  Similarly, average rates using railroad railcars increased 29% from 2000-2003, but increased by 70.2% from 2004-2007.  *Id*.  Average rates and Oxbow's rates for 2010 were both more than 200% of 2004 rates.  *Id*.  UP has been able to impose these rates even as it maintains an approximate market share of 100% for the rail shipment of coal mined in the Uinta Basin.  Am. Compl. ¶ 129.

**ARGUMENT**

## I. PLAINTIFFS HAVE STATED A VALID SECTION 1 CLAIM IN CONNECTION WITH THE DEFENDANTS' CONSPIRACY TO FIX FUEL SURCHARGES

Oxbow alleges in the Amended Complaint that starting in 2003 with meetings at a trade association convention and in a sharp departure from prior practice, UP and BNSF conspired to impose non-negotiable fuel surcharges, which were calculated as a percentage of base rates unrelated to actual fuel costs that the railroads incurred to provide the transportation. Am. Compl. ¶¶ 2-4, 8, 46-90, 137-142. The railroads assessed these surcharges on shipments by all of their customers, including the Oxbow plaintiffs, and on all products, including coal and petcoke. *Id.*

Defendants UP and BNSF assert that the Section 1 fuel-surcharge claims of all but Oxbow Carbon should be dismissed for two reasons: (a) that the Amended Complaint does not contain sufficient allegations that the fuel surcharges imposed on coal shipments in later years (2004 and thereafter) were the result of a conspiracy, and (b) that the Amended Complaint does not contain adequate detail on the injury sustained by plaintiffs other than Oxbow Carbon. Memorandum of Points and Authorities in Support of Defendant Union Pacific Railroad Company's Motion to Dismiss Plaintiffs' First Amended Complaint ("UP Mem.") [Dkt 54-1], at 8; Memorandum of Points and Authorities in Support of Defendant BNSF Railway Company's Motion to Dismiss Plaintiffs' First Amended Complaint ("BNSF Mem.") [Dkt 55], at 11-15. As discussed below, neither of these arguments has merit. Defendants also do not dispute that Oxbow Carbon has stated a valid Section 1 claim. *See* Section I(C).

### A. Plaintiffs Have Stated A Valid Section 1 Claim Based On Defendants' Conspiracy To Fix Fuel Surcharges

The Amended Complaint alleges that beginning in 2003, UP and BNSF conspired to impose identical, non-negotiable rate-based fuel surcharges for all customers and on all products,

including coal.  Am. Compl. ¶¶ 52-65, 72-78.  These allegations are the same in all respects as those the Court held sufficient to state a Section 1 claim for relief in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp.2d 27 (D.D.C. 2008).  Defendants do not challenge the sufficiency of these allegations for purposes of this motion to dismiss.

The fuel surcharge that applied to coal throughout the duration of the conspiracy utilized the same combination of parameters:  *i.e.*, it was calculated as a percentage of the base rate and thus did not serve as an actual cost recovery mechanism; it required inclusion of the AIILF in the contract instead of the RCAF; it was based on the same HDF index; it was non-negotiable; and it applied changes to the HDF average price calculation beginning in the second month following the change.  Am. Compl. ¶ 83.  The only distinction is that over one year after the commencement of the conspiracy (and accompanied by an agreement not to compete at all for new coal business as alleged in Count II of the Amended Complaint), UP and BNSF *increased* the previously identical percentages that applied to the base rate for coal by slightly different amounts (.75 percent for every 5 cent increase for UP v. .625 percent for every 5 cent increase for BNSF).  Am. Compl. ¶ 84.

These allegations establish that the fuel surcharges for coal were part of the same conspiracy.  Indeed, in light of the allegations, it is inconceivable that they were the product of independent action.  It also has been well-established for decades that a Section 1 conspiracy need not result in identical prices to be actionable under Section 1.  *See City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) *aff'd sub nom. City of Moundridge, KS v. Exxon Mobil Corp.*, 409 F. App'x 362 (D.C. Cir. 2011) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-23 (1940) ("Nor is it important that

the prices paid by the combination were not fixed in the sense that they were uniform and

inflexible. . . . An agreement to pay or charge rigid, uniform prices would be an illegal agreement

under the Sherman Act.  But so would agreements to raise or lower prices whatever machinery

for price-fixing was used.") (emphasis added).[3]

BNSF and UP offer no basis for asserting or concluding otherwise.  Instead, they portray

the increases in the fuel surcharge percentage for coal shippers as a "separate conspiracy."  UP

Mem. at 8; BNSF Mem. at 11-13.  This argument ignores that the railroads already had entered

into a fuel-surcharge conspiracy with the same elements that applied to all products including

coal.  The increase merely worsened the impact of the fuel-surcharge conspiracy for coal

shippers.  As "with all other products covered by the fuel surcharge conspiracy, UP and BNSF

*continued* to calculate their fuel surcharges" using the same features that had been part of the

conspiracy entered into by the four major railroads from the outset.  Am. Compl. ¶ 83 (emphasis

added).  *See* Am. Compl. ¶ 3 ("*The fuel surcharge conspiracy* imposed *even more severe*

*burdens* on coal shippers when UP and BNSF later raised the percentage of coal shippers' base

rates that determined the fuel surcharge.")  It is therefore ultimately beside the point whether UP

---

[3] *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) ("The continuation of some price competition is not fatal to the Government's case. The limitation or reduction of price competition brings the case within the ban, for as we held in *United States v. Socony-Vacuum Oil Co.*," 310 U.S. 150, 222-23 (1940), "interference with the setting of price by free market forces is unlawful per se."); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48-49 (1990) (summarily reversing lower court opinion that per se unlawful horizontal price fixing required an explicit agreement on prices to be charged or that one party have the right to be consulted about the other's prices.) (citing *Socony-Vacuum*); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 309 (D.D.C. 2007) ("'neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that the price range was affected generally.'") (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001)); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) ("The court agrees that illegal price fixing need not be exactly simultaneous and identical in order to give rise to an inference of agreement.") (citing *Socony-Vacuum*, among other cases); *N. Jackson Pharmacy, Inc. v. Express Scripts Inc.*, 345 F. Supp. 2d 1279, 1295 (N.D. Ala. 2004) ("The Defendants argue that 'these nebulous allegations of similar rates or prices do not support the inference that there was any conspiracy to fix such rates or prices.'  Illicit price-fixing does not require a finding that the prices set are 'uniform and inflexible.'") (citations omitted).

and BNSF agreed to further increase coal fuel surcharges or whether they made that decision independently.  In either case, the Amended Complaint makes clear that the coal fuel surcharges were part of the same fuel-surcharge conspiracy between UP and BNSF that the Court already has found to be plausibly alleged.

Defendants also fail to acknowledge the inconsistency of their position with this Court's prior certification of the class in the MDL proceeding.  The class was defined as

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing.")  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 29, 74 (D.D.C. 2012), *vacated on other grounds*, ___ F.3d ___, 2013 WL 4038561 (D.C. Cir. Aug. 9, 2013).

This class definition includes coal purchasers, for which the fuel surcharge also applied as a percentage of the base rate.[4]  Thus, the railroads' arguments amount to a baseless *sub silentio* attack on the Court's certification decision as to the most important product shipped by rail.  Am. Compl. ¶ 82.

## B. The Amended Complaint Explains How Each Of The Oxbow Plaintiffs Was Injured

In its opinion dismissing Oxbow's original complaint, the Court found, "Absent from the Complaint are any facts about which plaintiffs purchased freight transportation services from defendants, or which plaintiffs paid the alleged surcharge."  Op. at 8.  As a result, the Court stated it could not "identify within the Complaint the basic facts to support an inference that each plaintiff was harmed by the imposition of *any* surcharge."  *Id*. (emphasis in original).

---

[4]  The recent vacatur of the Court's certification order was unrelated to asserted differences between coal shippers and other class members or any issue that is relevant to UP and BNSF's motions.

The Amended Complaint addresses this issue.  It identifies the Oxbow entities that directly paid fuel surcharges that they would not have paid but for the fuel-surcharge conspiracy, the specific products for which they paid them, and the dollar amount of the wrongfully imposed charges.  Am. Compl. ¶¶ 8-13, 134-142.

BNSF asserts that Oxbow "does not allege that four of the five named plaintiffs" – *i.e.*, other than Oxbow Carbon – "paid the allegedly inflated fuel surcharge directly to either of the Defendants."  BNSF Mem. at 13-15.  This is simply incorrect.  The Amended Complaint alleges that Oxbow Mining, LLC, contracts "directly as the 'shipper'" to ship coal from the Elk Creek Mine, Am. Compl. ¶ 10, and that "Both" Oxbow Mining and Oxbow Carbon "paid the illegal fuel surcharge that **UP** imposed for shipments from the Elk Creek Mine as the proximate result of the conspiracy between UP and BNSF."  *See* Am. Compl. ¶ 141 (emphasis added).  The Elk Creek mine, moreover, was "served by **UP** and located on an approximately 70-mile **UP rail spur**."  Am. Compl. ¶ 141 (emphasis added).  There is accordingly no basis for BNSF's assertion that it cannot tell whether Oxbow Mining paid the fuel surcharge to "UP, BNSF, or some other railroad."  BNSF Mem. at 14.

Similarly, the Amended Complaint alleges that Oxbow Calcining LLC and Oxbow Midwest Calcining LLC "each **directly** paid illegal fuel surcharges for the shipment of petroleum coke ('petcoke') that they would not have paid but for the fuel surcharge conspiracy."  *See* Am. Compl. ¶ 8.  The Amended Complaint further alleges that these companies paid $3.6 million in wrongfully imposed fuel surcharges "as direct purchasers" and that their injury resulted from "**Defendants'** illegal conduct," not the conduct of "some other railroad."   Am. Compl. ¶¶ 8, 137.  Identification of which defendant Oxbow paid is irrelevant given that each is jointly and severally liable for illegal fuel surcharges paid as a result of the conspiracy.  *See In re Vitamins*

*Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002); *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980); *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257 (7th Cir. 1980) (all holding that antitrust co-conspirators are jointly and severally liable for damages caused by the conspiracy).[5]

The Amended Complaint alleges that "Terror Creek LLC "paid fuel surcharges for the shipment of coal that" it "would not have paid but for the fuel surcharge conspiracy." Am. Compl. ¶ 8. BNSF asserts that it is unclear whether Terror Creek purchased coal directly or through Oxbow Carbon as its agent but cites no authority for the proposition that a principal is precluded from asserting a claim for a direct purchase made by an agent (so long as both do not assert the same claim). BNSF Mem. at 15. To the contrary, the lone case cited by BNSF (*see* BNSF Mem. at 15), makes clear the opposite – *i.e.*, that a principal may recover for a purchase made by an agent. *See Diskin v. Daily Racing Form, Inc.*, 1994 WL 330229, *5 (S.D.N.Y. July 7, 1994).

Accordingly, unlike the inapposite cases cited by BNSF, this case presents no question of direct purchaser injury and standing with respect to any of the plaintiffs. *See* BNSF Mem. at 15; *Warren Gen. Hosp. v. Amgen, Inc.*, 2010 WL 2326254, at *3 (D.N.J. June 7, 2010) (finding a lack of standing where there was "no question" that the plaintiff had purchased the product from a "middleman wholesaler"); *In re Refrigerant Compressors*, 795 F. Supp. 2d 647, 659 (E.D. Mich. 2011) (allegation was insufficient where the plaintiff's definition of "compressor" (the product at issue) included products containing compressors and thus made it unclear whether the plaintiff was a direct purchaser).

---

[5] Though a precise breakdown as to the relative amount paid to each defendant is legally unnecessary because both are jointly and severally liable, as a matter of information, Oxbow Midwest Calcining LLC directly paid its fuel surcharges to BNSF, and Oxbow Calcining LLC directly paid approximately 70 percent of its fuel surcharges to UP and 30% to BNSF.

C.   **Defendants Do Not Dispute That Plaintiff Oxbow Carbon & Minerals LLC Has Stated A Valid Section 1 Claim**

As BNSF recognizes, the Amended Complaint "specifies that Oxbow Carbon & Minerals LLC contracts with UP for shipment of coal and contracts with both UP and BNSF for shipment of petroleum coke." BNSF Mem. at 14. There is accordingly no dispute that plaintiff Oxbow Carbon has sufficiently alleged direct purchaser standing with respect to both coal and petcoke. Defendants' only other argument applies only to coal and not petcoke, and is wrong for the reasons discussed in subsection I(A). There is accordingly no dispute that Oxbow Carbon has stated a valid Section 1 claim.

II.   **COUNTS II AND III ALLEGE A PLAUSIBLE CONSPIRACY NOT TO COMPETE THAT VIOLATED SECTIONS 1 AND 2 OF THE SHERMAN ACT**

The Court dismissed Oxbow's complaint with respect to its Section 2 conspiracy claim with leave to replead based on its conclusion that "the Complaint lacks factual allegations about how the alleged agreement came about, the basic terms of the agreement itself, or how the defendants used the agreement to monopolize the rail freight market." Op. at 15. In particular, the Court noted that in the initial Complaint, "Plaintiffs do not once explicitly specify which market UP and BNSF allegedly agreed to allocate to UP, but rather suggest that UP and BNSF continued to serve their respective incumbent customers within the same markets." Op. at 15. Oxbow demonstrates in Section II(A) below that plaintiffs have addressed the issues identified by the Court.

The Court's order simultaneously recognized that "defendants overstate the degree to which plaintiffs allege only parallel conduct" with respect to the conspiracy not to compete and that the Amended Complaint "alleges a parallel sudden shift in defendants' conduct in the context of an industry structure conducive to collusion and alongside an alleged conspiracy regarding pricing." Op. at 15. The Amended Complaint contains all of the allegations that

supported the Court's original conclusion, together with numerous additional allegations that further confirm the plausibility of plaintiffs' conspiracy allegations.  As Oxbow demonstrates in Section II(B), defendants' motions simply repeat the same arguments, ignore additional allegations provided by the Amended Complaint, and thus, do nothing to refute Oxbow's showing of a plausible conspiracy that violates both Sections 1 and 2 of the Sherman Act.

###    A.    The Amended Complaint Defines The Basic Terms Of The Conspiracy And How It Enabled UP To Monopolize The Uinta Basin Market

The basic terms of the conspiracy not to compete are that UP and BNSF agreed that they would not compete for each other's coal customers.  Am. Compl. ¶¶ 49, 91.  This conspiracy ended UP and BNSF's previously vigorous competition for each other's coal customers in the Powder River Basin.  Am. Compl. ¶¶ 49, 92-99, 102.  Further, it enabled UP to monopolize the Uinta Basin by eliminating the competitive constraint that, as the STB found and both UP and BNSF admitted, BNSF's Central Corridor trackage rights and aggressive bidding for UP's customers had previously imposed on UP's pricing in the region.  Am. Compl. ¶¶ 40-45, 49, 102, 123-129.  UP thereafter significantly increased rates in the region even as it maintained a market share of approximately 100%.  Am. Compl. ¶¶ 108, 129.  The Uinta Basin is a distinct antitrust market by virtue of the characteristics of Uinta Basin coal and the nature and location of the customers who purchase it.  Am. Compl. ¶¶ 32-34, 36, 127-128.

The conspiracy came about because in the view of the railroads, previously vigorous competition had led to the need to increase rates.  Am. Compl. ¶¶ 40-48, 91-93.  In the Uinta Basin, both UP and BNSF understood and represented, and the STB found, that competitive pressure from BNSF had forced UP to maintain coal rates at competitive levels to avoid losing business to BNSF.  Am. Compl.  ¶¶ 43-45.  Similarly, in the Powder River Basin, vigorous competition had maintained rates at competitive levels, and large coal transportation contracts

regularly changed hands; this competition led to the loss of major coal contracts for both UP and BNSF in the year prior to the conspiracy.  Am. Compl. ¶¶ 92, 109.

Both BNSF and UP, moreover, had recognized the inability to impose significant rate increases unilaterally.  UP lost major coal contracts in the year preceding the conspiracy and had long recognized (in statements that defendants fail to address) that a strategy of attempting to raise coal prices unilaterally would be far too risky.  *See* Am. Compl. ¶ 105 (asserting that a strategy of attempting to raise coal rates unilaterally would be "dangerous in the extreme" and that setting rates at higher levels for Uinta Basin coal "would risk the loss of traffic to a Utah Railway-BN/Santa Fe interline movement"); *see also* Section II(B)(2) *infra* (further discussing UP's representations to the STB that the market structure could be expected to foster competition).  BNSF similarly lost a major contract to deliver 2.4 million tons of coal per year for five years to OPPD after BNSF publicly signaled increased rates in early 2003 and refused to negotiate the rates.  Am. Compl. ¶ 116; *see also* Am. Compl. ¶ 47 (quoting a BNSF executive as stating "We need to be able to achieve price rate improvement.  How can we do this if the other competing railroads do not do this at the same time?").

The conspiracy not to compete also directly advanced the fuel-surcharge conspiracy by preventing "competition on base rates, rate adjustment provisions (including for changes in fuel costs), and service terms that would have undercut the fuel surcharge conspiracy for the commodity that represented the greatest percentage of railcar traffic."  Am. Compl. ¶ 91.  BNSF disregards these allegations in asserting that Oxbow has failed to explain how the fuel-surcharge conspiracy and the conspiracy not to compete "are connected or why these agreements would have been formed together."  BNSF Mem. at 18.  Further, evidence relied on in the Court's class certification opinion establishes that part of the fuel-surcharge conspiracy was a directive not to

discount base rates to counteract the impact of the fuel surcharges. *See In re Rail Freight Fuel Surcharge Antitrust Litigation*, 287 F.R.D. at 58-59; *see also* note 4 *supra*. This finding further confirms that the cessation of competition directly advanced the fuel-surcharge conspiracy.

Oxbow thus has made more than ample allegations under Rule 8 to put BNSF and UP on notice of the nature of the alleged conspiracy. Offering no basis for a contrary conclusion, defendants ask for additional detail that neither *Twombly* nor this Court's order required and that is unnecessary to notify them as to the basic terms of the conspiracy. Defendants, for example, fault the Amended Complaint for failing to supply more specificity as to the individuals or precise meetings involved in forming the conspiracy. The Amended Complaint, however, specifies the basic terms of the conspiracy as well as its timing (the second half of 2003, the same time as the fuel-surcharge conspiracy) and explains the connection between the two agreements.[6] The high-level meetings that provided the occasion to discuss the fuel-surcharge conspiracy provided the same opportunity to discuss the conspiracy not to compete. *See* Am. Compl. ¶¶ 53, 62-63. *Twombly* does not require more information where, as here, the Amended Complaint rests not on direct allegations of an agreement but rather on conduct that gives rise to a plausible inference of conspiracy. Instead, as this Court recognized in the MDL case, "Rule 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled

---

[6] In falsely asserting that Oxbow alleges only an agreement not to compete "at some unknown time and on some unknown occasion," UP Mem. at 11, UP ignores the allegation that the market-allocation agreement was entered into at the same time as the fuel-surcharge conspiracy. Am. Compl. ¶ 91; *see also* Am. Compl. ¶ 49 (stating that the conspiracy began in "the second half of 2003"). BNSF acknowledges the allegation but complains that the Amended Complaint does not identify whether the agreement was made "at exactly the same time and place, and by the same persons." BNSF Mem. at 18. BNSF does not, however, explain why such detail is necessary to put defendants on notice of plaintiffs' claim. *See Milliken & Co. v. CAN Holdings, Inc.*, No. 08-578, 2011 WL 3444013, at *1 (W.D.N.C. Aug. 8, 2011) (upholding the sufficiency of the complaint's allegations that a conspiracy began in "late 1994 or early 1995"); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 944 (E.D. Tenn. 2008) (upholding the sufficiency of allegations despite the complaint being "somewhat weak on allegations related to 'when'"); *see also* note 7 *infra*.

to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *In re Rail Freight Fuel Surcharge Litig.*, 587 F. Supp.2d at 31 (quoting *Twombly*, 550 U.S. at 555) (ellipses and brackets in original).[7]

The railroads' contrary contention repeats the same misquotation that Oxbow previously pointed out in connection with the prior motion.  UP asserts that footnote 10 of *Twombly* requires allegations "of a specific time, place, or person involved in the alleged conspirac[y],' or 'when and where the illicit agreement took place.'"  UP Mem. at 10-11 (quoting *Twombly*, 550 U.S. at 565 n.10) (brackets in UP brief).  As noted previously, the full quote in *Twombly* actually states: "***If*** the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by Rule 8."  *Twombly*, 550 U.S. at 565 n.10 (emphasis added).

---

[7] *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) ("In this case, as in *Twombly*, the claim of agreement rests on the parallel conduct described in the complaint. Therefore, plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation."); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1004 (E.D. Mich. 2010) ("Although Defendants dismiss each of the pieces of evidence offered as either 'conclusory hearsay' or lacking the 'who, what, when, and where,' *Twombly* does not require the latter nor does Plaintiffs' [complaint] contain only the former."); *Milliken & Co. v. CAN Holdings, Inc.*, 2011 WL 3444013, at *5 (W.D.N.C. Aug. 8, 2011) ("Even when a plaintiff does not answer all of the specific questions about who, what, when and where, a plaintiff can still survive a motion to dismiss."); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) ("These complaints, while not answering all specific questions about 'who, what, when, and where,' do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their complaints exist.").

By contrast, none of the cases cited by defendants involved conduct that, as here, gives rise to a plausible inference of conspiracy.  *See, e.g., Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, No. 12-60741, 2013 WL 2303764, at *10 (S.D. Fla. May 9, 2013) (holding that the conduct alleged – sending a letter to promote duty-free stores that carried its products – was "not only compatible with, but more likely explained by, lawful, unchoreographed free-market behavior"); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (notwithstanding the opportunity for discovery, plaintiffs identified no conduct suggesting a conspiracy); *In re Travel Agent Commission Antitrust Litig.* 583 F.3d 896, 908-09 (6th Cir. 2009) (no allegation that the two defendants ever even met and the complaint on its face suggested an obvious explanation (technological innovations in the airline ticketing industry) that explained a reduction in commissions far better than a conspiracy); *RxUSA Wholesale Inc. v. Alcon Labs*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009) ("conduct claimed to be conspiratorial is nothing more than the continuation of preexisting distribution patterns").

The Supreme Court in *Twombly* did not find that *Twombly*'s complaint provided inadequate notice, much less hold that plaintiffs must know these particulars in order to file a complaint.

Defendants also claim that the Amended Complaint should provide additional detail with respect to the railroads' use of sham bidding.  But nothing in the Court's order or *Twombly* requires such a showing given that the Amended Complaint defines the conspiracy not to compete and given that the factors discussed in Section II(B) plausibly establish its existence. Nor do defendants' objections otherwise have merit.  Contrary to BNSF's assertion that it is unclear whether the defendants used refusals to bid or sham bids to effect the conspiracy, the Amended Complaint provides examples of both, and both are evidence of conspiracy.  *See* Am. Compl. ¶¶ 94-99; BNSF Mem. at 20.

Similarly, UP's professed confusion as to how public pricing facilitated sham bidding makes no sense when (1) such signaling tells competitors that if they bid higher than the signaled rate, they will not acquire the business, (2) UP itself admitted to the STB that aggressive competition depended upon the railroads' "*Not knowing each other's actual prices, present or proposed*," (3) the STB itself has recognized the competitive dangers posed by such practices, and (4) the railroads have never offered *any* legitimate justification for the move to public pricing, let alone just as they stopped competing and began to fix fuel surcharges (*see infra* at 44-47); UP Mem. at 24-26; Am. Compl. ¶¶ 106, 116, 118-119, 157, 159.  UP's contention that significant communications or an "elaborate system" would have been required is, apart from being conclusory, both inaccurate and irrelevant.  UP Mem. at 11.  It is wrong for all of the reasons already stated and because, as Judge Posner for the Seventh Circuit has recognized, elaborate communications are unnecessary to coordinate prices in a highly concentrated

industry.[8]   Am. Compl. ¶¶ 27, 29, 48.  UP's contention also is irrelevant because nothing in the

Amended Complaint precludes the existence of such communications, while nothing in *Twombly*

requires the plaintiffs to detail such communications at the pleading stage.  Instead, it requires

only that the conduct alleged, as here, give rise to a plausible inference of conspiracy.[9]

### B.   The Amended Complaint Plausibly Alleges The Existence Of A Conspiracy Not To Compete

#### 1.   The railroads' common motive to conspire supports the plausibility of the conspiracy

As the foregoing description of the terms of the conspiracy reflects, both railroads gained

an enormous amount from entering into this conspiracy – namely, insulation from previously

vigorous competition to ship coal, the consequent ability to raise base rates on their customers

with impunity, and the stability of the fuel-surcharge conspiracy as to the most important

commodity shipped by rail.  *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009-10

(6th Cir. 1999) (denying summary judgment where plaintiff had proven, among other things, that

both defendants had an incentive to impose "adverse splits against the new entrant" but that it

was "highly unlikely" for either to do so absent "an agreement"); *In re Blood Reagents Antitrust*

*Litig.*, 756 F. Supp. 2d 637, 643 (E.D. Pa. 2010) (denying motion to dismiss where complaint

alleged, among other things, that recent unprofitability in the relevant market provided evidence

of a motive to collude); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 160 (N.D.N.Y.

---

[8] *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (holding that the five original defendants in the case "accounted during the period of the alleged conspiracy for 90 percent of the sales of the product.  Therefore elaborate communications, quick to be detected, would not have been necessary to enable pricing to be coordinated.  And if one seller broke ranks, the others would quickly discover the fact, and so the seller would have gained little from cheating on his coconspirators").

[9] UP's lone case on this issue involved, as UP admits, only a naked allegation of bid rigging and thus lacked any of the allegations discussed in Section II(B).  *See* UP Mem. at 11 (citing *United States ex rel Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 882 (D.C. Cir. 2010)).

2010) (denying summary judgment where plaintiff had proven, among other things, that there was "potential for enormous gains" as a result of defendants' agreement to depress wages "because nurses represent the 'largest single cost for hospitals.'").

There is accordingly no merit to UP's suggestion that BNSF lacked a plausible motive to refrain from competing in the Uinta Basin.  UP Mem. at 14.  BNSF exchanged the ability to compete in a region where it had no appreciable customer base to obtain protection from competition for its customer base in the Powder River Basin – a far larger market and the source of virtually all of BNSF's coal business.[10]  None of the cases cited by defendants addressing motive involved a similarly lucrative *quid pro quo*, or indeed, any *quid pro quo* at all.  UP Mem. at 15-16.[11]

_____

[10] In addition to disregarding what BNSF gained by entering into the conspiracy, UP's argument assumes without any basis, and contrary to the only relevant allegation of the Amended Complaint, that BNSF had an appreciable customer base in the Uinta Basin at the time of the conspiracy.  The Amended Complaint alleges that BNSF had a 0% market share in the Uinta Basin prior to 1996.  Am. Compl. ¶ 36.  The most that BNSF was able to achieve thereafter were successful bids to transport Utah coal "on a number of occasions."  Am. Compl. ¶ 42.  Moreover, the Amended Complaint makes clear (based on the STB's findings and UP and BNSF's own admissions) that BNSF's presence in the market kept UP from imposing significant rate increases precisely so that it would ***not*** lose substantial business to BNSF.  Am. Compl. ¶¶ 43-45.  There is no basis for UP's assumption, which is critical to UP's argument, that BNSF ever accumulated a significant customer base, let alone that it maintained a significant customer base at the commencement of the conspiracy.  As the STB recognized, the "most important indicator of the impact of BNSF's Central Corridor traffic rights" was not share, but instead "the effect that BNSF's presence in the market has on the rates offered by UP" – the precise competitive constraint that the conspiracy eliminated.  Am. Compl. ¶ 43.

[11]  Instead, the cases cited by defendants involved allegations that on the face of the complaint made it clear that the defendants had no motive to conspire.  In *Mayor and City Council of Baltimore, Maryland v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013), for example, where the plaintiffs alleged a conspiracy to exit a particular market, the motive allegations related "almost exclusively to Defendants' joint motivation to conspire to *support* the market."  (emphasis in original).  In *Advanced Technology Corp. v. Instron, Inc.*, No. 12-10171, 2013 WL 692936, at *6 (D. Mass. Feb. 26, 2013), the defendants had no motive to conspire to block a standard because a single vote could do so, and so no conspiracy was necessary.  *See also Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 871-72 (6th Cir. 2012) (the incentive to sham bid only made sense under an interpretation of an Ohio law that the plaintiff had specifically disavowed); *Ruotolo v. Fannie Mae*, No. 09-CV-7851, 2013 WL 989740, at *5 (S.D.N.Y. Mar. 13, 2013) (Fannie Mae had no motive to conspire with its sales agents to keep prices low on houses that it owned).

Nor is there any sense to UP's apparent suggestion that because the Powder River Basin and Uinta Basin are separate antitrust markets, they cannot logically be part of the same conspiracy. UP Mem. at 17. The fact that Powder River Basin coal is only partially substitutable for Uinta Basin coal for consumers has nothing to do whether a conspiracy that encompassed both regions plausibly benefited both parties. *See* Am. Compl. ¶¶ 127-128. As discussed above, there is no question that it did.

Moreover, a conspiracy not to compete with respect to coal would naturally have included neighboring coal-producing regions.[12] And even assuming that UP and BNSF could have reached a different agreement that would have allowed BNSF to continue to constrain UP's rates in the Uinta Basin, the Amended Complaint alleges that they did not, and the fuel-surcharge conspiracy and various additional allegations support an inference of conspiracy with respect to *both* regions.[13] The conspiracy as alleged is thus quite logical if one is willing to violate the Sherman Act to achieve it.

---

[12] The relationship between the markets in this case thus bears no relationship to the markets at issue in cases UP cites. In *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51-52 (2d Cir. 2007), the plaintiffs attempted to use allegations of anticompetitive conduct in Europe to establish anticompetitive conduct in the United States resting entirely on conclusory allegations. Here, by contrast, various factors establish that the conspiracy applied to both regions, including the fact that the price-fixing conspiracy applied in both markets and the cessation of competition with accompanying increases in rates similarly occurred in both markets at the same time. *See* note 13 *infra*. The only other case cited – *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986) – involved the Court's inapposite determination at summary judgment that the plaintiffs had implausibly asserted that the defendants had conspired to sell products at a loss in the United States for decades with the expectation of eventually driving out competition. By contrast, as discussed in the text, both railroads reaped immediate dividends from the conspiracy.

[13] Those factors, discussed in other sections, include (1) BNSF "stopped submitting competitive bids for Utah coal" (Am. Compl. ¶ 102); (2) UP and BNSF's own statements and the STB's finding, that prior to the conspiracy competitive pressure from BNSF had constrained UP's coal rates in the region (Am. Compl. ¶¶ 35, 43-45); (3) UP's recognition that a strategy of attempting to increase rates unilaterally in the region would have been "dangerous in the extreme" and would have risked "the loss of traffic to a Utah Railway-BN/Santa Fe interline movement" (Am. Compl. ¶ 105); (4) UP switched to public pricing in both regions (Am. Compl. ¶ 117-119); (5) The cessation of competition in the Uinta Basin occurred at the same time as the cessation of competition in the Powder River Basin and fuel-surcharge conspiracy,

### 2. High industry concentration and significant barriers to entry, combined with UP's admissions to the STB about market structure, plausibly reflect the existence of the conspiracy

The market structure of the rail freight industry, and UP's own admissions that such a structure would naturally have fostered competition in the absence of an agreement, further demonstrate the plausibility of the conspiracy. The only significant Class I carriers in the western United States following the 1996 UP-SP merger have been UP and BNSF, and there are "significant barriers to entry" in the railroad industry. Am. Compl. ¶¶ 29, 48. Allegations concerning "an industry structure that facilitates collusion constitutes supporting evidence of collusion." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010) (denying motion to dismiss where complaint alleged, among other things, that four defendants controlled 90 percent of the market). *See also Evergreen Partnering Grp.*, 720 F.3d at 48 (denying motion to dismiss based in part on the allegation that the five producer defendants controlled 90 percent of the market); *see also* Op. at 15 (citing plaintiffs' allegation that the relevant conduct took place "in the context of an industry structure conducive to collusion").

UP itself told the STB that absent an agreement, the railroads could be expected to compete aggressively. According to UP, a strategy of refraining from bidding aggressively to increase rate levels would be "dangerous in the extreme and could readily result in a multi-year loss of substantial traffic and associated revenue." Am. Compl. ¶ 105. UP specifically emphasized that this was true in the Uinta Basin, asserting that setting rates at higher levels for

---

which applied to both regions (Am. Compl. ¶¶ 94-99, 102-103); (6) UP significantly increased rates in the Uinta Basin (Am. Compl. ¶¶ 108); and (7) UP maintained a 100 percent market share in the region, notwithstanding the increase in rates (Am. Compl. ¶ 129). UP's assertion that Oxbow has not alleged "specific instances" where BNSF did not submit a bid in the Uinta Basin, UP Mem. at 12, fails to account for all of the foregoing allegations, which readily establish an across the board failure to compete in the region. *See also* Am. Compl. ¶¶ 92, 94-101, 109 (discussing the accompanying cessation of competition and increased rates in the Powder River Basin).

Utah/Colorado coal "would risk the loss of traffic to a Utah Railway-BN/Santa Fe interline movement."  *Id*.

UP further mocked as the "esoterica of the classroom, not the stuff of facts," the suggestion that UP and BNSF might "magically" arrive at a "simple understanding that each would not aggressively pursue business in corridors that the other had dominated in the past, ***corridors where they had trackage rights*** or corridors where the other had made substantial investments."  Am. Compl. ¶ 106 (emphasis added).  Instead, according to UP: "Not knowing each other's actual prices, present or proposed, the railroads can be expected, in pursuit of their self-interests, to seek business and aggressively to compete, holding no respect for the other's traffic and indeed seeing that traffic as something to be sought in the interest of revenue and profit enhancement."  *Id*. ¶ 106.  UP cannot now contradict what it then said in securing approval of one of the largest mergers in industry history.  Nor can it dismiss as not plausible the very propositions on rates and competition that it made to the federal government – let alone in a motion to dismiss where Oxbow's allegations must be presumed true and Oxbow is entitled to the benefit of all reasonable inferences.

> **3.  The cessation of competition in both the Powder River and Uinta Basins plausibly reflects the existence of the conspiracy**

The railroads' simultaneous decision not to compete for each other's customers in departure from a prior history of vigorous competition plausibly demonstrates the existence of the conspiracy not to compete for one another's customers.  *See* Am. Compl. ¶¶ 91-106.  The prior competition (together with the admissions from UP discussed in the prior subsection) demonstrates the joint understanding of the parties that such competition was in the parties' self-interest absent agreement.  *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011) (a conspiracy was plausible where the challenged conduct

carried a "significant risk that competitors won't follow"); *see also In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d at 642 (holding that a competitor's cancellation of a contract coupled with an announced intent to raise prices "cut against its self-interest" by providing a rival "with an opportunity to increase its share" of the market).

The prior competition described in this case is the opposite of the situation in *Twombly*, where there had been no competition prior to the asserted conspiracy and where the complaint was "replete with indications" that any attempt to compete in another ILEC's region would have "faced nearly insurmountable barriers to profitability." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 568; *see also id.* (prior to the conspiracy, monopoly "was the norm in telecommunications, not the exception"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d at 35 ("plaintiffs' allegations that 'there was a marked change in defendants' behavior in the market around the time the conspiracy allegedly started . . . . if true would make an antitrust conspiracy plausible'") (quoting *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1096 (N.D. Cal. 2007)) (ellipses in original).

The inference of conspiracy resulting from the joint cessation of competition is even stronger because non-incumbents repeatedly submitted bids that were far higher than already inflated bids of incumbents, again in departure from a prior history of vigorous competition. Am. Compl. ¶¶ 95, 99. As the Areeda & Hovenkamp treatise recognizes: "A strong inference of coordinated behavior arises when a participant actively seeks to lose a bid. Deliberate sacrifice of a contract implies an unusual confidence that the winning party will return the favor. Moreover, spurious bidding indicates an awareness of wrongdoing coupled with a desire to hide it by simulating normal bidding. A spurious bid is almost always anticompetitive." 6 Phillip E.

Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1420b at 154 (3d ed. 2010).  *See Erie County*, 702 F.3d at 871 (quoting this language with approval).

Neither UP nor BNSF offer an "obvious alternative explanation" for this joint cessation of previously vigorous competition, coupled with sham bids.  *Twombly*, 550 U.S. at 567.  UP speculates that the failure to compete could have resulted from an independent but identical and uniform response to decreased capacity and increased demand.  This argument does nothing to undermine the inference of conspiracy, first because UP supports it exclusively with material from outside the complaint – specifically, statements in STB documents about demand and capacity trends (even though the Court already has held that such documents are not properly subject to judicial notice) and a statement from the National Coal Transportation Association that similarly is not subject to judicial notice.  UP Mem. at 19-20; Memorandum Opinion and Order granting in part and denying in part request for judicial notice [Dkt. 46], at 2.  *See Evergreen Partnering Group, Inc.*, 720 F.3d at 45 ("At these early stages in the litigation, the court has no substantiated basis in the record to credit a defendant's counterallegations.  Instead, we may at this early stage only accept as true all factual allegations contained in a complaint, make all reasonable inferences in favor of the plaintiff, and properly refrain from any conjecture as to whether conspiracy allegations may prove deficient at the summary judgment or later stages.").

Further, at the motion to dismiss stage, a plaintiff need not allege facts that eliminate all possible lawful explanations for challenged conduct.  *See Erie County*, 702 F.3d at 869 ("a plaintiff need not allege a fact pattern that 'tends to exclude the possibility' of lawful independent conduct.").[14]  "Rational people, after all, do not conspire in the open, and a plaintiff

---

[14] *See also* II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 307d1 (3d ed. 2007) ("The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment."); *Starr*, 592 F.3d at 325 (rejecting the contention that a plaintiff "'must allege facts that tend to

is very unlikely to have factual information that would exclude the possibility of non-conspiratorial explanations *before* discovery." *Id.* at 869 (emphasis in original). "'Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleading stage;'" thus, the plausibility of one explanation "'does not render all other reasons implausible.'" *Id.* at 868 (quoting *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011)). *See also Evergreen Partnering Group,* 720 F.3d at 46 (It is "clear that allegations contextualizing" a Section 1 "agreement need not make any unlawful agreement more likely than independent action nor need they rule out the possibility of independent action at the motion to dismiss stage."); *Anderson News, LLC v. American Media*, 680 F.3d 162, 189 (2d Cir. 2012) ("The question at the pleading stage is not whether there is a plausible *alternative* to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible") (emphasis in original); *In re Text Messaging Antitrust Litig.*, 630 F.3d at 629 (holding that although a complaint "must establish a nonnegligible probability that the claim is valid," "the probability need *not* be as great as such terms as 'preponderance of the evidence' connote") (emphasis added).

Instead, to justify a motion to dismiss, there must be an "*obvious alternative explanation*," rooted either in "common economic experience" or the facts alleged in the complaint. *Twombly*, 550 U.S. at 565-567 (emphasis added).[15] Indeed, it has been found that

---

exclude independent self-interested conduct as an explanation for defendants' parallel behavior"); *City of Moundridge v. Exxon Mobile Corp.*, 250 F.R.D. 1, 4-5 (D.D.C. 2008) (holding that allegations need not exclude the possibility of independent conduct at the pleading stage); *In re Plasma-Derivative Protein Therapies Antitrust Litig.,* 764 F. Supp. 2d at 1002 ("It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants.  That is the standard appropriate for a summary judgment motion."); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 637, 642 (E.D. Pa. 2010) (*Twombly* does not require "an antitrust plaintiff to plead facts that, if true, definitively rule out all possible innocent explanations").

[15]  In addition to the cases cited in the text, the Court in *In re Plasma-Derivative Protein Therapies Antitrust Litigation*, denied a motion to dismiss even though it recognized that defendants had a

such an explanation cannot prevail unless plaintiffs' pleading "on its face" "*inexorably*" supports the defendants' proffered justification.  *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 720, 730 (E.D. Pa. 2011) (emphasis added) (internal citation omitted).[16]

UP's explanation does not come close to meeting this standard.  It does not rely upon "common economic experience" or the facts alleged in the Amended Complaint.  Instead, the Amended Complaint's allegations, including UP's own admissions to the STB, specifically negate its proffered explanation (see below), and UP relies upon material that is outside the

---

"somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with the firms' independent self-interest," because the court concluded that under *Twombly* "the plaintiffs need only allege a conspiracy which is plausible in light of the competing explanations."  764 F. Supp. 2d at 999-1002.  Similarly in *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 637, 642-43 (E.D. Pa. 2010), the Court applied the "obvious alternative explanation" standard in denying the defendants' motion to dismiss plaintiffs' Section 1 claim.  *See also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible.") (emphasis in original); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009) ("Not every potential lawful explanation for the defendant's conduct renders the plaintiff's theory implausible. Just as a plaintiff cannot proceed if his allegations are merely consistent with a defendant's liability, so a defendant is not entitled to dismissal if the facts are merely consistent with lawful conduct.") (internal citations and quotations omitted); *Maidhof v. Celaya*, No. 11-C-4971, 2012 WL 1438805, at *7 (N.D. Cal. 2012) ("Contrary to Defendants' assertions, *Iqbal*, did not hold that *any* obvious alternative explanation was sufficient to defeat a complaint.  Rather, the Court examined the extraordinarily persuasive alternative explanation before it and concluded that this alternative explanation was so likely to be true that, as between the two explanations, *Iqbal*'s explanation was not plausible.  In contrast, Defendants' interpretation of the facts alleged does not render Plaintiffs' explanation implausible.") (internal citations and quotations omitted) (emphasis in original); *Chao v. Ballista*, 630 F. Supp. 2d 170, 177 (D. Mass. 2009) ("A complaint should only be dismissed at the pleading stage where the allegations are so broad, and the alternative explanations so overwhelming, that the claims no longer appear plausible.").

[16]  Whether a defendant has offered a valid business justification for its conduct, or whether the proffered justification is instead merely pretextual, is an inquiry that occurs throughout antitrust law.  *See, e.g., United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir. 2001).  As courts long have recognized, such pretext determinations are questions of fact that often cannot be resolved even on motions for summary judgment, let alone on motions to dismiss.  *See, e.g., High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("Whether valid business reasons motivated a monopolist's conduct is a question of fact."); *Carefusion Corp. v. Medtronic, Inc.*, No. 10-cv-01111, 2010 WL 4509821, at *9 (N.D. Cal. Nov. 1, 2010) ("whether 'valid business decisions' motivated Defendants' conduct is a question of fact inappropriate for review at the pleading stage") (internal citation omitted).  *Twombly* does not change this body of law.

complaint.[17]  As reflected by UP's reliance on such material, it is not "obvious" that a railroad

would respond to increased demand by focusing on existing customers rather than taking

advantage of the leverage the increased demand gives them to compete for new customers.  Nor

is it obvious that capacity constraints existed, let alone to such an extent that they could account

for a simultaneous, joint and uniform cessation of competition throughout the period in question.

Further, although Oxbow is not required to do so, the allegations of the Amended

Complaint negate UP's proffered explanation.  UP specifically represented to the STB that

aggressive competition was in the railroads' self-interest and did not qualify those

representations with the phrase "unless demand increases."  Am. Compl. ¶¶ 105-106.  Instead, its

own statements demonstrate that, even if a railroad would otherwise have been inclined to refrain

from competing for new business, it would have been exceedingly risky and thus irrational to do

so without the confidence that the railroad's competitor would do the same.  *Id*.  The risks of

doing so would only have been further exacerbated by significantly raising rates at the same time

and in light of the vigorous competition described in the Amended Complaint that preceded the

conspiracy.  *See* Am. Compl.  ¶¶ 91-113.

The Amended Complaint further alleges that "the railroads had ample capacity to take on

new business profitably throughout the period."  Am. Compl. ¶ 100.[18]  The railroads also

---

[17]  Reliance on such material is particularly inappropriate where, as here, their proffered excuse for significant increases in rates and diminished service between 2004 and 2006 was and remains the subject of intense debate.  *See, e.g.,* FERC (Docket No. AD06-08-000) (2006 Federal Energy Regulatory Commission proceeding on the causes of increased rail rates and diminished service); *Study of Competition in the Freight Railroad Industry*, STB *Ex Parte* No. 680, 2008 WL 4829294 (S.T.B. Nov. 6, 2008) (2008 STB proceeding seeking public comment on an independent study analyzing, among other issues, competition, rail capacity, and the interplay between the two).

[18]  UP's assertion that this allegation is "conclusory" ignores the other allegations discussed in the text and confuses the pleading of facts (which must be presumed true under *Twombly* and *Iqbal*) with the elements of a cause of action which require more than a conclusory assertion.  UP Mem. at 20 n.7.  Both *Twombly* and *Iqbal* make clear that they did not intend to eliminate the presumption that factual allegations are true.  Instead, "the Supreme Court's concerns about conclusory allegations expressed in *Twombly* and *Iqbal*

"continued to fail to compete even during the economic downturn and period of reduced demand that began in 2008." *Id*. Their proffered rationale cannot account for this continued failure to compete. UP also cannot account for the coincidence that the failure to compete began at the same time as the plausibly alleged fuel surcharge conspiracy and other conduct discussed herein.

Nor can UP's explanation account for the submission of sham bids by non-incumbents that were far in excess of the already high bids of incumbent railroads. As discussed above, such bids are quintessentially collusive. Indeed, UP's lone source for its capacity constraints explanation itself predicts only that an overcapacity situation would yield a situation where "the 'competitive' bid for new business" would be only "*slightly* higher than the existing rate." *See* UP Mem. at 19 (emphasis added). By contrast, Ameren reported that the bids of non-incumbents were an average of 43 percent higher than the bids of incumbents. Am. Compl. ¶ 95. Moreover, individuals with the opportunity to view the railroads' behavior over the course of multiple negotiations reported that Ameren's experience was typical of coal shippers generally:  non-incumbents routinely submitted bids that were well in excess of the already high bids submitted by incumbents. Am. Compl. ¶ 99. Further refuting UP's explanation, non-incumbents never attempted to justify these bids as resulting from capacity constraints but rather claimed that their unrealistically high bids were the "market rate" even though the same railroad would cite a far lower "market rate" when bidding as the incumbent. *Id*. UP ignores these allegations, which

---

focused on allegations of ultimate legal conclusions and on unadorned recitations of a cause-of-action's elements couched as factual assertions." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2011) (noting that the allegations in *Twombly* that defendants "engaged in parallel conduct" were not dismissed as conclusory). Neither of the two cases cited by UP is to the contrary; instead, those cases simply rejected allegations that were unclear and implausible on their face. *See Nat'l ATM Council, Inc. v. Visa, Inc.*, 922 F. Supp. 2d 73, 86-87 (D.D.C. 2013) (rejecting an allegation that certain ATM networks were less costly because it did not explain what it meant by less costly or allege that the networks charged anyone for using their facilities); *Erie County*, 702 F.3d at 873 (finding that an allegation that sham bidding in one market caused other markets to become "'less dense and therefore less susceptible to effective competition' simply does not follow").

further demonstrate that its proffered explanation cannot account for the joint cessation of competition alleged in the Amended Complaint.

BNSF does not even attempt to offer an obvious alternative explanation for the joint failure to compete.  Instead, it asserts that Oxbow has failed sufficiently to allege a failure to compete.  The Court, however, already has concluded that the initial complaint alleged a "parallel sudden shift in defendants' conduct in the context of an industry structure conducive to collusion and alongside an alleged conspiracy regarding pricing."  Op. at 15.  The Amended Complaint both repeats the allegations from the initial complaint that formed the basis for this conclusion and supplements those allegations with additional facts that further reinforce it.

In particular, the Amended Complaint alleges that "Starting in or about 2004," the "railroads stopped competing for new coal business.  UP and BNSF stopped offering competitive bids for one another's customers.  As a result, the incumbent railroad retained the business no matter what unfavorable terms it sought to impose."  Am. Compl. ¶ 94.  BNSF's dismissal of this allegation as conclusory ignores basic standards of notice pleading that provide that factual allegations (as opposed to legal conclusions) are entitled to the presumption of truth at the pleading stage.  *See* note 18 *supra*; *see also* Am. Compl. ¶ 102 (asserting that BNSF "stopped submitting competitive bids for Utah coal and ceased to serve as a competitive constraint on UP prices in the region").

The Amended Complaint also:

- identifies and refers to BNSF and UP admissions and an STB finding that competitive pressure from BNSF had required UP to offer competitive rates to ship Colorado/Utah coal prior to the conspiracy (Am. Compl. ¶¶ 40-45);

- alleges that following the conspiracy, UP increased its rates in the region by over 200% while maintaining a 100 percent market share.  Oxbow also cites UP's statements mocking the notion that it would have been able to take such steps in a competitive market (Am. Compl. ¶¶ 102, 105-106, 108, 129);

- provides examples of specific shippers who had experienced competitive bidding prior to the conspiracy but stopped receiving competitive bids from non-incumbents during the conspiracy despite significant increases in rates by incumbents (Am. Compl. ¶¶ 95-98);

- alleges that the experience of such shippers was typical of coal shippers generally as reflected in the experience of bid negotiators who witnessed the railroads' anticompetitive bidding practices over the course of multiple negotiations (Am. Compl. ¶¶ 99).

BNSF ignores most of these allegations and distorts the few that it addresses.  For example, BNSF asserts it is "not surprising" that "the non-incumbents' bids may have been higher 'on average,' than those of incumbents."  BNSF Mem. at 22.  This conclusory assertion omits the fact that "the non-incumbent's quoted rate or tariff was, on average, *43 percent higher* than the rate of the incumbent railroad" notwithstanding the incumbent's "significantly increased rates."  Am. Compl. ¶ 95 (emphasis added).  It also ignores the "number of instances" of non-responsive bidding reported by Ameren.  *Id.*[19]

In addressing the shipper examples, BNSF also demands a level of detail that is not required at the pleading stage or remotely necessary to establish a plausible inference of conspiracy given the facts alleged.   BNSF, for example, faults the Amended Complaint for not

---

[19]  BNSF asserts that the Amended Complaint contains no allegations that BNSF competed "for Oxbow's business in the Uinta Basin."  BNSF Mem. at 3.  It thereby disregards the Amended Complaint's allegation that regardless of whether it served Oxbow's mines directly, "competitive pressure from BNSF and Utah Railway at other mines in the Uinta Basin would have constrained UP's rates for shipping coal emanating from the Elk Creek Mine as it had prior to the conspiracy."  Am. Compl. ¶ 142.  It further disregards this Court's prior rejection of the conclusion "that a sole-served (or 'captive') shipper cannot suffer antitrust injury as a matter of law."  Op. at 7.  BNSF also does not address Oxbow's allegations that but for the conspiracy not to compete, it could have transported the coal to Grand Junction, Colorado where BNSF and Utah Railway have trackage rights.  Am. Compl. ¶ 143.  UP's assertion that there is no evidence that Oxbow's inability to do so resulted from conspiracy, *see* UP Mem. at 22 n.9, ignores the fact that the conspiracy not to compete (as well as the railroads' refusal to quote to locations where no tracks had been built, *see* Am. Compl. ¶ 96) would have rendered futile any such attempt.  UP's apparent suggestion that Utah Railway could have transported the coal ignores the Amended Complaint's allegation that Utah Railway only had the right to transport coal from Utah mines "to junctions," including Grand Junction, "where BNSF, UP, or both, would provide further transportation service."  Am. Compl. ¶ 37.

identifying individual bids or whether the incumbent railroad had "cost advantages" over the

non-incumbent.  BNSF Mem. at 21-22.  BNSF thus ignores the fact that these non-incumbents

had previously served and/or competed effectively for those customers prior to the conspiracy,

*see* Am. Compl. ¶¶ 95, 98, thus demonstrating that the incumbent likely did ***not*** have significant

cost advantages that prevented the submission of a competitive bid.

      BNSF also ignores the experience of negotiators with the opportunity to witness the

railroads' bidding behavior over the course of multiple negotiations.  Such negotiators confirm

that the railroads routinely submitted far higher bids when bidding as the incumbent.  Am.

Compl. ¶ 99.  Further, the railroads did not use cost disadvantages to justify their unrealistically

high rates, but rather simply cited the non-competitive rate as the "market rate" while citing a

lower "market rate" to the same negotiators when bidding as the incumbent.  *Id.*

### 4.  The railroads' significantly increased rates and decreased service terms plausibly reflect the existence of the conspiracy

      The Amended Complaint further alleges that the agreements described in the complaint

resulted in drastic increases in rates in both the Uinta and Powder River Basins in comparison to

the period preceding the conspiracy.  Am. Compl. ¶¶ 107-113.  The railroads

> also jointly stopped offering rate adjustment mechanisms designed to track actual
> cost changes, and service commitments that had been common in prior contracts,
> including guaranteed cycle and transit times and liquidated damage provisions.
> They also demanded that customers assume regulatory responsibilities such as
> required railcar inspections for which the railroads are responsible in the first
> instance under applicable federal regulations.  *Id.* ¶ 113.

The increased rates and diminished service terms further demonstrate the existence of the

conspiracy because they represented marked departures from prior practice and because they

occurred at the same time as a failure to compete even though the less competitive terms in a free

competitive market should have increased the ability of BNSF and UP to take business from one

another.  UP's admissions cited in the Amended Complaint and discussed in Section II(B)(2)
also specifically contradict the notion that such rate increases could occur unilaterally.  *See also*
Am. Compl. ¶¶ 105-106.  UP's assessment was reinforced by the economists who recognized
that there "is strong evidence that in about 2004 BNSF and UP successfully colluded to raise
prices."  *See* Am. Compl. ¶¶ 105-106, 112.

 Neither UP nor BNSF offer any obvious alternative explanation for the dramatically
increased rates and diminished service terms.  To the contrary, both UP and BNSF fail to address
the allegations quoted above concerning diminished service from paragraph 113 of the Amended
Complaint.  *See* UP Mem. at 21; BNSF Mem. at 25 n.9.

 Further, UP devotes only passing attention to increased rates, positing only that they
could be a function of increased costs.  UP Mem. at 21.  The Amended Complaint, however,
contains allegations that specifically negate UP's proffered explanation, including that the
railroads earned increasing profits every year of the conspiracy and earned revenues from fuel
surcharges alone that were more than $1 billion above actual fuel costs.  Am. Compl. ¶ 86.
Moreover, UP does not and could not assert that increased costs could "obviously" account for
an increase in rates to 200-275% of prior rates, alongside a cessation of competition, plausibly
alleged price-fixing conspiracy, and move to public pricing and short-term contracts.

 BNSF only addresses rates in a footnote with the weak assertion that Oxbow's citation of
average rates does not specify the relative increases of BNSF and UP's rates.  BNSF Mem. at 25
n.9.  Reported rates in the Uinta Basin, however, necessarily were UP rates given UP's
approximate 100 percent market share in that market and the Amended Complaint's allegation
that the conspiracy eliminated the competitive constraint that BNSF imposed on its rates prior to
the conspiracy.  Am. Compl. ¶¶ 129-130.  As for the PRB, a significant discrepancy between the

rates of BNSF and UP would mean that one railroad had raised its rates by far more than 200-250% and thus make it even more suspicious that there was no competition for contracts. BNSF also asserts that increased rates cannot "without more" establish a conspiracy. However, as discussed, Oxbow relies on numerous mutually reinforcing factors to establish the conspiracy in this case.

### 5. The railroads' joint shift to public pricing plausibly reflects the existence of the conspiracy

The Amended Complaint's allegations that the railroads jointly moved to public pricing at the same time that they ceased competing also strongly demonstrates the plausibility of Oxbow's conspiracy allegations. Am. Compl. ¶¶ 114-119; *see United States v. Apple Inc.*, No. 12-2826, 2013 WL 3454986, at *40 (S.D.N.Y. July 10, 2013) ("Plus factors commonly considered by courts include" the "'use of facilitating practices' like information sharing. An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants may also strengthen the inference.") (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) (holding in evaluating public statements by defendants, "Courts have held that a conspiracy to fix prices can be inferred from an invitation, followed by responsive assurances and conduct"); *Water Transp. Ass'n v. ICC*, 722 F.2d 1025, 1032 (2d Cir. 1983) (it "has long been recognized under the antitrust laws that public disclosure of contract terms can undermine competition by stabilizing prices at an artificially high level.").[20]

---

[20] *See also United States v. Container Corp. of Am.*, 393 U.S. 333, 337-38 (1969) (finding that an exchange of pricing information violated Section 1 in part because the market was "dominated by relatively few sellers") (citing cases); *Interstate Circuit v. United States*, 306 U.S. 208, 222 (1939) (finding inference of an agreement justified where each defendant was informed that its competitors had received the same offer to restrain trade and each defendant "was aware that all were in active competition and that without substantially unanimous action" the anticompetitive agreement could not succeed); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 445-

As the Amended Complaint explains, UP and BNSF both moved to the use of circulars that announced an intent to haul coal only for significantly higher rates and minimal service terms. Am. Compl. ¶ 116-117. These new practices "served no legitimate business purpose and instead were adopted to signal price changes and coordinate market allocation by enabling competitors to structure bids to avoid taking business away from their rivals." Am. Compl. ¶ 116. By using public pricing for competitively served traffic that previously had moved by confidential contract, the railroads markedly departed from a prior industry practice that the STB and D.C. Circuit have specifically identified as an important check against industry collusion. Am. Compl. ¶¶ 115, 118-119; *W. Coal Traffic League v. Surface Transp. Bd.*, 169 F.3d 775, 779 (D.C. Cir. 1999) (upholding Board conclusion "that collusion was unlikely due to the secrecy about prices and services that pervades the rail industry"). Moreover, the introduction of these practices at the same time as the fuel-surcharge conspiracy only further demonstrates that their purpose was to eliminate the competition on base rates that could have undermined the conspiracy. Am. Compl. ¶ 91.

The railroads have never offered any legitimate basis for the shift to public pricing. Moreover, UP itself admitted to the STB that the aggressive competition that it represented would be the norm depended upon "*Not knowing each other's actual prices, present or proposed*." *See* Am. Compl. ¶ 106 (emphasis added). Instead, they continue to attempt to justify this shift solely as an extension of their statutory common carrier obligation even though Oxbow has pointed out multiple times that this explanation is untenable. *See* UP Mem. at 13; BNSF

---

50 (9th Cir. 1990) (evidence concerning price announcements when considered with parallel price increases was "sufficient to support a reasonable and permissible inference of an agreement, whether express or tacit, to raise or stabilize prices"); *In re OSB Antitrust Litig.*, No. 06-cv-826, 2007 WL 2253419, at *3 (E.D. Pa. Aug. 3, 2007) (publication of prices in an industry periodical supported allegation of conspiracy by enabling defendants to "monitor their competitors and ensure that no member of the conspiracy 'cheated' by offering significantly different prices").

Mem. at 26; Oxbow Opp. Mot. Dismiss 46, ECF No. 36; Am. Compl. ¶¶ 118-119.  As the

Amended Complaint explains and as Oxbow has explained previously with no response from UP

or BNSF, the railroads in this case "quoted rates and service terms for competitively served

traffic that had traditionally moved by confidential contract.  Indeed, over 80% of the coal

shippers in UP's circular could be served by both UP and BNSF."  Am. Compl. ¶ 118.  The

railroads have never addressed this point.

Nor have the railroads ever addressed the STB's concerns about this practice or its

recognition of the protection against collusion that confidential contracting had long provided to

the industry.  As the STB stated in a proceeding that began shortly after the issuance of UP's

March 2004 circular, while

> the terms and conditions of common carrier rates must be publicly
> disclosed under section 11101, the terms of a rail transportation contract
> are to be kept confidential, a factor that makes collusion in this highly
> concentrated industry more difficult.  Thus, a carrier's hybrid pricing
> mechanism may not contain the same protection against collusion as do
> confidential transportation contracts.

*Id.* (quoting Surface Transportation Board, Interpretation of the Term "Contract" in 49 U.S.C. §

10709, 2007 WL 934379, at *3 (March 28, 2007)).  The STB also stated that Congress intended

for these contractual agreements to be confidential, outside Board jurisdiction, and subject to the

scrutiny of the antitrust laws, rather than regulation under the Interstate Commerce Act.  *Id*.

Moreover, common carrier obligations that have always existed cannot explain why UP chose to

implement its circular only after the fuel-surcharge conspiracy was in place and at the same time

that the railroads stopped competing for new business.  One can only assume from the railroads'

consistent failure to address these points that they have no response and certainly no explanation

that can be accepted as a matter of law at the pleading stage.

The only other explanation that UP or BNSF even attempts to provide is UP's assertion that rates "in shorter contracts and in public tariffs can be changed more readily than long-term contractual rates to respond to evolving market conditions (such as changing demand and increased costs)."  UP Mem. at 21.  There is nothing about a short-term contract that requires its terms to be public.

With no legitimate competitive justification for their conduct, UP and BNSF argue only that Oxbow has not explained how public pricing advanced the conspiracy.  Oxbow demonstrates above that this point is baseless and a demonstrable attempt to distract from the railroads' failure to offer any competitive justification for the practice.  *See supra* at 28-29.  BNSF also offers the separate suggestion that public pricing would make it easier "for other existing or potential competitors to win business from both UP and BNSF."  BNSF Mem. at 27.  As an initial matter, there were no other such competitors.  As BNSF has previously argued, the railroad industry is "highly concentrated" with "high fixed costs" and "significant barriers to entry."  *See* BNSF Mem. in Support Mot. Dismiss 19-20, ECF No. 19; Am. Compl. ¶ 27 (stating that the four major railroads account for "approximately 90 percent of all freight revenue in the United States"); *id*. ¶ 48 (alleging that the industry is "heavily concentrated" with "significant barriers to entry").  The competition that confronted BNSF and UP prior to the conspiracy was from one another.  Moreover, BNSF's admission that public pricing would be counter to the railroads' self-interest in a competitive market only further demonstrates the plausibility of the conspiracy by confirming that BNSF and UP did not fear competition from each other.

### 6.  The railroads' joint shift to short-term contracts plausibly reflects the existence of the conspiracy

The Amended Complaint alleges that UP and BNSF changed an additional longstanding practice by moving from long-term contracts of 5-20 years to denying Oxbow and other shippers

contracts of longer than a year and imposing minimum volume commitments to obtain contracts

from 1-3 years.  Am. Compl. ¶ 120.  This shift in practice was probative of conspiracy because it

"demonstrated a lack of fear of competition," both because in a competitive environment short-

term contracts increase the opportunity for loss of share by increasing the frequency of bidding

and because "it is not in a railroad's economic interest to refuse – across the board – to enter into

long-term contracts even when substantial customers for their own reasons might want them."

Am. Compl. ¶ 121.  *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp.

2d at 1001-02 (holding that conduct that was contrary to a competitor's self-interest absent

conspiracy was probative of conspiracy); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d

at 642 (same).

    The railroads have conceded the fundamental point that short-term contracts are

"evidence" that "incumbent firms do not particularly fear competition."  *See* BNSF Reply in

Supp. Mot. Dismiss 22, ECF No. 42.  This concession alone confirms the probative value of this

shift in practice given that absent agreement "there is no reason why either UP or BNSF, much

less both of them, would have this level of confidence about the lack of competition, in an

industry that had, up until recently, experienced robust competition for customers the size of

Ameren, OPPD and other large utilities."  Am. Compl. ¶ 122.

    UP and BNSF's current motions also do not, and could not, deny that short-term

contracts reflect a lack of fear of competition, and do not attempt to explain how the railroads

would have jointly reached the conclusion that competition would not be an issue in the absence

of an agreement.  As with public pricing, UP offers virtually no discussion of short-term

contracts, asserting only that short-term contracts allow a more ready response to evolving

market conditions.  UP Mem. at 21.  Given that "evolving market conditions" were not a new

issue for the railroads in 2004, and given the various mechanisms that exist for accounting for issues such as cost increases in a long-term contract, UP fails to provide an innocent explanation (much less an obvious one) for why the railroads would have moved to short-term contracts to address evolving market conditions at the same time that they jointly stopped competing, entered into a fuel-surcharge conspiracy, and moved to public pricing.

BNSF fares no better in its discussion of the issue.  It asserts correctly that short-term contracts allow competitors more easily to take advantage of the latest rate increase, see BNSF Mem. at 28, but this explanation undermines its position.  This advantage of short-term contracts requires confidence that rates will continue to increase significantly over a long period of time and that there will be no aggressive competition to undercut those rate increases and take the business.  Such confidence (particularly when arrived at simultaneously with one's competitor) bespeaks conspiracy, not independent action.

Nor is it helpful to BNSF's position to point out that long-term contracts also can be anti-competitive when they foreclose a large percentage of the market.  *See* BNSF Mem. at 29 and n.12.  As already discussed, the pursuit of long-term contracts was a rational strategy if the railroads genuinely feared competition because, as BNSF states, "with shorter contracts, the firms would be subject to competition for those customers much more frequently."  BNSF Mem. at 29.  The fact that the railroads jointly chose ***not*** to pursue the strategy they had pursued during the preceding years of vigorous competition, demonstrates that they were no longer worried about competition.

BNSF's speculation that conspirators would prefer long-term contracts also does nothing to undermine the fundamentally suspicious nature of this shift.  According to BNSF, long-term contracts would decrease the frequency of bidding and decrease monitoring costs.  BNSF Mem.

at 28.  But as BNSF elsewhere notes, it is not difficult to monitor a conspiracy not to compete

because the loss of a contract establishes that the competitor has cheated.  BNSF Mem. at 25-26.

As for the bidding process, BNSF posits that a conspirator would prefer to lose the opportunity

to raise prices more frequently to avoid the inconvenience of having to submit more sham bids.

To put it mildly, this is not "obvious."[21]  Similarly not obvious is UP's assertion that conspirators

are "more likely" to lock in long-term rates than to maintain the flexibility to increase non-

competitive rates on a regular basis.  UP Mem. at 13.  What is obvious (and conceded), however,

is that short-term contracts reflect a lack of fear of competition.  The railroads do not attempt to

explain why they did not fear competition notwithstanding the vigorous competition that

preceded the conspiracy.

Finally, neither UP nor BNSF explains why companies that previously generally found it

in their interests to use long-term contracts would simultaneously – and across the board – both

refuse to use them, and continue to refuse even as market conditions changed.  There is not any

good explanation for this enduring shift other than conspiracy.

### 7.   The railroads' increase in fuel surcharges in 2004 for coal beyond the already excessive amounts they were illegally charging plausibly reflects the existence of the conspiracy

The railroads' increase in fuel surcharges for coal beyond the already excessive fuel

surcharges imposed for other products provides further evidence of the existence of a conspiracy

not to compete with respect to coal.  *See* Am. Compl. ¶¶ 82-84.  As with various other factors

discussed, this decision plausibly reflected an absence of fear of competition with respect to that

---

[21] BNSF also misses the significance of Oxbow's allegation that short-term contracts "provided assurances that each railroad would not deviate on the conspiracy by leaving its customers regularly available for competitive bidding."  Am. Compl. ¶ 122.  The point is not, as BNSF alleges, that UP and BNSF "agreed to use short-term contracts so that each could monitor more frequently whether the other was competing."  BNSF Mem. at 28.  Instead, the point is that a competitor whose customers were more frequently available for competitive bidding would be far less likely to cheat on the conspiracy.

product.  As discussed in the previous section, in light of the previously vigorous competition that had existed with respect to coal, the railroads identify no reason why they could be confident that there would be no competition other than because of an illicit agreement.

### 8.   The combination of these factors together with the fuel-surcharge conspiracy plausibly reflects the existence of the conspiracy

Defendants' motions do not attempt to account for the combined probative impact of the various identified factors or their occurrence at the same time as the fuel-surcharge conspiracy. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d at 33 n.4 (the "character and effect of a Sherman Act conspiracy are not to be judged by dismembering it and viewing its separate parts"); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124 (3d Cir. 1999) (the "non-movants' evidence should be analyzed as a whole and not be tightly compartmentalized to see if together it supports an inference of concerted action."); *see also* Op. at 15 (noting that the Amended Complaint alleges that the "sudden shift in defendants' conduct" occurred "in the context of an industry structure conducive to collusion and alongside an alleged conspiracy regarding pricing").

The fuel-surcharge conspiracy demonstrates a contemporaneous willingness to engage in illegal activity to increase industry rates and explains why the railroads would have been motivated to cease all competition at that particular point in time.  At the same time, the railroads offer no explanation, let alone an "obvious" one, that can account for the decision to engage in the various conduct alleged, all in departure from past practice, at the same time and alongside an illegal price-fixing conspiracy.

Instead, the railroads offer explanations that, in addition to suffering from the defects discussed above, cannot account for the coincidence that such practices occurred together, just as

the railroads were engaging in the fuel-surcharge conspiracy.  It is far more reasonable to believe, for example, that the cessation of competition was designed to protect the fuel-surcharge conspiracy than that it resulted from an innocent, independent and identical perception of demand trends and capacity constraints that just happened to occur at the same time that the railroads were illegally conspiring on fuel surcharges.

The defendant railroads, moreover, do not and could not offer increased demand as an explanation for the move to public pricing, and the railroads cannot explain why statutory common carrier obligations that always existed would have prompted the move to public pricing just when the railroads began conspiring on fuel surcharges and stopped competing.  Nor can the railroads explain why they stopped competing for new business, significantly increased rates and moved to public pricing, while making themselves more vulnerable to more frequent competitive bidding through short-term contracts, other than an unnatural confidence that there would be no further competition.

**9.  The railroads' assertions of inconsistency do not undermine the plausibility of any of the amended complaint's allegations**

With no ability to challenge the plausibility or sufficiency of Oxbow's allegations, defendants vaguely assert that the Court should "take account" of asserted inconsistencies between the amended and initial complaints.  Defendants, however, neither explain how the Court should do so nor identify a single allegation that lacks plausibility as the result of an asserted inconsistency.  Defendants' arguments are thus irrelevant to assessing the sufficiency of the Amended Complaint.[22]

---

[22] None of the cases cited by defendants supports striking allegations simply because they are inconsistent with a prior pleading, nor would there be any basis for doing so.  To the contrary, a court "has no free-standing authority to strike pleadings simply because it believes that a party has taken inconsistent positions in the litigation.  Rather, the District Court's powers are generally limited to those provided by the Federal Rules of Civil Procedure."  *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 859 (9th Cir.

Oxbow has alleged from the outset that UP and BNSF agreed not to compete with respect to coal, and provides in the Amended Complaint the detail that the Court found wanting in the original complaint as to how this conspiracy enabled UP to monopolize a distinct antitrust market. The original complaint identified a region consisting of both the Powder River and Uinta Basins as an area where "competition is affected by, but distinct from, what is found in the Western United States generally" while also specifically alleging in the alternative the possibility of local markets that would be identified in discovery. Complaint ¶¶ 73-74, ECF No. 1.[23]

The Amended Complaint adds detailed allegations establishing the existence of such a local market while still recognizing that coal from the PRB has some impact on the shipping price of Uinta Basin coal. *See* Am. Compl. ¶¶ 127-128 (asserting that "As delivered prices for Powder River Basin coal, and coal from certain other areas, have some effect on the price, and

---

2007). The cases cited by defendants involved, unlike here, Rule 11 motions and/or fabricated allegations where the circumstances of the alteration made clear that the amended allegations were untrue. *See Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324 (Fed. Cir. 1998) (to meet requirements of defense that required him to exercise due diligence plaintiff changed allegation contained in two prior complaints that no attorney had explained a document to him prior to signing it); *Hourani v. Mirtchev*, No. 10-1618, 2013 WL 1901013, at *8-9 (D.D.C. 2013) (denying Rule 11 motion and dismissing case on substantive grounds); *Green v. Niles*, No. 11-1349, 2012 WL 987473, at *4-5 (S.D.N.Y. March 23, 2012) (plaintiff changed the date of the filing of a grievance set forth in two prior complaints to make it plausible that he had been retaliated against for doing so); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011) (addressing allegations of a new agreement to circumvent a finding that a prior claim was time-barred); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08-0400, 2008 WL 4386764, at *13 (S.D.N.Y. Sept. 24, 2008) (finding Rule 11 sanctions appropriate based on contradictions to original verified complaint that "were a transparent attempt to plead around the legal defenses presented by" the defendant, including changes to the dates of alleged wrongful acts and reversal of the plaintiff's prior claim that he had been employed as an attorney).

[23]   *See Hear-Wear Techs., LLC v. Oticon, Inc.*, 551 F. Supp. 2d 1272, 1279 (N.D. Okla. 2008) ("The Court notes that both market definitions, as they stand, are facially plausible because they are pled in the alternative."); *Daniel v. Am. Bd. of Emergency Med.*, 802 F. Supp. 912, 925 (W.D.N.Y. 1992) (holding that in light of Fed. R. Civ. P. 8(e)'s authorization of alternative and inconsistent pleadings, "Plaintiff's use of factually inconsistent market definitions (assuming for the sake of this discussion that they are inconsistent) does not render his complaint inadequate") (citations omitted); *W.A. Butler Co. v. Colgate-Palmolive Co.*, No.. 91-1882, 1992 WL 278008, at *2 (E.D. Pa. Sept. 30, 1992) ("The complaint sets forth various alternative definitions of relevant geographic markets. These allegations suffice to withstand dismissal at this stage.").

shipping price, for Uinta Basin coal" but that for the reasons described in the Amended

Complaint, "the characteristics of Uinta Basin coal and the nature and location of customers for

it cause the transportation of Uinta Basin coal to be a separate market for antitrust purposes").

Moreover, defendants could have no possible basis for challenging the plausibility of the

Amended Complaint's market definition (the primary asserted inconsistency) when the Amended

Complaint explains in detail the basis for the definition and when their own prior statements

support that definition.  Both UP and BNSF represented to the STB (and the STB found) that

BNSF's competitive presence in the Uinta Basin had constrained UP's ability to raise its coal

rates in the Uinta Basin prior to the conspiracy.  Am. Compl. ¶¶ 38-39, 44-45.  Further, UP itself

previously argued in this case that Uinta Basin coal does not compete with PRB coal.  *See* UP

Mem. in Support Mot. Dismiss 19 n.5, ECF No. 21-1.[24]

The only other asserted inconsistency is a statement from Oxbow's initial opposition

(excerpted by UP) that, fully quoted, asserts:  "the Complaint's allegation is not that BNSF

agreed to 'turn its customers over' to UP, but rather the ***very opposite***:  that BNSF conspired to

obtain UP's agreement ***not*** to compete for BNSF's customers."  Oxbow Opp. Mot. Dismiss 27,

ECF No. 36 (emphasis in original).  The conspiracy alleged in the Amended Complaint protected

BNSF's massive customer base in the PRB while relinquishing its ability to compete in an area

where its competitive presence constrained UP's rates but it lacked a significant customer base.

---

[24] Oxbow acknowledges that paragraph 102 of the original complaint incorrectly asserted that the refusal
to ship Oxbow's coal west reflected UP's desire to protect Utah shippers served by both UP and BNSF.
At that point in time, BNSF was no longer competing with UP in the Uinta Basin, and so Oxbow has
removed that allegation.  Defendants do not, however, contest the plausibility of plaintiffs' allegations
that UP now holds a monopoly over Uinta Basin coal traffic, nor could they do so given the Amended
Complaint's allegations that UP has both significantly increased its rates in the region while maintaining a
100 percent market share.  Am. Compl. ¶¶ 108, 129.  Moreover, UP specifically admitted to the STB that
it would not be able to undertake such a strategy in a competitive market.  Am. Compl. ¶ 105.

*See supra* at 30 n.10.  It therefore is fully consistent with the conspiracy alleged in the prior

complaint.

### III.     THE COMPLAINT ALLEGES A VALID SECTION 2 CLAIM AGAINST UP FOR UNILATERAL MONOPOLIZATION

The Amended Complaint alleges that even in the absence of a conspiracy not to compete,

"UP's unilateral decision to take" the various actions alleged "particularly in the context of the

fuel surcharge conspiracy, and to signal BNSF, knowing and expecting that the BNSF would act

in kind, and to induce BNSF to act in kind by providing the *quid pro quo* of not competing with

BNSF, constitutes unlawful monopolization and attempted monopolization."  Am. Compl. ¶ 159.

The Amended Complaint further alleges that even if UP had otherwise lawfully acquired its

monopoly over the Uinta Basin market where Oxbow's Elk Creek mine is located, it illegally

maintained that monopoly through "its participation in the fuel surcharge conspiracy (and other

anticompetitive acts alleged herein)" by artificially raising the as-delivered price of Uinta Basin

coal and therefore the ceiling on prices it could charge Oxbow and other mine owners in the

Uinta Basin.  Am. Compl. ¶ 160.

Such allegations state a claim for monopolization under Section 2 of the Sherman Act.

Defendants willfully acquire monopoly power when they engage in conduct "to foreclose

competition, to gain a competitive advantage, or to destroy a competitor."  *Eastman Kodak Co. v.

Image Technical Servs., Inc.*, 504 U.S. 451, 482-83 (1992).  The "willful acquisition" element

looks to whether the power has been acquired, maintained, or increased through "exclusionary

conduct" – *i.e.*, by "conduct, other than competition on the merits."  *S. Pac. Commc'ns Co. v.

Am. Tel. & Tel. Co.*, 740 F.2d 980, 999 n.19 (D.C. Cir. 1984); *Neumann v. Reinforced Earth Co.*,

786 F.2d 424, 427 (D.C. Cir. 1986); *see also Microsoft*, 253 F.3d at 50 (distinguishing the willful

acquisition or maintenance of monopoly power "from growth or development as a consequence

of a superior product, business acumen, or historic accident").  Such conduct may include

agreements that also violate Section 1.  *See United States v. Griffith*, 334 U.S. 100, 106 (1948)

(holding that a firm violates Section 2 by acquiring, maintaining or expanding its monopoly

power "by means of those restraints of trade which are cognizable under § 1" of the Sherman

Act).[25]  UP's entry into the fuel-surcharge conspiracy and the other conduct alleged such as

public pricing – are not "competition on the merits" and thus may properly form the basis for a

Section 2 claim where, as here, they result in the acquisition or expansion of monopoly power.

UP does not defend the alleged conduct as competition on the merits and does not

address the cases cited by Oxbow establishing that anti-competitive agreements can provide a

basis for a claim of monopolization.  Nor does it otherwise justify its position that such

agreements cannot be exclusionary.  UP's argument that such agreements can create

opportunities for other actual or potential competitors necessarily has no bearing where, as here,

barriers to new entry are high, and UP's only other competitor was BNSF.[26]  Monopoly pricing

---

[25] *See also, e.g., Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 463 (1960) ("Although
the Court was not confronted with charges under s 2 of the Sherman Act in that case we do not believe
that Congress intended to immunize cooperatives engaged in competition-stifling practices from
prosecution under the antimonopolization provisions of s 2 of the Sherman Act, while making them
responsible for such practices as violations of the antitrade-restraint provisions of §§ 1 and 3 of that Act.
These sections closely overlap, and the same kind of predatory practices may show violations of all.");
*Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 757 (10th Cir. 1999) (plaintiff properly pled
monopolization when it alleged that defendants obtained monopoly power "as a consequence of their
unlawful boycott and other wrongful conduct rather than a superior product, business acumen, or historic
accident"); *Behrend v. Comcast Corp.*, 532 F. Supp. 2d 735, 742-43 (E.D. Pa. 2007) (denying defendants'
motion for judgment on the pleadings because the alleged agreement to divide the market between
competitors in order to suppress competition made "the Class' entitlement to relief under § 1" "clearly
plausible" and, along with the defendant's later acquisition of a competitor, also made plausible "the
claims alleging violation of § 2 of the Sherman Act").

[26]  By contrast, one of the cases cited by UP on this question addressed low barriers to entry, and the other
involved an existing competitor who was not part of the conspiracy.  *FTC v. H.J. Heinz Co.*, 246 F.3d
708, 717 n.13 (D.C. Cir. 2001) ("*If entry barriers are low*, the threat of outside entry can significantly
alter the anticompetitive effects of the merger by deterring the remaining entities from colluding or
exercising market power") (emphasis added); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d
775, 777 (7th Cir. 1999) (holding that a plaintiff who was not part of a conspiracy would be aided, not
injured, by a conspiracy among its competitors to raise prices).

is deterred only where there are competitors to deter it. *See Gulf States Reorganization Group, Inc. v. Nucor Corp.*, No. 11-14983, 2013 WL 3490824, at *4 (11th Cir. July 15, 2013) (holding that monopoly pricing is deterred by a "high cross-elasticity of supply," defined as "a condition in which the cost and rapidity of new entry are such that a monopolist of the product would have negligible power to increase its price above the competitive level") (internal citation and quotation marks omitted). The elimination of competition from BNSF through the fixing of fuel surcharges, together with public signaling of base rates and cessation of competition, therefore constituted exclusionary conduct because it prevented the only competition that could have constrained UP's monopoly power in the Uinta Basin.

UP similarly offers no basis for denying that its move to public pricing was exclusionary conduct. As discussed above at 44-47, there is no basis for UP's contention that public pricing "was a recognized means of rail pricing" for competitively served traffic that historically had always moved by confidential contract. UP and BNSF have repeatedly failed to offer a legitimate competitive justification for their move to public pricing, and have repeatedly ignored Oxbow's allegations concerning this issue and the STB's recognition that the railroads' use of public pricing markedly departed from prior practice.

Various other facts similarly refute UP's suggestion that public pricing is indistinguishable from legitimate pro-competitive "pricing decisions." First, the public pricing and other anti-competitive conduct at issue here did not occur in a vacuum, but rather "in the context of the fuel surcharge conspiracy." *See* Am. Compl. ¶ 159. Given the important connection between the fuel-surcharge conspiracy and prevention of base rate discounting, *see supra* at 25-26, Am. Compl. ¶ 91, UP would have been well aware that unilateral signaling of public prices in this context was likely to further discourage base-rate price competition. UP

makes no attempt to explain how applying Section 2 to public pricing where the defendant already has engaged in related illegal conduct would "extend the antitrust laws" or pose any risk of deterring pro-competitive activity.  Instead, UP only addresses public pricing in isolation.

Second, UP itself admitted to the STB that the aggressive competition that it represented would be the norm depended upon "*Not knowing each other's actual prices, present or proposed*."  *See* Am. Compl. ¶ 106 (emphasis added).[27]  By moving to public pricing, UP thus took an action that it knew, in light of its own understanding of competition in the industry, was likely to lead to the elimination of competition.

Third, BNSF had previously adopted a tariff in January 2003 "that announced an intent to haul coal only for significantly higher rates and minimal service terms."  Am. Compl. ¶ 116.  UP thus would have known that BNSF's inclination was not to compete under these circumstances and that it would therefore view UP's tariff as a proposal not to compete and respond in kind.  As Professors Areeda and Hovenkamp explain:  "Solicitations can become a convenient vehicle for coordinating behavior more closely than would be possible through mere tacit coordination among oligopolists."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1419d (3d ed. 2007).  This is because

> inability to prove an agreement does not mean that there was none.  *And the state of mind reflected in a rejected solicitation may increase the solicitee's expectations that the solicitor will follow some future anticompetitive initiative. Or the solicitation may mean that the actors will trust one another to respond favorably and thus lead each to respond favorably itself to an anticompetitive initiative.  Id*. (emphasis added).[28]

---

[27] The only case cited by UP on the issue of public pricing relates addressed the distinct question of whether the public pricing in that case could by itself give rise to an inference of conspiracy.  *See* UP Mem. at 25.  It has no bearing on whether public pricing can qualify as unilateral exclusionary conduct in the circumstances described here.

[28] UP argues that Oxbow would not have been injured by an unsuccessful conspiracy to monopolize.  UP Mem. at 25.  Oxbow, however, does not allege that it was injured by an unsuccessful conspiracy to

The fuel-surcharge conspiracy (coupled with UP's 100% market share in the Uinta Basin) also is actionable under Section 2, even if viewed in isolation from all other conduct, because it illegally increased UP's monopoly power regardless of whether it was lawfully acquired.  Under settled Sherman Act precedent and mainstream antitrust economics, even a lawful monopolist may not maintain or expand its monopoly power through exclusionary or anticompetitive conduct.  *United States v. Griffith*, 334 U.S. at 106.  *See also* 1 ABA Antitrust Law Section, *ANTITRUST LAW DEVELOPMENTS (SEVENTH)* 245 n.111 (2012) ("As a general matter, conduct that would violate § 1 also will violate § 2 if it is engaged in by a monopolist") (citing *Griffith*).  As the Amended Complaint alleges, through its participation in the fuel-surcharge conspiracy, UP expanded its monopoly power in the Uinta Basin by raising the as-delivered price of coal and thereby raising the ceiling on prices it could charge to mine owners in the Uinta Basin.  Am. Compl. ¶ 130.

UP asserts that the fuel-surcharge conspiracy is not actionable under Section 2 because it was only a component of the price and thus "could not accomplish control over that price, particularly if the alleged conspirators are free to set any final, 'all-in' price for the coal."  UP Mem. at 26.  Here, UP places exclusive reliance on *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348 (N.D. Ga. 2010), which addressed the conspiracy of airlines to charge $15 bag fees.  *See* UP Mem. at 26.

The fuel-surcharge conspiracy, however, is unlike the $15 bag fee at issue in the *Delta* case because it gave UP the ability for years to maintain without cost justification an increase of 10-50% in base prices.  Indeed, the Justice Department Merger Guidelines have used a "hypothetical monopolist" test to determine how a define a market.  The test posits that if a

---

monopolize.  It alleges a successful conspiracy to monopolize, a successful customer-allocation conspiracy that constituted a per se violation of Section 1 of the Sherman Act, and, in the alternative, unilateral conduct by UP that accomplished the same result and harm.

hypothetical monopolist for all of the products in a group could maintain a "small, but significant non-transitory increase in prices" of 5 percent, that monopolist would have market power because other products were not sufficient substitutes effectively to constrain the prices.  *See* United States Department of Justice & Federal Trade Commission, Commentary on the Horizontal Merger Guidelines (March 2006), *available at* http://www.justice.gov/atr/public/guidelines/ 215247.htm.  UP's ability to add a 10 to 50% surcharge to its base prices displays far more significant market power, in contrast to the prices at issue in *Delta/Airtran*, which applied only to certain passengers and amounted to only a small fraction of the total air travel price.  733 F. Supp. 2d at 1366.  This Court already has found sufficient evidence based on a full discovery record that the parties were not free under the fuel-surcharge conspiracy to set any "all-in" price because the conspiracy prohibited the discounting of base rates to make up for the fuel-surcharge.  *See supra* at 25-26.

## IV.   OXBOW HAS STATED A VALID CLAIM FOR BREACH OF THE TOLLING AGREEMENT

Paragraph 6(c) of the January 14, 2010, Tolling Agreement between Oxbow and UP provides that "if Oxbow becomes a party to the class action or files a complaint, UP will take reasonable steps to facilitate Oxbow's access to discovery in the class action."  Am. Compl. ¶ 166(b) (citing ECF No. 26-2).  As alleged in the Amended Complaint, notwithstanding Oxbow's filing of the complaint and Oxbow's express request for such material, UP has taken no steps to facilitate Oxbow's access to documents produced in the MDL proceeding, but instead has actively opposed those efforts.  Am. Compl. ¶¶ 168-170.  It therefore has breached the Tolling Agreement.

UP offers no basis for its motion to dismiss Oxbow's breach of contract claim.  UP's argument that it has no obligation under the Agreement to facilitate access to MDL discovery

until after resolution of its motion to dismiss contradicts the plain language of the Agreement, which provides that it is Oxbow's filing of the complaint that gives rise to UP's obligation.  Nor can the words "*reasonable* steps to facilitate access" be plausibly understood to mean "*no* steps to facilitate access" or "resisting access."  Further, UP's understanding of the provision as imposing no obligations not already imposed by the Federal Rules of Civil Procedure also would render the provision meaningless in violation of a "cardinal" principle of contractual interpretation.[29]

UP similarly ignores the plain language of paragraph 6(c) in relying on other provisions of the Tolling Agreement addressing Oxbow's right to initiate discovery or the parties' right to object to it.  Those provisions provide no support for its position because paragraph 6(c) expressly contemplates that Oxbow would have access to discovery produced in the MDL proceeding without the need to submit a discovery request in this proceeding.  Provisions addressing the right to conduct discovery in this proceeding are thus inapposite.

---

[29]  *See Beal Mortg., Inc. v. FDIC*, 132 F.3d 85, 88 (D.C. Cir. 1998) ("We will not adopt such an interpretation, which would be inconsistent with the cardinal interpretive principle that we read a contract to give meaning to all of its provisions") (internal quotation omitted); *Russell v. Harman Int'l Indus., Inc.*, No. 07-2212, 2013 WL 2237793, at *6 (D.D.C. May 22, 2013)  ("Every word, phrase, and clause in a contract must be given effect, and contract interpretation that would render any part of the contract surplusage or nugatory must be avoided."); *U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 56 (D.D.C. 2006), *aff'd*, 530 F.3d 980 (D.C. Cir. 2008) ("The Court construes contracts in a manner that gives effect to the words used by the parties, and assumes that the parties intend every part of a contract to mean something, 'so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory.'"); *Flynn v. S. Seamless Floors, Inc.*, 460 F. Supp. 2d 46, 50-51 (D.D.C. 2006) (rejecting a proffered contractual interpretation that would render particular words meaningless and without effect); *Beltway Mgmt. Co. v. Lexington-Landmark Ins. Co.*, 746 F. Supp. 1145, 1150 (D.D.C. 1990) ("Indeed, upon close analysis, Landmark's interpretation is unacceptable because it would render 'other invasion[s] of the right of private occupancy' mere surplusage.") (brackets in original); *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012) ("Our construction is guided by the terms of the Agreement in its entirety – which means we must strive to give reasonable effect to all its parts and eschew an interpretation that would render part of it meaningless or incompatible with the contract as a whole") (internal quotation omitted).

UP's motion additionally fails because a motion to dismiss a breach of contract action for failure to state a claim is appropriate only where the contract unambiguously favors the defendant's position.  *See Transformational Strategies Consulting, Inc. v. ACS State Healthcare, LLC*, 526 F. Supp. 2d 66, 71-72 (D.D.C. 2007) ("Because both parties' interpretations of the early termination provision are 'sufficiently reasonable to render the [provision] ambiguous,' the Court cannot conclude that ACS's interpretation is correct as a matter of law, and the motion to dismiss must be denied.") (quoting *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994)) (brackets in original); *see also Martin Marietta Corp. v. Int'l Telecommc'ns Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992) ("As the district court noted, the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.").  Because UP has not even claimed that the agreement unambiguously forecloses Oxbow's interpretation, its motion must be rejected for this reason as well.[30]

## V.   IF NECESSARY, THE COURT SHOULD GRANT OXBOW THE RIGHT TO REPLEAD THE CLAIMS THAT DEFENDANTS HAVE MOVED TO DISMISS

As discussed above, the railroads do not dispute that plaintiff Oxbow Carbon has stated a valid Section 1 claim with respect to petcoke.  Nor, as discussed above, is there any basis for dismissing any of the Oxbow plaintiffs' other claims.  If, however, the Court finds that some issue has not been sufficiently pled or the Court is otherwise inclined to grant either defendant's motion in any part, Oxbow respectfully requests that it grant Oxbow leave to replead those claims.  *See, e.g., Belizan v. Hershon*, 495 F.3d 686, 694 (D.C. Cir. 2007).

---

[30] UP asserts that Oxbow has not adequately pleaded injury in connection with UP's pre-complaint duty under the Tolling Agreement to "keep Oxbow reasonably informed of the status of discovery proceedings" in the class action. Am. Compl. ¶ 166a.  Oxbow, however, does not rely on this provision as an independent basis for a breach of contract claim, but cites it as a further demonstration of UP's disregard for its obligations under the Agreement.

## CONCLUSION

For the foregoing reasons, defendants' motions should be denied.

Dated:  August 30, 2013                          Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP        TROUTMAN SANDERS LLP

David Boies, admitted *pro hac vice*        /s/   John R. Gerstein
333 Main Street                                          John R. Gerstein, D.C. Bar No. 913228
Armonk, New York 10504                        Merril Hirsh, D.C. Bar No. 366952
Telephone: (914) 749-8200                       Glenn B. Manishin, D.C. Bar No. 395724
                                                                901 9th Street, NW, Suite 1000
Robert B. Silver, admitted *pro hac vice*    Washington, DC 20004-2134
Ellen Brockman                                       Telephone:  (202) 274-2950
Mathew Schutzer
John Nicolaou                                          Fletcher W. Paddison
575 Lexington Avenue                             11682 El Camino Real, Suite 400
New York, New York 10022                     San Diego, CA 92130
Telephone: (212) 446-2300                       Telephone:  (619) 235-4040

Samuel C. Kaplan, D.C. Bar No. 463350
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone: (202) 237-2727


*Attorneys for Plaintiffs Oxbow Carbon & Minerals LLC; Oxbow Mining, LLC;*
*Oxbow Midwest Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OXBOW CARBON & MINERALS LLC;                )
OXBOW MINING, LLC; OXBOW MIDWEST   )
CALCINING LLC; OXBOW CALCINING LLC; )
and TERROR CREEK LLC,                                     )
                                                                              )
                        Plaintiffs,                                    )
                                                                              )     Case No. 1:11-cv-01049 (PLF)
                        v.                                                 )
                                                                              )
UNION PACIFIC RAILROAD COMPANY;       )
and BNSF RAILWAY COMPANY,                     )
                                                                              )
                        Defendants.                                  )

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of August, 2013, I caused the foregoing to be

electronically filed with the Clerk of Court using the CM/ECF system, which will then send a

notification of such filing to all counsel of record.

    /s/ John R. Gerstein
John R. Gerstein, D.C. Bar No. 913228
901 9th Street, NW, Suite 1000
Washington, DC 20004-2134
Telephone:  (202) 274-2950