IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OXBOW CARBON & MINERALS LLC, et al., | Case No.  1:11-cv-01049 (PLF) |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| UNION PACIFIC RAILROAD COMPANY, et al., | |
| Defendants. | |

**DEFENDANT BNSF RAILWAY COMPANY'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED
COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   ARGUMENT ...................................................................................................... 2

    A.    Oxbow Abandons Its Allegations of a Separate Agreement to
        Increase Coal-Specific Fuel Surcharges ..................................................... 2

    B.    Oxbow Fails to Allege that Four of the Five Named Plaintiffs Paid
        a Fuel Surcharge Directly to UP or BNSF.................................................. 4

    C.    Oxbow's Deficient, Contradictory, and Inconsistent Allegations
        Do Not Plausibly Suggest a Market-Allocation Conspiracy ..................... 7

III.  CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ..............................................................8

*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*,
   297 F. Supp. 2d 165 (D.D.C. 2003) .........................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..............................................................................8, 9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................ passim

*Coleman v. Pension Benefit Guar. Corp.*,
   94 F. Supp. 2d 18 (D.D.C. 2000) .............................................................4

*Crowder v. Bierman, Geesing, and Ward LLC*,
   713 F. Supp. 2d 6 (D.D.C. 2010) .........................................................3, 4

*Diskin v. Daily Racing Form, Inc.*,
   1994 WL 330229 (S.D.N.Y. 1994) ...........................................................6

*Duty Free Americas, Inc. v. Estee Lauder Cos.*,
   ___ F. Supp. 2d ___, 2013 WL 2303764 (S.D. Fla. May 9, 2013)...........9

*Erie Cty. v. Morton Salt, Inc.*,
   702 F.3d 860 (6th Cir. 2012) .................................................................13

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013).....................................................................12

*FTC v. Mylan Labs.*,
   62 F. Supp. 2d 25 (D.D.C. 1999) .............................................................5

*Illinois Brick v. Illinois*,
   431 U.S. 720 (1977)..............................................................................2, 6

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999).....................................................................10

*In re Late Fee and Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007) ...............................................10, 13

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Microsoft Antitrust Litig.,*
 127 F. Supp. 2d 702 (D. Md. 2001) .......................................................................5

*In re Nat'l Ass'n of Music Merchants, Musical Instr. and Equip. Antitrust Litig.,*
 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012) ..................................................11, 13

*In re Processed Egg Prods. Antitrust Litig.,*
 821 F. Supp. 2d 709 (E.D. Pa. 2011) ....................................................................11

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
 587 F. Supp. 2d 27 (D.D.C. 2008) ................................................................. passim

*In re Vitamins Antitrust Litig.,*
 2001 WL 855463 (D.D.C. July 2, 2001).................................................................5

*Jacobs v. Tempur-Pedic Int'l, Inc.,*
 626 F.3d 1327 (11th Cir. 2010) ............................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
 475 U.S. 574 (1986)............................................................................................10

*Milliken & Co. v. CNA Holdings Inc.,*
 2011 WL 3444013 (W.D.N.C. Aug. 8, 2011).........................................................12

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.,*
 926 F. Supp. 2d 36 (D.D.C. 2013) ......................................................................3, 5

*United Presbyterian Church in the U.S.A. v. Reagan,*
 738 F.2d 1375 (D.C. Cir. 1984)............................................................................6

**STATUTES AND RULES**

Section 4 of the Clayton Act, 15 U.S.C. § 15 ...............................................................5

**OTHER AUTHORITIES**

VI Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of
 Antitrust Principles and Their Application* ¶ 1411, at 68 (2003) ............................10

I.    **INTRODUCTION**

In their First Amended Complaint ("FAC"), Oxbow Carbon & Minerals LLC,

Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and

Terror Creek LLC (collectively, "Oxbow") allege the same fuel-surcharge conspiracy at

issue in the related class action, *In re Rail Freight Fuel Surcharge Litigation*, MDL 1869

(the "standard fuel-surcharge conspiracy").  They also attempt, however, to expand the

nature and scope of conduct at issue by alleging two additional unlawful conspiracies

between Defendants Union Pacific Railroad Company ("UP") and BNSF Railway

Company ("BNSF"):  a separate conspiracy to increase coal-specific fuel surcharges and

a separate conspiracy to allocate markets.  Oxbow's allegations supporting those two

additional conspiracies are insufficient to state a claim.  This Court should therefore

dismiss Oxbow's claims beyond the alleged standard fuel-surcharge conspiracy at issue

in the MDL litigation.

In its opposition brief, Oxbow effectively abandons the allegation of a separate

conspiracy to increase coal-specific fuel surcharges.  *See* Opp. to Defs.' Mots. to Dismiss

Plaintiffs' FAC, Docket Item 57, at 3, 19-20 (filed Aug. 30, 2013) ("Oxbow Opp.").

Thus, there is no real dispute that this Court should dismiss Oxbow's claims relying on

such a conspiracy and strike the charging allegations.

Oxbow's allegations are also insufficient with respect to the alleged market-

allocation conspiracy.  Indeed, those allegations themselves demonstrate the

implausibility of this alleged conspiracy.  For example, Oxbow's theory of conspiracy

centers on BNSF's alleged exit from the Uinta Basin.  *See* Oxbow Opp. at 30.  But

Oxbow itself alleges that BNSF had failed to obtain a "significant customer base" in the

Uinta Basin despite 7-8 years of trying to compete *before the onset of the alleged*

*conspiracy*, *see id*. at 30 n.10.  This allegation establishes an obvious alternative explanation for BNSF's supposed exit from the Uinta Basin:  that, assuming it happened, it was an independent decision based on 7-8 years of lackluster results.  Moreover, although the conspiracy supposedly took place principally in regions where Oxbow itself operates extensively, Oxbow offers only second-hand, vague, ambiguous, and conclusory allegations about the conspiracy's operation.  Oxbow's principal allegations—supposedly parallel shifts by UP and BNSF to public pricing and short-term contracts—are plagued by contradictions (for example, Oxbow itself alleges that BNSF *independently* shifted to public pricing well before the start of the alleged conspiracy) and inconsistencies (for example, public pricing would have seriously impeded the conspiracy's alleged system of sham bidding and refusals to bid).

This Court should also dismiss the claims of four of the five named Oxbow entities for failure to adequately allege their standing as direct purchasers under the *Illinois Brick* rule.  The FAC fails to allege that those four entities paid the alleged illegal surcharges directly to either UP or BNSF.  Moreover, while Oxbow Mining and Terror Creek appear to rely on an "agency" theory to establish standing, the FAC lacks the requisite specificity about the nature of those agency relationships.

## II.   <u>ARGUMENT</u>

### A.   <u>Oxbow Abandons Its Allegations of a Separate Agreement to Increase Coal-Specific Fuel Surcharges.</u>

In its complaint, Oxbow alleges that "[m]ore than a year after the commencement of the conspiracy, UP and BNSF *agreed* to impose even higher rate-based fuel surcharges on transportation for coal. . . .  [A] *conspiracy* to further increase the already illegal fuel surcharge for coal shipments was especially lucrative."  FAC ¶ 82 (emphasis added).

Oxbow inserted those allegations into the FAC—allegations that did not exist in Oxbow's original Complaint—to address the defect this Court identified in Oxbow's theory that it was injured by the standard fuel-surcharge conspiracy at issue in the MDL:  Oxbow "appear[s] to concede that certain plaintiffs did not pay the uniform standard fuel surcharge, but rather a distinct but similar coal-specific surcharge."  *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 43 (D.D.C. 2013).  In its opposition, however, Oxbow suddenly disclaims and abandons these explicit allegations that UP and BNSF "agreed" and "conspire[ed]" specifically to increase their coal-specific fuel surcharges.  *See* Oxbow Opp. at 3, 19-20 ("Oxbow is not alleging any such separate conspiracy.").

        BNSF's motion explained that Oxbow's insufficient allegations cannot support a claim that there was any agreement or conspiracy between UP and BNSF with respect to coal-specific fuel surcharges.  *See* Mem. ISO Def. BNSF Railway Company's Mot. to Dismiss FAC, Docket Item 55, at 11-12 (filed July 1, 2013) ("BNSF Mot.").  Oxbow does not address BNSF's arguments.  Instead, Oxbow abandons that claim entirely without explanation and then asserts that the separate agreement alleged in the FAC is irrelevant because the coal-specific surcharges were part of the standard fuel-surcharge conspiracy.  *See id.* at 19-20.  That is not the theory alleged in the FAC, which plainly alleges that increases in the coal-specific fuel surcharges were the result of a separate agreement entered into "[m]ore than a year after the commencement" of the standard fuel-surcharge conspiracy, *see* FAC ¶ 82.  Oxbow cannot amend the allegations in its complaint through arguments in its opposition brief.  *See Crowder v. Bierman, Geesing, and Ward LLC*, 713 F. Supp. 2d 6, 9 n.5 (D.D.C. 2010) (A "plaintiff may not amend her

complaint by the briefs in opposition to a motion to dismiss."); *see also Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("'It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.'") (quoting *Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000)).

BNSF does not dispute, in this motion, the sufficiency of Oxbow's allegations with respect to the standard fuel-surcharge conspiracy that is at issue in the MDL litigation and that this Court held sufficient. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 32 (D.D.C. 2008). BNSF does dispute, however, Oxbow's attempts in the FAC to expand the nature, scope, and subject of that conspiracy by alleging a separate (or additional) agreement between UP and BNSF with respect to coal-specific fuel surcharges. The Court should hold (1) that Oxbow has not sufficiently alleged an agreement or conspiracy between UP and BNSF to increase coal fuel surcharges and (2) that Oxbow has, in any event, abandoned any such allegation. The Court should then dismiss Oxbow's Section 1 claim to the extent it is predicated on a coal specific agreement or conspiracy and strike Paragraph 82 from the FAC. Oxbow's price-fixing claim under Section 1 should be limited to the same alleged agreement among the four railroads asserted in the MDL litigation.[1]

**B.    Oxbow Fails to Allege that Four of the Five Named Plaintiffs Paid a Fuel Surcharge *Directly* to UP or BNSF.**

This Court dismissed Oxbow's original Complaint because, among other reasons,

---

[1] As explained in UP's reply brief, Oxbow's Section 1 claim with respect to fuel surcharges for coal should be dismissed because Oxbow has not sufficiently alleged that the fuel surcharges it paid for coal were even part of the standard fuel-surcharge conspiracy at issue in the MDL. *See* UP Reply at 5-10. BNSF fully incorporates herein UP's argument on that issue.

Oxbow failed to allege sufficient facts that each named plaintiff purchased transportation services from, and therefore paid the alleged surcharge to, one of the defendants.  *See Oxbow*, 926 F. Supp. 2d at 43.  To assert a claim for damages under the federal antitrust law, *i.e.*, a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, a plaintiff must allege sufficient facts to show that it paid the alleged overcharge ***directly*** to the defendant.  *See* BNSF Mot. at 13-14.  Oxbow's opposition does not dispute this legal requirement.  *See* Oxbow Opp. at 20-22.[2]

BNSF explained that the FAC lacks sufficient allegations to show that four of the five named plaintiffs paid the supposed illegal fuel surcharge ***directly*** to either UP or BNSF, and thus the claims of those four plaintiffs must be dismissed.  *See* BNSF Mot. at 13-15.  Oxbow's opposition fails to demonstrate the allegations are sufficient.  For example, neither the FAC nor Oxbow's opposition reveals whether Terror Creek paid any fuel surcharge directly to one of the Defendants.  Paragraph 8 of the FAC—which is the sole paragraph Oxbow cites, *see* Oxbow Opp. at 22—merely states that Terror Creek "paid illegal fuel surcharges for the shipment of coal that [it] would not have paid but for the fuel surcharge conspiracy."  That does not indicate whether Terror Creek paid the surcharge *directly* or *indirectly*:  exactly the same allegation could be made by an indirect

---

[2] A plaintiff claiming damages under federal antitrust law generally must show that it purchased the relevant product "directly from an antitrust violator."  *See In re Microsoft Antitrust Litig.*, 127 F. Supp. 2d 702, 708 (D. Md. 2001).  There are specific exceptions to that rule, *see* BNSF Mot. at 14 n.5, none of which Oxbow purports to rely upon.  Nor does Oxbow appear to rely on the so-called "umbrella theory" by which plaintiffs have sought to recover damages for purchases from competitors of the alleged conspirators.  In any event, courts in this District have rejected that theory.  *See In re Vitamins Antitrust Litig.*, 2001 WL 855463, at *3-6 (D.D.C. July 2, 2001) (rejecting claims for damages under the "umbrella" theory); *FTC v. Mylan Labs.*, 62 F. Supp. 2d 25, 38-39 (D.D.C. 1999) (granting a motion to dismiss claims premised on "umbrella liability": "purchasers from competitors of price-fixing defendants may not seek damages under an umbrella theory of liability").

purchaser lacking standing under *Illinois Brick v. Illinois*, 431 U.S. 720 (1977).[3]

Oxbow contends also that it is relying on an agency theory, at least in part, to establish Terror Creek's standing as a direct purchaser. *See* Oxbow Opp. at 22. But Paragraph 11 of the FAC—which states that Terror Creek holds some "rail contracts . . . through Oxbow Carbon & Minerals LLC, acting as its agent"—does not allege those contracts are with UP or BNSF. Moreover, an agency relationship does not automatically confer direct-purchaser standing on the principal. *See Diskin v. Daily Racing Form, Inc.*, 1994 WL 330229, at *4-5 (S.D.N.Y. 1994) ("Too readily concluding that a particular industry structure constitutes a principal-agent arrangement outside the direct-purchaser rule would . . . undermine the rule" established in *Illinois Brick*); *id.* at *5 (discussing specific facts—*e.g.*, the nature and amount of risk borne by the agent—relevant to determining whether a purported agent or its principal is the direct purchaser). Oxbow's mere allegation of "agency," therefore, is insufficient to establish standing. *Cf. United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1383 (D.C. Cir. 1984) ("The burden is on the plaintiff to allege facts sufficient to support standing.").

Oxbow relies on paragraphs 8 and 137 of the FAC in an effort to show the allegations are sufficient with respect to Oxbow Calcining and Oxbow Midwest Calcining. *See* Oxbow Opp. at 21-22. Paragraph 8 states that those two entities "each directly paid illegal fuel surcharges for the shipment of petroleum coke ('petcoke') that they would not have paid but for the fuel surcharge conspiracy." The FAC does not allege whether those surcharges were paid "directly" to one of the Defendants, one of the

---

[3] The deficiencies in the FAC are highlighted by a comparison to the allegations in the class action complaint, which clearly state that each of the named class plaintiffs "**purchased . . . directly from one or more of the Defendants**." *See* Second Consolidated Amended Class Action Compl., ¶¶ 21-28, No. 07-489, Docket Item 324 (D.D.C. filed Feb. 3, 2010) (emphasis added).

unnamed co-conspirators, or some other entity altogether.  Paragraph 137 similarly does not identify to whom the surcharges were paid.  Oxbow effectively concedes this deficiency, as it now purports to supplement its pleading in footnote 5 of its opposition, which asserts that each of these entities paid fuel surcharges directly to either UP or BNSF.  *See* Oxbow Opp. at 22 n.5.  Oxbow cannot, however, correct the deficiencies in the FAC through additional facts asserted in an opposition brief.  *See supra*, pp. 3-4.

The FAC never alleges that Oxbow Mining paid any fuel surcharge *directly* to one of the Defendants.  Paragraph 141 states that Oxbow Mining and Oxbow Carbon & Minerals "[b]oth paid the illegal fuel surcharge that UP imposed," but does not allege that they did so directly.  Oxbow Mining is apparently attempting to rely on an agency relationship (like Terror Creek) with Oxbow Carbon & Minerals to establish standing as a direct purchaser.  *See* FAC ¶ 137 (alleging surcharges were paid by either Oxbow Mining "or through Oxbow Carbon & Minerals LLC acting as its agent").  But a mere allegation of "agency," without further details, is insufficient to establish standing as a direct purchaser.  *See supra*, p. 6.

The claims of Oxbow Mining, Oxbow Calcining, Oxbow Midwest Calcining, and Terror Creek should be dismissed.

**C.    Oxbow's Deficient, Contradictory, and Inconsistent Allegations Do Not Plausibly Suggest a Market-Allocation Conspiracy.**

Oxbow makes clear for the first time in its opposition that the alleged market-allocation conspiracy involved only coal shipped from the Uinta and Powder River Basins.  Oxbow Opp. at 24; *see* BNSF Mot. at 18-21 (explaining deficiencies in the FAC with respect to the terms of the alleged market-allocation conspiracy).  Oxbow's theory is that BNSF agreed to exit the Uinta Basin and in return UP and BNSF agreed to stop

competing for each other's customers in the Powder River Basin.  Oxbow alleges that UP and BNSF implemented this supposed conspiracy through both sham bids and outright refusals to bid; Oxbow also alleges that a shift to public pricing by UP and BNSF facilitated the use of sham bids.  *See* Oxbow Opp. at 28.  As explained below, there are numerous significant deficiencies, contradictions, and inconsistencies in Oxbow's allegations with respect to critical components of this alleged conspiracy.  As a result, the FAC cannot allege a plausible market-allocation conspiracy.

*First*, Oxbow's theory depends on prior competition between UP and BNSF in the Uinta Basin that could plausibly have ceased only as a result of an unlawful agreement, which requires showing that it was in BNSF's self-interest to continue to compete aggressively in the Uinta Basin.  *See* Oxbow Opp. at 33-4.  But Oxbow claims that in the 7-8 year run-up to the alleged conspiracy "[t]he most BNSF was able to achieve [] were successful bids to transport Utah coal 'on a number of occasions'" and BNSF *never* "accumulated a significant customer base" there.  *See* Oxbow Opp. at 30 n.10.  Thus, even assuming BNSF exited the Uinta Basin (and there are no specific allegations to suggest that happened), the obvious alternative explanation—indeed, the *most* plausible explanation—based on Oxbow's own allegations would be that BNSF independently decided to exit a geographic area where it had failed to achieve any significant market share after 7-8 years of trying to compete.  *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.") (quoting *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 682  (2009)).

A Section 1 claim should be dismissed where the alleged conduct is "not only compatible with, but indeed is more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680; *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342-43 (11th Cir. 2010) (affirming dismissal of Section 1 claim because the alleged conduct was as consistent with independent economic activity as it was with conspiracy); *Duty Free Americas, Inc. v. Estee Lauder Cos.*, ___ F. Supp. 2d ___, 2013 WL 2303764, at *7, 10 (S.D. Fla. May 9, 2013) (granting motion to dismiss Section 1 claim because "the most plausible" explanation of the alleged conduct was that the defendant was acting independently).  Oxbow concedes that a motion to dismiss should be granted where there is  an "'obvious alternative explanation[]' rooted either in 'common economic experience' or the facts alleged in the complaint."  *See* Oxbow Opp. at 36 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565-67 (2007)).  Oxbow's own allegations provide precisely that type of alternative explanation:  BNSF independently decided to exit the Uinta Basin after 7-8 years of seemingly dismal results.[4]  It is the plaintiff's burden to "allege additional facts that tend to exclude independent self-interested conduct."  *Twombly*, 550 U.S. at 552, *see also Tempur-Pedic*, 626 F.3d at 1342.  Oxbow fails to offer any specific factual allegations to show that an independent decision by BNSF to exit the Uinta Basin would not have been in its own self-interest, or even what motivation BNSF independently had to continue competing in the Uinta

---

[4] Oxbow's affirmative position that BNSF had no significant presence in the Uinta Basin prior to the alleged conspiracy renders UP's motivation for the market-allocation conspiracy more implausible.  Effectively, Oxbow is alleging that UP agreed to cease competing with BNSF in the Powder River Basin—which it concedes is "a far larger market" than Uinta (Oxbow Opp. at 30)—in exchange for BNSF's not competing in a location where BNSF had never had a significant market presence in the first place.

Basin.[5]

**Second**, BNSF previously explained that the FAC lacks sufficient detail to show the alleged market-allocation conspiracy actually in operation.  BNSF Mot. at 21-23. Oxbow's principal response is that a complaint is sufficient if it puts the defendants "on notice of the nature of the alleged conspiracy."  Oxbow Opp. at 26.  But that is clearly not the standard.  To state a claim under Section 1, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made . . . [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556; *see also In re Rail Freight Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 32 (D.D.C. 2008) (noting that "plaintiffs have supported their theory of conspiracy with *sufficient factual details* to bring their allegations beyond the realm of bare legal conclusions") (emphasis added).

The lack of factual detail in the FAC is remarkable given that Oxbow alleges a sweeping market-allocation conspiracy, allegedly effectuated through both outright refusals to bid and sham bidding, and which would have affected nearly every coal shipper in the Uinta and Powder River Basins.  Oxbow, despite arguing that it paid various fuel surcharges "directly" to both UP and BNSF, offers no specific allegations whatsoever regarding its own experience with either UP or BNSF in either location to

---

[5] Oxbow also argues that Defendants' "common motive to conspire" to raise prices supports the plausibility of the alleged conspiracy.  *See* Oxbow Opp. at 29-30.  A common motive is *necessary* to support an inference of an antitrust conspiracy, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986), but such a motive does not itself plausibly suggest a conspiracy:  "if 'a motive to achieve higher prices' were sufficient, every company in every industry could be accused of conspiracy because they all 'would have such a 'motive.''"  *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999)).  Indeed, "'[m]otivation to enter a conspiracy is never enough' to show an agreement."  *Id.* (quoting VI Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1411, at 68 (2003)).

show the type of refusals to bid or sham bids that it contends were used to effectuate the

conspiracy.  Instead, Oxbow offers conclusory allegations that must be disregarded in

assessing the sufficiency of the FAC.  *See* BNSF Mot. at 16 n.6.  In *Twombly*, for

example, the Supreme Court disregarded similar conclusory allegations, such as those

merely alleging that the incumbent local exchange carriers (ILECs) "agreed not to

compete with one another": "Although in form a few stray statements speak directly of

agreement, on fair reading these are merely legal conclusions . . . ."  550 U.S. at 564 &

n.9; *see also Rail Freight*, 587 F. Supp. 2d at 32.

Oxbow's only other allegations that purport to show the conspiracy in operation

are vague and ambiguous and involve the isolated experiences of three shippers unrelated

to Oxbow.  *See* BNSF Mot. at 21-23.  Moreover, only one of the three incidents is even

alleged to have involved competition in the Uinta or Powder River Basins.  *See id*.  While

Oxbow insists that it is not required to plead specific facts, Oxbow Opp. at 41,

"ambiguous or overly generalized allegations leave open the distinct possibility that

Defendants' behavior was entirely normal and legitimate."  *See, e.g.*, *In re Nat'l Ass'n of*

*Music Merchants, Musical Instr. and Equip. Antitrust Litig.*, 2012 WL 3637291, at *5

(S.D. Cal. Aug. 20, 2012).  The Court is not required to accept the unwarranted

inferences Oxbow attempts to draw from ambiguous allegations.  *See, e.g.*, *In re*

*Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 716 (E.D. Pa. 2011) ("the

Court need not accept as true unsupported conclusions and unwarranted inferences, or the

plaintiff's bald assertions or legal conclusions") (internal quotation marks and citations

omitted); *Rail Freight*, 587 F. Supp. 2d at 32 ("The Court . . . need not accept inferences

drawn by plaintiffs if those inferences are unsupported by facts alleged in the

complaint . . . .").[6]

**Third,** Oxbow relies heavily on allegations of a parallel shift to public pricing, which it argues "strongly demonstrates the plausibility of [its] conspiracy allegations." *See* Oxbow Opp. at 44.  The alleged shift to public pricing, in Oxbow's view, "'served no legitimate business purpose and instead [was] adopted to signal price changes and coordinate market allocation by enabling competitors to structure bids to avoid taking business away from their rivals.'"  Oxbow Opp. at 45 (quoting FAC ¶ 116).  There are two fundamental flaws in Oxbow's reasoning:  first, its own allegations show that BNSF actually shifted to public pricing *before the conspiracy*; second, public pricing would undermine, not advance, the alleged system of sham bidding and refusals to bid.

Oxbow alleges the market-allocation conspiracy began in the "second half of 2003."  Oxbow Opp. at 26.  The FAC, however, alleges that "BNSF first experimented with public pricing beginning in January 2003, publishing a tariff that specified rate and services terms for shipping coal from mines in the Powder River Basin."  FAC ¶ 116.  Oxbow's own allegation thus shows that BNSF independently—and presumptively for legitimate business reasons—decided to shift to public pricing.  That allegation directly contradicts Oxbow's contention that there could not have been any legitimate business purpose for the Defendants to shift to public pricing, and accordingly undermines Oxbow's attempt to infer a conspiracy from the subsequent adoption of public pricing by

---

[6] The principal cases relied upon by Oxbow where a court denied a motion to dismiss involved significantly more detailed and specific factual allegations.  For example, in *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013), numerous, specific factual allegations of the plaintiff's own direct experience with four of the five alleged conspirators supported the claim of an unlawful group boycott.  *See id.* at 48.  In *Milliken & Co. v. CNA Holdings Inc.*, 2011 WL 3444013 (W.D.N.C. Aug. 8, 2011), the complaint alleged specific meetings where agreements were allegedly reached and the specific terms of those agreements, named specific employees involved in the agreements, and alleged the specific ways in which the conspiracy was implemented.  *See id.* at *2.

UP.  *See, e.g.*, *Erie Cty. v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012)

(allegations that "plausibly raise an inference of agreement include 'parallel behavior that

would probably not result from . . .  independent responses to common stimuli[] or mere

interdependence'") (quoting *Twombly*, 550 U.S. at 556 n.4).

Oxbow alleges that BNSF "quickly suspended" its unilateral attempts at public

pricing and then UP began public pricing in March 2004, but that pattern reflects nothing

more than legitimate parallel behavior.  Indeed, it is not surprising and certainly not

suggestive of a Section 1 conspiracy that a similarly situated competitor, such as UP, in a

highly-concentrated industry might observe BNSF's initial attempts at public pricing and

subsequently implement similar policies.  In granting a motion to dismiss a Section 1

claim in *Music Merchants*, the court held that allegations that competitors adopted similar

"minimum advertised price" policies were insufficient because that behavior "could just

as easily be attributable to a similar business model or similar business conditions."  2012

WL 3637291, at *4; *see also Late Fee and Over-Limit Fee*, 528 F. Supp. 2d at 964

("parallel behavior in a concentrated market is insufficient to suggest a conspiracy

because it is a 'common reaction of firms in a concentrated market' to 'recogniz[e] their

shared economic interests' and to reach similar 'price and output decisions'

independently") (quoting *Twombly*, 550 U.S. at 553).

The other flaw in Oxbow's theory with respect to public pricing is that, as BNSF

previously explained, it would have undermined the alleged system of sham bidding.  *See*

BNSF Mot. at 26.  The Defendants could not realistically have submitted "sham" bids to

customers that deviated from the publicly announced prices.  *See id*.  Oxbow does not

even respond to these points; instead, Oxbow simply suggests that public pricing

facilitated sham bidding because it signaled to competitors the price they should bid to ensure losing the business.  Oxbow Opp. at 28.  But that does not address BNSF's main point:  that publicly announced prices would enable a customer to see whether, if BNSF or UP bid, its bid deviated from its public prices, thereby undermining the purported conspiracy.

Oxbow's other attempts to connect public pricing to the alleged market-allocation conspiracy also miss the mark.  Oxbow's arguments, the cases it cites, and the alleged statements from the STB, *see* Oxbow Opp. at 44-46, reflect at most that public pricing may in certain circumstances be conducive to a *price-fixing* conspiracy (as BNSF previously discussed, *see* BNSF Mot. at 25).  Oxbow does not provide any authority, explanation, or facts that suggest public pricing is evidence of (or even consistent with) the type of *market-allocation* conspiracy that it alleges.

***Fourth,*** the alleged shift to short-term contracts has no apparent relationship to the alleged market-allocation conspiracy.  Oxbow provides no explanation how the use of shorter term contracts could have facilitated the alleged market-allocation conspiracy.  In contrast, BNSF explained a number of ways in which short-term contracts would have undermined the system of sham bidding allegedly used to effectuate that conspiracy.  For example, shorter-term contracts would have required far more frequent "sham" bids, thus resulting in the need for more coordination and increasing the probability that customers would detect any conspiracy; and it would have provided many more opportunities for the alleged conspirators to "cheat" on the supposed agreement (whereas conspirators generally try to minimize opportunities to cheat on an agreement).  *See* BNSF Mot. at 28-29.

14

The only relevance of an alleged shift to short-term contracts identified by Oxbow is that such a shift may reflect a lack of fear of competition.  Defendants have, however, explained, without rebuttal from Oxbow, the legitimate reasons both why companies would shift to short-term contracts and why such a shift would have undermined the alleged market-allocation conspiracy.  *See* BNSF Mot. at 27; Mem. ISO of Def. Union Pac. RR. Co.'s Mot. to Dismiss Plfs. FAC, Docket Item 54-1, at 21 (filed July 1, 2013).  Thus, Oxbow's reliance on a shift to short-term contracts renders the alleged conspiracy less, not more, plausible.

## III.   <u>CONCLUSION</u>

BNSF submits that, for all the foregoing reasons and those set forth in its opening memorandum, its Motion to Dismiss should be granted.

Dated: October 15, 2013                                    Respectfully submitted,


                                                           */s/ Bradley S. Phillips*
                                                           Bradley S. Phillips (admitted *pro hac vice*)
                                                           Henry Weissmann (admitted *pro hac vice*)
                                                           MUNGER, TOLLES & OLSON LLP
                                                           355 S. Grand Avenue, Suite 3500
                                                           Los Angeles, CA  90071
                                                           Telephone:  (213) 683-9100

                                                           Attorneys for Defendant
                                                           BNSF RAILWAY COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I, Bradley S. Phillips, an attorney, certify that on October 15, 2013, I caused a true

and correct copy of the foregoing to be filed with the Clerk of the Court using the

CM/ECF system, which will send notice of such filing to counsel for all parties.


*/s/ Bradley S. Phillips*

Bradley S. Phillips (admitted *pro hac vice*)
Henry Weissmann (admitted *pro hac vice*)
MUNGER, TOLLES & OLSON LLP
355 S. Grand Avenue, Suite 3500
Los Angeles, CA  90071
Telephone:  (213) 683-9100

Attorneys for Defendant
BNSF RAILWAY COMPANY