UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
OXBOW CARBON & MINERALS             )
LLC, et al.,                        )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )
                                    )    Civil Action No. 11-1049 (PLF)
UNION PACIFIC RAILROAD              )
COMPANY, et al.,                    )
                                    )
            Defendants.             )
_____ )


OPINION AND ORDER

        This Court previously dismissed plaintiffs' complaint without prejudice for failure

to state a claim.  After plaintiffs filed a substantially revised amended complaint, defendants

Union Pacific Railroad Company ("UP") and BNSF Railway Company ("BNSF") again have

moved to dismiss for failure to state a claim and for lack of Article III standing.  After carefully

considering the arguments made by the parties in their papers and the oral arguments presented

by counsel in court on January 8, 2015, the Court concludes that plaintiffs' amended complaint

sufficiently states a claim on all counts and it therefore denies defendants' motions to dismiss.[1]

_____

        [1]        The papers reviewed in connection with the pending motions include the
following: plaintiffs' first amended complaint ("Am. Compl.") [Dkt. No. 53]; UP's motion to
dismiss ("UP Mot.") [Dkt. No. 54]; BNSF's motion to dismiss ("BNSF Mot.") [Dkt. No. 55];
plaintiffs' opposition to defendants' motions to dismiss ("Opp.") [Dkt. No. 57]; UP's reply in
support of its motion to dismiss ("UP Reply") [Dkt. No. 58]; and BNSF's reply in support of its
motion to dismiss ("BNSF Reply") [Dkt. No. 59].

## I. BACKGROUND

The facts of this case are described in detail in this Court's February 26, 2013 Opinion granting defendants' prior motions to dismiss. Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co. ("Oxbow I"), 926 F. Supp. 2d 36, 39-40 (D.D.C. 2013). They are summarized here as relevant.

Plaintiffs are five related companies (collectively referred to as "Oxbow") — Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC — that mine, sell, and ship coal and petroleum coke.[2] They allege that UP and BNSF engaged in anticompetitive conduct, both in concert and, in the case of UP, independently, that harmed plaintiffs. In short, plaintiffs allege that defendants conspired to (1) fix prices above competitive levels through a uniform fuel surcharge and (2) allocate certain markets to each other, granting UP a monopoly in at least one region.[3]

Plaintiffs' original complaint was dismissed without prejudice for failure to state a claim. Oxbow I, 926 F. Supp. 2d at 41-42. In Oxbow I, this Court held that (1) plaintiffs failed to allege sufficient facts under Section 1 of the Sherman Act regarding each Oxbow plaintiff's payment of the illegal fuel surcharges, id. at 42-44; (2) plaintiffs' allegations that UP and BNSF shared a monopoly could not support a Section 2 Sherman Act conspiracy claim, id. at 45-47;

---

[2]     Oxbow Calcining International LLC, a plaintiff in the original complaint, has been removed from the amended complaint.

[3]     The price-fixing allegations are virtually identical to those previously alleged in a related class action before this Court. In re Rail Freight Fuel Surcharge Antitrust Litig., Misc. No. 07-0489 (PLF). In that suit, a class of direct and indirect purchasers of rail freight transportation services claim that BNSF and Union Pacific, along with two other railroad companies, violated Section 1 of the Sherman Act by conspiring to raise freight prices above competitive levels through the imposition of a uniform fuel surcharge. In re Rail Freight Fuel Surcharge Antitrust Litig., 587 F. Supp. 2d 27, 29-31 (D.D.C. 2008) (direct purchasers); see also In re Rail Freight Fuel Surcharge Antitrust Litig., 593 F. Supp. 2d 29 (D.D.C. 2008) (indirect purchasers).

(3) even if the complaint was construed to allege a conspiracy to allocate an entire market to UP

only, Oxbow had nevertheless failed to state a claim because Oxbow omitted basic information

about the Section 2 conspiracy, id. at 46-47; and (4) the complaint failed to state a claim of

monopolization or attempted monopolization against UP because allegations of "insufficient

assistance in the provision of service to rivals" could not support such a claim.  Id. at 48 (citing

Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 410 (2004)).

      In response to the Court's Opinion, Oxbow filed a substantially amended

complaint which brings claims under Section 1 and Section 2 of the Sherman Act.  Count I, the

fuel surcharge conspiracy claim, and Count II, the conspiracy not-to-compete claim, are brought

under Section 1.  Count III, which alleges both monopolization or attempted monopolization by

UP and a conspiracy to monopolize by both defendants, is brought under Section 2.  Counts II

and III concern two specific markets for coal and petcoke, the Uinta Basin and the Powder River

Basin.  The final count, for breach of contract, is brought under state law.  Oxbow alleges that

UP breached the "Tolling Agreement," an agreement to, among other things, toll the statute of

limitations for Oxbow's claims while the parties negotiated a potential settlement for those

claims that did not come to fruition.

      UP and BNSF then filed motions to dismiss.  Importantly, neither UP nor BNSF

requests that this Court dismiss Count I of the amended complaint in its entirety, but rather only

that it dismiss those claims that go beyond the allegations in In re Rail Freight Fuel Surcharge

Antitrust Litig. (the "Rail Freight Action"), Misc. No. 07-0489 (PLF), which this Court has

already found sufficient under Rule 8 of the Federal Rules of Civil Procedure.  See 587 F. Supp.

2d 27 (D.D.C. 2008); 593 F. Supp. 2d 29 (D.D.C. 2008), aff'd, 602 F.3d 444 (D.C. Cir. 2010).

## II.  ARTICLE III STANDING

Defendants UP and BNSF move to dismiss the amended complaint for (1) lack of standing and (2) for failure to state a claim.  The Court first addresses the threshold issue of standing, finding that plaintiffs have sufficiently alleged facts establishing standing on all counts, with the exception of certain plaintiffs' claims for breach of contract, Count IV.  On that count, the Court dismisses two plaintiffs, Oxbow Midwest Calcining LLC and Terror Creek LLC, because they are not parties to the contract.

### A.  Legal Standard

Federal jurisdiction is limited under Article III of the Constitution to "Cases" and "Controversies."  Massachusetts v. EPA, 549 U.S. 497, 516 (2007).  The doctrine of standing flows directly from this limitation.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  That doctrine assures that "the litigant is entitled to have the court decide the merits of the dispute or of particular issues," Warth v. Seldin, 422 U.S. 490, 498 (1975), by demanding that he or she "possess a 'direct stake in the outcome' of the case."  Hollingsworth v. Perry, 133 S. Ct. 2652, 2662 (2013) (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997)).

To establish the requisite standing, each plaintiff must show, at an "irreducible constitutional minimum," that (1) it has suffered an "injury in fact" through the "invasion of a 'legally protected interest;'" (2) the injury is "fairly traceable" to the defendant's conduct; and (3) a favorable decision on the merits likely will redress the injury.  Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 273-74 (2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560-61).  In addition to an "injury in fact," plaintiffs bringing federal antitrust claims also must show an "antitrust injury" — that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Meijer, Inc. v. Biovail

Corp., 533 F.3d 857, 862 (D.C. Cir. 2008) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat,

Inc., 429 U.S. 477, 489 (1977) (emphasis omitted)).

## B. Analysis

This Court previously dismissed plaintiffs' complaint, in part because "plaintiffs

ha[d] not alleged adequate facts about their payment of surcharges to support an inference of

injury" caused by the alleged fuel surcharge conspiracy, and because "each plaintiff must

demonstrate that it has suffered injury in order to establish standing." Oxbow I, 926 F. Supp. 2d

at 43. Specifically, the original complaint "fail[ed] to specifically allege that each entity paid a

surcharge at all." Id. The amended complaint corrects that deficiency by alleging that each

plaintiff paid "fuel surcharges . . . that they would not have paid in the absence of the

conspiracy." Am. Compl. ¶ 135.[4] The amended complaint, however, neglects to state to *whom*

plaintiffs Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and

Terror Creek LLC paid those surcharges.[5]

Defendants argue that this failure is fatal and that those four plaintiffs must be

dismissed from Count I. Defendants, however, are jointly and severally liable under Section 1

for any injury suffered by plaintiffs. In re Uranium Antitrust Litig., 617 F.2d 1248, 1257 (7th

Cir. 1980). Plaintiffs therefore need not identify, at this stage, to which co-conspirator they paid

fuel surcharges. See In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 508

(S.D.N.Y. 1996) (holding that "[b]ecause antitrust liability is joint and several, a Plaintiff injured

---

[4]      In Oxbow I, this Court also noted that Oxbow's original "[c]omplaint provide[d]
only a one or two sentence description of each entity and include[d] very little information about
the business operations of the individual plaintiffs." The amended complaint corrects this
problem. Compare Am. Compl. ¶¶ 9–13, with Compl. ¶¶ 12-17.

[5]      There is no such deficiency regarding plaintiff Oxbow Carbon & Minerals, as
defendants concede. Am. Compl. ¶ 9; see, e.g., BNSF Mot. at 14.

by one Defendant as a result of the conspiracy has standing to represent a class of individuals

injured by any of the Defendant's co-conspirators") (citing Rios v. Marshall, 100 F.R.D. 395,

404 (S.D.N.Y. 1983)); In re Motor Fuel Temperature Sales Practices Litig., 271 F.R.D. 221, 230

(D. Kan. 2010) (holding that, under a Kansas law imposing joint and several liability, "even if

plaintiffs did not purchase motor fuel directly from some defendants, it appears that they would

have standing to assert claims for civil conspiracy claims against them").  At this stage, plaintiffs

"need not show more than general factual allegations laying out a good faith basis for how one or

more of the defendants injured plaintiffs.  Nor must each plaintiff allege facts against all

defendants, nor each defendant's relationship with a plaintiff be explicitly identified." Bodner v.

Banque Paribas, 114 F. Supp. 2d 117, 125 (E.D.N.Y. 2000).  Instead, plaintiffs need only allege,

as they have in the amended complaint, that they suffered damages as a result of the conspiracy

in which defendants participated.  See Am. Compl. ¶¶ 8-13, 134-42.  Plaintiffs therefore have

established sufficient standing to bring their Count I claim for price-fixing under Section 1 of the

Sherman Act.

As to Count II, the Section 1 conspiracy not-to-compete claim, UP argues that

Oxbow Carbon & Minerals and Oxbow Mining — the only two plaintiffs to bring this claim —

lack standing as to any allegations concerning the Powder River Basin because they solely reside

in the Uinta Basin.  UP Mot. at 22.  According to UP, Oxbow thus "does not have standing to

maintain an action for an alleged antitrust violation affecting a relevant market in which it does

not participate." UP Mot. at 23.  But the alleged conspiracy not-to-compete encompasses *two*

relevant markets: the Uinta and Powder River Basins.  That alleged conspiracy therefore does

affect the relevant market in which Oxbow participates.  The fact that it also affected another

market that plaintiffs do not participate in does not deprive plaintiffs of standing; nor does it bar

6

them from making allegations concerning that market.  This reasoning applies equally to Count

III, the Section 2 conspiracy to monopolize claim, which is brought by the same two plaintiffs.

Plaintiffs' claim for breach of contract (Count IV), however, is a different story.

The amended complaint states that Count IV (Breach of Contract: Tolling Agreement) is brought

"[b]y all Plaintiffs against UP."  Am. Compl. ¶¶ 163-72.  Although defendants failed to raise the

argument, a review of the Tolling Agreement reveals that plaintiffs Oxbow Midwest Calcining

LLC and Terror Creek LLC are not parties to the contract.  See Lee's Summit v. Surface Transp.

Bd., 231 F.3d 39, 41 (D.C. Cir. 2000) ("When there is doubt about a party's constitutional

standing, the court must resolve the doubt, *sua sponte* if need be.").  And neither the amended

complaint nor Oxbow's briefs suggest that those plaintiffs were intended third-party

beneficiaries to the contract, such that they would possess Article III standing.  See generally

Beckett v. Air Line Pilots Ass'n, 995 F.2d 280, 286 (D.C. Cir. 1993).  Oxbow Midwest

Calcining and Terror Creek's claim for breach of contract therefore is dismissed.

## III.  FAILURE TO STATE A CLAIM

### A.  *Rule 12(b)(6) of the Federal Rules of Civil Procedure*

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal of a

complaint if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P.

12(b)(6).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of

the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice

of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Although "detailed

factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, the facts

alleged must be "enough to raise a right to relief above the speculative level."  Id.  The complaint

"must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. at 678).

In deciding a motion to dismiss under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002)). The complaint is considered in its entirety, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007), and construed liberally in plaintiffs' favor. Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir.1979) (internal quotations omitted)). The Court must grant plaintiffs "the benefit of all inferences that can be derived from the facts alleged." Id. (quoting Schuler v. United States, 617 F.2d at 608). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept the plaintiffs' legal conclusions. Id. (citing Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## B. *Oxbow Alleges One Fuel Surcharge Conspiracy, Not Two*

Defendants concede that Count I states a valid Section 1 claim with respect to the illegal fuel surcharges imposed for the shipment of petcoke. See UP Mot. at 4-5; BNSF Mot. at 1. Defendants instead argue that Oxbow has pled no facts in Count I that plausibly suggest the existence of a separate conspiracy to impose higher fuel surcharges for the shipment of coal. See UP Mot. at 8 ("Oxbow does not identify when this alleged agreement on coal surcharges was

supposedly formed; who was involved; how it was communicated; or what its terms included."); BNSF Mot. at 11-12 ("[T]he [amended complaint] lacks sufficient allegations regarding the formation, timing, nature, or operation of this supposed separate conspiracy."). Oxbow responds that the amended complaint, fairly read, alleges only one solitary conspiracy. Opp. at 8 ("The fuel surcharges for coal were part of the same conspiracy.").

The Court agrees with Oxbow. Contrary to defendants' portrayal, there is no separate conspiracy regarding coal surcharges — plaintiffs have not alleged one, and the amended complaint does not indicate that coal fuel surcharges should be treated separately. Instead, plaintiffs allege the existence of "a conspiracy to increase revenue by . . . imposing across-the-board, non-negotiable 'fuel surcharges' on *all* customers and for *all* products." Am. Compl. ¶ 49 (emphasis added). Oxbow further clarifies that each plaintiff paid a fuel surcharge for the shipment of coal, petcoke, or both, see id. ¶ 8, and that "for the duration of the conspiracy, coal fuel surcharges either exceeded or (for the first year of the conspiracy) equaled the illegal fuel surcharges applied to all other products, including petcoke." Id. ¶ 84; see also id. ¶¶ 146-49.

That UP and BNSF later increased the fuel surcharge for the shipment of coal, whether unilaterally or in concert, is irrelevant at this stage. Either way, the amended complaint is clear that coal fuel surcharges were part and parcel of the overall fuel surcharge conspiracy. There may be a separate issue regarding damages, but it is inappropriate to address that issue at this stage of the litigation.

### C.  Oxbow Has Sufficiently Alleged a Conspiracy Not-to-Compete

Defendants argue that Oxbow's allegations in Count II regarding a Section 1 conspiracy not-to-compete (1) contradict the allegations in the original complaint, UP Mot. at

9-10; BNSF Mot. at 19-20; (2) are conclusory, UP Mot. at 10-11; BNSF Mot. at 15-23; and

(3) are explained by natural market factors, rather than by conspiracy.  UP Mot. at 17-22; BNSF

Mot. at 24-30.[6]

          1.  The amended complaint does not contradict Oxbow's original allegations

          Defendants argue that the original complaint alleged a "conspiracy to divide a

broad western coal market, with each railroad agreeing not to compete for the other's existing

customers in that broad market."  UP Reply at 12; <u>see also</u> BNSF Mot. at 19-20.  In contrast,

defendants claim that the amended complaint alleges a much more complicated agreement in

which BNSF "agreed to give up its customers in the Uinta Basin (which Oxbow now alleges is a

separate market) . . . just to preserve the status quo in the Powder River Basin."  UP Reply at 12.

According to defendants, these allegations are contradictory, requiring the Court to either strike

the new allegations or "take account of such blatant inconsistencies in evaluating the plausibility

of Oxbow's new allegations."  BNSF Mot. at 20; <u>see also</u> UP Mot. at 10.

          The Court will do neither.  Defendants fail to acknowledge that a relevant market

may include "cognizable submarkets which themselves [may] constitute the appropriate market

for antitrust analysis."  <u>Geneva Pharm. Tech. Corp. v. Barr Labs, Inc.</u>, 386 F.3d 485, 496 (2d Cir.

2004) (citing <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325 (1962)).  Plaintiffs have

---

[6]      At the outset, it is important to delineate that Oxbow has alleged two distinct conspiracies, apart from the fuel surcharge price-fixing conspiracy: a Section 1 conspiracy not-to-compete (Count II); and a Section 2 conspiracy to monopolize (Count III).  UP and BNSF frequently conflate the two in their arguments, although some arguments appear directed towards one or the other.  <u>See</u> UP Mot. Part III.C ("Oxbow's Second and Third Claims For Relief Must Be Dismissed, Because Oxbow's Amended Complaint Fails to Allege Facts Supporting A Conspiracy Not To Compete"); BNSF Mot. Part III.C ("Oxbow Does Not Adequately Allege An Unlawful Market-Allocation Conspiracy Under Section 1 or Section 2").

simply narrowed their allegations from a larger market — the entire western United States — to a submarket — the Uinta and Powder River Basins.  There is no contradiction.[7]

Cases cited by the defendants are inapposite.  See UP Mot. at 9-10; UP Reply at 11-14; BNSF Reply at 7-15.  In both Hourani v. Mirtchev, 943 F. Supp. 2d 159 (D.D.C. 2013), and Stanislaus Food Prods. Co. v. USS-POSCO Indus., 782 F. Supp. 2d 1059 (E.D. Cal. 2011), the amended and original complaints were irreconcilable — the allegations in both could not be true.  See Hourani v. Mirtchev, 943 F. Supp. 2d at 170-71 (amended and original complaints alleged that different parties stole the same funds); Stanislaus Food Prods. Co. v. USS-POSCO Indus., 782 F. Supp. 2d at 1075-76 (original complaint alleged defendants conspired in 1986 to exit a certain market, while the amended complaint alleged defendants conspired to allocate that same market in 2006).  That is not the case here.

2.  Oxbow has stated a valid claim of a conspiracy not-to-compete

A plaintiff alleging a conspiracy in violation of Section 1 of the Sherman Act must plead "enough factual matter (taken as true) to suggest that an agreement was made."  Bell Atl. Corp. v. Twombly, 550 U.S. at 556.  In other words, Twombly "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  Id.  The Supreme Court in Twombly noted that:

> [L]awful parallel conduct fails to bespeak unlawful agreement.  It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply

---

[7]     Defendants also misstate plaintiffs' allegations.  The amended complaint does not allege that BNSF had a significant customer base in the Uinta Basin prior to the formation of the conspiracy not-to-compete.  Instead, Oxbow alleges that BNSF (1) possessed trackage rights, which applied competitive pressure, Am. Compl. ¶ 36, but (2) did not serve Colorado mines, id. ¶ 35, and (3) successfully bid to ship Utah coal only on "a number of occasions."  Id. ¶ 42.

> facts adequate to show illegality.   Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

Id. at 556-57.  Defendants argue that Oxbow's amended complaint fails to satisfy this standard and offers only conclusory allegations of parallel conduct that are readily explained by natural market forces.  The Court disagrees.

### a. Oxbow's allegations plausibly suggest conspiracy

As in Twombly, plaintiffs' amended complaint rests on circumstantial evidence of agreement.  Bell Atl. Corp. v. Twombly, 550 U.S. at 564-65; see Opp. at 26.  While this Court previously dismissed plaintiffs' conspiracy not-to-compete claim for failure to state a claim, see Oxbow I, 926 F. Supp. 2d at 46, this Court also found that "defendants overstate[d] the degree to which plaintiffs allege[d] only parallel conduct."  Id. at 47.  Defendants make the same mistake here.

In addition to the allegations in the original complaint (the defendants' involvement in the fuel surcharge conspiracy, the elimination of long-term contracts, and the simultaneous switch to public pricing), the amended complaint adds allegations that:

> (1) Prior to 2003-2004, BNSF used its trackage rights in the Central Corridor and served as a competitive constraint on UP's prices in the Uinta Basin, Am. Compl. ¶¶ 40-45; and that, prior to 2003-2004, defendants "vigorously competed" in the Powder River Basin.  Id. ¶ 92.

> (2) At the same time defendants conspired to adopt the uniform fuel surcharges, they also agreed to stop competing for each other's customers, id. ¶ 91; specifically, BNSF agreed not to compete to serve shippers of Uinta Basin coal, id. ¶¶ 91, 157(a), in exchange for UP's agreement not to compete for BNSF's customers in the Powder River Basin.  Id. ¶ 157(a).

(3) Defendants stopped offering competitive bids for one another's customers, id. ¶ 94, even as UP significantly raised its rates in the Uinta Basin.  Id. at ¶ 102.

(4) Defendants dramatically increased their prices in both basins and reduced service.  Id. ¶¶ 107-13.

It is difficult for the Court to surmise what more Oxbow could offer before discovery has commenced.  See Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 183 (2d Cir. 2012) (noting that "conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through 'inferences that may be fairly drawn from the behavior of the alleged conspirators'") (quoting Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir. 1976)).  These allegations amply "raise a reasonable expectation that discovery will reveal evidence of illegal agreement" and place the allegations of parallel conduct "in a context that raises a suggestion of a preceding agreement."  Bell Atl. Corp. v. Twombly, 550 U.S. at 556-57.  Thus, they are far from conclusory.

#### b.  *Twombly* did not create a heightened specificity requirement

Defendants assert that the amended complaint is deficient because Twombly requires plaintiffs to identify a "specific time, place, or person involved in the alleged conspirac[y]," and "when and where the illicit agreement took place."  UP Mot. at 10-11 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 565 n.10); see also BNSF Mot. at 17-18 (quoting the same).  Defendants misread the Twombly footnote on which they rely.  Footnote 10 of Twombly reads as follows:

> *If the complaint had not explained that the claim of agreement rested on the parallel conduct described*, we doubt that the complaint's references to an agreement . . . would have given the notice required by Rule 8. Apart from identifying a 7-year span in which the § 1 violations were supposed to have occurred . . . the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies. This lack of notice contrasts sharply with

> the model form for pleading negligence, Form 9 . . . . Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

Bell Atl. Corp. v. Twombly, 550 U.S. at 565 n.10 (emphasis added).

Defendants correctly point out that some courts have interpreted this passage to require such heightened specificity for antitrust conspiracies. See UP Mot. at 14 n.6; BNSF at 17-18 & n.7. This Court, however, is not persuaded. Twombly expressly rejected the kind of particularity requirement that defendants seek to impose. Bell Atl. Corp. v. Twombly, 550 U.S. at 569 n.14 ("Here, our concern is not that the allegations in the complaint were insufficiently 'particular[ized];' rather, the complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible.") (alteration in original) (citations omitted). id. at 570 ("[We] do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."). Thus, many courts have rejected the argument defendants make here. See City of Moundridge v. Exxon Mobil Corp., 250 F.R.D. 1, 3 (D.D.C. 2008) ("Twombly did not purport to require a heightened fact pleading of specifics.") (citations and quotations omitted); id. at 4-5; see also Starr v. Sony BMG Music Entm't, 592 F.3d 314, 325 (2d Cir. 2010); In re Polyurethane Foam Antitrust Litig., 799 F. Supp. 2d 777, 792, 794-95 (N.D. Ohio 2011); Milliken & Co. v. CNA Holdings, Inc., No. 3:08-CV-578, 2011 WL 3444013, at *5 (W.D.N.C. Aug. 8, 2011); In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1005 (E.D. Mich. 2010); In re Se. Milk Antitrust Litig., 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008); In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).

14

The amended complaint alleges when (late 2003-2004) and what (an agreement not to compete with each other's customers).  Am. Compl. ¶ 91.  That, in combination with allegations of parallel conduct and other circumstantial evidence, "raise[s] a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555.  That is all the specificity Twombly and Rule 8 of the Federal Rules of Civil Procedure require.

### c. Oxbow need not rule out independent action at this stage

Finally, defendants argue that Oxbow's allegations of parallel conduct are "entirely consistent with" and "fully explained by" natural market forces.  See BNSF Mot. at 24-28; UP Mot. at 17-22 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 566-67).  Defendants are correct that conspiracy allegations may fail to state a claim "if there are 'obvious alternative explanation[s]' for the facts alleged."  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 322-23 (3d Cir. 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 567).  But "[i]t is also clear that allegations contextualizing agreement need not make any unlawful agreement more likely than independent action nor need they rule out the possibility of independent action at the motion to dismiss stage."  Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 47 (1st Cir. 2013); see also Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d at 184.

Twombly — which defendants cite for support — is inapposite on this point.  Plaintiffs there failed to allege *any* facts, circumstantial or otherwise, to render the alleged conspiracy plausible.  Bell Atl. Corp. v. Twombly, 550 U.S. at 566 ("We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy.").  "[T]here [was therefore] no reason to infer that the companies had agreed among themselves to do what was only natural anyway."  Id.  Oxbow, in contrast, has alleged facts from which there is ample reason to infer that defendants engaged in a conspiracy.

See supra at 12-13.[8]  Because Oxbow's allegations are plausible, Oxbow need not eliminate the

possibility of independent action to survive defendants' motions to dismiss, even if defendants'

allegations are also plausible.[9]

### D. Oxbow Has Sufficiently Alleged that UP and BNSF Conspired to Grant UP a Monopoly

Count III's Section 2 conspiracy to monopolize claim directly dovetails with the

above-discussed conspiracy not-to-compete claim brought under Section 1 — Oxbow alleges

UP's monopolization of the Uinta Basin was a direct and intended result of the conspiracy not-

to-compete.  To state a cognizable claim for conspiracy to monopolize under Section 2 of the

Sherman Act, plaintiffs must plead "(1) the existence of a combination or conspiracy to

monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect

upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize a

designated segment of commerce."  City of Moundridge v. Exxon Mobil Corp., 471 F. Supp. 2d

20, 41-42 (D.D.C. 2007) (quoting Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 420

(D.D.C. 1988) (internal quotation marks omitted)).  Notably, as relevant for BNSF, "[a]

defendant may be liable for conspiracy to monopolize where it agrees with another [company] to

---

[8]        Even if one were to accept defendants' arguments, their alleged "natural market forces" fail to explain defendants' (1) significantly increased rates and decreased service terms; (2) simultaneous shift to public pricing and short-term contracts; (3) or participation in the fuel surcharge conspiracy.

[9]        For this reason, among others, the summary judgment cases cited by BNSF are irrelevant.  See, e.g., BNSF Mot. at 26 & n.11 (citing cases at the summary judgment and trial stage).  At the summary judgment stage, plaintiffs must provide evidence that "tends to exclude the possibility of independent action."  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984).  But "such a requirement at [the motion to dismiss] stage in the litigation would be counter to Rule 8's requirement of a short, plain statement with 'enough heft to sho[w] that the pleader is entitled to relief.'"  City of Moundridge v. Exxon Mobil Corp., 250 F.R.D. at 5 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557).

assist that [company] in its attempt to monopolize the relevant market."  Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1062 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128 (1998).

Oxbow has sufficiently alleged the existence of a conspiracy, overt acts done in furtherance of that conspiracy, and an appreciable effect on interstate commerce.  See supra at 12-13.  As to specific intent, although the complaint states only that "UP and BNSF intentionally conspired to afford UP a monopoly," Am. Compl. ¶ 127, "[s]pecific intent is sufficiently pled where 'it is otherwise apparent from the character of the defendants' actions' alleged."  City of Moundridge v. Exxon Mobil Corp., 471 F. Supp. 2d at 43 (quoting GTE New Media Servs., Inc. v. Ameritech Corp., 21 F. Supp. 2d 27, 45 (D.D.C. 1998)).  Defendants' alleged conduct, if true, "has no legitimate business justification but to destroy or damage competition."  Id. at 42-43. That alone satisfies the specific intent requirement.

### E.  Oxbow Has Sufficiently Alleged that UP Monopolized or Attempted to Monopolize

A violation of Section 2 of the Sherman Act requires allegations showing the acquisition or maintenance of monopoly power in the relevant market through exclusionary conduct.  See United States v. Microsoft, 253 F.3d 34, 50 (D.C. Cir. 2001).  UP argues that the amended complaint fails to allege such exclusionary conduct.  UP Mot. at 23-26.  Oxbow, in response, identifies two acts it asserts qualify: (1) UP's shift to public pricing; and (2) its participation in the fuel surcharge and not-to-compete conspiracies.

First, UP argues that Oxbow's allegations that UP "signaled" BNSF to cede the Uinta Basins cannot constitute exclusionary conduct because public pricing is a recognized means of rail pricing.  UP Mot. at 24 (citing 49 U.S.C. §§ 11101(b), (e) (2012)).  But the fact that public pricing is a "recognized means" fails to explain UP's allegedly sudden and unexplained shift from private to public pricing — particularly when UP previously asserted to the Surface

Transportation Board that "not knowing each other's actual prices, present or proposed," was crucial to competition.  Am. Compl. ¶ 106.  Such an unexplained shift from longstanding practice "reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power," and thus qualifies as exclusionary conduct in this case.  S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co., 740 F.2d 980, 999 n.19 (D.C. Cir. 1984) (citation omitted).

Second, UP asserts that the alleged Section 1 conspiracy cannot constitute exclusionary conduct because "price-fixing or market allocation schemes actually encourage competition from other firms."  UP Mot. at 24 (citing FTC v. H.J. Heinz Co., 246 F.3d 708, 717 (D.C. Cir. 2001); JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 777 (7th Cir. 1999)).[10]  That may be true in markets with multiple competitors and a low barrier to entry.  But it is not true in a closed market lacking non-co-conspirator competitors.  BNSF was UP's only competitor in the Uinta Basin, which is why the federal government required UP to grant BNSF trackage rights in UP's merger with Southern Pacific Railroad.  And the barrier to entry in the rail freight business is unquestionably high.  Under such circumstances, price-fixing and market allocation harms "the competitive process and thereby harm[s] consumers."  United States v. Microsoft Corp., 253 F.3d at 58 (citing Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993)).

### F.  Oxbow Has Sufficiently Alleged a Breach of the Tolling Agreement by UP

The amended complaint alleges that UP breached Paragraph 6(c) of the Tolling Agreement by refusing to provide Oxbow with discovery materials from the related Rail Freight

---

[10]    Although this Court previously acknowledged this issue, it "d[id] not consider whether price-fixing or market allocation are 'exclusionary acts,' as required for monopolizing behavior."  Oxbow I, 926 F. Supp. 2d at 46 n.7.

Action after Oxbow filed its initial complaint in this case.[11]  UP argues, however, that the

Tolling Agreement imposes no obligation on UP to facilitate access to the class action materials

before Oxbow has filed a *viable* complaint and before discovery in this case has begun.  UP

Reply at 24; <u>see</u> <u>also</u> UP Mot. at 27- 28 (noting that this Court has already determined that the

Tolling Agreement did not amount to an agreement to commence discovery) (citing

Memorandum Opinion and Order, at 2 (Sept. 25, 2012) [Dkt. No. 47]).

        UP's interpretation of the Tolling Agreement does not comport with the plain

language of the contract.  The word "viable" does not appear in Paragraph 6(c) or anywhere else

in the Tolling Agreement.  <u>See</u> Am. Compl. ¶ 166.  And reading that term into Paragraph 6(c)

would render that paragraph meaningless — Oxbow already would be entitled to discovery

under the Federal Rules of Civil Procedure after surviving a motion to dismiss.  <u>See</u> <u>Beal Mortg.,</u>

<u>Inc. v. FDIC</u>, 132 F.3d 85, 88 (D.C. Cir. 1998) ("We will not adopt an interpretation, which

would be inconsistent with the cardinal interpretive principle that we read a contract to give

meaning to all of its provisions."); <u>see</u> <u>also</u> <u>Russell v. Harman Int'l Indus., Inc.</u>, 945 F. Supp. 2d

---

[11]    Paragraph 6(c) of the Tolling Agreement states in full that:

> At such time as Oxbow files a complaint, it may initiate reasonable discovery as to all Claims in its complaint, consistent with the goals of this Agreement and the Federal Rules; provided, however: . . . in order for the parties to avoid being prejudiced for engaging in Discussions, and to avoid duplication of discovery, if Oxbow becomes a party to the class action or files a complaint, UP will take reasonable steps to facilitate Oxbow's access to discovery in the class action and the parties will be permitted to use any discovery taken of UP in the class action litigation with the same force as if adduced in Oxbow's suit against UP.  This Agreement will not limit or otherwise impact the ability of Oxbow or UP to use any discovery taken or adduced of any party or non-party in the class action other than UP as may be approved by the Court.

> Mot. to Compel, Ex. 1 [Dkt. No. 26-2].

68, 77-78 (D.D.C. 2013) (noting that "contract interpretation that would render any part of the contract surplusage or nugatory must be avoided").  As such, this Court cannot determine, as a matter of law, that Oxbow's interpretation of the Tolling Agreement is unreasonable and the motion to dismiss Count IV therefore must be denied.[12]

## IV.  CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that defendant Union Pacific Railroad Company's motion to dismiss [Dkt. No. 54] is DENIED; it is

FURTHER ORDERED that defendant BNSF Railway Company's motion to dismiss [Dkt. No. 55] is DENIED; it is

FURTHER ORDERED that plaintiffs Oxbow Midwest Calcining LLC and Terror Creek LLC are dismissed from Count IV of the amended complaint for lack of standing; and it is

---

[12]     The amended complaint also alleges that UP breached Paragraph 5 of the Tolling Agreement, which states that "prior to Oxbow filing any complaint against UP, UP will keep Oxbow reasonably informed of the status of discovery proceedings in the fuel surcharge class action litigation."  But Oxbow did not address Paragraph 5 in its opposition.  See Opp. at 60-62 (only discussing the alleged Paragraph 6(c) breach); see also UP Mot. at 26-27.  The Court therefore considers this claim conceded.  Cureton v. U.S. Marshal Serv., 322 F. Supp. 2d 23, 27 (D.D.C. 2004) ("When a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded . . . .").

FURTHER ORDERED that the parties shall meet and confer and file a joint report with the Court on or before March 24, 2015, explaining how they wish to proceed in this case and containing a proposed schedule for doing so.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  February 24, 2015