IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **OXBOW CARBON & MINERALS LLC,** et al.,<br><br>PLAINTIFFS,<br><br>v.<br><br>**UNION PACIFIC RAILROAD COMPANY, et al.,**<br><br>DEFENDANTS. | NO. 1:11-CV-1049 (PLF)<br><br>***REDACTED VERSION*** |

**DEFENDANTS' MOTION TO COMPEL PRODUCTION
OF DOCUMENTS FROM PLAINTIFFS**

**I.     INTRODUCTION**

Defendants Union Pacific Railroad Company ("UP") and BNSF Railway Company ("BNSF," and collectively with UP, "Defendants") move this Court pursuant to Rule 37(a) to compel Plaintiffs' Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC (collectively "Oxbow" or "Plaintiffs") to produce documents from the files of William I. Koch, the founder, CEO, and principal owner of Oxbow.[1]

It is indisputable that Mr. Koch is a source of information relevant to this action. Documents already produced in this case demonstrate he possesses information that refutes Oxbow's claims of collusion, undermines Oxbow's product market definition, contradicts

---

[1] Pursuant to Rule 37 and Local Rule 7(m), the parties have met and conferred on this matter in good faith on October 14, 2016, and December 12, 2016, and exchanged correspondence on December 17, 2016, January 13, January 20, 2017, and February 1, 2017, which confirmed an impasse had been reached.

Oxbow's lost profit and sales damages claim, and demonstrates that market forces—not any alleged conspiracy—negatively impacted Oxbow's business. Nonetheless, Oxbow objects to producing Mr. Koch's files on the unsupported assumption that any relevant materials he has are duplicative of other custodians' files, and that the estimated expense—which Oxbow asserts is in the "tens of thousands of dollars"—is disproportionate to the needs of the case. These objections lack merit. Defendants respectfully request an Order compelling Oxbow to produce documents from Mr. Koch's files within twenty-one (21) days.

## II.     BACKGROUND

### A.     Oxbow's Claims

Plaintiffs' First Amended Complaint ("FAC") (Docket No. 53) alleges in Count I a conspiracy to fix fuel surcharge rates applied to commercial rail freight service. FAC ¶¶ 52-53. Oxbow's Count II alleges that UP and BNSF allocated markets for coal shipments originating from the Uinta basin in Colorado (where Oxbow's Elk Creek Mine formerly operated) and Utah, and the Powder River Basin in Montana and Wyoming. FAC ¶ 91-92. Oxbow's related monopolization claim, Count III, alleges that the relevant product market at issue is shipments of Uinta Basin coal west of the Mississippi River. FAC ¶ 125. Further, Oxbow alleges that UP and BNSF's conduct, in addition to resulting in overcharges for rail services that Oxbow—or Oxbow's customers—paid, also caused Oxbow to "los[e] business and profits," which Oxbow seeks to recover in this action. FAC ¶ 134. Oxbow claims that it paid defendants more than $50,000,000 in illegal fuel surcharges. This amount does not include any recovery for the lost profits or the trebling of damages permitted under 15 U.S.C. § 15. FAC ¶ 137.

### B.     Oxbow's Refusal to Produce Documents From Mr. Koch

Throughout the meet and confer process, Defendants have sought documents from Mr. Koch on the basis that he is a likely source of relevant information.

Defendants served their First Set of Requests for Production on August 13, 2015 (hereafter "Defs. 1st Requests for Prod.") (Ex. 1).  On a number of occasions, beginning in June 2016, Defendants requested that Oxbow provide a fulsome list of custodians that it proposed searching for documents responsive to Defendants' Requests.  *See* 6/13/16 Letter from K. Lejnieks to A. Lockner, at 2 (Ex. 2); 7/20/16 Letter from K. Lejnieks to A. Lockner, at 4 (Ex. 3); 9/16/16 Letter from C. Woodson to A. Lockner, at 1-2 (Ex. 4).  Defendants also requested that Oxbow produce organizational charts as soon as possible to allow the parties to effectively meet and confer regarding custodians.  *Id*.  Following Oxbow's production of organizational charts on September 13, 2016, and, in an effort to move forward with the meet and confer process, Defendants provided a proposed list of Oxbow custodians on September 16, 2016.  This list included Mr. Koch.  *See id.* at 6.

Oxbow responded on October 13, 2016, that it would not add Mr. Koch as a custodian because he did "not have information relevant to this litigation" and his "documents would be duplicative of those collected from other custodians already offered."  10/13/16 Letter from M. Hollywood to C. Woodson and G. Sergi, at 3-4 (Ex. 5).  Defendants provided additional grounds for their request during a telephonic meet and confer on October 14, 2016, and, in the November 23, 2016, letter, provided an example from Oxbow's prior production evidencing Mr. Koch's involvement in matters relevant to this litigation.  11/23/16 Letter from C. Woodson to A. Lockner, at 2 (Ex. 6) (citing OX0114665 (Ex. 7)).  Oxbow responded with unsupported claims that, to the extent Mr. Koch had relevant documents, they would "be duplicative of information [UP] will be receiving from other custodians."  12/7/16 Letter from M. Hollywood to C. Woodson and G. Sergi, at 2 (Ex. 8); *see also* 1/13/2017 Letter from C. Woodson to A. Lockner and M. Hollywood, at 3 (Ex. 9).

On January 20, 2017, Oxbow reiterated its position that it would not produce Mr. Koch's files, but stated that, if Defendants identified other "specific documents" containing relevant information related to Mr. Koch, they would take that information under consideration.  1/20/17 Letter from M. Hollywood to C. Woodson and G. Sergi, at 3 (Ex. 10).  On January 25, 2017, Defendants provided Oxbow with additional documents supporting their contention that Mr. Koch is a proper custodian.  1/25/17 Email and Attachments from K. Lejnieks to M. Hollywood, at 1 (Ex. 11).  On February 1, 2017, Oxbow again refused to add Mr. Koch as a custodian. 2/1/17 Email from M. Hollywood to K. Lejnieks, at 1 (Ex. 12).

### III.   LEGAL STANDARD

Rule 26 permits a party to "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  Relevancy within the meaning of Rule 26 "is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense."  *U.S. ex rel Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

On a motion to compel discovery under Rule 37(a), the moving party bears the burden of establishing that the information sought is relevant under Rule 26(b)(1).  *U.S. ex rel Shamesh*, 314 F.R.D. at 8.  The burden then shifts to the party resisting discovery to show why the discovery is objectionable.  *Id.*; *see also LaBrier v. State Farm Fire and Casualty Company*, 314 F.R.D. 637, 643 (W.D. Mo. 2016) (holding that the objecting party failed to demonstrate the

4

undue burden of producing additional discovery, given its resources and the centrality of the discovery request to both sides of the case). Thus, if the information sought is relevant, it is the opponent's burden to demonstrate that relevant information is otherwise not discoverable because it is not proportional to the needs of the case applying the factors enumerated in the Rule. *See U.S. ex rel Shamesh*, 314 F.R.D. at 8.

IV. ARGUMENT

    A. **Mr. Koch's Files Unquestionably Contain Information Directly Relevant To Core Issues.**

Though Oxbow has refused to make Mr. Koch a document custodian, documents produced by Oxbow from the files of other custodians show the type of information he possesses and the matters in which he is directly involved as CEO of Oxbow. Defendants' review of the documents already produced by Oxbow prove that Mr. Koch possesses information that more than meets Rule 26's relevancy standard, overwhelming Oxbow's slight claim of burden and entitling Defendants to production of Mr. Koch's files.

    1. **Mr. Koch is a demonstrated source of information that undermines Oxbow's claims.**

Defendants' review of the documents already produced by Oxbow reveal that emails sent and received by Mr. Koch undermine Oxbow's allegations of collusive conduct, refute the market definition supporting its monopolization claim, and contradict its claims to lost profit damages. Of course, Defendants only have access to those documents in the files of already-produced custodians, but these documents demonstrate the likelihood that probative evidence exists in Mr. Koch's possession.

Mr. Koch possesses documents that rebut Oxbow's allegations of collusive conduct, including documents that:

- Demonstrate that market forces, rather than collusion, explained increasing rail freight costs. ■

- Undermine Oxbow's allegations that UP refused to negotiate rail rates and refused to move coal west to Asia for export. *Compare* ■, *with* FAC ¶¶ 101, 111.

Further, Mr. Koch's documents undermine Oxbow's alleged market definition, which depends on the purported uniqueness of Uinta Basin coal. *See* FAC ¶ 128. Memos and emails sent to Mr. Koch show:

- Large, export buyers can substitute Uinta Basin coal with coal from other sources. ■

- ■

Finally, though Oxbow alleges it lost profits by reason of defendants' conduct, ■. *Compare* ■ *with* FAC ¶ 134 (alleging lost business and profits were the result of anticompetitive conduct). This is consistent

with Mr. Koch's own statement in March, 2014, that: "The coal business in the United States has kind of died . . . so we're out of the coal business now."[2]

### 2. Mr. Koch regularly involved himself in contracting with customers, scrutinizing the terms of sale—including fuel surcharge pass-throughs and rail rates.

Mr. Koch routinely involved himself in transactional-level detail of customer sales, which undoubtedly puts him in possession of relevant information in this case. *See, e.g.*,

███████████████████████████████████████████

███████████████████████████████████████████

████████████ ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████; *see also* FAC ¶ 134.

---

[2] Elizabeth Harball and Manuel Quiñones, "William Koch, pessimistic about coal's future in the U.S., is out of the business," Energy & Environmental News, Mar. 17, 2014, *available at* www.eenews net/stories/ 1059996211 (last reviewed Feb. 3, 2017) (Ex. 17).

### 3. Mr. Koch lobbied government officials in response to UP's rate increases, and investigated UP's conduct.

In addition to personal involvement in the negotiation of rail rates, Mr. Koch had an active role in Oxbow's strategic response to UP's pricing and service changes. Oxbow's documents show that:

- 

Mr. Koch was indisputably involved and active in Oxbow's response to UP's rate and service changes, which is both relevant to Oxbow's claims here and responsive to Defendants' document requests.

In sum, the documents in Oxbow's current production establish that Mr. Koch's files contain information relevant to this litigation, discoverable under Rule 26, and likely responsive to—at least— Defendants' Request Nos. 1, 5, 9, 11-13, 25, 32, 34, 35, 37, 41, 49, 55, 56, 59, 67, 68, 76, and 80. Defs. 1st Requests for Prod., at 5-7, 9, 11-13, 15, 17-19 (Ex. 1).

### 4. Mr. Koch's position makes it implausible that he lacks responsive documents.

Oxbow asserts a claim for lost profits relating to, among other things, the closure of the Elk Creek mine. *See* FAC ¶ 134. For a company in the mining business, the closure of a mine is a major event. FAC ¶ 9-10 (Oxbow owned and operated Elk Creek for fifteen years at the time of the FAC). It is inconceivable that Oxbow would close a mine without involving its CEO and principal owner. Likewise, Oxbow's lost profits claim implicates a wide range of high-level

business issues, both concerning the company's financial condition and the reasons for that condition. Any firm in perceived financial trouble would involve its CEO in discussions of whether, as Oxbow alleges, those troubles stem from transportation costs or, alternatively, from other causes, such as lack of demand, problems with quality or reliability, or competition from other suppliers. *See, e.g.*, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ And, of course, a firm would also involve its CEO in discussions about possible business solutions. *See id.* Oxbow cannot argue that Defendants' conduct had a material adverse effect on Oxbow's business operations and, yet, those matters somehow escaped the attention of Oxbow's CEO.

### B. Production of Mr. Koch's Files Is Proportionate To The Needs Of This Case.

Mr. Koch possesses relevant information within the meaning of Rule 26. Therefore, it is Oxbow's burden to demonstrate why production of that information is not proportional to the needs of the case. *See U.S. ex rel Shamesh,* 314 F.R.D. at 8. To date, Oxbow has proffered two objections to producing Mr. Koch's documents. First, Oxbow says Mr. Koch's relevant documents are likely to be duplicative of productions from other custodians. *See, e.g.*, 12/7/16 Letter from M. Hollywood to C. Woodson and G. Sergi, at 2-3 (Ex. 8). Second, they assert that the effort and cost of making this production—roughly estimated as "tens of thousands of dollars"—is unduly burdensome, and thus not proportionate to the needs of the case. *See, e.g.*, 1/20/17 Letter from M. Hollywood to C. Woodson and G. Sergi, at 3 (Ex. 10). Neither objection has merit.

#### 1. Oxbow's claim that Mr. Koch's files are likely duplicative of other custodians is not sufficient to establish a lack of proportionality.

Oxbow's primary (and repeated) argument against producing Mr. Koch's files is that his documents are likely to be duplicative of documents produced from other Oxbow custodians.

9

*See, e.g.*, 12/7/16 Letter from M. Hollywood to C. Woodson and G. Sergi, at 2-3 (Ex. 8); 10/13/16 Letter from M. Hollywood to C. Woodson and G. Sergi, at 3-4 (Ex. 5); 1/20/17 Letter from M. Hollywood to C. Woodson and G. Sergi, at 3 (Ex. 10). This argument fails.

First, Oxbow's own statements and prior productions undercut its claims that Mr. Koch's files are likely duplicative of other custodians. In its January 20, 2017, letter, Oxbow made clear that no effort had been made to collect, search, or analyze Mr. Koch's files. *Id.* (Ex. 10) (stating "we would *need to* collect his entire inbox and archive files, process them through an early case assessment tool . . . ." (emphasis added)). Oxbow does not actually know to what extent responsive materials in Mr. Koch's files overlap documents produced from other custodians' files. Further, documents already produced indicate it is likely Mr. Koch possesses unique information. For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Second, Oxbow's duplication claim rests on the logical fallacy that since the documents Defendants have identified to date are in the files of other custodians, all of Mr. Koch's relevant documents must be in the files already produced. *See* 12/7/16 Letter from M. Hollywood to C. Woodson and G. Sergi, at 2 (Ex. 8) (stating that the likelihood of duplication is evidenced by the fact the "email chain that [UP's counsel] cited in your November 23 letter, which includes not one but *four* custodians from Oxbow already agreed to produce documents and information from." (emphasis in original)). It is no surprise—and in fact it is entirely expected—that since Mr. Koch's files have *not* been produced, all the documents evidencing his knowledge or

possession of relevant information will come from the files of *current custodians*. But that does not exclude the probability that Mr. Koch possesses *other*, relevant documents which have not yet been produced. The mere risk of some duplication is not sufficient to show that the request for an additional custodian lacks proportionality.

The United States District Court for the District of Connecticut recently analyzed facts similar to those presented here. In *Family Wireless #1*, *LLC v. Automotive Technologies, Inc.*, plaintiff moved to compel production of documents from the files of 6 additional employees of defendant. No. 3:15CV01310, 2016 WL 2930887, at *1 (D. Conn. May 19, 2016). The defendant there, like Oxbow, argued that production from the proposed additional custodians was unduly burdensome and not proportional because it would be duplicative of materials already produced from other employees' files. *Id.* at *2. The Court rejected this argument. *Id.* at *3. The Court found that plaintiff had made a showing that certain of the proposed custodians *likely* possessed relevant documents because the custodians' "business activities related to the programs at issue in the case." *Id.* at *3. The Court dismissed defendant's claim that production from these additional custodians would be duplicative of documents already produced noting that "[t]he mere fact that many documents have already been produced is not sufficient to establish that there are no other relevant materials to be found." *Id.* at *3 (internal citations omitted); *see also U.S. v. AT&T Inc.*, No. 1.11-cv-01560, 2011 WL 5347178, at *1 n.4, 5, 7–8 (D.D.C. Nov. 6, 2011) (granting a motion to compel documents from additional custodians because the "mere fact of involvement of some additional custodians or some amount of necessary legal review are insufficient to demonstrate undue burden" and whose documents are "relevant and highly probative"). Further, application of de-duplication measures would eliminate some of the cost associated with the additional collection and production of documents from these custodians.

*Family Wireless #1, LLC*, 2016 WL 2930887, at *3. Therefore, the Court held that the addition of three custodians likely to have relevant information was proper and proportional to the needs of the case under Rule 26(b)(1). *Id.*; *see also AT&T Inc.,* 2011 WL 5347178, at *1 n.4, 5, 7–8; *Fyfe Co. LLC v. Structural Group Inc. et al.*, No. 13-00176-CCB, 2014 WL 556716, at *3 (D. Md. Feb. 10, 2014) (granting a motion to compel the designation of one additional custodian because of his working proximity to individual defendants, his potential access to and use of Plaintiff's files, and the "slight" burden to image his computer).

The same is true here. As discussed, the documents identified thus far by Defendants show that Mr. Koch's business activities relate directly to, and put him in possession of information about, critical issues in this case such as collusive conduct, market definition, and damages.[3] The risk of duplicative discovery can be minimized through appropriate use of de-duplication technology during the collection, search, and review of Mr. Koch's documents. The possibility of duplication, standing alone, is not a sufficient basis to deny Defendants access to this relevant information. *See Family Wireless #1, LLC*, 2016 WL 2930887, at *3.

> **2. The cost of adding Mr. Koch as a custodian is slight in comparison to issues in the case, the amount in controversy, and the importance of this discovery in resolving those issues.**

Oxbow objects to producing Mr. Koch's files as an undue burden because it may cost "tens of thousands of dollars." 1/20/17 Letter from M. Hollywood to C. Woodson and G. Sergi, at 3 (Ex. 10). Although this is not an insubstantial cost, it is overwhelmed by the other Rule 26 proportionality factors which favor Defendants' request. The issues at stake in this case are important. In fact, in a company press release about this litigation, Mr. Koch himself described

---

[3] Defendants' review of Oxbow's production is ongoing, and it is entirely possible that Defendants will identify additional documents further demonstrating the need to add Mr. Koch as a custodian.

the significance of this case: "Union Pacific and BNSF . . . have a long history of using aggressive tactics to prevent competition and intimidate customers. We stand with our fellow American farmers, miners and shippers in fighting the railroads' efforts to deny us competitive prices and services." OX0240315, at OX0240316 (Ex. 22). Setting aside the self-serving nature of that statement, Oxbow levels serious allegations of collusion and alleges serious harm to Oxbow (and others) against UP and BNSF. Oxbow cannot now, when trying to deny access to the documents of its CEO, owner, and spokesperson, minimize the importance of the issues in this case.

    Defendants' motion seeks production of Mr. Koch's documents on the same terms already agreed to for Oxbow's other custodians. In short, other than adding Mr. Koch as a custodian, Defendants are not expanding the scope of the documents or information they seek. Nor has Oxbow claimed that Mr. Koch's files are maintained differently or are any less accessible than other custodians in this litigation. Mr. Koch's documents can be collected and run through the same search term filters negotiated by the parties that apply to all other Oxbow custodians.

    Moreover, the "tens of thousands of dollars" at issue in producing Mr. Koch's files (even assuming that figure is accurate) is dwarfed by the amount of damages sought by Oxbow. Oxbow's surcharge damages alone are claimed to be more than $50,000,000 before trebling and without including any amounts for lost profits or business. *See* FAC ¶¶134, 137. In total, Oxbow seeks to recover more than $150,000,000. In comparison to these alleged damages, the costs of the requested discovery are minimal. Nor do "tens of thousands of dollars" in discovery costs pinch Oxbow's purse strings. Oxbow (the collective companies) is a multi-billion dollar

enterprise that has not shown any sign that the costs it will bear to prosecute this case are imposing any undue hardship on it or its principal, Mr. Koch.

Any costs involved in producing this discovery are slight when compared to the relevance of the discovery sought. For the reasons described above, there is a compelling basis to believe that Mr. Koch's files are a repository of critical information relating to Oxbow's claims of collusion, its market definition allegations, and its alleged damages. Defendants are entitled to this information to defend themselves in this case.

Therefore, because the cost and burden of collecting Mr. Koch's files is far outweighed by the relevance of the information sought, Oxbow cannot show that the requested discovery is disproportionate to the needs of this case.

## V.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion, and compel Oxbow to produce Mr. Koch's files within twenty-one (21) days.

Dated:  February 9, 2017

Respectfully submitted,

/s/ John M. Majoras
John M. Majoras (D.C. Bar# 474267)
Kristen Lejnieks (D.C. Bar# 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939

Tyrone R. Childress (admitted *pro hac vice*)
Carolyn A. Woodson (admitted *pro hac vice*)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA  90071-2300
Telephone:  (213) 489-3939

Michael L. Rosenthal (D.C. Bar# 446216)
Thomas A. Isaacson (D.C. Bar# 376959)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, D.C. 20001
Telephone:  (202) 662-5069

Attorneys for Defendant
UNION PACIFIC RAILROAD COMPANY


Bradley S. Phillips (admitted *pro hac vice*)
Gregory M. Sergi (D.C. Bar# 994418)
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100

Attorneys for Defendant
BNSF RAILWAY COMPANY

## CERTIFICATE OF SERVICE

      I, John M. Majoras, certify that on February 9, 2017, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to counsel for all parties.

/s/ John M. Majoras
John M. Majoras

Attorney for Defendant
UNION PACIFIC RAILROAD COMPANY

# Exhibits 1-22

# Filed Under Seal