## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OXBOW CARBON & MINERALS LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 11-cv-1049 (PLF) (GMH) |
| ) | |
| v. ) | |
| ) | **FILED UNDER SEAL** |
| ) | |
| ) | |
| UNION PACIFIC RAILROAD ) | |
| COMPANY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
### TO COMPEL PRODUCTION OF DOCUMENTS

### I.    INTRODUCTION

Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC (collectively, "Oxbow" or "Plaintiffs") respectfully submit this opposition to the motion by Defendants Union Pacific Railroad Company ("UP") and BNSF Railway Company ("BNSF") (together, "Defendants") to compel production of the electronic files of William I. Koch, Oxbow's Chief Executive Officer ("CEO"). (ECF No. 105).

Defendants' motion should be denied because the Defendants have not satisfied their burden of showing that Mr. Koch is a source of responsive, non-cumulative or non-duplicative information within the meaning of Federal Rule of Civil Procedure 26. Furthermore, the cost and burden of producing Mr. Koch's files would be enormous, and not proportional to the needs of the case.

Defendants insist that "Mr. Koch's position makes it implausible that he lacks responsive documents." But Oxbow never claimed otherwise. The question for purposes of this motion to compel is not whether Mr. Koch's files *may* contain *some* responsive documents; it is whether (a) any such information is "unreasonably cumulative or duplicative" of information already produced, or (b) "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1), (b)(2)(C). Defendants' motion fails both of those tests.

Mr. Koch is CEO and Chairman of Oxbow Carbon LLC, a giant energy and mining company that operates globally, but it is only Oxbow's U.S. coal and petcoke (*i.e.,* calcined and petroleum coke) divisions that are relevant for purposes of this lawsuit. Contrary to Defendants' assertions, Mr. Koch does not negotiate the terms of sales contracts with customers, or freight rates with railroads. That is the province of the managers and employees of the coal and petcoke divisions. To the extent that Mr. Koch is involved in the affairs of those divisions, he communicates through those employees.

Oxbow agreed to produce responsive documents from the files of nineteen executives, managers, and employees of the coal and petcoke divisions ("custodians"), and from shared network files. These custodians include individuals in the U.S. coal and petcoke divisions with whom Mr. Koch interacts. Therefore, as a matter of simple logic, any (or almost any) responsive documents in Mr. Koch's files are duplicative or cumulative of documents that have already been produced from the files of the nineteen custodians.

Defendants try to muddy the waters by citing a few documents cherry-picked from the Oxbow document productions, which they say demonstrate that Mr. Koch was involved in the day-to-day affairs of the coal and petcoke businesses. However, Defendants mischaracterize the

nature of these documents in order to mislead the Court as to the nature of Mr. Koch's role at

Oxbow. For example:



- They also seek Mr. Koch's files pertaining to the closure of the Elk Creek mine,
  claiming that they need this information to assess Oxbow's damage claim:

  - But they know that Elk Creek closed almost a year after the end of the
    damages period in this litigation, and six months after Oxbow filed its
    amended complaint, because of a geological event that rendered the mine
    unsafe and not because of Defendants' anticompetitive conduct.

Thus, as discussed more fully below, these documents don't help Defendants at all. Indeed,

Defendants do not and cannot show that Mr. Koch possesses responsive, non-duplicative

documents, and therefore, their motion to compel should be denied for this reason alone.

The motion should also be denied because the burden and expense of the proposed

discovery outweighs any likely benefit that it might have. Because of Mr. Koch's position as CEO

of all the Oxbow companies, his uncompressed email files will be enormous— ███████ based

on estimates by a document production vendor. Just the cost of processing and filtering that

amount of data alone is estimated to be about ██████. Moreover, because of Mr. Koch's position

and the scope of his responsibilities, it is reasonable to expect that his files will contain many

documents that "hit" in response to a search term, but that will, on review, turn out to be non-responsive to the Defendants' First Set of Requests for Production of Documents to All Plaintiffs. (Defendants Ex. 1) ("Defendants' Requests"). As discussed more fully below, it is estimated that as much of ████████ of Mr. Koch's files may generate such "false positives," meaning that approximately ██████████████████ will have to be reviewed, at a cost of over ████████. In sum the total cost of producing Mr. Koch's email files likely would be in the region of ████████. Clearly, whatever benefits might accrue to Defendants from production of non-cumulative documents (if any) by Mr. Koch could not justify this enormous expense. Defendants' motion should be denied on that basis as well.

## II.     BACKGROUND

Oxbow brought this suit against UP and BNSF to recover damages arising out of defendants' conspiracies to fix fuel surcharges, to allocate markets in the western United States, and to enhance and maintain UP's rail freight monopoly in the Uinta Basin. Because of Defendants' unlawful conduct, Oxbow had to pay supracompetitive prices to ship coal and petcoke, and thus suffered economic injury.

On February 24, 2015 this Court denied Defendants' motion to dismiss Oxbow's amended complaint. (ECF No. 62). On June 2, 2016 the Court entered a scheduling order that is intended to take the case through summary judgment. (ECF No. 97).

Starting in July 2016, while negotiating the scope of document production, Oxbow and Defendants exchanged lists of proposed custodians whose files were to be searched for potentially relevant documents. On September 14, 2016, Oxbow proposed additions to the Defendants' custodian lists, including the request that each Defendant add their CEO. *See* September 14, 2016

4

Letter from M. Hollywood to C. Woodson and G. Sergi, at 2 (Ex. 1)[1]. Two days later, the

Defendants sent Oxbow their list of proposed additional Oxbow custodians, including Mr. Koch.

*See* September 16, 2016 Letter from C. Woodson and S. Sergi to A. Lockner, Appendix I

(Defendants' Ex. 4). This was the first time the Defendants requested that Mr. Koch be added as a

custodian.

In response, Oxbow agreed to include two of the Defendants' proposed additional

custodians, but declined to add Mr. Koch (and others) because "(1) either they do not have

information relevant to this litigation or (2) their documents would be duplicative of those

collected[.]" *See* October 13, 2016 Letter from M. Hollywood to C. Woodson and G. Sergi, at 3-4

(Defendants' Ex. 5). Defendants similarly refused to add their own CEOs (and every other

requested employee) to the list of custodians whose files were to be searched, asserting that the

documents of the requested individuals "would largely be duplicative" of other agreed-upon

custodians. *See* October 5, 2016 Letter from C. Woodson to A. Lockner, at 2 (Ex. 2); October 13,

2016 Letter from G. Sergi to A. Lockner and M. Hollywood, at 2-3 (Ex. 3). Defendants, however,

rejected the same reasoning when Oxbow raised it with respect to Mr. Koch.

During several subsequent telephone conferences and exchanges of correspondence,

Defendants continued to insist that Mr. Koch's emails and other electronic files be produced.

Oxbow continued to maintain its position that production of Mr. Koch's files is not appropriate for

the reasons stated. *See* December 7, 2016 Letter from M. Hollywood to C. Woodson and G. Sergi,

at 2-3 (Defendants' Ex. 8); *see also* January 20, 2017 Letter from M. Hollywood to C. Woodson

and G. Sergi, at 2-3 (Defendants' Ex. 10).

---

[1] All Exhibits to this opposition are attached to the Declaration of Meegan Hollywood in support
of Plaintiffs' Opposition to Defendants' Motion to Compel Production of Documents.

On February 9, 2017, with the parties at an impasse, Defendants filed their motion to compel. (ECF No. 105).

## III.    LEGAL STANDARD

On a motion to compel, the movant bears the burden of demonstrating that the discovery it seeks is relevant. *Alexander v. FBI*, 186 F.R.D. 154, 159 (D.D.C. 1999).  But "a finding of relevance does not end the inquiry." *Burlodge Ltd. v. Standex Int'l Corp. (In re Motion of Burlodge)*, No. 08-525, 2009 U.S. Dist. LEXIS 79576, at *12 (D.D.C. Sept. 3, 2009); *Smith v. Cafe Asia*, 246 F.R.D. 19, 20 (D.D.C. 2007) ("relevancy alone does not entitle a requesting party to *carte blanche* in discovery"). A party demanding discovery is obligated to ensure that the information it seeks is not only relevant, but also that the burden of production does not outweigh the benefit. *Peskoff v. Faber*, 244 F.R.D. 54, 59 (D.D.C. 2007). In turn, a party objecting to production must demonstrate "any burden that tempers the production of such information." *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 245 F.R.D. 26, 31 (D.D.C. 2007);  *DL v. District of Columbia*, 251 F.R.D. 38, 43 (D.D.C. 2008).

Rule 26 requires the court to evaluate whether the "burden or expense of the proposed discovery outweighs the benefit." Fed. R. Civ. P.  26(b)(1). Specifically, "[w]hen considering whether to grant a motion to compel, a court must consider whether . . .  the request falls under any of the limitations listed in Rule 26(b)(2)(C)." *United States v. Kellogg Brown & Root Servs.*, 284 F.R.D. 22, 27 (D.D.C. 2012). These limitations include whether (a) "the discovery sought is unreasonably cumulative or duplicative," and (b) "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1), (b)(2)(C). Indeed, as this Court recently noted in ruling on a motion to compel, "[T]he 2015 amendments have brought to the forefront of Rule 26 the concept of 'proportionality' – that is, the duty of the parties and the court

to make a 'case-specific determination of the appropriate scope of discovery,' considering the six factors set forth in the Rule…" *Saidu Kargbo v. National Railroad Passenger Corporation*, No. 15-698, slip op. at 3 (D.D.C. Jan. 14, 2016) (Harvey, M.J.). "This proportionality concept was previously buried in subsection (b)(2)(C)(iii), but it now enjoys pride of place in the amended Rule." *Id*. This is to avoid the very concern raised here, "expansive, redundant, and disproportionate discovery, which can cause delay and oppression." *Id*. Thus, where the information sought is highly likely to be duplicative of documents already produced, and the burden and expense of production is prohibitive, the motion should be denied.

## IV.   ARGUMENT

### A. The Motion Should Be Denied Because the Discovery Sought from Mr. Koch's Files Is Unreasonably Cumulative or Duplicative of Information That Has Already Been Produced

#### 1. Mr. Koch Is Not a Source of Unique Information Responsive to Defendants' Requests

Mr. Koch is the CEO and Chairman of the Board of Oxbow Carbon LLC ("Oxbow Carbon"), a privately held company that is one of the largest producers of fuel grade and calcined petroleum coke, sulphur, coal and other resources.[2] In fact, Oxbow Carbon is consistently listed on Forbes' list of America's Largest Private Companies.[3] Oxbow Carbon maintains offices in 25 countries around the world, including in Asia, Europe, South America, and the Middle East.[4] Mr. Koch oversees the entire worldwide operations of Oxbow Carbon and its approximately 60 subsidiaries and affiliates, and its more than 1300 employees.[5]

---

[2] *Who We Are*, Oxbow Corp., https://www.oxbow.com/About_Us_Our_Company_Who_We_Are.html
[3] *America's Largest Private Companies*, Forbes, http://www.forbes.com/companies/oxbow/
[4] *Worldwide Locations*, Oxbow Corp., https://www.oxbow.com/contact_us_worldwide_locations_main.html
[5] *Who We Are*, Oxbow Corp., https://www.oxbow.com/About_Us_Our_Company_Who_We_Are.html

During the time period relevant to the issues in this litigation, specifically from 2004 through 2012, the operations of Oxbow Carbon and its subsidiaries and affiliates in the United States included the production, sales, and marketing of coal, fuel grade petcoke, calcined coke, sulphur, and steel. *See* OX1124572 (Ex. 4). Only a limited portion of this activity, Oxbow's production, sales, and transportation of coal and petcoke in the United States, is relevant for purposes of this lawsuit. Therefore, Defendants' claim that a busy CEO like "Mr. Koch routinely involved himself in transactional-level detail of customer sales," Mot. at 7, and had "personal involvement in the negotiation of rail rates," Mot. at 8, is preposterous. Oxbow's coal and petcoke operations are only a part of Oxbow Carbon's global business, and represent a smaller part of what Mr. Koch does in his role as CEO. In overseeing, at an executive level, the operations of Oxbow's coal and petcoke divisions (as with all of its divisions), Mr. Koch communicates with and through the officers and management of that division.

When negotiating the appropriate scope of discovery in this case, Oxbow agreed to produce the files, including email accounts and personal network drives, of nineteen custodians deemed to have information responsive to the Defendants' Requests. Oxbow carefully considered which individuals had primary responsibility for the production, sales, marketing, and transportation of coal and petcoke. Ultimately, the nineteen custodians agreed upon with Defendants included a range of current and former Oxbow employees, including a former Chief Operating Officer, former President of U.S. Coal and Oxbow Mining, several senior sales and marketing executives for coal and petcoke, a coal and petcoke marketing manager, logistics executives and managers, sales representatives, and even an administrative assistant. [6] These are

---

[6] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

the very Oxbow employees who were involved in "transaction-level detail of customer sales" and the negotiation of rail rates.

Over the course of seven productions, Oxbow produced 411,921 responsive documents from the files of these custodians, and from shared network drives. Significantly, Mr. Koch's name appears on only 4,662 of those documents; that is to say, Mr. Koch's name appears on just over 1% of all documents produced by Oxbow in accordance with search parameters agreed to in this litigation. If Mr. Koch were truly involved in customer sales at a "transaction level" as Defendants assert, or if he were personally involved in negotiations with the railroads, one would expect to see his name appear on many, many more documents produced by Oxbow.

Moreover, there is no hidden trove of potentially relevant, unproduced documents in Mr. Koch's files. If Mr. Koch communicated with Oxbow personnel regarding any of the issues implicated in this litigation, he would have communicated with one or more of the nineteen designated custodians. In fact, Defendants, themselves, have never identified a single Oxbow employee with whom they thought Mr. Koch might be communicating about issues relevant to this litigation, other than the nineteen agreed-upon custodians. Therefore, to the extent that Mr. Koch has any information responsive to the Defendants' Requests in this case, those documents have been produced from the files of the custodians. Simply, Mr. Koch is not a source of unique information potentially relevant to this case.



In addition, Oxbow agreed to search shared network drives for relevant information responsive to the Defendants' Requests.

## 2. Defendants Have Not Demonstrated That Mr. Koch's Files Contain Responsive, Not-Duplicative Information

Defendants cite several documents in an effort to bolster their contention that Mr. Koch is routinely involved in day-to-day coal and petcoke operations, and thus, is a source of uniquely responsive documents. But far from helping Defendants, these documents merely illustrate that Mr. Koch's involvement in Oxbow's coal and petcoke businesses was at a high, executive level. Thus, any discovery from Mr. Koch's files would be unreasonably cumulative or duplicative of information that has already been produced from those who were actually involved in the day-to-day coal and petcoke operations.[7]

### a. Mr. Koch Was Not "Routinely Involved" in Customer Sales Negotiations or Discussing Rail Freight Charges with Railroads

In an effort to argue that Mr. Koch was involved in routine customer sales, Defendants cite

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████[8]████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ They do not in any way support

Defendants' assertions that he "routinely involved himself in transactional-level detail of customer

---

[7] Defendants discuss in their motion several documents that they characterize as containing "information that undermines Oxbow's claims." While Oxbow emphatically disagrees with that characterization, Defendants' characterization is irrelevant for purposes of this motion. To the extent that Defendants' assertions regarding the documents raise any material issues of fact, these should be resolved at summary judgment or trial.

[8] Contrary to what Defendants claim, these documents do not indicate that Mr. Koch "has knowledge and information about the origination and continuation of Oxbow's pass-through practice," which Defendants claim is necessary to evaluate Oxbow's damages claim for lost profits. In any event, Oxbow recently agreed to run a search term specifically designed to capture documents relevant to "pass-through," and thus, Defendants now have full discovery related to Oxbow's pass-through practices.

sales," or "scrutinized" the terms of any sales agreements. Mot. at 7. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

Defendants also attempt to argue that Mr. Koch had "personal involvement in the

negotiation of rail rates." Mot. at 8 In doing so, they point to OX0114665-69 (Defendants' Ex. 7),

for the proposition that "Mr. Koch even weighed in on negotiations between Oxbow employees

and UP." Mot. at 7. Defendants' use of this document is entirely disingenuous, particularly since

Oxbow already explained to the Defendants in writing that Mr. Koch's opinion was sought in this

particular, extraordinary instance ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

Moreover, the fact that certain Oxbow employees (who are designated custodians for

discovery) may have occasionally informed Mr. Koch about changes in rail rates does not suggest

that Mr. Koch was "personally involved" in rail rate negotiations, or that he would have unique

information relevant to this litigation. Mot. at 7. ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

If it were true that Mr. Koch were regularly involved in the negotiation of rail freight rates,

logic dictates there would be some direct communications between Mr. Koch and Defendants.

Tellingly, however, out the 433,772 documents produced by the Defendants in this lawsuit, Mr.

Koch's name appears on only two. Neither of those documents supports the claim that Mr. Koch

was engaged in negotiating rail freight charges with defendants. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████

████████████████████████████████████████████

████████████████████████████████████

b.    *Mr. Koch Did Not Routinely Lobby Congressmen Regarding Rail Rates*

Defendants cite a ██████████ email produced by ████████████████ which,

they contend, shows that "Mr. Koch personally lobbied Colorado's congressional delegation to

advocate for the 're-regulation' of rail rates *because* of UP's increased prices." Mot. at 8

(emphasis in original); Defendants' Ex. 20. They further contend that because purportedly the only

Oxbow employees who attended the meeting with the Congressional delegation ████████████

████████████████████████████ are not custodians, they will be denied

discovery regarding these events unless Mr. Koch's files are produced. Mot. at 10.

These contentions are false in every way. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ In short, this episode illustrates that discovery

from the designated custodians like ██████████ give Defendants the discovery they are entitled to

under Rule 26, and that production of Mr. Koch's files would be unreasonably duplicative.

In addition, as Defendants are well aware, their assertion that "Mr. Koch personally

lobbied Colorado's congressional delegation to advocate for the 're-regulation' of rail rates

---

[9] This is the second of the only two documents produced by Defendants that refers to Mr. Koch.

*because* of UP's increased prices" (Mot. at 8) grossly mischaracterizes the purpose of the ███

███meeting. At that time, a proposed railroad re-regulation bill was pending before Congress

(H.R. 2125 and S.953) entitled, "The Railroad Competition and Service Improvement Act of

2007." This was not the result of some initiative by Mr. Koch "because of UP's increased prices."

On the contrary, shippers, trade organizations, *and railroads* were all heavily involved in lobbying

Congress with respect to re-regulation, █████████████████████████████

████████████████████████ Indeed, Defendants vigorously

lobbied Congress with respect to the bills. *See* J.C. O'Connell, *Railroad industry DNC donations*

*add freight to regulation bill*, The Colorado Independent, July 29. 2008,

http://www.coloradoindependent.com/4434/railroad-industry-dnc-donations-add-freight-to-

regulation-bill (discussing multi-million donations from UP and BNSF in an effort to lobby

Congress on re-regulation).[10] Far from being evidence that Mr. Koch routinely lobbies Congress

regarding matters related to this litigation, these documents show that the lobbying took place

under unique circumstances that affected the entire railroad industry, and that Oxbow's designated

custodians provided Defendants with full discovery on the matter.

      c.      *The Closure of the Elk Creek Mine Has No Bearing on Oxbow's Lost Profits Claim*

---

[10] Defendants argue out of both sides of their mouths on this issue. They argue that Mr. Koch's
attendance at meetings with Congressional representatives justifies burdening Oxbow with the
costs of producing Mr. Koch's files, while at the same time they refuse to produce documents
from their own CEOs or other officials who lobbied the government on the same issues. *See*
October 5, 2016 Letter from C. Woodson to A. Lockner, at 2 (Ex. 2); October 13, 2016 Letter
from G. Sergi to A. Lockner and M. Hollywood, at 2-3 (Ex. 3)████████████████
███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████

Bizarrely, Defendants also argue that they are entitled to Mr. Koch's email files because he *must* have documents related to the closure of the Elk Creek mine, which they claim (without any foundation) is related to Oxbow's lost profits claim. *See* Mot. at 8 ("Oxbow asserts a claim for lost profits relating to, among other things, the closure of the Elk Creek mine. It is inconceivable that Oxbow would close a mine without involving its CEO and principal owner."). The problem with this argument is that Oxbow has never claimed that there is a causal connection between Defendants' anticompetitive conduct (and thus Oxbow's damages), and the closure of Elk Creek.

In fact, not a single paragraph in Oxbow's Amended Complaint mentions the fact that Elk Creek closed—for the simple reason that the mine did not close until six months *after* Oxbow's Amended Complaint was filed. *See* Aldo Svaldi, *Elk Creek Mine in Somerset will go idle*, Denver Post, Dec. 2, 2013 (updated Apr. 29, 2016), http://www.denverpost.com/2013/12/02/elk-creek-mine-in-somerset-will-go-idle/ (discussing Elk Creek's shut down in December 2013). Moreover, Elk Creek did not close because of Defendants' anticompetitive conduct—it was closed in late 2013 because of a geological event that opened a vent of dangerous gas into the mine, causing a fire and leading to the mine being sealed as unsafe for human activity. *Id.* ("A year ago, the mine suffered a collapse that ignited a fire that continues to burn despite efforts to seal off the oxygen supply. Dangerous air levels have prevented the retrieval of expensive machinery needed to restore production.").Thus, while the Defendants are correct that "for a company in the mining business, the closure of a mine is a major event," in this instance the closure had nothing to do with the claims made in this litigation. [11]

---

[11] Defendants' own motion cited a news article, which quoted Mr. Koch as discussing the reason for the mine's closure in 2013. *See* Defendants' Ex. 17 ("Unfortunately, we had to close our mine down because we had a gas explosion in it," Koch said. "Fortunately, no one got hurt, but if we went back in, it could have killed people, so we're saying, 'All right, we're going to close it.'").

      *d.*    *None of the Other Documents That the Defendants Cite in Their Motion Justifies*
              *Production of Mr. Koch's Files*

The other documents cited by Defendants in their motion merely reinforce that Mr. Koch

was involved in Oxbow's coal and petcoke business only at a high executive level. ■

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████

In sum, none of the documents that the Defendants cite in their motion supports an order

for production of Mr. Koch's files.[12] Because Defendants have not met their burden under Rule

26(b)(1), the motion should be denied. *Peskoff v. Faber*, 244 F.R.D at 59 (a demand for

information must satisfy the standard "that, on balance, the burden of production is truly justified

by its potential relevancy."); *Burlodge*, 2009 U.S. Dist. LEXIS 79576 at *12; *Smith v. Cafe Asia*,

246 F.R.D. at 20; *see also Abt v. Jewell*, 303 F.R.D. 166, 168-69 (D.D.C. 2014) (a court must limit

discovery if it is unreasonably cumulative or duplicative).

      **B.**  **The Motion Should Be Denied Because the Costs of Producing  Mr. Koch's**
           **Files Would Be Unreasonably Burdensome**

          **1.**  **The Cost of Producing Mr. Koch's Files Would Be Prohibitive**

---

[12] A press release issued by Oxbow on the subject of this lawsuit, which quotes its CEO in the
most general of terms, cannot support the notion that Mr. Koch has unique information relevant to
this lawsuit. *See* OX0240315-16 (Defendants' Ex. 22).

Mr. Koch's files include ██████ of compressed emails and attachments, and ██████ of electronic documents stored on a personal network drive, a total of ██████. Declaration of Vivian M. Enck at ¶ 9. Due to limitations with Oxbow's IT systems, in order even to get to the point of de-duplication and filtering by date and search term, Mr. Koch's entire email and network files would need to be collected and run through an Early Case Assessment tool provided by the same outside vendor that processed the data for Oxbow's prior document custodians in a similar manner. *Id.* at ¶¶ 6, 8.

Because email attachments are stored as compressed files, the overall size of the email files necessarily expands when they are decompressed. *Id.* at ¶ 10. On average, the email files from the previous Oxbow custodians expanded by approximately ██████ when decompressed. *Id.* Therefore, assuming that Mr. Koch's email files expand at the same rate, the total size of his email files and attachments to be processed by Planet Data will be approximately ██████████ ██████ *Id.* at ¶ 11. Including his network files at ██████, the total size of Mr. Koch's files for processing are estimated to be ██████. *Id.* at ¶ 12.

As described in the attached Declaration of Vivian M. Enck, it is estimated that just the initial costs of processing Mr. Koch's files, filtering the data by date and search term, and de-duplicating the data would be in the region of ██████. *Id.* ¶¶ 13-19. The cost of reviewing Mr. Koch's documents following de-duplication and filtering would cost an estimated ██████, for a total cost of approximately ██████. *Id.* ¶¶ 20-24.This is broken out as follows:



Due to Mr. Koch's position at Oxbow and the scope of his responsibilities, it is reasonable to expect that his files would contain many unique documents that "hit" on a search term, but were ultimately not responsive to the Defendants' Requests. ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████ It is therefore conservatively estimated that after de-duplication and filtering, approximately ███████████████████████ would need to be reviewed in order to weed out the many false positives that filtering cannot exclude. *Id.* at ¶¶ 16-17. It is also reasonable to expect that given Mr. Koch's position, his files would contain many privileged documents

██████████████████████████████████████████████████████████████

██████████████████████████████████████████ further

underscoring the need for a full document review. *Id.*

One gigabyte equals approximately 6500 documents, and therefore █████████████████ a review team would need to review █████████ documents from Mr. Koch's files.  *Id.* at ¶ 20. Therefore, at a cost of approximately ████████████████, document review charges would be an estimated ████████. *Id.* at ¶ 21. This does not include project management, and technical time necessary throughout the project to manage the review. This also does not include costs related to attorney time necessary to create a privilege log. *Id.* at ¶ 22.

In sum, from collection through review, it is conservatively estimated that it would cost Oxbow approximately ████████ to collect, search, and review Mr. Koch's files. Given the expectation that his files will contain a very high rate of false positives and privileged documents, and few to any responsive documents that have not already been produced by other custodians, the cost and burden cannot outweigh what little relevance may exist here.

18

Defendants argue that the Court should not be put off by the costs of producing Mr. Koch's files because: (1) the amount "is dwarfed by the amount of damages sought by Oxbow;" and (2) the amount does not "pinch Oxbow's purse strings." Mot. at 13.[13] Defendants do not cite any authority for the proposition that businesses should be compelled to collect and review vast amounts of likely duplicative documents on the off-chance that the process might yield something uniquely responsive, as long as the costs of doing so do not drive them to bankruptcy. Nor could they, because the appropriate inquiry is whether the cost and burden of collecting Mr. Koch's files is outweighed by the relevance of the information sought. In fact, as this Court noted in *Saidu Kargbo*, the Court must apply "the standards in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak *or affluent*." *Saidu Kargbo*, No. 15-698, slip op. at 3 (Harvey, M.J.) (emphasis added); *see also* Rule 26(2)(b)(1)(C); *FTC v. Staples, Inc.*, No.15-2115, 2016 U.S. Dist. LEXIS 49965, at *6 (D.D.C. Feb. 26, 2016) ("the sixth factor under Rule 26(b)(1)—whether the burden or expense of the discovery sought [] will outweigh its likely benefit—will be the Court's primary consideration."); *Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 320 (D.D.C. 1998) ("The time and expense required for the agencies to respond to the requested expanded search, *even taking into account the resources of the federal government* [] also support the Court's conclusion that the requested search is unduly burdensome.") (emphasis added).

---

[13] Defendants repeatedly refer to the cost of producing Mr. Koch's files as "tens of thousands of dollars," taking out of context a rough estimate by Oxbow's counsel of the costs of *processing and filtering* the files. *See* January 20, 2017 Letter from M. Hollywood to C. Woodson and G. Sergi, at 3 (Defendants' Ex. 10). As discussed above, a more systematic assessment undertaken in conjunction with Oxbow's document production vendor confirms this estimate, concluding that the cost of collecting, processing and filtering Mr. Koch's files would be approximately ███ . This does not include, however, the over █████ that would have to be spent on document review in order to eliminate the anticipated huge number of false positives and privileged documents.

*Petcou v. C.H. Robinson Worldwide, Inc.*, No. 1:06-CV-2157, 2008 U.S. Dist. LEXIS 13723 (N.D. Ga. Feb. 25, 2008), in which the Northern District of Georgia denied a motion to compel is instructive here. The plaintiffs in *Petcou* moved to compel production of thousands of emails sent within an eight year period. *Id.* The court found that (a) the emails sought would provide little, if any, relevant information that had not already been produced, and (b) the cost of searching thousands of emails would be substantial, creating an undue burden. *Id.* at *3-5. Like the *Petcou* court, this Court should deny Defendants' motion. *See also Kellogg Brown & Root Servs.*, 284 F.R.D. at 34-35 (denying motion to compel where the value of the documents requested was "vastly outweighed by the enormous expense and burden that producing this information would place on the United States"); *Slate v. ABC*, 802 F. Supp. 2d 22, 26 (D.D.C. 2011) (magistrate judge properly limited scope of discovery where the majority of files sought were unresponsive and the "burden and expense of wading through these files outweighed any benefit").

Defendants tip their hand when they argue that the Court should permit the discovery they seek because "Oxbow … is a multi-billion dollar enterprise that has not shown any sign that the costs it will bear to prosecute this case are imposing any undue hardship on it or its principal Mr. Koch." Mot. At 13-14. Mr. Koch is a wealthy energy and mining entrepreneur, potentially an unsympathetic figure in the eyes of many jurors, and no doubt Defendants would love to rifle through his email files in hope of finding something unflattering. Such blatant fishing expeditions are strongly disfavored by the courts. *Kellogg Brown & Root Servs.*, 284 F.R.D. at 36 (courts deny fishing expeditions, where "only a small fraction of the produced documents may be relevant.").

In *Dryer v. NFL*, No. 09-2182, 2012 U.S. Dist. LEXIS 194684 (D. Minn. May 21, 2012), noting its concerns about discovery amounting to a "fishing expedition," the court denied a motion to compel with respect to four out of five proposed custodians. The court found that some of the

custodians were not likely to have relevant information because their positions did not afford them sufficient familiarity with the information sought . *Id*. at \*8-9. Moreover, production of the custodians' emails would be duplicative because defendants had already produced the emails of the custodians' superiors and subordinates. *Id*. at \*9-13. In addition, it would cost hundreds of thousands of dollars to produce the documents of at least one custodian. *Id*. at \*13. Accordingly, "[i]n light of the heavy economic burden in producing [the custodian's] ESI, and the unlikelihood that significant relevant documents will be found, the Court will not compel the Defendant to produce the ESI[.]" *Id*.

Similarly, Mr. Koch is not involved in day-to-day coal and petcoke operations and therefore likely does not have much, if any, relevant information.  Defendants, however, have access to Oxbow's prior productions of the files of, among other custodians, Mr. Koch's subordinates who were directly involved with the matters relevant to this case. Any relevant information Mr. Koch has will be largely duplicative of these emails. Finally, producing Mr. Koch's emails will cost hundreds of thousands of dollars. Therefore, like the *Dryer* court, respectfully this Court should deny the motion to compel.

## 2. There Is No Merit to Defendants' Argument That Oxbow Should Conduct Sampling of Mr. Koch's Files

Defendants contend that Oxbow should not be allowed to assert that Mr. Koch's files are likely duplicative of those produced from the files of the already agreed-upon nineteen custodians, without first performing an analysis of Mr. Koch's files. *See* Mot. at 10. However, for the reasons stated above, Oxbow does not need to "collect, search, or analyze" Mr. Koch's files in order to know that any relevant information thereof would be duplicative of information already produced. The nineteen custodians, subordinates to Mr. Koch, are the persons who actually conducted Oxbow's coal and petcoke business on a day-to-day basis during the relevant period. To the extent

that Mr. Koch was communicating about any of the issues relevant to this litigation with the coal
and petcoke divisions, he would have had to do so through one or more of those nineteen people.
There is simply no justification for exposing Oxbow to the burden and considerable expense of
"collect[ing], search[ing], or analyz[ing]" Mr. Koch's files in order to prove what should already
be self-evident.

It is noteworthy that the Defendants argue that collection and analysis of Mr. Koch's files
is necessary to know "to what extent responsive materials in Mr. Koch's files overlap documents
produced from other custodians' files." Mot. at 10. Defendants saw no need to conduct such an
analysis when they refused Oxbow's requests to them for files from additional UP and BNSF
custodians, including their own CEOs. At no point did the Defendants indicate that they
"collected, searched, or analyzed" the files of the additional custodians that Oxbow proposed. *See*
October 5, 2016 Letter from C. Woodson to A. Lockner, at 2 (Ex. 2) ("UP does not agree to
Oxbow's September 14 request to add ██████████████████████████████
███████████████ as custodians for this litigation because those UP representatives'
documents *would largely be duplicative of documents already collected from the previously 13
Relevant Custodians or duplicative of the MDL production.*") (emphasis added); *see also* October
13, 2016 Letter from G. Sergi to A. Lockner and M. Hollywood, at 2-3 (Ex. 3) ("BNSF, however,
does not agree to Oxbow's September 14, 2016 request to add ████████████████████
███████ as custodians for this litigation. We do not believe, given the positions of those BNSF
employees during any relevant period, *that they would have any document relevant to Oxbow's
claims for which BNSF has agreed to produce additional documents that are not duplicative of
those in the files of the 11 custodians that BNSF previously proposed.*") (emphasis added).
Defendants seemed to be confident that such a position was sustainable without sampling the files

of its own representatives. The Court should reach the same conclusion here.

None of the cases that Defendants cite supports a contrary conclusion. They point to *Family Wireless #1, LLC v. Auto. Techs., Inc.,* No. 3:15CV01310, 2016 U.S. Dist. LEXIS 65885, *7 (D. Conn. May 19, 2016) as support for the proposition that "the mere fact that many documents have already been produced is not sufficient to establish that there are no other relevant materials to be found." But Oxbow does not contend that the "mere fact" of if its prior productions means that Mr. Koch's files are unlikely to contain non-duplicative information. In *Family Wireless*, the court noted that the additional custodians were likely to have non-duplicative information because they were involved in "day to day operations, or engaged in business activities "directly related to the programs at issue in [the] case." *Id.* at *4-*5, *8. Here, by contrast, Mr. Koch was not directly involved in day-to-day transactions at issue in this case— customer sales and rail rate negotiations. It is Mr. Koch's lack of proximity to any of the information that Defendants seek, which makes it unlikely that unique relevant information is contained in his files, and not the "mere fact" that Oxbow has already produced numerous documents. Moreover, Defendants have done nothing to show that that Mr. Koch has non-duplicative files that are "highly probative," a deciding factor in another case cited by Defendants, *United States v. AT&T Inc.*, No. 1:11-cv-01560, 2011 U.S. Dist. LEXIS 156303, *22 (D.D.C. Nov. 6, 2011).

Defendants also rely on *Family Wireless* and *AT&T* for the proposition that production of Mr. Koch's files would not constitute an undue burden because "some amount of legal review" is not burdensome, and de-duplication measures can be applied to mitigate costs. Mot. at 11-12. In *AT&T*, however, the defendant had already produced some of the requested documents to the DOJ. *AT&T Inc.*, 2011 U.S. Dist. LEXIS 156303, at *4. Accordingly, the court found that its

burden was mitigated by "efficiencies" it had developed in the DOJ production.  *Id.* at *17. Further, as discussed above at page 17, de-duplication cannot be applied to Mr. Koch's files until after the entire 59.23 GB (compressed) email and network file has been collected and assessed by an outside vendor at considerable cost. Unlike the custodians in *Family Wireless* and *AT&T,* there are no special efficiencies or convenient de-duplication measures that can mitigate the burden and cost of the production in this case.

## V.    CONCLUSION

For the reasons stated above, Defendants' motion to compel production of the files of William I. Koch should be denied.

## VI.    ORAL ARGUMENT REQUESTED

Pursuant to LCvR 7(f), Plaintiffs respectfully request oral argument on this motion.


Dated:          February 23, 2017             *s/Hollis Salzman*
                                              Hollis Salzman (D.C. Bar No. NY0207)
                                              Eamon O'Kelly (admitted *pro hac vice*)
                                              Meegan Hollywood (D.C. Bar No. NY0206)
                                              **ROBINS KAPLAN LLP**
                                              601 Lexington Avenue, Suite 3400
                                              New York, NY 10022
                                              Phone: (212) 980-7400
                                              Fax:  (212) 980-7499
                                              hsalzman@robinskaplan.com
                                              eokelly@robinskaplan.com
                                              mhollywood@robinskaplan.com

                                              Roman Silberfeld (D.C. Bar No. CA00002)
                                              **ROBINS KAPLAN LLP**
                                              2049 Century City Park East, Suite 3400
                                              Los Angeles, CA 90067
                                              Phone: (310) 552-0130
                                              Fax: (310) 229-5800
                                              rsilberfeld@robinskaplan.com

                                              Stephen P. Safranski (admitted *pro hac vice*)

Anne M. Locker (admitted *pro hac vice*)
Cassandra B. Merrick (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Phone: (612) 349-8500
Fax: (612) 339-4181
ssafranski@robinskaplan.com
alockner@robinskaplan.com
cmerrick@robinskaplan.com

*Attorneys for Plaintiffs Oxbow Carbon & Minerals LLC; Oxbow Mining, LLC; Oxbow Midwest Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I, Hollis Salzman, certify that on February 23, 2017, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to counsel for all parties.

<u>        /s/  *Hollis Salzman*                        </u>

Hollis Salzman