IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **OXBOW CARBON & MINERALS LLC,** et al.,<br><br>            PLAINTIFFS,<br><br>      v.<br><br>**UNION PACIFIC RAILROAD COMPANY,** et al.,<br><br>            DEFENDANTS. | NO. 1:11-CV-1049 (PLF)<br><br>***REDACTED VERSION*** |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION
TO COMPEL PRODUCTION OF DOCUMENTS**

**I.      INTRODUCTION**

Plaintiffs' objections to Defendants' Motion to Compel Documents from William I. Koch (Docket No. 105, hereafter "Mot.") fail because they are based on assumptions not fact. Mr. Koch, as Defendants demonstrated and as Oxbow concedes, possesses relevant information. Pls. Opp. to Defs. Mot. to Compel at 2 (Docket No. 109, hereafter "Opp.").

Oxbow presents contradictory objections to this discovery that it never reconciles. On one hand, it argues Mr. Koch's files will be unreasonably duplicative, and, on the other, it argues it will be unduly burdensome to review the trove of more than ▮▮▮▮▮ *unique* documents it expects to find in his files. Oxbow cannot have it both ways.

Even setting aside their incompatibility, each objection fails on its own merits. First, Oxbow's mere guess, without supporting facts, about the risk of unreasonable duplication is not sufficient to deny Defendants relevant, highly probative discovery from Mr. Koch, Oxbow's

1

CEO, who led Oxbow's strategic response to changes in rail rates and services, as well as its response to industry-wide challenges that impacted the coal business's profitability. Second, Oxbow's undue-burden objection fails to account for all the Federal Rule of Civil Procedure 26(b)(1) proportionality factors, which fall in favor of granting Defendants' request. *See* Fed. R. Civ. P. 26(b)(1). Oxbow's objection is paradoxically premised on its prediction that Mr. Koch has more than ▮▮▮▮ unique documents hitting on the parties' agreed-upon responsiveness search terms. Attuned to this inconsistency, Oxbow speculates (because it has no basis to know) that these unique documents will be non-responsive to Defendants' discovery requests. This just illuminates the unreliability of the cost estimate underpinning Oxbow's undue-burden objection, which cannot serve as grounds to deny this discovery.

In short, Oxbow's assertions, without bases in fact, cannot sustain its objections, and Defendants motion should be granted.

**II.     ARGUMENT**

    **A.     There Is No Dispute That Mr. Koch Possesses Relevant Information.**

On a motion to compel, the moving party bears the burden of establishing that the information they seek is relevant under Rule 26(b)(1). *U.S. ex rel Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016). Defendants have shown that Mr. Koch's files contain relevant information, i.e., that they "'encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." *Id.* (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, (1978)); *see also* Fed. R. Civ. P. 26(b)(1); Mot. at 5-9. Oxbow concedes as much. Opp. at 2 ("But Oxbow never claimed otherwise.").

In the Motion to Compel, Defendants identified a number of examples demonstrating that Mr. Koch is in possession of information that is highly probative of significant issues in this case, including:

- [REDACTED]
- [REDACTED]
- [REDACTED]

While Oxbow does not contest the relevance of Mr. Koch's files, Oxbow mischaracterizes the documents identified by Defendants as well as Defendants' arguments regarding the relevance of Mr. Koch's files. *See* Opp. at 10-13. Fundamentally, Oxbow is asserting a claim for lost profits and cannot (and does not) dispute that its CEO must have substantial responsive documents bearing on the many factors that influence Oxbow's profitability.[2]

Collectively, the documents identified by Defendants show Mr. Koch's involvement in the relevant lines of Oxbow's business, active participation in Oxbow's strategic responses to changes in rail rates and service, and leadership of Oxbow's strategic response to industry challenges facing Oxbow's coal business. *See* Mot. at 5-8. Defendants are not arguing that Mr. Koch's files are relevant merely because he was "routinely involved in day-to-day coal and petcoke operations." Opp. at 10. Rather, the documents identified by Defendants demonstrate

---

[1] In their Opposition, Oxbow cites to [REDACTED]

[2] Instead, Oxbow only says that the reasons for closing the Elk Creek mine in December 2013 are not relevant because it now states (for the first time) that it does not claim that the Defendants' alleged conduct caused the closure. However, events precipitating the closure—including the mine fire and collapse—occurred in 2012, which is within Oxbow's damages period. [REDACTED]

that Mr. Koch's involvement, as the senior-most executive at Oxbow, at every level of Oxbow's coal and petcoke businesses—from both the strategic, executive level down to the transaction level for key transactions. *See* Mot. at 5-8; *see also* Opp. at 10 (acknowledging Mr. Koch's involvement in the coal and petcoke business at an "executive" level).

Oxbow argues Mr. Koch's documents are less relevant to this case because he is the CEO, which, Oxbow argues, means he is not involved in certain day-to-day transactional matters. *See* Opp. at 10, 21 ("Mr. Koch is not involved in day-to-day coal and petcoke operations and therefore likely does not have much, if any, relevant information.").[3] This is not the governing question; rather, whether or not a custodian's documents are relevant turns solely on whether the substance of the information they possess "'encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." *Shamesh*, 314 F.R.D. at 8 (citing *Oppenheimer Fund, Inc.*, 437 U.S. at 351). Oxbow's Complaint (Docket No. 53) includes allegations that Oxbow's rates to ship Uinta Basin coal increased over 200% from 2008-2011 (¶ 108); that Oxbow's coal is "well-suited" to export markets (¶ 111); that UP "generally refused to ship Oxbow's coal west" (¶ 111); that the characteristics of Uinta Basin coal make it "only partially substitutable with coal mined outside the Uinta Basin" (¶ 128); that UP raised the "as delivered" price of Oxbow's coal (¶ 130); and that as result of the conspiracy, Oxbow "lost business and profits, . . . received reduced revenues from sales of their products, experienced increased costs of doing business, and lost the benefits of competition that would have led to growth." (¶ 134). These allegations go to the heart of Oxbow's claims and, given the importance and complexity of these issues to Oxbow, are exactly

---

[3] The accuracy of Oxbow's claim is questionable. The exemplar documents also demonstrate that Mr. Koch was not divorced from the U.S. coal or petcoke businesses and ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

the sort of matters on which a CEO would provide strategic input or make decisions. Regardless of Mr. Koch's day-to-day transactional-level involvement in Oxbow's coal and petcoke businesses, Defendants are entitled to the discovery that will allow them to probe Mr. Koch's knowledge on these key issues.

Defendants have shown that Mr. Koch possesses relevant information.

**B.     Oxbow Has Not Met Its Burden To Show Why It Should Not Produce This Admittedly Relevant Discovery.**

Oxbow's Opposition misstates each party's respective burdens for a Motion to Compel and misconstrues the standard under Rule 26.

Contrary to Oxbow's assertions, it is the responsibility of Oxbow, not Defendants, to demonstrate why it should not be required to produce Mr. Koch's files. It is well-settled that once the relevancy of the sought discovery has been established, "the objecting party then bears the burden of 'showing why discovery should not be permitted.'" *Shamesh*, 314 F.R.D. at 8 (citing *Alexander v. FBI*, 194 F.R.D. 316, 326 (D.D.C. 2000)); *U.S. Dept. of the Treasury v. Pension Benefit Guaranty Corp.*, 301 F.R.D. 20, 28, 30 (D.D.C. 2014) (on a motion to quash, the burden to show oppression or unreasonable duplication falls on the party opposing the discovery). This includes claims by the objecting party that the requested discovery would be "unreasonably cumulative or duplicative" under Rule 26(b)(2)(C)(i) or unduly burdensome under Rule 26(b)(1). *See, e.g.*, *Shamesh*, 314 F.R.D. at 8; *Pension Benefit Guaranty Corp.*, 301 F.R.D. at 28, 30; *Clayton Corp. v. Altachem NV*, No. 4:12-cv-01349-AGF, 2015 WL 2412178, at *3 (E.D. Mo. May 20, 2015) ("[the moving party] does not have the burden of proving that its requests will produce non-duplicative documents, indeed, it would be difficult for it to make such a determination as it has not had the chance to review the documents."). Oxbow's claims in

both of these respects are unsupported by the facts and do not justify withholding from Defendants discovery that Oxbow has conceded is relevant.

Oxbow further misstates the requisite analysis under Rule 26.  Although it is true that the 2015 Amendments to the Rules put the focus on proportionality, inherent in the Amendments is a recognition that responding to discovery, even proportionate discovery, will always pose a burden.  As such, the Committee Notes on the 2015 Amendments explicitly state that the change in the rules was not "intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." Fed. R. Civ. P. 26(b)(1), Advisory Committee Notes (2015 Amendment).  Here, Oxbow's "boilerplate objection" based on cost ignores the other factors identified in Rule 26(b)(1) and is itself flawed.

Plaintiffs have brought a high-stakes antitrust case claiming over $150 million in damages; Defendants seek documents from only one additional custodian.  The requested discovery is reasonable and proportionate to the needs of the case under Rule 26(b)(1).

> **1. Oxbow has not shown that production of Mr. Koch's documents would be unreasonably duplicative.**

Oxbow's cursory claims do not carry its burden of establishing that the production of Mr. Koch's files will be unreasonably cumulative or duplicative. *See, e.g.*, *Pension Benefit Guaranty Corp.*, 301 F.R.D. at 30 ("Although the documents requested may have some overlap with documents already produced by PBGC, [opposing party] has failed to show, as it must, that it would be unreasonably cumulative or duplicative."); *Clayton Corp.*, 2015 WL 2412178, at *3.

First, Oxbow has proffered no facts or analysis to support its Rule 26(b)(2)(C)(i) objection.  Oxbow argues that "as a matter of simple logic, any (or almost any) responsive documents in Mr. Koch's files are duplicative or cumulative of documents that have already been produced from the files of the nineteen custodians." Opp. at 2.  However, Oxbow's "simple

logic" is just a guess.  Oxbow still does not know to what extent Mr. Koch's those files are duplicative of any other custodian's files.  Any assertions to the contrary are mere speculation.  *See* Opp. at 21-22 (arguing it has no obligation to sample Mr. Koch's files).[4]  Oxbow's guess is not good enough to meet its burden to proffer facts establishing that any overlap is unreasonable.  *See Pension Benefit Guaranty Corp.*, 301 F.R.D. at 20, 28; *Drummond Co., Inc. v. Collingsworth*, No. 13-mc-80169, 2013 WL 6074157, at *10 (N.D. Cal. Nov. 18, 2013) (finding that objection to discovery as unreasonably duplicative was "without merit in light of [opposing party's] failure to provide any evidence showing what discovery they produced in previous litigation" and whether that prior discovery "satisfied their discovery obligations.").

Second, Oxbow's reliance on *Dryer v. NFL* is misplaced.  No. 09-2182, 2012 WL 12895563 (D. Minn. May 21, 2012).  First, unlike Oxbow, the party resisting discovery in *Dryer* had performed an extensive analysis of the requested custodians, including reviewing a sample of documents from each custodian.  *Id.* at *3.  This sampling provided the court–and the requesting party–with information on the likely number of responsive documents in each custodian's files.  *Id.* (noting that for each requested custodian, "less than five percent of reviewed material has proven to be at all relevant").  Second, in each instance where the *Dryer* court denied production from a custodian, it relied on the sampling and also found that the employee's superior's documents had been produced.  *Id.* at *3–6.  Finally, the *Dryer* court did order production from one senior executive, finding that, despite the defendant's assertion that his job did not touch on issues in the litigation, the benefit of searching his files outweighed the

---

[4] Whether or not Oxbow has an obligation to perform preliminary analytics or sampling, it has the burden to establish that Mr. Koch's files are unreasonably duplicative or lack of responsiveness, something it cannot do with argument alone.  Moreover, Defendants do not dispute that it could be cost-effective to perform a preliminary analysis to determine the quantity of unique documents hitting on the search terms that exist in Mr. Koch's files.  Even under Oxbow's cost projections, it would cost less than 20% of the total estimate to process Mr. Koch's data, de-duplicate, and run the search terms.

burden because his executive position made it likely that if relevant documents existed, they would reside in his files. *Id.* at *5–6. As with the executive in *Dryer*, Mr. Koch's position makes it likely that relevant documents will reside in his files and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Third, contrary to Oxbow's assertions, Defendants have no obligation to identify non-custodians who communicated with Mr. Koch about matters relevant to this litigation. Although it is possible that Oxbow's search and production would have captured all communications between Mr. Koch and the custodians, it is also possible that Mr. Koch retained certain emails that other custodians did not, especially considering that the litigation concerns events back to 2003 or earlier. In addition, Mr. Koch may very well have relevant communications with third-parties, such as consultants, customers, or other railroads, that would be relevant to this litigation and not captured in the files of other custodians. Moreover, Defendants' brief and exhibits to both briefs *do* identify a number of non-custodians involved in communications with Mr. Koch, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] Defendants noted in their motion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, there is a simple response to Oxbow's histrionic claims: the documents speak for themselves ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[7] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendants initially sought production of ▮▮▮▮▮▮▮▮▮▮▮▮▮, but, based on representations made by Oxbow about the sufficiency of production from ▮▮▮▮ dropped that request. 11/23/16 Letter from C. Woodson to A. Lockner, at 1 (Mot. Ex. 6).

▬▬▬▬▬   For all of these reasons, there is good cause to believe that Mr. Koch's files are not "unreasonably" duplicative of the current Oxbow custodians.

Fourth, Oxbow's own cost estimates undercut its arguments that Mr. Koch's files are duplicative. Oxbow's cost calculation assumes that Mr. Koch will have ▬▬▬ unique documents hitting on the parties' agreed-upon search terms. (Enck Dec. at ¶ 17, 23.) This estimate is purportedly based on the average rate of duplicates and responsiveness hits among all Oxbow custodians. *Id.* ¶ 17. That is, despite asserting that Mr. Koch's files are unreasonably duplicative, Oxbow's estimate represents that Mr. Koch's files are in fact no more duplicative than those of the average Oxbow custodian. *Id.* If Mr. Koch possesses more than ▬▬▬ unique documents that hit on the parties' agreed-upon responsiveness search terms, that supports Defendants' contention that he likely has a substantial number of non-duplicative documents relevant to this case. Recognizing the paradox, Oxbow attempts to rationalize this by arguing that "it is reasonable to expect that his files would contain many unique documents that 'hit' on a search term" but are not responsive. Opp. at 18. But that is true of almost any custodian. Oxbow, again, has no evidence that Mr. Koch's documents are unusually likely to generate hits and yet be unresponsive.

Finally, Oxbow's protests about Defendants' productions are irrelevant to this motion and off-base. *See* Opp. at 14 n.10, 22. First, UP has produced documents from its executives, including ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Second, to Defendants' knowledge, Oxbow has no outstanding objections to Defendants' custodians, which

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[8] ▬▬▬▬▬▬▬▬▬▬▬

were proposed last year and the subject of extensive negotiations between the parties. Defendants have been, and remain, willing to meet and confer regarding any discovery disputes, including custodians.

In sum, there is a reasoned basis to believe that Mr. Koch has non-duplicative, relevant information in his files, and Oxbow has provided no factual basis to support its claim to the contrary. Its objection should be overruled.

### 2. Production of Mr. Koch's files is proportional to the needs of this case.

Contrary to the direct instructions of the Federal Rules, Oxbow ignores the proportionality factors of Rule 26 in favor of focusing on just one of those factors—the cost to Oxbow of producing the discovery. Setting aside the dubious accuracy of this calculation (addressed below), a fair assessment of all of the factors enumerated in Rule 26(b)(1) compels a finding that production of the files of Mr. Koch is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

In their Motion to Compel, Defendants addressed all six of the factors outlined in Rule 26(b)(1). *See* Mot. at 9-14. Defendants showed that:

- The issues in this case are important—the significance of this litigation was acknowledged by Mr. Koch himself. (Mot. at 12-13.)

- The amount in controversy is large—Oxbow seeks to recover more than $150,000,000. (Mot. at 13.)

- Defendants have no other source for this relevant information—only Oxbow has access to Mr. Koch's files. (Mot. at 9-12.)

- Oxbow has sufficient resources—Oxbow is a multi-billion dollar enterprise. (Mot. at 13-14.)

- Discovery from Mr. Koch is important to the issues in this case—Mr. Koch's involvement permeates all aspects of Oxbow's business. (Mot. at 5-9.)

- The burden of this discovery does not outweigh its benefit—any costs involved in producing the requesting discovery are slight when compared to the relevance. (Mot. at 5-9, 14.)

In its Opposition, Oxbow does not address at all the first three factors—importance of the issues, amount in controversy, and the parties' relative access to Mr. Koch's documents—all of which fall in favor of Defendants. Nor does Oxbow dispute that it has the resources to pay for the discovery sought. Opp. at 19.

Rather, Oxbow argues that the court can disregard the other factors and focus only on its costs to produce the relevant information. *See* Opp. at 19 ("the appropriate inquiry is whether the cost and burden of collecting Mr. Koch's files is outweighed by the relevance of the information sought."). That simplistic construction cannot stand. The inquiry is fulsome and must account for all the other factors as well. *See FTC v. Staples*, No. 15-2115, 2016 WL 4194045, at *2 (D.D.C. Feb. 26, 2016) (compelling third-party to produce documents after weighing all six factors, finding the first five easily resolved in favor of production, and determining that the burden and expense of producing several classes of documents was justified); *Kargbo v. National Passenger Railroad Corp.,* No. 1:15-cv-698, Memorandum Opinion, Dkt. 18, at 3 (D.D.C. Jan. 14, 2016) (Harvey, MJ.) (recognizing "the duty of the parties and the court to make a 'case-specific determination of the appropriate scope of discovery,' considering the six factors set forth in the Rule") (Ex. A). Even assuming Oxbow's estimate is accurate, Oxbow's costs may look high in isolation, but the true measure of the purported burden must be viewed in the complete context of Oxbow's serious charges of anticompetitive conduct, its claim to hundreds of millions of dollars in damages, its singular access to Mr. Koch's files, the absence of financial barriers to paying for the discovery, and the fact that the discovery sought is highly probative of the central issues in the case. Therefore, under these facts, even Oxbow's inflated estimate of discovery costs does not constitute an undue burden. *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y 2003) (noting that "a response to a

discovery request costing $100,000 sounds (and is) costly, but in a case potentially worth millions of dollars, the cost of responding may not be unduly burdensome"); *U.S. v. AT&T*, No. 1:11-cv-01560, 2011 WL 5347178, at *5–7 (D.D.C. Nov. 6, 2011) (compelling third-party to expend resources to produce an estimated 440,000 documents where the other Rule 26 proportionality factors favored production).

Oxbow cites a series of inapt cases to prop up their argument that the cost of this discovery is unduly burdensome. *Petcou v C.H. Robinson Worldwide, Inc.* provides no support for Oxbow's assertion that producing documents from Mr. Koch is unduly burdensome. No. 1:06-CV-2157-HTW-GGB, 2008 WL 542684 (N.D. Ga. Feb. 25, 2008). In *Petcou*, plaintiffs sought every email for a six-year period that contained sexually explicit content for all employees working in two of defendant's branch offices. *Id.* at *2. Complying with plaintiffs' discovery request required defendant to search the archived emails of every one of its 5,300 employees costing more than $79,000 *per employee*—a total of over $418 million. *Id.* at *1. The court found under those facts that the defendant met its burden of showing that the requested emails were not reasonably accessible, and their production was unduly burdensome in light of the tangential relevance of plaintiffs' document requests. *Id.* at *2. Here, even Oxbow's inflated cost estimate does not come close to the costs at issue in *Petcou*, nor is Oxbow required to sift through thousands of employees' files to collect Mr. Koch's documents. Defendants only seek production of the files of a single custodian who possesses relevant information about core matters in the case and whose files are as accessible as those of any other Oxbow custodian.

In *U.S. v. Kellogg Brown & Root Services*, the court declined to compel a further response to an interrogatory related to invoices that the moving party already had and limited discovery into unrelated contracts the plaintiff had with third-parties. 284 F.R.D. 22, 35–39

12

(D.D.C. 2012).  Here, the discovery sought relates directly to the parties, and Defendants seek information—Mr. Koch's documents—that is accessible to Oxbow.  Likewise, other than relating to the Court's inherent power to limit discovery under Rule 26(b)(2)(C), *Slate v. ABC,* 802 F. Supp. 2d 22 (D.D.C. 2011), has no tether to the facts of this dispute.  There, the court refused to compel re-production of documents subpoenaed from a third-party—who responded to the subpoena by dumping irrelevant and privileged documents on defendant—to assuage plaintiff that it was not prejudiced by defendant's nominal review of those irrelevant documents.  *Id.* at 23–25, 27–28.  *Slate,* like all of Oxbow's authorities, is unpersuasive.

Furthermore, Oxbow has not proposed to Defendants alternative or narrower search terms that it might use for Mr. Koch's files in order to reduce the purported volume of documents to be reviewed, while still ensuring production of documents responsive to Defendants' requests.  Alternate search terms could easily address Oxbow's apparent concern with ███████  ████████████████████████  While Oxbow had many opportunities to do this, it decided instead to stand on a blanket objection to producing any documents from Mr. Koch's files.

Therefore, because Oxbow has not shown that the cost of producing Mr. Koch's files is disproportionate to the needs of the case under Rule 26(b)(1), its undue-burden objection should be overruled.

### 3. Oxbow's cost calculation is inaccurate, unsupported by industry standards, and should be disregarded.

Oxbow asserts—for the first time—that the costs of producing Mr. Koch's documents will exceed ██████.[9]  This estimate should be disregarded for three reasons:  (1) Oxbow's

---

[9] Previously, Oxbow represented to Defendants that "to collect his entire inbox, archive files, process them through an early case assessment tool, run appropriate search terms, process out any attendant hits, **and review**

estimate relies on assumptions that are inconsistent with industry norms; (2) Oxbow's estimated document count for Mr. Koch is unsupported by evidence; and (3) Oxbow's estimate does not account for appropriate use of technology to minimize review burden, as provided for in the federal rules.

First, as outlined in the attached declaration, Oxbow's estimate is inconsistent with industry norms and contains a number of unsupported assumptions. (*See* Reizen Dec. at ¶¶ 10-18.) As one example, Oxbow's estimate of more than ▓▓▓ in document review costs assumes that Mr. Koch's files will have ▓▓▓ documents per gigabyte ("GB"). (Enck Dec. at ¶ 20.) It is well-understood in the electronic discovery industry that files per GB vary widely among sources, companies, and even custodians within the same company. (*See* Reizen Dec. at ¶¶ 16-18.) Oxbow's estimate is based on Ms. Enck's "general experience," (Enck Dec. at ¶ 20), rather than industry research (one industry analyst who surveyed millions files and noted an average of 3,500 files per GB, and in similar earlier studies found averages between 3,000 and 5,000 files per GB). (Reizen Dec. at ¶ 17 (citing John Tredennick, *How Many Documents in a Gigabyte? An Updated Answer*, Jan. 13, 2014, published at http://catalystsecure.com/blog/2014/01/how-many-documents-in-a-gigabyte-an-updated-answer-to-that-vexing-question/; John Tredennick, *How Many Documents in a Gigabyte? Revisiting an E-Discovery Mystery*, Aug. 20, 2015, published at http://catalystsecure.com/blog/2015/08/how-many-documents-in-a-gigabyte-revisiting-an-e-discovery-mystery/; John Tredennick, *How Many Documents in a Gigabyte: 2016 Edition,* June 2, 2016, published at http://catalystsecure.com/

**those documents for responsiveness**. The estimated **cost to complete this process** is at least **in the tens of thousands of dollars**." (Mot. Ex. 10 at 3) (emphasis added). Oxbow plainly did represent to Defendants that the all-in cost to produce Mr. Koch's files, including review costs, would be in the "tens of thousands of dollars," which is not suggestive of the ▓▓▓▓▓▓ dollar figure it now presents to the Court. *See* Opp. at 19 n. 13.

blog/2016/06/how-many-documents-in-a-gigabyte-2016-edition/).) It is entirely possible that Oxbow's estimate overstates—by two times or more—the number of documents in Mr. Koch's files. (*See Id.* at ¶¶ 10-11.) If one applies a number closer to the most recent industry estimate—3,500 documents per GB—the number of documents in the estimated review universe drops to about ▮ documents. (*Id.* at ¶ 19.) As another example, Oxbow's ECA data processing rates are about two and three-times the market rate. (*Id.* at ¶ 12 (market price for processing data into ECA processing rate is about ▮ instead of ▮, and market price for processing data out of ECA is ▮ instead of ▮).) Using the market prices for processing data into and out of ECA drops the processing costs by almost ▮. (*Id.* at ¶ 19.) In sum, using alternate, reasonable, values for just these variables decreases Ms. Enck's estimate by more than ▮ (*Id.* at ¶ 19.)

      Second, Oxbow's estimate relies heavily on the assumption that at least ▮ ▮ will hit upon the parties' agreed-upon search terms, resulting in more than ▮ unique documents to be reviewed—even after de-duplication. (Enck Dec. at ¶¶ 20-21.) As discussed above, this analysis is in tension with Oxbow's repeated assertions that Mr. Koch's files are "unreasonably" duplicative. Oxbow's estimate of search hits is purportedly based on the average rate of duplicates and responsiveness hits among all Oxbow custodians; however Oxbow has repeatedly suggested that Mr. Koch's files are not similarly situated to those of other custodians. *Compare* (Enck Dec. at ¶17) *with* Opp. at 2, 8-9. It is entirely possible (and perhaps likely given Oxbow's representations) that Mr. Koch will have substantially less hits than other custodians or that more of his documents will de-duplicate out, drastically changing the review costs. In other words, Oxbow's review costs will only be as high as Oxbow suggests if Mr. Koch's documents turn out to be more responsive than Oxbow expects—precisely the situation

in which such an expense would be reasonable. Unfortunately, Oxbow's analysis provides little insight into these issues and rests only on its own assumptions.

Finally, Oxbow's estimate assumes that it must conduct a document-by-document review of every document hitting on the agreed-upon search terms. Although Oxbow is entitled to conduct its review as it deems appropriate, "[t]he burden or expense of proposed discovery should be determined in a realistic way," which includes considering the use of technology to reduce the burden or expense of review. Fed. R. Civ. P. 26(b)(1), Advisory Committee's Note (2015 Amendment). In assessing Oxbow's purported review costs, it is appropriate to consider the existence of various means of technology-assisted review that can reduce the need to review each and every document prior to production. (*See* Reizen Dec. at ¶ 15.) In addition, Defendants note that the parties have entered into a protective order which contains a clawback provision, which "can facilitate prompt and economical discovery by reducing delay before the discovering party obtains access to documents, and by reducing the cost and burden of review by the producing party." Fed. R. Civ. P. 26(f), Advisory Committee's Note (2006 Amendment).

For these reasons, Oxbow's cost calculation raises more questions than it answers, is not reliable, and is not sufficient to support Oxbow's undue burden argument.

### III. CONCLUSION

Because Defendants carried their burden to establish the relevance of Mr. Koch's documents, and, because Oxbow failed to carry its burden to sustain its objections to that discovery, Defendants again respectfully request the Court Order production of Mr. Koch's documents.

Dated: March 2, 2017

Respectfully submitted,

/s/ John M. Majoras
John M. Majoras (D.C. Bar# 474267)
Kristen Lejnieks (D.C. Bar# 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3939

Tyrone R. Childress (admitted *pro hac vice*)
Carolyn A. Woodson (admitted *pro hac vice*)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939

Michael L. Rosenthal (D.C. Bar# 446216)
Thomas A. Isaacson (D.C. Bar# 376959)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, D.C. 20001
Telephone: (202) 662-5069

Attorneys for Defendant
UNION PACIFIC RAILROAD COMPANY


Bradley S. Phillips (admitted *pro hac vice*)
Gregory M. Sergi (D.C. Bar# 994418)
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100

Attorneys for Defendant
BNSF RAILWAY COMPANY

Dated: March 2, 2017

Respectfully submitted,

/s/ John M. Majoras
John M. Majoras (D.C. Bar# 474267)
Kristen Lejnieks (D.C. Bar# 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3939

Tyrone R. Childress (admitted *pro hac vice*)
Carolyn A. Woodson (admitted *pro hac vice*)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939

Michael L. Rosenthal (D.C. Bar# 446216)
Thomas A. Isaacson (D.C. Bar# 376959)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, D.C. 20001
Telephone: (202) 662-5069

Attorneys for Defendant
UNION PACIFIC RAILROAD COMPANY


Bradley S. Phillips (admitted *pro hac vice*)
Gregory M. Sergi (D.C. Bar# 994418)
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100

Attorneys for Defendant
BNSF RAILWAY COMPANY

Dated: March 2, 2017

Respectfully submitted,

/s/ John M. Majoras
John M. Majoras (D.C. Bar# 474267)
Kristen Lejnieks (D.C. Bar# 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3939

Tyrone R. Childress (admitted *pro hac vice*)
Carolyn A. Woodson (admitted *pro hac vice*)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939

Michael L. Rosenthal (D.C. Bar# 446216)
Thomas A. Isaacson (D.C. Bar# 376959)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, D.C. 20001
Telephone: (202) 662-5069

Attorneys for Defendant
UNION PACIFIC RAILROAD COMPANY


Bradley S. Phillips (admitted *pro hac vice*)
Gregory M. Sergi (D.C. Bar# 994418)
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100

Attorneys for Defendant
BNSF RAILWAY COMPANY

## CERTIFICATE OF SERVICE

I, John M. Majoras, certify that on March 2, 2017, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to counsel for all parties.

/s/ John M. Majoras
John M. Majoras

Attorney for Defendant
UNION PACIFIC RAILROAD COMPANY

# Declaration

# &

# Exhibit A

# Filed Under Seal