UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | )<br>)<br>)<br>) |
| This document relates to: | MDL Docket No. 1869<br>Miscellaneous No. 07-0489 (PLF) |
| ALL DIRECT PURCHASER CASES | )<br>)<br>) |
| OXBOW CARBON & MINERALS LLC, et al., | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )   Civil Action No. 11-1049 (PLF) |
| UNION PACIFIC RAILROAD CO., et al., | )<br>) |
| Defendants. | )<br>) |

OPINION

Defendants in <u>Rail Freight</u> and defendants in <u>Oxbow</u> move pursuant to 49 U.S.C.
§ 10706 to exclude evidence of any discussion or agreement between or among rail carriers that
concerned interline movements (and any rate or other action resulting from such discussion or
agreement), and to enforce the statutory bar on inferring a conspiracy from specified evidence.
Defendants' Motion and Memorandum of Law Regarding the Interpretation and Application
of 49 U.S.C. § 10706 [Dkt. No. 927];[1] <u>see also</u> Defendants' Motion to Exclude Interline-Related
Communications from Consideration for Class Certification or Any Other Purpose Prohibited

---

[1]     All cites to docket entries, unless otherwise specified, will refer to the first above
captioned matter, <u>In re Rail Freight Fuel Surcharge Antitrust Litig.</u>, MDL No. 1869,
Miscellaneous No. 07-0489.

by 49 U.S.C. § 10706 [Dkt. No. 417].  Plaintiffs in Oxbow and direct purchaser plaintiffs in Rail

Freight oppose the motions.  Plaintiffs' Memorandum of Points and Authorities in Opposition to

Defendants' Motion Regarding the Interpretation and Application of 49 U.S.C. § 10706

[Dkt. No. 952]; see also Plaintiffs' Memorandum in Opposition to Defendants' Motion to

Exclude Interline-Related Communications from Consideration for Class Certification or Any

Other Purpose Prohibited by 49 U.S.C. § 10706 [Dkt. No. 438].  Upon consideration of the

written submissions, the relevant case law, the oral arguments presented by counsel at a motions

hearing on August 26, 2020, and relevant portions of the record in this case, the Court will deny

defendants' motions.[2]

---

[2]     The documents considered in connection with the pending motion include:
Plaintiffs' Motion for Class Certification ("Pl. Class Cert. Mot.") [Dkt. No. 337]; Defendants'
Motion to Exclude Interline-Related Communications from Consideration for Class Certification
or Any Other Purpose Prohibited by 49 U.S.C. § 10706 ("Def. Class Cert. Mot.") [Dkt. No. 417];
Defendants' Memorandum in Support of Motion to Exclude Interline-Related Communications
from Consideration for Class Certification or Any Other Purpose Prohibited by 49
U.S.C. § 10706 ("Def. Memo. in Support Class Cert. Mot.") [Dkt. No. 420]; Plaintiffs'
Memorandum in Opposition to Defendants' Motion to Exclude Interline-Related
Communications from Consideration for Class Certification or Any Other Purpose Prohibited
by 49 U.S.C. § 10706 ("Pl. Class Cert. Opp.") [Dkt. No. 438]; Defendants' Reply Memorandum
in Support of Motion to Exclude Interline-Related Communications from Consideration for
Class Certification or Any Other Purpose Prohibited by 49 U.S.C. § 10706 ("Class Cert. Reply")
[Dkt. No. 444]; Transcript of October 6, 2010 Proceedings ("Tr. Oct. 6, 2010") [Dkt. No. 446];
Transcript of October 7, 2010 Proceedings ("Tr. Oct. 7, 2010") [Dkt. No. 447]; Defendants'
Objections Under 49 U.S.C. Section 10706(a)(3)(B)(ii) to Plaintiffs' Exhibits in Support of
Plaintiffs' Motion for Class Certification ("Def. Class Cert. Obj.") [Dkt. No. 454]; Plaintiffs'
Response to Defendants' Objections Under 49 U.S.C. § 10706(a)(3)(B)(ii) to Plaintiffs' Exhibits
in Support of Plaintiffs' Motion for Class Certification ("Pl. Class Cert. Obj. Resp") [Dkt.
No. 457-19]; Plaintiffs' Notice of Additional Evidence Relevant to Parties' Briefing on 49
U.S.C. § 10706(a)(3)(B)(ii) ("Pl. Notice Additional Evid.") [Dkt. No. 530-1]; Defendants'
Response to Plaintiffs' Notice of Additional Evidence Relevant to Parties' Briefing on 49 U.S.C.
§ 10706(a)(3)(B)(ii) ("Def. Notice of Additional Evid. Resp.") [Dkt. No. 532]; Defendants'
Motion & Memorandum of Law Regarding the Interpretation and Application of 49 U.S.C.
§ 10706 ("Def. Mot.") [Dkt. No. 927]; Plaintiffs' Memorandum of Points and Authorities in
Opposition to Defendants' Motion Regarding the Interpretation and Application of 49 U.S.C.
§ 10706 ("Pl. Opp.") [Dkt. No. 952]; Direct Purchaser Plaintiffs' Second Amended Consolidated

## I.  FACTUAL AND PROCEDURAL HISTORY

The Court has previously recounted at length the factual and procedural history of the Rail Freight and Oxbow litigation.  See In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight I"), 587 F. Supp. 2d 27, 29-31 (D.D.C. 2008); In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight II"), 593 F. Supp. 2d 29, 32, 34-35 (D.D.C.  2008), aff'd sub nom. Fayus Enters. v. BNSF Ry. Co., 602 F.3d 444, 445-46, 454 (D.C. Cir. 2010); In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight III"), 287 F.R.D. 1, 10 (D.D.C. 2012), vacated sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869, 725 F.3d 244 (D.C. Cir. 2013); In re Rail Freight Fuel Surcharge Antitrust Litig., ("Rail Freight IV"), 292 F. Supp. 3d 14, 33-38 (D.D.C. 2017), aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869, 934 F.3d 619 (D.C. Cir. 2019); see also Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co. ("Oxbow I"), 926 F. Supp. 2d 36, 39-40 (D.D.C. 2013); Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co. ("Oxbow II"), 81 F. Supp. 3d 1, 5-6

---

Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs By (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railway Company ("Defendants") ("Pl. 2d Am. Obj. & Resp.") [Dkt. No. 952-11]; Memorandum of Points and Authorities of New Plaintiffs In re Rail Freight Surcharge Antitrust Litigation (No. II) Regarding the Interpretation and Application of 49 U.S.C. § 10706 ("New Pl. Opp.") [Dkt. No. 954]; Defendants' Reply Memorandum of Law Regarding the Interpretation and Application of 49 U.S.C. § 10706 ("Def. Reply") [Dkt. No. 961]; Statement of Interest for the United States in Support of No Party Regarding the Meaning of 49 U.S.C. § 10706(a)(3)(B)(ii) ("Gov't SOI") [Dkt. No. 969]; Defendants' Response Memorandum to the Statement of Interest for the United States Regarding the Meaning of 49 U.S.C. § 10706(a)(3)(B)(ii) ("Def. Supp.") [Dkt. No. 973]; Plaintiffs' Supplemental Brief in Response to the United States' Statement of Interest Regarding the Meaning of 49 U.S.C. § 10706(a)(3)(B)(ii) ("Pl. Supp.") [Dkt. No. 975]; Transcript of August 26, 2020 Proceedings ("Tr. Aug. 26, 2020") [Dkt. No. 985]; and demonstratives provided at the August 26, 2020 hearing.

(D.D.C. 2015).  The Court therefore will limit its discussion here to the issues presented under 49

U.S.C. § 10706.

In <u>Rail Freight</u>, plaintiffs claim that defendants, BNSF Railway Company

("BNSF"), CSX Transportation, Inc. ("CSX" or "CSXT"), Norfolk Southern Railway Company

("NS"), and Union Pacific Railroad Company ("UP"), in violation of the Sherman Act, 15

U.S.C. § 1, "engaged in a price-fixing conspiracy to coordinate their fuel surcharge programs as

a means to impose supra-competitive total price increases on their shipping customers."  <u>Rail</u>

<u>Freight IV</u>, 292 F. Supp. 3d. at 34.[3]  A rail fuel surcharge, as defined by the plaintiffs, "'is a

separately-identified fee that is charged by the railroads for . . . agreed-upon transportation

[services], purportedly to compensate for increases in the cost of fuel.'"  <u>Id.</u> (quoting Second

Consolidated Amended Class Action Complaint [Dkt. No. 324] ¶ 2).  Plaintiffs allege that

defendants conspired to impose rail fuel surcharges that far exceeded any of the defendants' fuel

costs.  <u>Rail Freight IV</u>, 292 F. Supp. 3d. at 34.  Similarly, in <u>Oxbow</u>, the plaintiffs allege that

---

[3]      In <u>Rail Freight</u>, "[p]laintiffs have been divided into two putative classes:  (1) the
direct purchasers – those who allegedly purchased rail freight transportation from defendants
from July 1, 2003, until December 31, 2008, and who were assessed a rail fuel surcharge for the
transportation; and (2) the indirect purchasers – those who allegedly purchased rail freight
transportation services indirectly from defendants."  <u>Rail Freight IV</u>, 292 F. Supp. 3d at 34
(denying direct purchaser plaintiffs' motion for class certification).

The direct purchaser plaintiffs in <u>Rail Freight</u> have filed the motions at issue here.
They currently are represented by the following plaintiffs:  Dust Pro, Inc.; Dakota Granite
Company; Donnelly Commodities, Inc.; U.S. Magnesium LLC; Olin Corporation; and Strates
Shows, Inc.  <u>Rail Freight III</u>, 287 F.R.D. at 13, 74; <u>see also</u> August 20, 2020 Order [Dkt.
No. 980] at 1 (granting voluntary dismissal with respect to class representative Carter
Distributing Company); May 3, 2018 Order [Dkt. No. 865] at 1 (granting motion substituting
Nyrstar Holdings, Inc. as named plaintiff and proposed class representative in place of Nyrstar
Taylor Chemicals, Inc., which was previously known as Zinifex Taylor Chemicals, Inc.);
January 29, 2021 Stipulation [Dkt. No. 1005] (voluntary dismissal of Nyrstar Holdings, Inc.).

defendants UP and BNSF conspired to "fix prices above competitive levels through a uniform

fuel surcharge." Oxbow II, 81 F. Supp. 3d at 5 (noting that plaintiffs also allege that defendants

conspired to allocate certain markets to each other, granting UP a monopoly in at least one

region).[4]

In 2008, defendants in Rail Freight moved to dismiss the claims of both putative

classes.  On November 7, 2008, the Court denied defendants' motion regarding the direct

purchaser plaintiffs, concluding that the direct purchasers had sufficiently alleged an agreement

in restraint of trade.  Rail Freight I, 587 F. Supp. 2d at 32.  Shortly thereafter, on

December 28, 2008, the Court denied in part and granted in part defendants' motion regarding

the indirect purchaser plaintiffs, concluding that the indirect purchasers' state law claims were

preempted and must be dismissed, but that the indirect purchasers' federal antitrust claim for

injunctive relief could proceed.  Rail Freight II, 593 F. Supp. 2d at 32, 43.  On appeal, the D.C.

Circuit affirmed this Court's dismissal of the indirect purchasers' state law claims.  Fayus Enters.

v. BNSF Ry. Co., 602 F.3d at 454.

On March 18, 2010, direct purchaser plaintiffs in Rail Freight moved for class

certification.  Pl. Class Cert. Mot. at 1.  On September 8, 2010, defendants in Rail Freight filed a

motion to exclude interline-related communications from consideration as part of the class

certification process, and further, to exclude such communications from consideration for any

other purpose prohibited by 49 U.S.C. § 10706.  Def. Class Cert. Mot. at 1; Def. Memo. in

Support Class Cert. Mot. at 1-28.  On June 21, 2012, the Court granted plaintiffs' motion for

---

[4]     The plaintiffs in Oxbow are Oxbow Carbon & Minerals LLC; Oxbow Mining,
LLC; Oxbow Midwest Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC.
Oxbow II, 81 F. Supp. 3d at 5.  Oxbow Calcining International LLC, a plaintiff in the original
complaint, was removed from the amended complaint.  Id. at 5 n.2.

class certification without relying on any of the disputed evidence.  Rail Freight III, 287 F.R.D. at 19-20, 74.  The Court therefore concluded that it was not necessary, at that time, to rule on defendants' Section 10706 motion.  Id.  Subsequently, the D.C. Circuit vacated this Court's decision granting class certification and remanded the case for further consideration.  In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869, 725 F.3d at 255.  On remand, this Court denied direct purchaser plaintiffs' motion for class certification – again without relying on the disputed evidence; it therefore did not reach defendants' Section 10706 motion.  Rail Freight IV, 292 F. Supp. 3d at 50 n.5, 145.  On appeal, the D.C. Circuit affirmed the denial of class certification.  In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869, 934 F.3d at 627.

After class certification was denied, the absent putative former class members filed individual actions in district courts across the country to pursue the conspiracy claim that had been advanced by the putative class against defendants.  Transfer Order at 1, In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II), Miscellaneous No. 20-0008 (BAH), MDL No. 2952 (D.D.C.) [Dkt. No. 1].  Because of the significantly different procedural postures of these cases from those in MDL No. 1869, the Multidistrict Litigation Panel consolidated them into a separate MDL which it assigned to Chief Judge Howell – In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II), Miscellaneous No. 20-0008 (BAH), MDL No. 2952 (D.D.C.).  Transfer Order at 1-2.  Since then, additional cases have been filed and transferred to MDL No. 2952.  In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II), Miscellaneous No. 20-0008 (BAH), MDL No. 2952, 2020 WL 5016922, at *5 (D.D.C. Aug. 25, 2020).  Aside from limited factual additions, the approximately ninety-three complaints in MDL No. 2952 generally repeat the claims made by the putative class members in MDL No. 1869.  See id. at *5-6.

On December 19, 2019, this Court issued a memorandum opinion and order permitting the plaintiffs and the defendants in both Rail Freight and Oxbow and the plaintiffs in any related cases before Chief Judge Howell to file additional memoranda addressing defendants' still-pending motions concerning Section 10706.  Memorandum Opinion and Order [Dkt. No. 918] at 3.  In addition, on March 16, 2020, the Court issued an order inviting the United States Department of Justice, the Federal Trade Commission, and the Surface Transportation Board to submit a statement of interest.  Order [Dkt. No. 947] at 2.  As a result of these two orders, additional memoranda were filed by (1) the defendants in Rail Freight and Oxbow ("the defendants"), see Def. Mot.; Def. Reply; Def. Supp.;[5] (2) the plaintiffs in Rail Freight and Oxbow ("the plaintiffs"), see Pl. Opp.; Pl. Supp.;[6] (3) the plaintiffs in In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II), Miscellaneous No. 20-0008 (BAH), MDL No. 2952 (D.D.C. Aug. 25, 2020) ("the new plaintiffs"), see New Pl. Opp.; Pl. Supp.;[7] and (4) the United States Department of Justice, the Federal Trade Commission, and the Surface Transportation Board ("the government"), see Gov't SOI.

---

[5]     See also Oxbow, Civil Action No. 11-1049 [Dkt. No. 171] (Notice by Oxbow defendants incorporating Rail Freight defendants' motion); Oxbow, Civil Action No. 11-1049 [Dkt. No. 198] (Notice by Oxbow defendants incorporating Rail Freight defendants' reply); Oxbow, Civil Action No. 11-1049 [Dkt. No. 210] (Notice by Oxbow defendants incorporating Rail Freight defendants' supplemental memorandum).

[6]     See also Oxbow, Civil Action No. 11-1049 [Dkt. No. 189] (Notice by Oxbow plaintiffs incorporating Rail Freight plaintiffs' motion); Oxbow, Civil Action No. 11-1049 [Dkt. No. 209] (Notice by Oxbow plaintiffs incorporating Rail Freight plaintiffs' supplemental memorandum).

[7]     A comprehensive list of new plaintiffs who submitted the memorandum addressing the interpretation and application of 49 U.S.C. § 10706(a)(3)(B)(ii) is provided at New Pl. Opp., Appendix A.  These new plaintiffs are from a majority (seventy-five) of the cases in MDL No. 2952.  See In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II), Miscellaneous No. 20-0008 (BAH), MDL No. 2952, 2020 WL 5016922, at *5 (D.D.C. Aug. 25, 2020) (indicating there were a total of ninety-two cases in MDL No. 2952 as of August 25, 2020).

Defendants, plaintiffs, new plaintiffs, and the government take divergent positions on the interpretation of Section 10706(a)(3)(B)(ii), its application to the evidence, and the proper allocation of the burden of proof.  See generally Def. Mot.; Pl. Opp.; New Pl. Opp.; Gov't SOI.

## II.  LEGAL FRAMEWORK

In resolving the relevant disputes, the Court is guided by the principle that "[i]t is for the court to define the statutory standard."  McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 356 (1991).  "[T]he function of the courts" is to "construe the language so as to give effect to the intent of Congress."  United States v. Am. Trucking Ass'n, Inc., 310 U.S. 534, 542 (1940).

As always, the Court begins with the plain language of the statute.  Grp. Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 210 (1979); United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1352 (D.C. Cir. 2002).  The first step in interpreting a statute is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997).  The words of a statute should be interpreted according to their ordinary meaning. Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012).  Where the language of the statute is clear and "the statutory scheme is coherent and consistent," that is the end of judicial inquiry. Robinson v. Shell Oil Co., 519 U.S. at 340 (internal quotations omitted); see also United States v. Braxtonbrown-Smith, 278 F.3d at 1352 (stating that when the plain meaning of the statute produces an unreasonable result which is "plainly at variance with the policy of the legislation as a whole [the Supreme Court] has followed that purpose, rather than the literal words [of the statute]") (internal quotations and citation omitted).

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. at 341. If the language is ambiguous, the Court should look to Congress's purpose in enacting the statute. United States v. Braxtonbrown-Smith, 278 F.3d at 1352; United States v. Cordova, 806 F.3d 1085, 1099 (D.C. Cir. 2015). The Court "'must avoid an interpretation that undermines congressional purpose considered as a whole when alternative interpretations consistent with the legislative purpose are available.'" United States v. Braxtonbrown-Smith, 278 F.3d at 1352 (quoting United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 543 (1940)). In order to determine "the general purpose of Congress in enacting the statute" the Court may look to the statute's "legislative history for helpful clues." United States v. Braxtonbrown-Smith, 278 F.3d at 1352; see also Demby v. Schweiker, 671 F.2d 507, 510 (D.C. Cir. 1981) ("Because the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent.").

Further, rules excluding relevant evidence should be strictly construed. See, e.g., Trammel v. United States, 445 U.S. 40, 50 (1980). As the Supreme Court has made clear, "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public . . . has a right to every man's evidence. As such, they must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." Id. at 50 (internal quotations and citations omitted). Also pertinent to the Court's analysis is the related principle that courts must construe statutes containing exemptions from the antitrust laws narrowly. See Union Lab. Life Ins. Co. v.

9

Pireno, 458 U.S. 119, 126 (1982); FMC v. Seatrain Lines, Inc., 411 U.S. 726, 732-33 (1973); see

also Grp. Life Health Ins. Co. v. Royal Drug Co., 440 U.S. at 231 (explaining that the doctrine of

construing antitrust exemptions narrowly "is not limited to implicit exemptions[], but applies

with equal force to express statutory exemptions.").[8]

### III.  SECTION 10706(a)(3)(B)(ii):  HISTORY AND PURPOSE

Section 10706(a)(3)(B)(ii) provides:

> In any proceeding in which it is alleged that a carrier was a party to
> an agreement, conspiracy, or combination in violation of a Federal
> law cited in subsection (a)(2)(A) of this section or of any similar
> State law, proof of an agreement, conspiracy, or combination may
> not be inferred from evidence that two or more rail carriers acted
> together with respect to an interline rate or related matter and that a
> party to such action took similar action with respect to a rate or
> related matter on another route or traffic.

> In any proceeding in which such a violation is alleged, evidence of
> a discussion or agreement between or among such rail carrier and
> one or more other rail carriers, or of any rate or other action resulting
> from such discussion or agreement, shall not be admissible if the
> discussion or agreement –

---

[8]     Defendants argue that the principle that antitrust exemptions should be construed narrowly is irrelevant because Section 10706 is not an antitrust immunity statute, but instead provides a "procedural framework to address the evidence."  Def. Reply at 3.  The government responds that "courts have long interpreted statutes and other legal rules to preserve the efficacy of the antitrust laws."  Gov't SOI at 4 (citing Latin Am./Pac. Coast S.S. v. Fed. Mar. Comm'n, 465 F.2d 542, 552 (D.C. Cir. 1972) ("[A]mbiguities, if any, should be resolved in favor of free competition."); Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 328-29 (1955) (rejecting claim preclusion theory that "would in effect confer on [defendants] a partial immunity," contrary to "the public interest in vigilant enforcement of the antitrust laws").

        While not itself an antitrust exemption, 49 U.S.C. § 10706 is entitled "Rate agreements: exemption from antitrust laws," which is one indication of the section's purpose.  See Almedarez-Torres v. United States, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (internal quotations and citations omitted).  Based on all pertinent considerations, the Court is persuaded that the provisions at issue here should be strictly construed.

(I)     was in accordance with an agreement approved under paragraph (2) of this subsection; or

(II)    concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause.

In any proceeding before a jury, the court shall determine whether the requirements of subclause (I) or (II) are satisfied before allowing the introduction of any such evidence.

49 U.S.C. § 10706(a)(3)(B)(ii).  This provision was first codified as part of the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895, which amended the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4R Act"), Pub. L. No. 94-210, 90 Stat. 31.[9]  The purpose of the 4R Act and the Staggers Rail Act was to partially deregulate and thereby revitalize the struggling railroad industry.  See Rail Freight II, 593 F. Supp. 2d at 37 n.3; Coal Exporters Ass'n of U.S., Inc. v. United States, 745 F.2d 76, 80-81 (D.C. Cir. 1984) ("The primary goal of the Act was to revitalize the railroad industry by reducing or eliminating regulatory burdens.  Faced with railroad bankruptcies and the need to assure railroads of adequate revenues, Congress revamped the structure of railroad regulation in order to restore the industry to health."); see also H.R. REP. NO. 96-1035, at 38 (1980) ("The overall effect of [railroad regulation] has meant that railroads have been severely handicapped in their ability to compete with other modes of transportation.").  "[T]he Act tries to achieve railroad revenue adequacy by means of the interaction of competitive forces."  Am. Short Line R.R. Ass'n v. United States, 751 F.2d 107, 113 (2d Cir. 1984).

The goals of the Staggers Act are set forth in the statute itself.  Am. Short Line R.R. Ass'n v. United States, 751 F.2d at 111 ("The purposes of the Staggers Act are clearly

---

[9]     49 U.S.C. § 10706(a)(3)(B)(ii) was originally codified at 49 U.S.C. § 10706(a)(3)(C)(ii) as part of the Staggers Rail Act § 219.  It was recodified from subsection (a)(3)(C)(ii) to subsection (a)(3)(B)(ii) with inconsequential changes during the passage of the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803.

enunciated, revealing its dominant procompetitive objectives."). "In regulating the railroad industry, it is the policy of the United States Government – (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail; [and] (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required." 49 U.S.C. § 10101 (listing fifteen separate goals).

To facilitate the ability of rail carriers to compete with other industries transporting goods, such as trucking, Congress authorized rail carriers to participate in interline traffic, or shared traffic, between or among two or more rail carriers. See 49 U.S.C. § 10703 (authorizing rail carriers to "establish through routes (including physical connections) with each other"); Def. Mot. at 1 (explaining that because "[n]o single railroad's tracks cover the entire country," independent rail carriers must cooperate with one another to ship freight cross-country).[10] Rail carriers generally are competitors with one another.[11] But when two or more rail carriers share an interline movement, they are not in competition as to that movement.

---

[10]     In contrast to an interline movement, which involves two or more rail carriers, a single-line movement is provided by a single rail carrier over its line only. See 49 U.S.C. § 10706(a)(1)(B). Defendants and the government also refer to single-line movements as "local" movements. See generally Def. Mot.; Gov't SOI.

[11]     See Def. Mot. at 1 (acknowledging that rail carriers are "sometimes direct competitors"); Def. Reply at 17 n.9 ("No one denies that CSXT and NS in the East and UP and BNSF in the West are vigorous competitors, nor that there is some competition between Eastern and Western railroads at the margins."); see also Gov't SOI at 12-13 (citing Russell Pittman, Options For Restructuring The State Owned Monopoly Railway, in RAILROAD ECONOMICS 182 (2007) (explaining that "source competition" "occurs when a shipper can send its product to an alternative destination using a different railroad")); Rail Freight IV, 292 F. Supp. 3d at 99-100 ("[C]aptive shippers[, shippers that are served by a single railroad,] are subject to competitive forces and therefore can suffer antitrust injury.").

See Def. Mot., Ex. 8 (Hearing on H.R. 4570 Before the Subcommittee on Transportation and

Commerce Committee on Interstate and Foreign Commerce, House of Representatives, 96th

Cong. 427 (Oct. 23, 1979) (statement of Donald L. Flexner)) (DOJ representative explaining that

two or more carriers who "interline at a particular junction point and provide a through service"

"do not compete with each other for the carriage of the interline traffic");[12] see also Def. Mot.

at 7 (arguing that "interlining railroads act[] as joint ventures in a vertical supply relationship"

and "communications necessary for partnering railroads to develop and optimize their joint

service are therefore procompetitive, output enhancing, and present no antitrust concern").[13]  To

prevent rail carriers from facing antitrust exposure for lawful communications about interline

traffic, Congress enacted Section 10706(a)(3)(B)(ii).

As noted above, the first sentence of Section 10706(a)(3)(B)(ii) bars certain

inferences, while the second sentence provides that evidence meeting certain requirements shall

not be admissible in any proceeding.  49 U.S.C. § 10706(a)(3)(B)(ii).  Congress explained the

purpose of the second sentence in providing for the exclusion of certain evidence as follows:

> Because of the requirement that carriers concur in changes to joint
> rates, carriers must talk to competitors about interline movements in
> which they interchange.  That requirement could falsely lead to
> conclusions about rate agreements that were lawfully discussed.  To
> prevent such a conclusion the Conference substitute provides
> procedural protections about lawful discussions and resulting rates.
> The Conferees intend that these protections be construed to insure

---

[12]     Contra New Pl. Opp. at 23 (arguing that Mr. Flexner's testimony reflected grave
concerns about (1) general rate increases and (2) discussion of single-line rates).

[13]     On an interline movement, the shipper may work with each rail carrier
individually to set a separate rate for each portion of the route under "Rule 11," Def. Mot. 8 at
n.3, or it may work together with all of the carriers to set a single "joint rate."  Def. Mot. at 7-8
(citing Balt. Gas & Elec. Co. v. United States, 817 F.2d 108, 110 (D.C. Cir. 1987) (defining joint
rate)).

> that remedies for anti-competitive activities remain under existing
> laws.

H.R. REP. NO. 96-1430, at 114 (1980) (Conf. Rep.).

After Section 10706(a)(3)(B)(ii) was enacted, the Interstate Commerce

Commission ("ICC") addressed the protections the statute afforded as well as its limitations.

W. Railroads - Agreement, 364 I.C.C. 635, 657-58 (1981).[14]  The ICC stated that through this

provision, "Congress is providing only procedural protections, not complete immunity."  Id.

at 658.  It noted that the Department of Justice "has stated that [Section 10706(a)(3)(B)(ii)] and

its amendments specifically and thoroughly grant the necessary protection under the antitrust

laws for ratemaking activities.  These protections allow practically participating carriers to set

joint-line routes collectively and then single-line rates individually.  These provisions are

sufficient and no further protections are required."  Id. at 658.[15]

The ICC's successor agency, the STB, has similarly noted the limitations of

Section 10706.  It explained that "railroads, like other firms, are not permitted to collaborate

where they compete.  Such collaboration is not permitted under the antitrust laws, and we may

not immunize it from antitrust scrutiny under 49 U.S.C. 10706."  Canadian Nat'l Ry. Co., Grand

Trunk Corp., & Grand Trunk W. R. R. Inc.-Control-Illinois Cent. Corp., Illinois Cent. R.R. Co.,

---

[14]      When the Staggers Act was enacted, rail traffic was subject to regulation or
oversight by the ICC.  The ICC was subsequently replaced by the Surface Transportation Board
("STB"), which was to perform some of the functions previously performed by the ICC.  See
ICC Termination Act of 1995, § 201.

[15]      See also New Pl. Opp., Ex. 19, at 9 (Comments of the United States Department
of Justice, W. Railroads – Agreement, ICC Docket No. Section 5(b) Application No. 2
(Nov. 26, 1980)) (stating that the "twin protections [of § 10706(a)(3)(B)(ii)(I) and (II)] allow
'directly connecting' carriers to set rates for joint-line routes collectively and their single-line
rates independently.  No further protections are necessary from the Commission or from the
Department.").

<u>Chicago, Cent. & Pac. R.R. Co., & Cedar River R.R. Co.</u> ("<u>Canadian Nat'l</u>"), 4 S.T.B. 122, 1999
WL 336285, at *16 (1999). Thus, "[a]ny attempts at price-signaling activities for competitive
traffic under the guise of interline ratemaking will continue to remain subject to the antitrust
laws." <u>Id</u>. at *16 n.79.

Until now, no court has interpreted the provisions of Section 10706(a)(3)(B)(ii).
<u>See</u> Def. Memo. in Support Class Cert. Mot. at 17; Pl. Class Cert. Opp. at 1.

## IV.  ANALYSIS

The provisions of Section 10706(a)(3)(B)(ii) at issue here are: the first sentence,
which bars certain inferences; the second sentence, which provides that evidence meeting certain
requirements shall not be admissible; and the third sentence, which requires the Court to act as
gatekeeper and determine whether the requirements of the second sentence are satisfied before
allowing the introduction of such evidence in any proceeding before a jury.

Defendants have moved to enforce the statutory bar on certain inferences and to
exclude certain evidence.  Specifically, defendants argue that, in contravention of the first
sentence of Section 10706(a)(3)(B)(ii), plaintiffs improperly attempt to infer a conspiracy based
on similar actions taken by the rail carriers with respect to other traffic.  Def. Mot. at 42-45
(citing Def. Mot., Exs. 18, 22-23, 25, 29-30, 36, 38, 42, 52, 54, 83-89).  Plaintiffs maintain that
there are no similar actions from which to draw inferences of a conspiracy.  Pl. Opp. at 34.
Defendants further argue that, pursuant to the second sentence of Section 10706(a)(3)(B)(ii), the
following evidence should be excluded:  (1) evidence of interline concurrence communications,
(2) evidence of alliance meetings, and (3) evidence of inter-railroad logistical discussions
regarding interline traffic.  Def. Mot. at 21-42 (citing Def. Mot., Exs. 16-43, 45-46, 49-56, 59-71,
73-82).  Plaintiffs maintain that the disputed evidence is not covered by

15

Section 10706(a)(3)(B)(ii) because all of the evidence defendants seek to exclude shows an overarching conspiracy regarding rates.  Pl. Opp. at 16.  These disputes stem in part from the defendants', plaintiffs', new plaintiffs', and government's divergent interpretations of Section 10706(a)(3)(B)(ii).

   The Court will first discuss the arguments to exclude evidence, and then it will address the arguments to bar inferences.

### A.  Exclusion of Evidence

   Under the Federal Rules of Evidence "[r]elevant evidence is admissible unless any of the following provides otherwise: . . . a federal statute."  Fed. R. Evid. 402.  The statute at issue, the Staggers Act, is such a federal statute.  It is applicable here because in this proceeding, "a violation" is alleged of one of the antitrust laws specified in the statute.  Under the statute, even if otherwise relevant, "evidence of a discussion or agreement" "between or among" rail carriers (or of a rate or any other action resulting from such a discussion or agreement) "shall not be admissible" in this proceeding (1) "if the discussion or agreement . . . concerned an interline movement of the rail carrier," and (2) "the discussion or agreement would not, considered by itself, violate [the antitrust laws]." 49 U.S.C. § 10706(a)(3)(B)(ii) (second sentence).  It is the responsibility of the Court to determine whether the above requirements are satisfied before allowing the introduction of any such evidence.  49 U.S.C. § 10706(a)(3)(B)(ii) (third sentence); see also FED. R. EVID. 104 (stating that courts must decide "any preliminary question about whether . . . evidence is admissible").

    Defendants, plaintiffs, new plaintiffs, and the government dispute which of the parties carries the burden of satisfying the requirements for inadmissibility.  They also dispute the scope and interpretation of the terms "[i]n any proceeding," "discussion," "agreement," and

"between or among" rail carriers, evidence of which (or of a rate or other action resulting

therefrom) is not admissible, as well as the phrases "concerned an interline movement of the rail

carrier," and "would not, considered by itself, violate [the antitrust laws]."

1.  Burden of Proof

Section 10706(a)(3)(B)(ii) contains two requirements governing the

inadmissibility of evidence.  Defendants, plaintiffs, new plaintiffs, and the government dispute

which party bears the burden of proving both the first requirement – that a discussion or

agreement between or among rail carriers concerned an interline movement of the rail carrier –

and the second requirement – that the discussion or agreement would not, considered by itself,

violate the antitrust laws.  Compare Def. Supp. at 27 (arguing that the entire burden should be

placed on the proponents of the evidence – the plaintiffs), with Pl. Supp. at 2 (arguing that the

entire burden should be placed on the opponents of the evidence – the defendants), and Gov't

SOI at 6 (same).

The Court is persuaded that the proper allocation of burdens under Section 10706

involves the following three-step approach:  (1) The burden is on the proponent of the admission

of evidence to identify the specific evidence (exhibits and testimony) it seeks to admit.  (2) The

burden is on the opponent of admission to show that the evidence it seeks to exclude is "of a

discussion or agreement" "between or among [a] rail carrier [alleged to be party to an agreement,

conspiracy, or combination in violation of the antitrust laws] and one or more other rail carriers,

or of any rate or other action resulting from such discussion or agreement;" and that it satisfies

the first requirement of the "concerned" clause, that the discussion or agreement "concerned an

interline movement of the rail carrier."  See 49 U.S.C. § 10706(a)(3)(B)(ii).  (3) The burden is on

the proponent of admission to satisfy the second requirement of the "concerned" clause, that the discussion or agreement would, considered by itself, violate the antitrust laws.  See id.[16]

In determining this allocation of burdens, the Court is guided first by the text of Section 10706 and by congressional intent, and then by the following policy considerations: (1) generally relevant evidence is admissible, see FED. R. EVID. 402; (2) rules excluding relevant evidence and statutes containing antitrust exemptions are to be strictly or narrowly construed, see Trammel v. United States, 445 U.S. at 50; Union Lab. Life Ins. Co. v. Pireno, 458 U.S. at 126; FMC v. Seatrain Lines, Inc., 411 U.S. at 732-33; Grp. Life Health Ins. Co. v. Royal Drug Co., 440 U.S. at 231; (3) ordinarily the party offering the evidence must prove its admissibility, see, e.g., United States v. McGill, 815 F.3d 846, 903 (D.C. Cir. 2016) (citing Meister v. Med. Eng'g Corp., 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001); United States v. Al-Imam, 382 F. Supp. 3d 51, 55 (D.D.C. 2019); (4) considerations of fairness and convenience may require departure from the ordinary placement of this burden, see Thompson v. Drug Enf't Admin., 492 F.3d 428, 434 (D.C. Cir. 2007) (allocating the burdens of production and persuasion); and (5) convenience and fairness normally point to not placing a burden on a litigant to establish facts peculiarly within the knowledge of an adversary, Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 50 (2005) (citing United States v. New York, N.H. & H.R. Co., 355 U.S. 253, 256 n.5 (1957)).

Section 10706(a)(3)(B)(ii) makes certain evidence inadmissible ("shall not be admissible").  It is nevertheless appropriate to place the initial burden on the proponent of

---

[16]   In arriving at this allocation and describing the second requirement of the "concerned" clause, the Court has eliminated the double negative of "shall not be admissible" if the discussion or agreement "would not, considered by itself, violate" the antitrust laws, see 49 U.S.C. § 10706(a)(3)(B)(ii) (emphasis added), and has recast it in the affirmative.

evidence to first identify the evidence it seeks to admit.  It would be inefficient and burdensome to require the opponent to predict all of the evidence the proponent might offer in order to gain the protection of Section 10706(a)(3)(B)(ii).  As for which party then should be required to prove the two predicate facts bearing on the inadmissibility of proffered evidence, the parties argue that the burden for both requirements should be allocated to a single party.  See Def. Supp. at 27; Pl. Supp. at 2; Gov't SOI at 6.  But the text of the statute – as well as the above cited policy considerations – persuade the Court that the proper allocation places the burden on the opponent to satisfy the first requirement of the statute, and then shifts the burden to the proponent to satisfy the second requirement.

Defendants rely on the policy that ordinarily the party offering evidence bears the burden of proving its admissibility to argue that the burden of proof for both requirements should be placed on the proponent of the evidence.  Def. Supp. at 27-28 (quoting United States v. Al-Imam, 382 F. Supp. 3d at 55).  By contrast, plaintiffs start with the language of the statute, asserting that when the statute expressly provides that evidence shall not be admissible, the burden is on the opponent of the evidence to show that it should be excluded.  Pl. Opp. at 16.  In support of plaintiffs' position, the government argues that "it would be anomalous to require plaintiffs, as the proponents of the evidence, to prove conditions for inadmissibility."  Gov't SOI at 7 (arguing that the burden of proof for both requirements should be placed on the opponent of the evidence).

Defendants maintain that a rule of inadmissibility may still place the burden on the proponent of the evidence.  Def. Supp. at 28.  To support this proposition, defendants point to Bourjaily, arguing that "the Supreme Court placed the burden of showing a conspiracy on the proponent of a co-conspirator statement despite the fact that the hearsay rule is also a rule of

19

inadmissibility." Id. (emphasis in original) (citing Bourjaily v. United States, 483 U.S. 171, 176 (1987); FED. R. EVID. 802). Rule 802 provides that hearsay is not admissible. FED. R. EVID. 802.[17] Bourjaily, however, does not involve the interpretation of Rule 802 of the Federal Rules of Evidence, but of Rule 801(d)(2)(E). See Bourjaily v. United States, 483 U.S. at 176. And unlike Rule 802, Rule 801(d) is a rule of admissibility. It provides that a statement that meets one of five specified conditions "is not hearsay." FED. R. EVID. 801(d) (emphasis added). In order to qualify as "not hearsay" under Rule 801, the Court in Bourjaily held that the proponent of the evidence shoulders the burden of proving the predicate facts. Bourjaily v. United States, 483 U.S. at 176 ("[W]hen the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence."). Bourjaily does not, therefore, make the defendants' case for where the burden should lie.

Putting Bourjaily to one side, the plaintiffs and the government are correct to start with the language of the statute at issue to determine the proper placement of burden. See Thompson v. Drug Enf't Admin., 492 F.3d at 434 (explaining that, in allocating the burdens of production and persuasion, courts should begin with the language of the statute before adopting the default rule placing the burden on the plaintiff). A significant factor in allocating burdens is whether, upon satisfying a particular requirement, a rule or statute makes the evidence in question admissible or inadmissible. This is perhaps best illustrated by a comparison of Rules 403 and 609(a)(1)(B) of the Federal Rules of Evidence, both of which require a court to

---

[17] Rule 802 provides that "[h]earsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." FED. R. EVID. 802 (emphasis added).

weigh the probative value of evidence against the danger of unfair prejudice before deciding whether to admit the evidence, but which allocate the burden of proof very differently.[18]

Under Rule 609(a)(1)(B), evidence is <u>admissible</u> upon satisfying a given requirement.  <u>See</u> FED. R. EVID. 609(a)(1)(B).  The burden is on the proponent of the evidence, the prosecutor, to prove that the probative value of a criminal defendant's prior conviction outweighs its prejudicial effect.  <u>United States v. Crawford</u>, 613 F.2d 1045, 1053 n.16 (D.C. Cir. 1979) (holding that the burden of proof for admitting prior convictions of defendant in criminal case under Rule 609(a) "is clearly on the prosecution rather than the defendant"); <u>United States v. Anderson</u>, 174 F. Supp. 3d 104, 106 (D.D.C. 2016).

Prior to the enactment of Rule 609, the D.C. Circuit interpreted a D.C. Code statute that allowed the admission of a defendant's prior convictions for impeachment purposes. Under that statute, such evidence was ordinarily admissible, but courts could exclude it if the defendant could demonstrate that the "prejudicial effect of impeachment far outweighs the probative relevance of the prior conviction to the issue of credibility."  <u>Luck v. United States</u>, 348 F.2d 763, 764-69 (D.C. Cir. 1965); <u>see also</u> <u>Gordon v. United States</u>, 383 F.2d 936, 939 (D.C. Cir. 1967).  When the Federal Rules of Evidence were being considered, Congress changed the allocation of the burden for admissibility of a criminal defendant's prior convictions for impeachment purposes, now placing the burden on the proponent of the

---

[18]     Rule 403 provides that "[t]he court may <u>exclude relevant evidence if</u> its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403 (emphasis added).

Rule 609(a)(1)(B) provides that evidence of a criminal conviction "<u>must be admitted</u> in a criminal case in which the witness is a defendant, <u>if</u> the probative value of the evidence outweighs its prejudicial effect to that defendant."  Fed. R. Evid. 609(a)(1)(B) (emphasis added).

evidence, the prosecutor, to demonstrate that the probative value of the evidence outweighed its

prejudice.  United States v. Smith, 551 F.2d 348, 360 (D.C. Cir. 1976) ("This modest variation in

language is not purely semantic;" placing the burden on the proponent of the evidence was "an

important change in the law").  Although the language of Rule 609 was subsequently modified in

certain respects, Rule 609(a)(1)(B) continues to provide that a prior conviction of a defendant in

a criminal case is admissible "if the probative value of the evidence outweighs its prejudicial

effect to that defendant."  FED. R. EVID. 609(a)(1)(B).  Thus, the burden remains on the

proponent of the evidence, the government, to demonstrate why the evidence should be admitted.

See United States v. Anderson, 174 F. Supp. 3d at 106.[19]

By contrast, under Rule 403, evidence is inadmissible upon satisfying a given

requirement.  See FED. R. EVID. 403.  Under this rule, the burden is on the opponent of the

evidence to show that the probative value is substantially outweighed by the danger of unfair

prejudice.  See Webb v. Hyman, 861 F. Supp. 1094, 1112 (D.D.C. 1994) (admitting testimony

where opponents of admission did "not meet their heavy burden of showing that any prejudice

'substantially outweighed' the obviously probative value of this testimony"); see also Anthony v.

Washington Metro. Area Transit Auth., Civil Action No. 04-0622, 2005 WL 5329516, at *4

(D.D.C. Apr. 8, 2005) (concluding that defendant "failed to demonstrate that the probative value

of this evidence is substantially outweighed by the unfair prejudice, as is its burden."); 1

MCCORMICK ON EVID. § 42 (8th ed. 2020) (explaining that under certain rules, including

---

[19]      The reversal of burdens in Rule 609(a) represented a clear policy choice by
Congress.  The prejudicial effect of admission of a prior conviction may be so great as to deter a
criminal defendant from testifying.  See United States v. Smith, 551 F.2d at 365 (explaining
defendant was likely dissuaded from testifying primarily by the trial court's refusal to exclude
evidence of his prior conviction).  Placing the burden of proof on the government furthers the
policy against placing undue burdens on a criminal defendant's right to testify.

Rule 403, "the burden of showing that prejudice substantially outweighs [the] probative value is on the objecting party").[20]

Consideration of the case law allocating burden under Rules 403 and 609(a)(1)(B) indicates the following:  If upon satisfying a particular requirement, the evidence in question is admissible, the burden generally is on the proponent of the evidence to prove that requirement. If, however, upon satisfying a particular requirement, the evidence in question is inadmissible, the burden generally is placed on the opponent of the evidence to prove that requirement.[21]

---

[20]   The language of Rule 403 largely mirrors the Luck standard abandoned by Congress.  Compare FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."), with Luck v. United States, 348 F.2d at 768 (holding that courts may exclude evidence of a prior conviction if the "prejudicial effect of impeachment far outweighs the probative relevance of the prior conviction to the issue of credibility").  Using similar language, both standards place the burden on the opponent of the evidence.

[21]   Comparing earlier draft versions of Rule 609(a) (and similarly the language used by the D.C. Circuit to describe the Luck standard) with the version of Rule 609(a) that was ultimately enacted, reveals an important point about the use of language in determining allocation of burden.  Both the earlier draft versions of Rule 609(a) and the final version of the rule that was enacted by Congress provided a defendant's prior conviction is "admissible," but the earlier draft versions and final enacted version used different conjunctions (unless and if, respectively), resulting in the placement of burden on different parties.  The version of Rule 609(a) that ultimately became law, under which the burden was on the proponent of the evidence, provided that evidence "shall be admitted . . . but only if" the stated requirement is met.  United States v. Smith, 551 F.2d at 356 n.16.  Under that standard, if the stated requirement is met, the evidence is admissible, suggesting that the burden should be placed on the proponent of the evidence to prove that requirement.

By contrast, the earlier draft versions of Rule 609(a), under which the burden would have been on the opponent of the evidence, see United States v. Smith, 551 F.2d at 360, provided that evidence "is admissible . . . unless" the stated requirement is met.  See Revised Draft of Proposed Rules of Evidence, 51 F.R.D. at 393; H.R. REP. NO. 93-650, at 7084; see also Gordon v. United States, 383 F.2d at 939 (explaining that under the Luck standard, conviction evidence would "ordinarily be admissible unless this burden is met") (emphasis added).  The use of the negative conjunction "unless" in place of "if" changes the result.  Under the earlier versions of Rule 609(a), if the stated requirement is met, the evidence is inadmissible, suggesting that the burden should be placed on the opponent of the evidence to prove that requirement.

Turning to Section 10706(a)(3)(B)(ii), the statute does not expressly allocate burden to a particular party.  Compare 49 U.S.C. § 10706(a)(3)(B)(ii), with 49 U.S.C. § 10706(a)(3)(B)(i) (expressly placing the burden on a particular party, stating that "[i]n any proceeding in which a party alleges that a rail carrier voted or agreed on a rate or allowance in violation of this subsection, that party has the burden of showing that the vote or agreement occurred.") (emphasis added).  The phrasing of the second sentence, which provides two requirements for inadmissibility, however, does suggest that Congress intended an allocation of burden.  This sentence provides, in relevant part, that "evidence of a discussion or agreement between or among [a] rail carrier [alleged to be party to an agreement, conspiracy, or combination in violation of the antitrust laws] and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement," "shall not be admissible" if "the discussion or agreement"  (1) "concerned an interline movement of the rail carrier" and (2) "would not, considered by itself, violate [the antitrust laws]."  49 U.S.C. § 10706(a)(3)(B)(ii) (emphasis added).[22]

Taking these two requirements separately, the language of the first requirement closely mirrors that of Rule 403.  Under Rule 403, relevant evidence is inadmissible if a certain

---

[22]    The third sentence of Section 10706(a)(3)(B)(ii) provides that "the court shall determine whether the requirements of subclause (I) or (II) [identified in the second sentence of Section 10706(a)(3)(B)(ii)] are satisfied before allowing the introduction of any such evidence." 49 U.S.C. § 10706(a)(3)(B)(ii).  The government argues that Congress's use of the disjunctive "make[s] clear that the burden falls on carriers to satisfy these requirements." Gov't SOI at 6-7 ("Had Congress intended to place the burden on plaintiffs, it would have demanded a showing that 'the requirements of subclause (I) and (II) are not satisfied.'") (emphasis in original).  The Court rejects the contention that this sentence "make[s] clear" which party bears the burden of proof.  See 49 U.S.C. § 10706(a)(3)(B)(i) (clearly stating Congress's intended placement of burden).  Furthermore, the Court does not view this sentence as evincing Congress's intention to allocate the burden of proof, but rather, as ensuring that the Court makes a ruling "before allowing the introduction of any such evidence."  See 49 U.S.C. § 10706(a)(3)(B)(ii).

requirement is met.  See FED. R. EVID. 403.  Similarly, under the statute, evidence is inadmissible
if the first requirement is met (subject to the second requirement).  See 49 U.S.C.
§ 10706(a)(3)(B)(ii).  The Court is persuaded, based on the language employed, the policy
considerations enumerated above, and convenience and fairness, that the burden should be
placed on the opponent of admission of the evidence.  Thus, the defendant must show that the
discussion or agreement was between or among rail carriers and concerned an interline
movement of the rail carrier.  It is appropriate that the opponent who seeks to exclude otherwise
relevant evidence be required to establish that conditions giving rise to inadmissibility are met.
This allocation also furthers Congress's direction that the statute "be construed to insure that
remedies for anti-competitive activities remain under existing laws."  See H.R. REP.
NO. 96-1430, at 114.  Moreover, the defendants here are in a better position to know and
establish whether a discussion or agreement was "between or among" rail carriers and whether it
"concerned an interline movement of the rail carrier."

    With respect to the second requirement, however, the text and policy
considerations, including convenience and fairness, warrant a different allocation of burden.  To
begin, the language of the second requirement, unlike the first, does not align with Rule 403.  It
provides that evidence is not admissible if a certain condition is not met (subject to the first
requirement).  See 49 U.S.C. § 10706(a)(3)(B)(ii).  The use of the negative in the second
requirement suggests a different outcome from the first requirement.  Eliminating the double
negative, cf. House v. Bell, 547 U.S. 518, 538 (2006) (rephrasing the Schlup standard without
the "double negative" to explain that petitioner had the burden to prove "that more likely than
not any reasonable juror would have reasonable doubt") (citing Schlup v. Delo, 513 U.S. 298
(1995)), results in the following affirmative statement:  notwithstanding satisfaction of the first

requirement, evidence of a discussion or agreement (or of any rate or other action resulting therefrom) is admissible if the discussion or agreement would, considered by itself, violate the antitrust laws.  This rephrasing more clearly expresses the result that if this condition of the statute is met the evidence is admissible.  Thus, the second requirement more closely resembles Rule 609(a)(1)(B), suggesting that the burden should similarly be placed on the proponent of the evidence.

In addition, considerations of convenience and fairness counsel in favor of imposing the burden of satisfying this condition on plaintiffs.  At trial the plaintiffs will have the burden of proving their allegations of price fixing.  Placing the burden of admission for plaintiffs' proffered evidence on the opponents (the defendants) would require "Defendants [] to anticipate the antitrust theories that Plaintiffs might advance and then preemptively establish that their discussion or agreement complied with these laws."  Def. Supp. at 29.  It would be especially problematic in a criminal antitrust case to require defendants to showcase their defense for the prosecution.  The proponents (the plaintiffs or prosecutor) who are alleging the conspiracy are in a better position to establish this fact.

To summarize, once the proponent has identified the evidence it wishes to offer, the burden is on the opponents (here, the defendants) to show that the proffered evidence is of a discussion or agreement "between or among [a] rail carrier [alleged to be party to an agreement, conspiracy, or combination in violation of the antitrust laws] and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement;" and that it "concerned an interline movement of the rail carrier."  49 U.S.C. § 10706(a)(3)(B)(ii).  The burden then shifts to the proponents (here, the plaintiffs) to show that the identified discussion or

agreement (or the rate or other action resulting from such discussion or agreement) would, considered by itself, violate the antitrust laws.  See id.

The Court will apply the shifting burdens of proof as outlined above in ruling on defendants' motions to exclude the identified exhibits.

### 2.  In Any Proceeding

Plaintiffs and new plaintiffs argue that Section 10706(a)(3)(B)(ii) only applies to regulated rates set in a rate bureau.  Pl. Opp. at 2, 26; New Pl. Opp. at 11-14.  Defendants and the government counter that the statute expressly states that the provisions barring certain inferences and excluding certain evidence apply "[i]n any proceeding" in which an antitrust violation is alleged.  Def. Mot. at 18; Gov't SOI at 5; see also Def. Mot. at 13 n.7.  The Court agrees with the defendants and the government.  Plaintiffs' and new plaintiffs' proposed limitation ignores the expansive language used by Congress, which applies the provisions of the statute "[i]n any proceeding." 49 U.S.C. § 10706(a)(3)(B)(ii).

"Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  United States v. Gonzales, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)) (concluding that the phrase "any other term of imprisonment" in 18 U.S.C. § 924(c)(1) is not limited only to federal sentences).  The use of the phrase "[i]n any proceeding" – together with the direction in the following sentence that "[i]n any proceeding before a jury" the court shall determine admissibility – suggests that the subsection applies in this proceeding – a civil antitrust action.  In addition, the avowed purpose of the provision is to provide "procedural protections about lawful discussions and resulting rates" to carriers who "must talk to competitors about interline movements in which

27

they interchange." H.R. REP. NO. 96-1430, at 114. This purpose would be ill-served if the protection were not available in civil antitrust actions.

        Plaintiffs' and new plaintiffs' primary arguments for restricting the availability of the protection to regulated traffic within a rate bureau is based on (1) limiting language expressed in other statutes and regulations governing contract traffic and exempt traffic, and (2) the fact that Section 10706(a)(3)(B)(ii) was enacted as a part of the Staggers Rail Act in a section entitled "Rate Bureaus." Pl. Opp. at 25-29; New Pl. Opp. at 11-14. As background, the Court notes that rail traffic may either be regulated or unregulated. Regulated traffic is subject to oversight by the STB, or previously the ICC. Unregulated traffic, such as contract traffic or exempt traffic, receives no such oversight.

        Plaintiffs and new plaintiffs first argue that limiting language in statutes and regulations governing contract traffic and exempt traffic indicates that Section 10706 does not apply to such unregulated traffic. Pl. Opp. at 2; New Pl. Opp. at 13-14. Specifically, plaintiffs argue that contract traffic is not subject to Section 10706 because Section 10709 provides that "a contract that is authorized by this section shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part." 49 U.S.C. § 10709(c)(1) (emphasis added). "[T]his part" refers to Part A of Title 49, Subtitle IV, which encompasses 49 U.S.C. §§ 10101 to 11908 (including Section 10706). See Pl. Opp. at 25-26; New Pl. Opp. at 14. The D.C. Circuit considered and rejected a similar argument in addressing the application of Section 10501(b) to contract traffic. Fayus Enters. v. BNSF Ry. Co., 602 F.3d at 447-50. The D.C. Circuit found plaintiffs' reading of Section 10709(c)(1) was "plainly erroneous," id. at 447-48, and held that

Section 10709(c)(1) does not make Section 10501(b) inapplicable, but "merely limits the Board's authority over the terms of private contracts." Id. at 448.[23]

Next, plaintiffs and new plaintiffs argue that because Section 10706(a)(3)(B)(ii) was enacted as part of the Staggers Rail Act under the section heading "Rate Bureaus," it must only apply to agreements or discussions, or actions resulting therefrom, that occurred in the context of a rate bureau. Pl. Opp. at 26; New Pl. Opp. at 11.[24] Rate bureaus, although no longer in existence, were comprised of rail carriers that were authorized to set rates collectively pursuant to an agreement approved by the ICC or STB. See Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 413 (1986). When rate bureaus were first established in 1948, Congress provided relief from antitrust laws for rate bureau agreements and actions in conformity with those agreements. Id. at 414 n.14 (citing 49 U.S.C. § 5b(9) (1970)). Concerned about the anti-competitive consequences of allowing broad collective rate setting, Congress significantly restricted permissible rate bureau activities with the enactment of the 4R Act and Staggers Rail Act so as to encourage competitive pricing. Am. Short Line R.R. Ass'n v. United States, 751 F.2d at 109-10; 4R Act, § 208; Staggers Rail Act, § 219; see also S. REP. No. 94-499, at 14 (1976). Because the Staggers Rail Act "eliminated antitrust immunity for collective ratemaking in the railroad industry[, i]t was foreseen that as a consequence the railroad rate

---

[23]     New plaintiffs also argue that similar language in 49 C.F.R. Parts 1039 and 1090, which provide that certain transportation is "exempt from" the provisions/requirements of "49 U.S.C. subtitle IV," makes Section 10706 inapplicable to exempt traffic. New Pl. Opp. at 14.

[24]     Plaintiffs and new plaintiffs point not to the title of 49 U.S.C. § 10706, which is "Rate agreements: exemption from antitrust laws," but to the title of Section 219 of the Staggers Rail Act, under which the provision now codified as Section 10706(a)(3)(B)(ii) was first enacted. In any event, the title of a statute alone does not change the statute's meaning. See Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212 (1998) ("[T]he title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, [it is] of use only when [it] shed[s] light on some ambiguous word or phrase.") (internal quotations omitted).

bureaus would be dismantled . . . ."  Benjamin v. Traffic Exec. Ass'n – E. R.R., 688 F.

Supp. 903, 905 (S.D.N.Y. 1988), aff'd sub nom. Benjamin v. Traffic Exec. Ass'n E. R.R., 869

F.2d 107 (2d Cir. 1989).

        It was in this context of the shrinking importance of rate bureaus that Congress

added the additional protections of Section 10706(a)(3)(B)(ii) in 1980.  The title for Section 219

of the Staggers Rail Act of 1980, "Rate Bureaus," was identical to the title used for Section 208

of the 4R Act of 1976.  It was perfectly logical for Congress to place the new antitrust

protections in the same section as the already existing rate bureau immunities.  This placement of

the new provision in a section entitled "Rate Bureaus" does not limit the plain language of

Section 10706(a)(3)(B)(ii).  Penn. Dep't of Corr. v. Yeskey, 524 U.S. at 212.

        Examination of the language of Section 10706(a)(3)(B)(ii) also indicates the

protection of the statute is not limited solely to rate bureaus.  Under Section 10706, certain

evidence "shall not be admissible if the discussion or agreement – (I) was in accordance with an

agreement approved under paragraph (2) of this subsection; or (II) concerned an interline

movement of the rail carrier, and the discussion or agreement would not, considered by itself,

violate [the antitrust laws]."  49 U.S.C. § 10706(a)(3)(B)(ii).  An agreement under subclause (I)

is an explicit reference to traffic regulated by rate bureaus – as plaintiffs and new plaintiffs

acknowledge.  See New Pl. Opp. at 13; Pl. Opp. 28 n.15.  As defendants and the government

argue, subclause (II) must protect conduct outside of rate bureaus in order to have any meaning.

Def. Reply at 29; Gov't SOI at 5-6.  Plaintiffs and new plaintiffs argue that the provision does

have meaning when read to apply to unapproved agreements and actions that did not conform

entirely to an approved rate bureau agreement.  New Pl. Opp. at 13; Pl. Opp. 28 n.15.  This

reading is at odds with the broad and plain language applying the protections "[i]n any

proceeding."   Accordingly, Section 10706(a)(3)(B)(ii) is applicable to these proceedings.

### 3.  Discussion or Agreement

Section 10706(a)(3)(B)(ii) makes inadmissible "evidence of a discussion or

agreement" "between or among" rail carriers (or actions resulting therefrom) that concerned an

interline movement of the rail carrier.  Defendants seek to exclude three categories of evidence in

their entirety:  (1) evidence of interline concurrence communications,[25] (2) evidence of alliance

meetings,[26] and (3) evidence of inter-railroad logistical discussions regarding interline traffic.

Def. Mot. at 21-42.[27]

---

[25]     As explained by defendants, "[a] concurrence communication is a request from one joint interline partner to another to agree to some term that will be applied to shared traffic. Whenever a rail carrier makes changes that impact traffic moving under joint rates, it must seek approval – or 'concurrence' – for the change from each rail carrier with which it interchanges such traffic." Def. Mot. at 21.  Defendants further explain the process for interline concurrence communications as follows:  "The carrier originating a particular shipment usually communicates with the customer about rates and handles billing.  The originating carrier then seeks concurrence to the proposed rate actions from other participating carriers."  This could include concurrences in periodic rate adjustments or concurrences by the participating carrier in the originating carrier's fuel surcharge program.  Id.  Defendants say that this category of concurrence communications may include a request by one rail carrier for concurrences to general rate increases.  Tr. Aug. 26, 2020 at 12-13.  Defendants also include in this category requests from one carrier defendant to all three other carrier defendants and communications that occurred before changes were actually being requested.  Def. Reply at 21-23.

[26]     As defined by defendants, alliance meetings are "strategic partnership meetings between connecting railroads," which include "discussion about forward looking opportunities and commercial strategy for joint traffic."  Def. Mot. at 26.  "They allow railroads to bridge the physical separation between their networks to offer continuous service for existing customers who require interline service. . . . They enhance efficiency, e.g., through discussion of the innumerable logistics involved in exchanging shipments."  Id.

[27]     Defendants explain that this category arises because "interline partners also need to coordinate in real time on the logistics involved in sharing shipments from one railroad to another at different interchange locations. . . . Railroads also must discuss what they will charge

An agreement is "an arrangement as to a course of action," Agreement,

Merriam-Webster.com, https://www.merriam-webster.com/dictionary/agreement, or "a

manifestation of mutual assent by two or more persons," Agreement, Black's Law

Dictionary (11th ed. 2019).[28]  A "discussion" is the "consideration of a question in open and

usually informal debate."  Discussion, Merriam-Webster.com, https://www.merriam-

webster.com/ dictionary/discussion; see also Discussion, Black's Law Dictionary (11th ed. 2019)

("The act of exchanging views on something; a debate.").

Plaintiffs contend that all of the documents identified by defendants for

exclusions are evidence of "one agreement," a single conspiracy among defendants to set fuel

surcharges as a means to raise rates for both single-line and interline movements, and that the

Court should consider whether this single conspiratorial agreement concerned an interline

movement of the rail carrier and would violate the antitrust laws.  See Pl. Opp. at 39-41; Pl.

Supp. at 7-9.  But as defendants point out, Def. Supp. at 7, the statute distinguishes between an

unlawful conspiratorial agreement and a discussion or agreement as understood in common

---

customers, the surcharges (including fuel) that they will assess, and the traffic on which such
surcharges will be applied."  Def. Mot. at 38-39.

[28]     "The term 'agreement,' although frequently used as synonymous with the word
'contract,' is really an expression of greater breadth of meaning and less technicality.  Every
contract is an agreement; but not every agreement is a contract.  In its colloquial sense, the term
'agreement' would include any arrangement between two or more persons intended to affect
their relations (whether legal or otherwise) to each other.  An accepted invitation to dinner, for
example, would be an agreement in this sense; but it would not be a contract, because it would
neither be intended to create, nor would it in fact create, any legal obligation between the parties
to it.  Further, even an agreement which is intended to affect the legal relations of the parties
does not necessarily amount to a contract in the strict sense of the term.  For instance, a
conveyance of land or a gift of a chattel, though involving an agreement, is . . . not a contract;
because its primary legal operation is to effect a transfer of property, and not to create an
obligation."  Agreement, Black's Law Dictionary (11th ed. 2019).

parlance.  A conspiratorial agreement, as used in the first sentence of Section 10706 (a)(3)(B)(ii), is one that is in violation of the antitrust laws.  49 U.S.C. § 10706(a)(3)(B)(ii) ("an agreement, conspiracy, or combination in violation of [the antitrust laws]").  A discussion or agreement, as used in the second sentence of Section 10706(a)(3)(B)(ii), may be totally benign; it may or may not be in violation of the antitrust laws.  Id. ("[E]vidence of a discussion or agreement . . . shall not be admissible if" it "would not, considered by itself, violate [the antitrust laws]") (emphasis added).  The Court rejects plaintiffs' suggestion that all the documents the defendants seek to exclude are evidence of a single agreement that violates the antitrust laws, and that they therefore are admissible.

Defendants seek to exclude over fifty documents in their entirety.  These documents reflect numerous communications ranging from phone and email exchanges to in-person meetings, each with varying participants.  See Def. Mot. at 21-42.  The Court agrees that two communications separated in time, space, and content may or may not be a single discussion.  See Def. Supp. at 7-8.  It depends on whether the context indicates that the second communication was, in fact, a continuation of the first.  Proof is required to conclude that two separate pieces of writing or oral conversations were part of the same discussion or agreement.  Furthermore, a single document may evidence more than one discussion or agreement, or it may evidence a single discussion or agreement which concerns more than one subject.  See infra at Section IV(A)(5)(c).

The problem is that the defendants seek to exclude entire documents, Def. Mot. at 21-42, even those portions that do not contain discussions or agreements concerning interlining.  While defendants argue that an entire document must be excluded if it is about interline traffic even if it also includes communications about local traffic or other subjects, Def.

33

Supp. at 27, there are more nuanced ways to read and apply the statute.  It need not be an all or nothing proposition.  Documents that include two or more discussions or agreements, only one of which meets the statutory criteria for exclusion, or discussions or agreements that concern two or more subjects, only one of which is inadmissible under the statute, may be admitted in part and excluded in part.

Identifying documents in broad categories does not provide the Court with a helpful framework within which to rule on defendants' motions.  Def. Mot. at 21-42 (identifying the following three categories of evidence:  (1) evidence of interline concurrence communications, (2) evidence of alliance meetings, and (3) evidence of inter-railroad logistical discussions regarding interline traffic).[29]  For example, under the category "concurrence communications," defendants seek to exclude documents reflecting limited communications setting rates for a particular interline movement or group of interline movements, but they also seek to exclude communications regarding such matters as periodic rate adjustments in the originating carrier's fuel surcharge program for all of its interline and single-line traffic, and requests by one rail carrier for concurrences by others to general rate increases unrelated to any particular shipments.  Defendants argue that rail carriers need to communicate with each other about issues such as fuel surcharges, that "do not come neatly packaged in interline and non-interline boxes," and that such broad discussions or agreements may, as a whole, be subject to exclusion by the statute.  Def. Supp. at 19.

---

[29]    Plaintiffs disagree with defendants' characterization  that "alliance meetings" are always between two interline partners.  Compare Def. Mot. at 26, with Pl. Opp. at 18 (referencing April 2003 meeting between two eastern rail carriers).  The Court need not resolve this dispute because the exhibits defendants seek to exclude, and which they categorize as "alliance meetings," evidence only those alliance meetings that were between two interline partners.

34

These assertions are much too expansive.  As discussed <u>infra</u> at Section IV(A)(5)(c), applying the statute this broadly would exclude evidence of discussions or agreements involving competing traffic well beyond the bounds of what Congress intended to protect.  <u>See</u> H.R. REP. NO. 96-1430, at 114 ("The Conferees intend that these protections be construed to insure that remedies for anti-competitive activities remain under existing laws."). Furthermore, reading the statute this expansively would undercut the principles that rules excluding relevant evidence should be strictly construed, <u>see</u> <u>Trammel v. United States</u>, 445 U.S. at 50, and that exemptions from the antitrust laws should be construed narrowly, <u>see</u> <u>Union Lab. Life Ins. Co. v. Pireno</u>, 458 U.S. at 126; <u>Grp. Life Health Ins. Co. v. Royal Drug Co.</u>, 440 U.S. at 231; <u>FMC v. Seatrain Lines, Inc.</u>, 411 U.S. at 732-33.

Fortunately, in carrying out the statute's direction that certain evidence "shall not be admissible," the Court is not limited to the blunt remedy of excluding entire documents. Redaction of the inadmissible portions may satisfy the statute's requirement.  <u>See</u> <u>McFarlane v. Caterpillar, Inc.</u>, 974 F.2d 176, 181-82 (D.C. Cir. 1992) (post-accident service report contained both (i) evidence of subsequent remedial measures that was inadmissible under Rule 407 of the Federal Rules of Evidence, and (ii) admissible evidence of unaltered state of item; report "could have been admitted into evidence with necessary redactions rather than excluded in entirety"); <u>Sabre Intern. Sec. v. Torres Advanced Enter.</u>, 72 F. Supp. 3d 131, 139-40 (D.D.C. 2014) (refusing to exclude tracking sheet in its entirety where document contained some relevant and some irrelevant entries; noting that moving party "has not explained why redaction of the [irrelevant entries] is not sufficient").  In addition, to the extent that redaction is impracticable or inadvisable, limiting instructions may be employed.  <u>See</u> FED. R. EVID. 105 ("If the court admits evidence that is admissible against a party or for a purpose – but not against another party or for

another purpose – the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."); see also Sabre Intern. Sec. v. Torres Advanced Enter., 72 F. Supp. 3d at 140 (refusing to exclude tracking sheet in its entirety and stating that objecting party "may seek a jury instruction instructing the jury that it may not consider [irrelevant entries] as evidence").  Documents that evidence discussions or agreements need not be either admitted or excluded in their entirety.  They may be partially excluded pursuant to Section 10706(a)(3)(B)(ii) and partially admitted to the extent that they are relevant.

### 4.  Between or Among Rail Carriers

The statute applies to evidence of a discussion or agreement that is "between or among such rail carrier [alleged to be party to an agreement, conspiracy, or combination in violation of the antitrust laws] and one or more other rail carriers."  49 U.S.C. § 10706(a)(3)(B)(ii).  Thus, evidence of a discussion or agreement not between rail carriers, such as an internal discussion among employees of a single rail carrier, generally is not excludable under the statute.  See, e.g., Def. Mot., Ex. 54 (evidencing internal discussion within single rail carrier).

An internal document, however, may be evidence of a protected discussion or agreement to the extent that it summarizes or otherwise conveys the substance of a discussion or agreement that occurred between two or more rail carriers.  See, e.g., Def. Mot., Exs. 28-29 (internal discussion among UP employees about external discussion that occurred between UP and NS concerning details of upcoming concurrence request).  Evidence of an internal discussion which suggests that a rail carrier intends to have a discussion or enter into an agreement with another rail carrier in the future is not evidence of a discussion or agreement that actually occurred.  See, e.g., Def. Mot., Ex. 54 (internal email discussing upcoming meeting between rail

carriers).  An agenda prepared in advance of a meeting is not evidence of what was discussed at

the meeting.  See, e.g., Def. Mot., Exs. 52-53 (agenda prepared in advance of meeting marked

"BNSF Internal Use Only").  Because such evidence is not evidence of a discussion or

agreement between or among rail carriers, it is not inadmissible under the statute.  On the other

hand, an agenda externally circulated via email or otherwise between or among rail carriers in

advance of a meeting – while not evidence of what was discussed at the upcoming meeting –

may be evidence of the discussion that occurred via email before the meeting between or among

rail carriers.  See, e.g., Def. Mot., Ex. 38 (email on March 5, 2003 between two rail carriers

sending agenda information in advance of upcoming meeting evidences a discussion that

occurred on March 5, 2003).  It therefore may be subject to exclusion if it meets the remaining

requirements of the statute.

       A single document may be evidence of both external and internal discussions or

agreements.  See, e.g., Def. Mot., Ex. 76 (email thread in which first email pertained to internal

discussion between personnel of single rail carrier, and second email provided details of external

discussion between two rail carriers); Def. Mot., Ex. 18 (concurrence request from CSX to UP

followed by internal UP discussions); Def. Mot., Ex. 50 (external email discussion followed by

subsequent internal email discussion); Def. Mot., Ex. 64 at BNSF-FSC000679-80 (internal email

exchange forwarded and discussed externally).  Where only a portion of the document is

between or among rail carriers, the document as a whole is not inadmissible under the statute;

only that portion is.

       The following exhibits appear to contain one or more internal discussions that are

not inadmissible under the statute:  Def. Mot., Exs. 18, 24-25, 28, 31-36, 38, 49, 51-56, 60, 68,

70-71, 73-76, 78, 81-82.  They therefore may be admitted in part in redacted form.

5.   Concerned an Interline Movement of the Rail Carrier

Evidence of a discussion or agreement shall not be admissible if it "concerned an interline movement of the rail carrier."  49 U.S.C. § 10706(a)(3)(B)(ii)(II).  Defendants, plaintiffs, new plaintiffs, and the government disagree on how to interpret the following terms: (1) "concerned;" (2) "an interline movement;" and (3) "of the rail carrier."

a.   An Interline Movement

An interline movement is transportation over a route on which lines of two or more railroads interchange.  See H.R. Rep. No. 96-1430, at 114; see also New Pl. Opp. at xi. Defendants, plaintiffs, new plaintiffs, and the government do not dispute this definition, but they disagree as to whether "an interline movement" refers to a specific, identifiable interline movement, see Pl. Opp. at 38; New Pl. Opp. at 17, or to multiple interline movements, see Def. Mot. at 19.  In support of their interpretation, plaintiffs point out that the language of the statute – "an interline movement" – is singular.  Pl. Opp. at 38 (emphasis added); see also id. at 30 (citing Comm'r v. Driscoll, 669 F.3d 1309, 1312 (11th Cir. 2012) ("[W]e conclude that 'a' maintains a singular connotation . . . ."))).  Defendants respond that under the Dictionary Act of 1947, "unless the context indicates otherwise, words importing the singular include and apply to several persons, parties, or things."  Def. Mot. at 18 (quoting Dictionary Act, 1 U.S.C. § 1 (1947)).  The Court agrees with the defendants.  Unless the context of the statute indicates otherwise, a phrase stated in the singular may be read with plural meaning.

Plaintiffs argue that the context of the words of the statute at issue here indicate otherwise.  They contrast Congress's use of the singular "movement" with its use of the plural "movements" in another part of the statute, 49 U.S.C. § 10706(a)(3)(A)(iii).  Pl. Opp. at 38.  A reading of the latter part of the statute, however, reveals that Congress had no choice but to use

the plural:  "[s]uch an organization may not – if there are <u>interline movements over two or more</u>

<u>routes</u> between the same end points, permit a carrier to discuss, to participate in agreements

related to, or to vote on rates except with a carrier which forms part of a particular single route."

49 U.S.C. § 10706(a)(3)(A)(iii) (emphasis added).  It would not have been possible for Congress

to explain that this portion of the statute applied to routes with the same endpoints without using

the plural.  Thus, Congress's use of the plural here does not suggest that the use of the singular

elsewhere was intended to displace the application of the Dictionary Act.

Defendants argue that the context of the words of the statute supports reading "an

interline movement" as applying to multiple interline movements.  Def. Mot. at 19.  They

identify portions of Section 10706 that limit the scope of an "interline movement" by use of the

term "particular."  Def. Mot. at 19 (citing 49 U.S.C. § 10706(a)(3)(A)(ii) ("Such an organization

may not – permit a rail carrier to discuss, to participate in agreements related to, or to vote on

rates related to <u>a particular interline movement</u> unless that rail carrier practicably participates in

the movement.").  There, Congress intended to refer to a single, specific interline movement.

The use of the term particular was not logically necessary unless Congress meant to import

additional meaning to the phrase.  <u>See</u> 49 U.S.C. § 10706(a)(3)(A)(ii).  By contrast, Congress did

not use the modifier "particular" in Section 10706(a)(3)(B)(ii)(II).

Defendants maintain that reading the words "an interline movement" to apply

only to a single, identifiable movement, as plaintiffs and new plaintiffs suggest, would be

contrary to Congressional intent to "protect[] robust interline cooperation."  Def. Mot. at 18-19.

To read the statute as plaintiffs and new plaintiffs suggest would require rail carriers to

correspond separately about each interline movement.  If, for example, one rail carrier was

seeking to impose the same rate on a group of specific interline movements which it shared with

a particular second rail carrier, the two carriers would have to correspond about each movement separately.  Such a requirement, defendants say, would be unnecessarily burdensome on the rail carriers.[30]  The Court concludes that for a discussion or agreement to be inadmissible, the carriers must be discussing or agreeing upon identifiable interline movements which they share; but context and logic confirm that "an interline movement" may refer to multiple interline movements.

Defendants also argue that "an interline movement" may include potential interline business of the participating carriers without regard to specific shipments or movements.  See Def. Supp. at 12; see also Def. Mot. at 6.  The Court cannot agree with this reading of the statute.  Defendants fail to acknowledge the distinction between general business exchanges – characterized sometimes as inter-railroad logistical discussions – and communications about identifiable future movements between specific routes and shippers.  See Def. Supp. at 19.  Thus, while the statute may protect a discussion in which rail carrier A requests cooperation from rail carrier B to make a specific shipment or shipments for a specific shipper, it cannot be stretched so far as to cover exchanges about general practices for gaining business or general discussions about fuel costs, fuel surcharges and their management.  The defendants' proposed construction has too tenuous a connection to the statutory language, "an interline movement of the rail carrier."  Thus, to be protected by the statute, an interline movement must be an identifiable movement or movements with identifiable circumstances, such as a specific shipper, specific shipments, and specific destinations.

---

[30]    This outcome could be especially onerous given the number of interline movements between or among carriers.  As defendants explain, during the period of the alleged conspiracy alone, there were "[m]illions of interline transactions."  Def. Mot. at 6 n.2.

b.  Of the Rail Carrier

Defendants, plaintiffs, new plaintiffs, and the government all agree that, to be inadmissible under the statute, evidence of a discussion or agreement must concern an interline movement of the participating rail carriers.  See Def. Supp. at 12-13;  Pl. Supp. at 4; Gov't SOI at 10.  A discussion or agreement between two rail carriers must concern an interline movement or movements in which the two carriers actually participate.  The government, plaintiffs, and new plaintiffs argue that the statute does not support the exclusion of evidence of a discussion or agreement among all four rail carriers about an interline movement or movements in which one or more of the rail carriers does not participate.  Gov't SOI at 12; Pl. Supp. at 5.  The Court agrees.

The word "of" in the phrase "an interline movement of the rail carrier" is a preposition linking and showing relationship between "an interline movement" and "the rail carrier."  See BRYAN A. GARNER, THE CHICAGO GUIDE TO GRAMMAR, USAGE, AND PUNCTUATION ¶¶ 243-44, 248 (2016).  While "the rail carrier" is singular, as the Court has already discussed, see supra Section IV(A)(5)(b), a word in a statute that is in the singular nevertheless may be read with a plural meaning.  Dictionary Act, 1 U.S.C. § 1.  The legislative history supports the view that "of the rail carrier" should be read with plural meaning.  The Conference Report states:  "Because of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange."  H.R. REP. NO. 96-1430, at 114 (emphasis added).[31]

---

[31]      The Department of Justice also echoed this understanding of the statute.  New Pl. Opp., Ex. 19, at 9 (Comments of the United States Department of Justice, W. Railroads – Agreement, ICC Docket No. Section 5(b) Application No. 2 (Nov. 26, 1980)) (The "twin protections [of § 10706(a)(3)(B)(ii)(I) and (II)] allow 'directly connecting' carriers to set rates for joint-line routes collectively and their single-line rates independently.  No further protections

Discussions and agreements between and among rail carriers about interline movements of those rail carriers are protected by the statute.  While rail carriers are not in competition for a shared interline or joint movement, the same carriers do compete with one another and with other carriers for other traffic.  Thus, an interline movement between rail carriers A and B may be in competition with an interline movement between rail carriers C and D.  Similarly, carriers A and B may be in competition with each other for non-interline movements.  As the STB has explained, "railroads, like other firms, are not permitted to collaborate where they compete." Canadian Nat'l, 1999 WL 336285, at *16.  Allowing rail carriers to discuss interline movements that they do not share would be anticompetitive and promote collusion among competitors.

It follows that a discussion among all four rail carriers about interline movements generally or one or more interline movements in which they are not participating is not "a discussion" that "concerned an interline movement of the rail carrier." See, e.g., Def. Mot., Ex. 82 at BNSF-FSC000770 (internal email evidencing a discussion among all four carriers about industry mileage-based FSC program).  Nor is the data or other information concerning interline movements with which a rail carrier is not involved, "of the rail carrier." See, e.g., Def. Mot., Ex. 77 at UPFSC0000675 (discussion "of the rail carrier" where UP emails CSX with a "list of all UP linehaul tariffs & circulars" stating that "CSXT very probably is not party to all of these documents").  In sum, a discussion or agreement is "of the rail carrier" only if all of the

_____

are necessary from the Commission or from the Department."); see also New Pl. Opp., Ex. 8 at 34 (FTC Answer (Jan. 4, 1979)) (Rail carriers can "insulate themselves from antitrust liability simply by confining their discussions to the establishment of a rate for the specific interline services they jointly provide.") (emphasis added).

parties to the discussion or agreement participate in the interline movement or movements that are the subject of the discussion or agreement.

### c.   Concerned

To reiterate, Section 10706(a)(3)(B)(ii) makes inadmissible evidence of any discussion or agreement between rail carriers if it "concerned an interline movement of the rail carrier" unless the discussion or agreement "considered by itself" violated the antitrust laws. The parties disagree over the meaning of the term "concerned" and its application to the evidence the defendants seek to exclude.  Their dispute first and foremost raises the question of the scope of the word "concerned" in the statute.  Then, applying the proper definition of "concerned," it raises the issue of how a court should rule when a document (1) mentions, refers to, or alludes to an interline movement of the rail carrier in the course of a discussion or agreement that also concerns other topics, (2) contains multiple discussions or agreements, one of which concerns an interline movement of the rail carrier and others of which concern single-line movements or other topics, (3) contains a single discussion or agreement that involves multiple topics, including interline movements of the rail carrier and single-line movements or other topics, or (4) contains a discussion of a general issue or topic, such as fuel surcharges, that applies to both interline movements and single-line movements or other topics.

The government, plaintiffs, and new plaintiffs argue for a narrow construction of "concerned," maintaining that a discussion or agreement must be "about" an interline movement of the rail carrier, such that any discussion or agreement that involves more than just the subject matter identified by Congress cannot be protected by the statute.  Pl. Supp. at 5; Gov't SOI at 8. By contrast, defendants urge a more expansive definition; "concerned," they say, also means "related to," "referring to," or "bearing on" an interline movement of the rail carrier, Def. Mot.

at 15; Tr. Aug. 26, 2020 at 41, such that a discussion or agreement may "concern[]" multiple topics, Def. Supp. at 16-18.

The Supreme Court has explained that in interpreting a word in a statute, a court looks to its ordinary or common meaning.  See Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. at 569 (relying on word's "ordinary or common" meaning); Mallard v. U.S. Dist. Ct. for S. Dist. Iowa, 490 U.S. 296, 301 (1989) (relying on the "most common meaning" and the "ordinary and natural signification" over other definitions).  The primary definition of "concern" includes both "to relate to" and "be about."  See Concern, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/concern.  Thus, all parties to this definitional dispute find support in the dictionary, but they all cannot be right.  "To choose between [] competing definitions, [courts should] look to the context in which the words appear."  McDonnell v. United States, 136 S. Ct. 2355, 2368 (2016).

In other nearby subsections of the statute, Congress explicitly used the term "related to."  See 49 U.S.C. §§ 10706(a)(2)(A), (a)(3)(A)(i).  Yet, in Section 10706(a)(3)(B)(ii)(II), instead of choosing this term again, Congress chose to use the word "concerned."  As the Supreme Court has explained, "[a] departure in language suggests a departure in meaning."  Thryv, Inc. v. Click-To-Call Techs., LP, 140 S. Ct. 1367, 1376 (2020). The Court therefore rejects the defendants' argument that "concerned" in this section means "related to," or its synonyms "referring to" or "bearing on."  The Court is persuaded that "concerned" as used in Section 10706(a)(3)(B)(ii) should be more narrowly defined.  A narrower definition is consistent with the principle that antitrust protections should be narrowly construed, see Union Lab. Life Ins. Co. v. Pireno, 458 U.S. at 126; FMC v. Seatrain Lines, Inc., 411 U.S. at 732-33; Grp. Life Health Ins. Co. v. Royal Drug Co., 440 U.S. at 231, and Congress's

44

intention that the protections of the statute "be construed to insure that remedies for anti-competitive activities remain under existing laws," H.R. REP. NO. 96-1430, at 114. Further, in describing the purpose of the statute, Congress explained that it resulted from the need for carriers to have discussions "about interline movements in which they interchange," nothing more. H.R. REP. NO. 96-1430, at 114 (emphasis added). For all of these reasons, the Court concludes that the word "concerned" in the statute means "about." Under this narrower definition, a discussion or agreement does not "concern" an interline movement of the rail carrier based on the mere mention of such a movement or of other topics related to such a movement.

With this narrower definition as a predicate, plaintiffs argue that when a discussion or agreement extends beyond the subject matter identified by Congress – an interline movement of the rail carrier – evidence of that discussion or agreement should not be excluded under the statute, but rather should be admitted in evidence. See Pl. Opp. at 33-34 ("[C]ourts consistently reject the idea that an agreement is immune from the antitrust laws if it is any broader than the very specific type of agreement identified by a statute as immune.") (citing United States v. Borden Co., 308 U.S. 188, 204-05 (1939); Abbott Labs. v. Portland Retail Druggists Ass'n, 425 U.S. 1, 14 (1976); United States v. Gosselin World Wide Moving, N.V., 411 F.3d 502, 509-10 (4th Cir. 2005)); see also New Pl. Opp. at 16 n.8 (citing F.T.C. v. Actavis, Inc., 570 U.S. 136, 158 (2013); Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 503 (1988)). It would be especially problematic, they say, for discussions or agreements involving single-line traffic to gain the protection of the statute. Pl. Supp. at 4; Gov't SOI at 8.

The government further explains that the regulatory context of the statute informs the analysis. "The rail freight industry involves two, mutually exclusive types of 'movements'—

interline and local—with different competitive dimensions."  Gov't SOI at 8.  The statute

governs only the former, and by limiting the "concerned" clause to interline movements,

Congress necessarily intended that its protections would not reach local or single-line

movements.  Id. (citing Am. Petroleum Inst. v. EPA, 198 F.3d 275, 278 (D.C. Cir. 2000) ("[I]f

Congress makes an explicit provision for apples, oranges and bananas, it is most unlikely to have

meant grapefruit.")).  To interpret the word "concerned" more broadly, it argues, would render

the term meaningless.  Gov't SOI at 8; see also Pl. Supp. at 5; Leocal v. Ashcroft, 543 U.S. 1, 12

(2004) ("[Courts] must give effect to every word of a statute wherever possible.").  To further

support the argument that Congress did not intend to provide protection for discussions of single-

line rates, plaintiffs and new plaintiffs emphasize that, under Section 10706(a)(3)(A)(i), rate

bureaus were not allowed to permit a discussion of single-line rates.  Pl. Supp. at 5; see also 49

U.S.C. § 10706(a)(3)(A)(i) ("[A]n organization may not – permit a rail carrier to discuss, to

participate in agreements related to, or to vote on single-line rates proposed by another rail

carrier.") (emphasis added).

        Defendants counter that a single discussion or agreement often involves more

than one topic, such as when two carriers discuss rates for interline and single-line movements in

the same communication, or when a document contains a discussion of fuel charges or rates that

apply to both interline and single-line movements.  In such circumstances, they say, evidence of

that entire discussion or agreement should be excluded by the statute.  Def. Supp. at 17-18; see

also Def. Reply at 11 (arguing that not extending the statute's protection  to discussions which

concern both interline and single-line movements "ignores the reality of running a functional,

nationwide rail network.  This statute exists because many of the issues rail carriers need to

discuss as interline partners are also significant to their broader operations, including local traffic

Case 1:11-cv-01049-PLF-GMH   Document 218   Filed 02/19/21   Page 47 of 56

on which they may compete."). Defendants maintain that their position is supported by the plain text of the statute, arguing that the statute only requires that the discussion or agreement "concern[] an interline movement," not that it concern an interline movement but not also a single-line movement. Def. Supp. at 18; see also Def. Reply at 9-10 (arguing the statute does not say the discussion or agreement must solely concern an interline movement). They say that reading the statute not to exclude discussions in which there are some references to single-line movements would improperly "'read[] words or elements into [the] statute that do not appear on its face,'" which courts "'ordinarily resist.'" Def. Supp. at 16 (citing Bates v. United States, 522 U.S. 23, 29 (1997)).

The Court does not agree with the defendants. Applying the statute in the way they suggest would extend its protection to discussions or agreements involving competing traffic of the rail carriers. This interpretation is inconsistent with Congress's stated purpose to protect limited categories of discussions and agreements that concern interline movements. See H.R. REP. NO. 96-1430, at 114 ("The Conferees intend that these protections be construed to insure that remedies for anticompetitive activities remain under existing laws.").

As explained supra at Section III, rail carriers are not in competition with regard to a shared interline movement, but they remain competitors with regard to other traffic, including single-line traffic and interline traffic in which they do not participate. The Court agrees with the government that it would make little sense for Congress to have limited rate bureaus' abilities to discuss, agree to, or vote on such competing traffic as a way to encourage competitive rate setting, but then to provide antitrust protection for these very same kinds of discussions and agreements when engaged in by unregulated private contractors. Gov't SOI at 10. To do so would incentivize competing rail carriers to engage in discussions and

agreements concerning such rates.  See S. REP. NO. 94-499, at 15 ("[T]he bureaus' role in single-

line and competitive joint-line ratemaking decisions, may well have tended to lessen

competition, and the bill corrects this by prohibiting such activity in many circumstances."); see

also Canadian Nat'l, 1999 WL 336285, at *15-16 (STB decision indicating that railroads are not

permitted to collaborate where they compete and Section 10706 does not immunize them from

antitrust scrutiny concerning collaboration on competing traffic).

        Defendants' interpretation is also inconsistent with the principle that evidentiary

exclusions – particularly an evidentiary exclusion providing antitrust protections – should be

strictly construed.  Trammel v. United States, 445 U.S. at 50; see also Union Lab. Life Ins. Co. v.

Pireno, 458 U.S. at 126; FMC v. Seatrain Lines, Inc., 411 U.S. at 732-33; Grp. Life Health Ins.

Co. v. Royal Drug Co., 440 U.S. at 231.[32]  On the other hand, allowing admission of all of the

evidence of the full discussion or agreement, including those portions referencing interline

movements, would deny the safeguards of the statute to evidence that Congress expressly

intended to protect.

        As discussed supra at Section IV(A)(3), the Court is not limited to the proposed

all or nothing approaches; the policy of the statute may be implemented by redaction, see

McFarlane v. Caterpillar, Inc., 974 F.2d at 181-82; Sabre Int'l Sec. v. Torres Advanced

Enter., 72 F. Supp. 3d at 139-40, or admission with a limiting instruction, see FED. R. EVID. 105;

Sabre Int'l Sec. v. Torres Advanced Enter., 72 F.Supp.3d at 139-40.  Where appropriate,

evidence of a discussion or agreement that "concerned an interline movement of the rail carrier,"

---

[32]    Defendants also refer generally to an evidentiary exclusion statute addressed in
Jung v. Ass'n of Am. Med. Colleges.  Def. Mot. at 17 (citing Jung v. Ass'n of Am. Med.
Colleges, 339 F. Supp. 2d 26 (D.D.C. 2004), aff'd, 184 F. App'x 9 (D.C. Cir. 2006)).  Jung is
inapposite because plaintiffs did not dispute the applicability of the statute.  Id. at 37-38.

and meets the other requirements of the statute, may be redacted so that evidence of a discussion or agreement that does not "concern[] an interline movement of the rail carrier," if relevant, may still be admitted.  Evidence of a discussion or agreement involving a general subject matter that concerns both interline movements of the participating rail carriers and other traffic, if the two are inextricably intertwined with one another and redaction is impossible or not feasible, may be admitted subject to a limiting instruction.

For the reasons discussed supra at Section IV(A)(3), defendants' motion for the exclusion of exhibits as a whole is denied.  The following exhibits appear to contain evidence of discussions or agreements beyond the limited subject matter protected by the statute; the Court therefore denies defendants' motions to exclude the following exhibits:  Def. Mot., Exs. 16-30, 38-43, 45-46, 49, 50, 59, 61-67, 69, 76-77, 79-82.  Defendants may propose redactions to remove discussions or agreements that concerned an interline movement of the rail carrier, and, where redaction is impracticable or not feasible, may request a suitable limiting instruction.

6.  The Discussion or Agreement Would Not, Considered By Itself, Violate the Antitrust Laws

Evidence of a discussion or agreement "shall not be admissible" if  "the discussion or agreement would not, considered by itself, violate [the antitrust laws]" and the other requirements of the statute are met.  49 U.S.C. § 10706(a)(3)(B)(ii).  If the defendants carry their burden of showing that a discussion or agreement between or among rail carriers (or any rate or other action resulting therefrom) concerned an interline movement of the rail carrier, the burden then shifts to the proponents of the evidence, here the plaintiffs, to show that any such discussion or agreement they seek to admit (or rate or other action resulting therefrom) would, considered by itself, violate the antitrust laws.  See supra Section IV(A)(1).  Defendants,

plaintiffs, new plaintiffs, and the government disagree on how to interpret the following terms:
(1) "by itself" and (2) "violate [the antitrust laws]."

### a.  By Itself

In applying Section 10706, defendants contend that "[the] Court should limit itself
to evidence that pertains to [a] particular agreement or discussion."  Def. Supp. at 11.  Plaintiffs
essentially agree, arguing that "the question is the legality of the discussion as a whole," not
whether "an individual piece of evidence fails to prove directly the anticompetitive nature of the
discussion or agreement on its own."  Pl. Supp. at 7; see also Gov't SOI at 16 ("The critical
question is . . .whether the discussion or agreement, viewed in its full evidentiary context, could
'violate the [antitrust] laws' when 'considered by itself.'") (quoting 49 U.S.C.
§ 10706(a)(3)(B)(ii)(II)).  In other words, the Court must individually assess each discussion or
agreement that defendants seek to exclude.

"[O]rdinarily, and within reason, modifiers and qualifying phrases attach to the
terms that are nearest."  Grecian Magnesite Mining, Indus. & Shipping Co. v. Comm'r IRS, 926
F.3d 819, 824 (D.C. Cir. 2019) (citing Barnhart v. Thomas, 540 U.S. 20, 26 (2003)).  "By itself"
is a prepositional phrase that modifies "the discussion or agreement," as referenced at this point
in the statute.  Thus, when determining if the discussion or agreement would violate the antitrust
laws, the Court will consider the discussion or agreement "by itself," not the evidence used to
prove the discussion or agreement.

As explained supra at Section IV(A)(3), a single discussion or agreement may be
evidenced by multiple documents.  Courts must consider all documents reflecting "a discussion
or agreement," as those terms were narrowly defined in Section IV(A)(3) supra.  As stated there,
the Court rejects plaintiffs' argument that all of the exhibits which the defendants seek to exclude

evidence a single agreement.  It therefore follows that all of the exhibits cannot be considered together.  Rather, in determining whether the discussion or agreement would violate the antitrust laws, the Court may only consider exhibits together if they evidence that narrowly defined discussion or agreement.

The "by itself" limitation does not apply when considering whether the discussion or agreement "concerned an interline movement of the rail carrier."  "[B]y itself" only modifies "the discussion or agreement" in the phrase "the discussion or agreement would not, considered by itself, violate [the antitrust laws]."  Thus, the "discussion or agreement" must only be considered "by itself" when determining whether it would or would not "violate [the antitrust laws]."

### b.  Violate the Antitrust Laws

Defendants acknowledge that a discussion or agreement that concerns an interline movement of the rail carrier but also involves other topics, such as single-line movements, may fail the second requirement of the statute (that it would not, considered by itself, violate the antitrust laws).  Def. Supp. at 13 n.4 (noting as an example, "if the evidentiary context of the agreement . . . shows that the agreement concerns interline traffic but also includes an illegal agreement on local rates, it would fail the second step").  Defendants, plaintiffs, new plaintiffs, and the government disagree, however, about whether a discussion or agreement that is limited to an interline movement of the rail carrier may ever fail this requirement.  Compare Pl. Supp. at 9, and Gov't SOI at 20-24, with Def. Mot. at 6.

This dispute stems from plaintiffs', new plaintiffs', and the government's assertion that the statute does not require the Court to find that the discussion or agreement conclusively violates the antitrust laws.  See Gov't SOI at 23 ("[C]ourts need not find that a

51

discussion or agreement <u>does</u> violate the antitrust laws by itself to reject a defendant's assertion that the discussion or agreement <u>would not</u> violate such laws) (emphasis in original); Pl. Supp. at 10 (same).  They argue that a discussion or agreement that does not conclusively violate the antitrust laws, but has "anticompetitive effects," may fail the second requirement, and that it therefore may be admissible.  Gov't SOI at 22-23 ("Even limited interline discussions and agreements may substantially harm competition by, for example, facilitating collusion through the exchange of competitively sensitive information, or by providing a mechanism to detect and punish competitive price reductions."); Pl. Supp. at 10.

The Court rejects this characterization of the statute.  Section 10706 requires that to be inadmissible, the discussion or agreement "would not, considered by itself, violate [the antitrust laws]."  49 U.S.C. § 10706(a)(3)(B)(ii).  The interpretation proposed by plaintiffs, new plaintiffs, and the government would effectively contravene the statute's "by itself" requirement.  As defendants point out, "'considered by itself' cannot possibly mean 'considered with everything else.'"  Def. Supp. at 24.  Thus, in order to persuade the court to admit evidence of a discussion or agreement which "concerned an interline movement of the rail carrier," the proponent must show that the discussion or agreement <u>would</u>, considered by itself, violate the antitrust laws.  The Court, however, need not now make a determination about whether the proponents of such evidence could ever meet their burden for admission of a discussion or agreement that is limited to an interline movement of the rail carrier.  When evidence of such a discussion or agreement is before a court, it should then consider the contents of the discussion or agreement, by itself, to determine if it would or would not violate the antitrust laws.

### B.  Bar on Inferences

Relying on the first sentence of subsection (a)(3)(B)(ii), defendants "request an order barring [p]laintiffs from seeking an inference of a conspiratorial agreement from the fact that the railroads engaged in bilateral, interline discussions, and then took [certain actions]." Def. Mot. at 45.  Defendants also request an order barring plaintiffs from seeking an inference of a conspiratorial agreement from any evidence of a rail carrier evaluating whether it would or would not take "similar action" as something previously discussed with an interline partner.  Id. at 44-45.

Section 10706(a)(3)(B)(ii), in relevant part, provides:

> In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic.

49 U.S.C. § 10706(a)(3)(B)(ii).  This sentence of the statute bars the court or jury from drawing any inferences from certain evidence, but it does not bar the admission of such evidence.  If certain evidence is admitted at trial over the defendants' objection, the Court will, in accordance with ordinary practice, provide the jury with a suitable instruction concerning inferences.  As such, defendants' motions seeking to bar inferences from the identified evidence is premature.

Given plaintiffs' and defendants' conflicting arguments as to the meaning of this sentence in the statute, the Court will provide the following guidance.

"In any proceeding" alleging an antitrust violation, the existence of an agreement, conspiracy, or combination may not be inferred from evidence that:  (1) two or more rail carriers acted together with respect to an interline rate or related matter, and (2) a party to such action

took similar action with respect to a rate or related matter on another route or traffic.  49 U.S.C.

§ 10706(a)(3)(B)(ii).  For the reasons discussed supra at Section IV(A)(2), this provision is

applicable in this proceeding.  For an inference to be barred under this provision, however, there

must be an action and a similar action.

       The first action, as described in the statute, must be of two or more rail carriers

"act[ing] together with respect to an interline rate or related matter."  49 U.S.C.

§ 10706(a)(3)(B)(ii).  This may include, for example, two or more rail carriers setting a rate for a

shared interline movement.  See 49 U.S.C. § 10706(a)(3)(B)(ii).  Plaintiffs argue that all of the

exhibits identified by the defendants evidence only a single action – "the single agreement to use

coordinated fuel surcharges as a means to raise all-in rail freight rates across the board."  Pl.

Opp. at 34.  Plaintiffs argue that because there is only a single action, there can be no separate

similar action from which inferences are barred.  Id. at 34-35.  The Court disagrees with this

assertion.  Even if there was a single conspiratorial agreement to set rates, plaintiffs in fact allege

numerous acts of rate setting by different rail carriers at different times to raise rates for both

interline and single-line movements.  There was not, therefore, just one concerted action.  The

Court rejects plaintiffs' argument that there is only a single action and therefore can be no

"similar action."[33]

       As for defendants' argument, they assert that an "action," as defined by the

statute, may include a discussion or agreement to take action.  See Def. Mot. at 43-44

---

[33]     Plaintiffs also argue that for inferences to be barred, the action (or the similar action) must be with respect to a single, identifiable rate.  See Pl. Opp. at 30 (arguing the term "an interline rate" indicates a single, identifiable rate).  Plaintiffs' arguments mirror those made with respect to "an interline movement," and their argument is rejected for the reasons previously explained.  See supra Section IV(A)(5)(a); see also Dictionary Act, 1 U.S.C. § 1; 49 U.S.C. § 10706(a)(3)(A)(ii)-(iii) (using "particular" to indicate the singular).  For the reasons outlined supra at Section IV(A)(5)(c), "an interline rate" may be read to include the plural.

(identifying as action discussions that took place at alliance meetings) (citing Def. Mot., Exs. 29, 36, 38, 42, 52, 54).  This is incorrect.  In the second sentence of the statute, Congress clearly differentiated between a "discussion or agreement" and an "action," referring to "evidence of a discussion or agreement . . . or of any rate or other action resulting from such discussion or agreement."  49 U.S.C. § 10706(a)(3)(B)(ii); see also Thryv, Inc. v. Click-To-Call Techs., LP, 140 S. Ct. at 1376 (holding that departure in language shows a departure in meaning).  There is no reason to think Congress intended the two to be synonymous in the first sentence.  A discussion or agreement is not an action within the meaning of the statute.  The statute therefore does not bar inferences from discussions or agreements to take action.

In order for an inference to barred, there must be not only the initial action, but also a similar action.  The statute provides that a party to the initial action of two or more rail carriers must take a "similar action with respect to a rate or related matter on another route or traffic."  49 U.S.C. § 10706(a)(3)(B)(ii).  While the statute specifies that the action of two or more rail carriers must be with respect to an "interline rate or related matter," the similar action may be with respect to "a rate or related matter on another route or traffic."  Id.  Therefore, similar action may include, for example, a single rail carrier (who was a party to the first action) setting a rate for one of its single-line movements.  A similar action may also include a single rail carrier (who was a party to the first action) setting a rate for an interline movement which it shares with another rail carrier (who was not a party to the first action).

Defendants argue that a similar action, as defined by the statute, may include a discussion or agreement to take action.  See Def. Mot. at 44-45 (citing Def. Mot., Exs. 85-89) (identifying as similar action discussions evaluating whether a particular rail carrier would take action).  For the same reasons that the Court rejected this argument as applied to "action," a

"similar action" may also not be a discussion or agreement under the statute.  Thus, the statute does not bar inferences from such discussions or agreements about whether to take a particular action.

At the proper time, the Court will instruct the jury in accordance with the requirements of the statute.

## V.  CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion to Exclude Interline-Related Communications from Consideration for Class Certification or Any Other Purpose Prohibited by 49 U.S.C. § 10706 [Dkt. No. 417] and Defendants' Motion and Memorandum of Law Regarding the Interpretation and Application of 49 U.S.C. § 10706 [Dkt. No. 927].  An Order consistent with this Opinion will issue this same day.

SO ORDERED.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  February 19, 2021